**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| TEXO ABC/AGC, INC.; ASSOCIATED BUILDERS AND CONTRACTORS, INC.; NATIONAL ASSOCIATION OF MANUFACTURERS; AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS; GREAT AMERICAN INSURANCE COMPANY; ATLANTIC PRECAST CONCRETE, INC.; OWEN STEEL COMPANY; and OXFORD PROPERTY MANAGEMENT, LLC;<br><br>      Plaintiffs,<br><br>    v.<br><br>THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor; DAVID MICHAELS, Assistant Secretary of Labor, Occupational Safety and Health Administration; and OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, United States Department of Labor,<br><br>      Defendants. | Civil Action No. 3:16-cv-1998 |

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    I.    Statutory and Regulatory Background ......................................................... 2

    II.    Procedural Background ................................................................................ 7

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ...................................................................................................................... 8

    I.    Plaintiffs Are Not Likely to Succeed in Their OSH Act Claim ..................... 8

    II.    Plaintiffs' Challenges to the Preamble Are Not Justiciable ......................... 15

        A.  Plaintiffs' Preamble Challenges Are Not Reviewable ........................... 15

        B.  Plaintiffs' Preamble Challenges Are Not Ripe ...................................... 17

    III.    Even If Subject to Review, None of the Preamble Challenges Is Likely to Succeed .... 19

        A.  The Preamble's Interpretation of the Retaliation Bar Is Reasonable ...................... 19

        B.  The Rule Does Not Affect State Workers' Compensation Laws ............................ 22

        C.  OSHA Gave Adequate Notice to Regulated Parties ................................ 23

        D.  The Preamble's Discussions Are Not Arbitrary or Capricious .............................. 27

        E.  The Rule Complies with the Regulatory Flexibility Act ......................... 33

    IV.    Plaintiffs Cannot Show a Likelihood of Irreparable Harm ........................... 34

    V.    An Injunction Would Harm Defendants, Workers, and the Public Interest ................. 36

CONCLUSION ................................................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones*, 722 F.3d 711 (5th Cir. 2013)................................................... 28

*Ace Sheeting v. OSHA*, 555 F.2d 439 (5th Cir. 1977).................................................................. 22

*Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161 (D.C. Cir. 2007)........................ 24

*AFL-CIO v. Chao*, 409 F.3d 377 (D.C. Cir. 2005) ................................................................ 10, 20

*Alenco Comm., Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) ............................................. 15, 19, 33

*Alto Dairy v. Veneman*, 336 F.3d 560 (7th Cir. 2003).................................................................. 26

*Am. Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993).............. 12

*Am. Petrol. Inst. v. EPA*, 661 F.2d 340 (5th Cir.1999) ................................................................ 28

*Am. Petrol. Inst. v. EPA*, 684 F.3d 1342 (D.C. Cir. 2012).................................................... 15, 17

*Anderson v. Jackson*, 556 F.3d 351 (5th Cir. 2009) .................................................................... 36

*Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542 (W.D. Tex. 2011) ....................................................................................................................................... 34, 36

*Assoc. Builders & Contractors of Texas, Inc. v. NLRB*, 2016 WL 3228174 (5th Cir. June 10, 2016) ............................................................................................................................................. 21

*BNSF Railway Co. v. United States*, 775 F.3d 743 (5th Cir. 2015)............................................. 19

*Brazos Elec. Power Co-op, Inc. v. Southwestern Power Admin.*, 819 F.2d 537 (5th Cir. 1987) . 24

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1996) ................................... 15

*Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006)....................................... 6

*Central & South West Servs., Inc. v. EPA*, 220 F.3d 683 (5th Cir. 2000) ............................ 17, 19

*Cerro Metal Products v. Marshall*, 620 F.2d 964 (3d Cir. 1980)................................................ 36

*Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177 (5th Cir. 1989)....................................................... 26

*Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984) ..................................................... 9, 11, 14, 20

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ................................................................... 9, 14

*City of L.A. v. Lyons*, 461 U.S. 95 (1983) ................................................................................... 34

ii

*Cornish v. Dudas*, 540 F. Supp. 2d 61 (D.D.C. 2008) .................................................. 37

*Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991) ............................... 31

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ................................... 9, 30

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)....................... 28, 29, 30, 32

*First American Discount Corp. v. CFTC*, 222 F.3d 1008 (D.C. Cir. 2000) ............................. 26

*Fleming Co. v. USDA*, 322 F.Supp.2d 744 (E.D. Tex. 2004) ...................................... 20

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ................................... 23

*Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016)................................................... 34

*Gulf Restoration Network v. McCarthy*, 783 F.3d 227 (5th Cir. 2015) ........................... 27, 28, 33

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) .......................................... 13

*Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191 (D.C. Cir. 1996) .. 15, 17, 18, 19

*La. Chemical Assoc. v. Bingham*, 550 F. Supp. 1136 (W.D. La. 1982) ......................... 9

*Markle Interests, LLC v. U.S. Fish & Wildlife Service*, 2016 WL 3568093 (5th Cir. 2016).. 27, 29

*Milena Ship Mgmt. v. Newcomb*, 804 F. Supp. 859 (E.D. La. 1992)........................... 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 28

*Mourning v. Family Publication Serv., Inc.*, 411 U.S. 356 (1973)........................... 10, 20

*Nat'l Oilseed Processors Assoc. v. OSHA*, 769 F.3d 1174 (D.C. Cir. 2014) ............................ 27

*Nat'l Tele. Co-op Assoc. v. FCC*, 563 F.3d 536 (D.C. Cir. 2009) ................................ 33

*NRDC v. EPA*, 559 F.3d 561 (D.C. Cir. 2009) ............................................. 15, 16, 17

*Peoples Nat'l Bank v. Comptr. of the Currency*, 362 F.3d 333 (5th Cir. 1999) ........................ 17

*Perez v. Postal Service*, 76 F. Supp. 3d 1168 (W.D. Wash. 2015)............................... 13

*Personal Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540 (D.C. Cir. 1995) ........... 31

*Texas Clinical Labs., Inc. v. Sebelius*, 612 F.3d 771 (5th Cir. 2010) ......................... 27

*Texas Medical Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012)..... 8

*Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999)..................... passim

*Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313 (5th Cir. 2001) ............................ 10

*Texas Pipeline Ass'n v. FERC*, 661 F.3d 258 (5th Cir. 2011) ...................................................... 12

*U.S. Telecom. Ass'n v. FCC*, 2016 WL 3251234 (D.C. Cir. 2016) ............................................. 27

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................................... 13

*United Steelworkers v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1980) ...................................... 10, 23

*United Steelworkers v. Schuylkill Metals Corp.*, 828 F.2d 314 (5th Cir. 1987) ......... 13, 24, 25, 26

*United Steelworkers, AFL-CIO v. St. Joe Resources*, 916 F.2d 294 (5th Cir. 1990).............. 12, 13

*Whirlpool Corp. v. Marshall*, 445 U.S. 1 (1980) ......................................................................... 8

*Winter v. NRDC*, 555 U.S. 7 (2008) ......................................................................................... 34

**Statutes**

16 U.S.C. § 2904 ...................................................................................................................... 22

25 U.S.C. § 293b ...................................................................................................................... 21

29 U.S.C. § 651 ................................................................................................................... 9, 31

29 U.S.C. § 653 ............................................................................................................. 12, 22, 23

29 U.S.C. § 655 ........................................................................................................................ 21

29 U.S.C. § 657 .................................................................................................................. passim

29 U.S.C. § 658 ........................................................................................................................ 10

29 U.S.C. § 660 ........................................................................................................... 5, 8, 11, 18

29 U.S.C. § 673 .................................................................................................................. passim

35 U.S.C. § 209 ........................................................................................................................ 22

5 U.S.C. § 553 .......................................................................................................................... 24

5 U.S.C. § 706 ............................................................................................................... 27, 31, 33

50 U.S.C. § 4329 ...................................................................................................................... 21

**Other Authorities**

Conf. Rep. No. 91-1765, 91st Cong., 2d Sess. (1970) ............................................................... 14

David Michaels, Ass't Sec., *Memorandum for Regional Administrators*, Aug. 14, 2014 ............ 4

Dorothy Dougherty, Deputy Ass't Sec., *Delay of Enforcement of the Employee Rights Provisions Under 29 CFR 1904.35*, July 13, 2016 ................................................................................ 7

Glenn Pransky, et al., *Under-Reporting of Work-Related Disorders in the Workplace: A Case Study and Review of the Literature*, 42 Ergonomics 171 (1999) ............................................. 31

H.R Rep. No. 91-1291, 91st Congress., 2d Sess. (1970) ............................................. 32

Hester J. Lipscomb, et al., *Safety, Incentives, and the Reporting of Work-Related Injuries Among Union Carpenters: "You're Pretty Much Screwed If You Get Hurt at Work"*, 56 Am. J. Industrial Medicine 389 (2013) ............................................. 31

Richard E. Fairfax, Deputy Ass't Sec., Memorandum to Regional Administrators, *Employer Safety Incentive and Disincentive Policies and Practices*, Mar. 12, 2012 .............. 4, 27, 29, 32

## Regulations

29 C.F.R. § 1904.35 ............................................................................................. 5, 7

29 C.F.R. § 1904.36 ............................................................................................. 18

29 C.F.R. § 1910.1025 ..................................................................................... 12, 13

29 C.F.R. part 1904 ............................................................................................... 3

66 Fed. Reg. 6050 (Jan. 19, 2001) .......................................................................... 32

*Improve Tracking of Workplace Injuries and Illnesses*, 81 Fed. Reg. 29624 (May 12, 2016) ............................................................................................................ passim

Proposed Rule, *Improve Tracking of Workplace Injuries and Illnesses*, 78 Fed. Reg. 67254 (Nov. 8, 2013) ............................................................................................................ 3

Supplemental NPRM, *Improve Tracking of Workplace Injuries and Illnesses*, 79 Fed. Reg. 47605 (Aug. 14, 2014) ................................................................................. passim

## INTRODUCTION

To protect worker safety, Congress has charged the Occupational Safety and Health Administration ("OSHA") with ensuring that employers keep accurate records of workplace injuries and illnesses. That goal is impaired when employers punish employees for reporting injuries. To address this threat to accurate recordkeeping, OSHA promulgated a Rule which, among other things, prohibits employers from retaliating against workers for reporting injuries. Plaintiffs seek to enjoin OSHA from enforcing that prohibition. Their motion should be denied.

Plaintiffs are not likely to succeed on the merits of their claims. They maintain that OSHA's expansive recordkeeping authority is cabined by a separate statutory bar on retaliation. But nothing about the OSH Act's anti-retaliation provision purports to restrict OSHA in carrying out its recordkeeping duties. Congress explicitly instructed OSHA to do whatever it deems "necessary" to ensure accurate injury records. Plaintiffs offer no reason why that authority should be limited simply because recordkeeping goals dovetail with anti-retaliation goals. In fact, the Fifth Circuit has held that the OSH Act's anti-retaliation provision is not an exclusive remedy when other OSHA programs require overlapping remedies.

Apart from their challenge to OSHA's ability to enact an anti-retaliation rule in the first place, Plaintiffs also challenge statements in the Rule's preamble about how long-established retaliation principles could apply to certain workplace policies. These statements are not reviewable at all, because they do not purport to bind the agency or regulated parties, but rather speak in hypothetical and conditional terms. These claims are also not ripe, because the preamble's abstract discussions have not yet been applied to any concrete set of facts.

In any case, Plaintiffs' preamble challenges are meritless. OSHA provided explicit notice that it was considering a regulatory ban on retaliation in the recordkeeping context; it asked

commenters to identify specific workplace practices that might discourage injury reporting, and it received voluminous comments about two of them: injury-based incentive programs and post-injury drug testing.  In promulgating the final Rule, OSHA discussed how the anti-retaliation provision might apply to those and other practices.  That discussion relied upon ample evidence, in many forms, from many sources.  It responded to counterarguments, struck a balance between a variety of competing interests, and articulated reasonable conclusions about which types of practices might violate the Rule.

Plaintiffs also cannot satisfy any of the other requirements for a preliminary injunction. They face no irreparable harm, because the Rule's anti-retaliation provision extends no further than the pre-existing statutory retaliation ban, and because there is no reason to think that retaliatory policies are necessary to protect worker safety.  As for the remaining preliminary injunction factors, the balance of hardships and the public interest both counsel in favor of allowing OSHA to ensure accurate injury records by protecting workers from retaliation. Accordingly, Plaintiffs' request for a preliminary injunction should be denied.

## BACKGROUND

## I.     Statutory and Regulatory Background

The Occupational Safety and Health Act of 1970 ("OSH Act"), Pub. L. No. 91-596, *codified at* 29 U.S.C. § 651 *et seq*., created OSHA and established a statutory framework for tracking and regulating workplace health and safety.  The Act delegates the Secretary of Labor, through OSHA, broad authority to "prescribe such rules and regulations as [it] may deem necessary to carry out [its] responsibilities" under the statute.  29 U.S.C. § 657(g)(2).  One of OSHA's primary responsibilities is to ensure that employers collect and report accurate data on workplace injuries and illnesses.  The Act requires OSHA to "compile accurate statistics on work

injuries and illnesses." *Id.* § 673(a).[1]   To that end, the Act directs OSHA to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries." *Id.* § 657(c)(2).[2]

In pursuit of those statutory goals, OSHA has long required employers to keep records of work-related injuries and illnesses at their establishments.   *See* 29 C.F.R. part 1904.   On November 8, 2013, OSHA issued a Notice of Proposed Rulemaking ("NPRM") to amend its recordkeeping rules to require certain employers to periodically submit injury and illness data to OSHA electronically. *See* Proposed Rule, *Improve Tracking of Workplace Injuries and Illnesses*, 78 Fed. Reg. 67254 (Nov. 8, 2013).   Upon receiving that data, OSHA proposed "to make the injury and illness data public," to allow "employees and potential employees, researchers, employers, and workplace safety consultants, to use and benefit from the data." *Id.* at 67276.

OSHA received numerous comments on this proposal, both in written form and at a public meeting held on January 9 and 10, 2014.   Commenters expressed concerns that "the increased visibility of establishment injury and illness data under the proposal would lead to an increase in the number of employers who adopt practices that have the effect of discouraging employees from reporting recordable injuries and illnesses."   Supplemental NPRM, *Improve Tracking of Workplace Injuries and Illnesses*, 79 Fed. Reg. 47605, 47606 (Aug. 14, 2014) ("Supplemental NPRM").   OSHA was therefore concerned "that the accuracy of the data collected under the new proposal could be compromised if employers adopt these practices." *Id.*

---

[1] Similarly, OSHA must "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics." 29 U.S.C. § 673(a).

[2] The Act similarly requires employers to "keep and preserve, and make available to [OSHA] such records regarding his activities" as OSHA "may prescribe by regulation as necessary or appropriate for the enforcement of this chapter or for developing information regarding the causes and prevention of occupational accidents and illnesses." 29 U.S.C. § 657(c)(1).

To address that concern, OSHA issued a Supplemental NPRM to expand its proposed changes to the recordkeeping rules.  *See id* at 47605 (summarizing).  Specifically, OSHA considered amending the proposed rule to

> (1) require that employers inform their employees of their right to report injuries and illnesses;
> (2) require that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome; and
> (3) prohibit employers from taking adverse action against employees for reporting injuries and illnesses.

*Id.* at 47606.  To aid its consideration of the proposed anti-retaliation provision, OSHA asked commenters to identify employer practices that had the effect of discouraging injury reporting. *See, e.g.*, *id.* at 47607 ("describe any techniques, practices, or procedures used by employers that you are aware of"); *id.* at 47608 ("What kinds of adverse actions might lead an employee to decide not to report an injury or illness?").  It also asked commenters to identify any practices that might discourage reporting to some degree, but that should nonetheless be excluded from the anti-retaliation provision "to ensure that employers are able to run an effective workplace safety program."  *Id.* at 47608.  OSHA noted several types of potentially retaliatory practices in the Supplemental NPRM itself.  *See, e.g.*, *id.* ("requiring an employee who reported an injury to undergo drug testing where there was no reason to suspect drug use").  Recent public guidance had similarly identified practices that OSHA considered potentially retaliatory.  *See, e.g.*, Richard E. Fairfax, Deputy Ass't Sec., Memorandum to Regional Administrators, *Employer Safety Incentive and Disincentive Policies and Practices*, Mar. 12, 2012 ("Fairfax Memo") (describing "[i]ncentive programs that discourage employees from reporting their injuries").[3]

---

[3] *Available at* https://www.osha.gov/as/opa/whistleblowermemo.html. *See also* David Michaels, Ass't Sec., *Memorandum for Regional Administrators*, Aug. 14, 2014 ("Michaels Memo"), *available at* https://www.osha.gov/dcsp/vpp/policy_memo5.html.

On May 12, 2016, OSHA issued its final Rule.  *See* OSHA, *Improve Tracking of Workplace Injuries and Illnesses*, 81 Fed. Reg. 29624 (May 12, 2016).  The Rule contains the automatic-reporting provisions announced in the NPRM.[4]  It also contains the three additional policies proposed in the Supplemental NPRM.  First, the Rule requires employers to "establish a reasonable procedure for employees to report work-related injuries and illnesses promptly and accurately," and provides that "[a] procedure is not reasonable if it would deter or discourage a reasonable employee from accurately reporting."  *Id.* at 29691, *amending* 29 C.F.R. § 1904.35(b)(1)(i).  Second, the Rule requires employers to "inform each employee" that their employer cannot retaliate "against employees for reporting work-related injuries or illnesses."  *Id.* at 29691, *amending* 29 C.F.R. § 1904.35(b)(1)(iii).  Third, to ensure that employers do not discourage reporting, the Rule provides that employers "must not discharge or in any manner discriminate against any employee for reporting a work-related injury or illness."  82 Fed. Reg. at 29692, *amending* 29 C.F.R. § 1904.35(b)(1)(iv).

The Rule's preamble provides additional background on the anti-retaliation provision.  It explains why OSHA concluded that, to ensure accurate recordkeeping, it was necessary to incorporate a preexisting statutory bar on retaliation into its final recordkeeping Rule.  *See* 81 Fed. Reg. at 29671 (discussing 29 U.S.C. § 660(c)).[5]  The Rule's anti-retaliation provision "does

---

[4] Employers were already required to record the information covered by the Rule. *See* 29 C.F.R. § 1904.4.

[5] The preamble gives a number of reasons.  For instance, it explains that "[s]ome employees may not have the time or knowledge necessary to file a section 11(c) complaint or may fear additional retaliation from their employer if they file a complaint."  81 Fed. Reg. at 29671.  To ensure accurate injury reporting in those workplaces, the Rule "allows OSHA to issue citations to employers for retaliating" based on injury-reporting "even if no employee has filed a section 11(c) complaint."  *Id.*  The Rule thus addresses recordkeeping failures outside the narrow confines of section 11(c).  In addition, the Rule allows the agency to "provide[] clear notice to employers of what actions are prohibited, which will help to prevent retaliatory acts from occurring in the first place.  In other words, the final rule serves a preventive purpose as well as a remedial one."  *Id.*

not change the substantive obligations of employers." *Id.*   Rather, as the preamble explains, it prohibits the same type of conduct as other anti-retaliation provisions in federal law: any "adverse action that 'could well dissuade' a reasonable employee from reporting a work-related injury or illness."  81 Fed. Reg. at 29672 (quoting *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006)).

Finally, the preamble discusses how the Rule's anti-retaliation provision might apply in a few general contexts.  It explains that an employer who disciplines employees for reporting injuries might violate the *Burlington Northern* retaliation standard, if the discipline would dissuade a reasonable employee from reporting.  81 Fed. Reg. at 29672 ("[A]pproximately 50 percent of workers reported that [certain discipline] polic[ies] deterred reporting.").  Similarly, it described certain types of drug-testing practices that "may inappropriately deter reporting," such as "drug testing that is designed in a way that may be perceived as punitive or embarrassing to the employee," or drug testing in response to an injury that "is very unlikely to have been caused by employee drug use."  *Id.* at 29673.[6]  Finally, the preamble acknowledges commenters' concerns that certain incentive programs—namely, those that reward employees for not reporting injuries—"have the potential to discourage reporting of work-related injuries and illnesses without improving workplace safety."  *Id.* It therefore encourages employers to "carefully design[]" such programs, lists a few illustrative examples, but grants that "[t]he specific rules and details of . . . any given incentive program must be considered to determine whether" its application could violate the anti-retaliation provision.  *Id*. at 29674 (quotation marks omitted). In general, the preamble makes clear that "the final rule prohibits employers only from taking adverse action against an employee *because the employee reported* an injury or illness."  *Id.* at

---

[6] For instance, the preamble states that, depending on the circumstances, "it would likely not be reasonable to drug-test an employee who reports a bee sting, a repetitive strain injury, or an injury caused by a lack of machine guarding or a machine or tool malfunction."  81 Fed. Reg. at 29673.

29672 (emphasis in original).   But "[n]othing in the final rule prohibits employers from disciplining employees for violating legitimate safety rules."  *Id.*

The original effective date for the anti-retaliation provision was August 1, 2016.  *See* 81 Fed. Reg. at 29624.   On July 13, 2016, however, OSHA decided to postpone the enforcement date until November 1, 2016, in order to develop guidance for itself and the regulated community as to how OSHA plans to enforce the Rule's anti-retaliation provision.  *See* ECF No. 13, at 2; Dorothy Dougherty, Deputy Ass't Sec., *Delay of Enforcement of the Employee Rights Provisions Under 29 CFR 1904.35*, July 13, 2016.

## II.    Procedural Background

Plaintiffs filed their Complaint on July 8, 2016, challenging all three additions to 29 C.F.R. § 1904.35(b)(1)—the requirements that injury-reporting procedures not be unduly burdensome, *id.* § 1904.35(b)(1)(i), that employers inform employees of their right to report injuries free from retaliation, *id.* § 1904.35(b)(1)(iii), and that employers not retaliate, *id.* § 1904.35(b)(1)(iv).  ECF No. 1, at 3.   On July 12, 2016, Plaintiffs moved for preliminary relief. ECF No. 8.   The motion purports to challenge all three provisions, *see id.* at 1, but the accompanying Memorandum of Law only discusses the anti-retaliation provision.  ECF No. 9-1 ("PI Mem.").   While it cites the other two provisions, *see id.* at 1-2, 10, the Memorandum never mentions them in its Argument section, and it never explains how they conflict with the OSH Act or the Administrative Procedure Act ("APA").[7] *See id.* at 15-34 (entire argument section).

---

[7] It is hard to imagine what such an argument would even look like.  OSHA has broad authority to require that employers take steps to ensure the accurate reporting of workplace injuries.  In promulgating the Rule, OSHA explained why subsections (i) and (iii) would serve those goals.  *See* 81 Fed. Reg. at 29669-70 (explaining § 1904.35(b)(1)(iii)); *id.* 29670-71 (explaining § 1904.35(b)(1)(i)).  Plaintiffs have not explained why either statute should require that they be allowed to impose unreasonable injury-reporting procedures, or how either statute could shield them from notifying employees about the right to report injuries free from discrimination.  At any rate, because the party seeking equitable relief bears the burden to establish that such relief is appropriate, Plaintiffs' silence as to these two provisions is dispositive.

## STANDARD OF REVIEW

Applicants for a preliminary injunction

must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*Texas Medical Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (quotes and alterations omitted).  The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* (quotes omitted).

## ARGUMENT

### I.    Plaintiffs Are Not Likely to Succeed in Their OSH Act Claim

The Rule's anti-retaliation provision is a reasonable exercise of authority under the statute OSHA administers.  The OSH Act gives OSHA broad power to ensure that workplace injuries and illnesses are accurately reported.  *See* 29 U.S.C. §§ 657(c)(1), 657(c)(2), 657(g)(2), 673(a), 673(e).  To carry out that mandate, the Rule prohibits employers from discouraging injury reporting through retaliation.  As Congress and the agency have long recognized, such reporting is a cornerstone of workplace safety.  Plaintiffs argue that the Rule is barred by a separate statutory provision banning retaliation generally.  *See id.* § 660(c).  But that provision does not purport to limit OSHA's otherwise-broad recordkeeping authority.  And the Fifth Circuit has already held that the statutory retaliation provision is not an exclusive remedy. Plaintiffs therefore have raised no serious doubt as to the Rule's consistency with the statute.

At the outset, OSHA receives ample deference when interpreting the OSH Act in general, and when exercising its recordkeeping authority in particular.  *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980) (OSH Act); *La. Chemical Assoc. v. Bingham*, 550 F. Supp. 1136, 1138-40

(W.D. La. 1982), *aff'd*, 731 F.2d 280 (5th Cir. 1984) (recordkeeping).  "[A] court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority (that is, its jurisdiction)."  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013).  That deference involves two steps.  "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.'"  *Id.* (quoting *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 842 (1984)).  Second, "'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"  *Id.* (quoting *Chevron*, 467 U.S. at 843).[8]

1.  The OSH Act repeatedly instructs OSHA and employers to collect accurate information on injuries and illnesses.  The Act directs the agency to "compile accurate statistics on workplace injuries and illnesses," and to "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics."  29 U.S.C. § 673(a).  Employers, in turn, must "file such reports with the Secretary as he shall prescribe by regulation, as necessary to carry out his functions under this chapter," *id.* § 673(e), and they must "make, keep and preserve, and make available" information requested by the agency "regarding the causes and prevention of occupational accidents and illnesses," *id.* § 657(c)(1).  Accurate injury reporting is thus one of the Act's primary concerns.  *See also* 29 U.S.C. § 651(b)(12).

---

[8] While Plaintiffs acknowledge that *Chevron* deference applies here, PI Mem. 12, they appear to imply in passing that *Chevron* might not actually apply, citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016).  PI Mem. 14, 23-24.  But *Encino* merely reiterated the established rule that "*Chevron* deference is not warranted where the regulation is 'procedurally defective,'" *id.* at 2125—in that case, where "the Department offered barely any explanation" for its rule and "said almost nothing" about its change in policy, *id.* at 2126; *see id.* at 2128 (Ginsburg, J., concurring) ("I write separately to stress that nothing in today's opinion disturbs well-established law.").  Plaintiffs claim several procedural defects in this case, which are discussed below.  But if the Court rejects those separate challenges, *Encino* provides no reason to withhold *Chevron* deference.

The Act does not specify the means that OSHA can or cannot use to ensure accurate injury reporting.  Instead, it delegates broad rulemaking authority to the agency.  *See United Steelworkers v. Marshall*, 647 F.2d 1189, 1230 (D.C. Cir. 1980) ("A number of terms of the statute give OSHA almost unlimited discretion to devise means to achieve the congressional mandated goal.").  For instance, the Act provides that the OSHA "shall prescribe regulations requiring employers to maintain accurate [injury] records."  *Id.* § 657(c)(2).  Even more expansively, the Act confers authority to "prescribe such rules and regulations as [the agency] may deem necessary to carry out [its] responsibilities under this chapter." *Id.* § 657(g)(2).  The statute then directs OSHA to enforce "any regulations prescribed pursuant to this chapter" by investigating potential violations and issuing citations. *Id.* § 658(a).  Such "lofty and expansive" delegations are analyzed under *Chevron* step two.  *Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313, 321 (5th Cir. 2001) (such provisions "hardly constitute a series of specific commands," but rather "reflect congressional intent to delegate difficult policy choices to the [agency's] discretion"); *see Mourning v. Family Publication Serv., Inc.*, 411 U.S. 356, 369 (1973) (holding that such regulations must be sustained if "reasonably related to the purposes of the enabling legislation"); *AFL-CIO v. Chao*, 409 F.3d 377, 393 (D.C. Cir. 2005) (reviewing "necessary" standard at *Chevron* step two because it is "inherently discretionary").

The Rule's anti-retaliation provision is plainly permissible under these provisions.  It "requir[es] employers to maintain accurate [injury] records" by prohibiting actions that decrease the accuracy of injury records.  29 U.S.C. § 657(c)(2).  And OSHA—to whose necessity determination the statute defers—has "deem[ed]" the Rule's prohibition on retaliation "necessary

to carry out his responsibilities."[9]  *Id.* § 657(g)(2); 81 Fed. Reg. 29671 (explaining its necessity). The Fifth Circuit has instructed courts to defer in these circumstances.  *Cf. Texas Office of Public Utility Counsel v. FCC ("TOPUC")*, 183 F.3d 393, 426 (5th Cir. 1999) ("[B]ecause the FCC has offered reasonable explanations of why it thinks the funds will still be 'sufficient' to support high-cost areas, we defer to the agency's judgment of what is 'sufficient.'").

2. Plaintiff argues that the Rule's anti-retaliation provision is not "authorized by Section 11(c) of the OSH Act."  PI Mem. 16.  But OSHA's authority for that provision comes from its recordkeeping authorities, *see* 29 U.S.C. §§ 657(c)(1), 657(c)(2), 657(g)(2), 673(a), 673(e), not section 11(c), *id.* § 660(c).

Moreover, nothing about section 11(c) cabins OSHA's discretion under those authorities. PI Mem. 16-18.  The text of section 11(c) does not purport to limit OSHA's options for ensuring accurate recordkeeping.  Section 11(c) prohibits discrimination against employees for exercising "*any* right afforded by this chapter," *id.* § 660(c)(1) (emphasis added), and provides an enforcement procedure whereby an employee may file a complaint, which OSHA may investigate and enforce in federal district court, *id.* § 660(c)(2).  The provision says nothing about recordkeeping.  It contains no limiting language of any kind.  In other words, it does not "directly sp[eak] to the precise question at issue"—whether OSHA may exercise its recordkeeping authority where anti-retaliation and recordkeeping goals overlap.[10]  *Chevron*, 467 U.S. at 842.  When Congress wants to circumscribe an agency's discretion under an otherwise-

---

[9]  Those responsibilities also include "developing information" about workplace injuries, 29 U.S.C. § 657(c)(1), and "develop[ing] and maintain[ing] an effective program" to collect and analyze injury data, *id.* § 673(a).

[10]  It also goes without saying that the Rule does not otherwise *conflict* with section 11(c), because the Rule does not disturb the broader set of rights and enforcement mechanisms available under section 11(c). *See* 81 Fed. Reg. at 29671 (explaining that "[t]he final rule does not abrogate or interfere with the rights or restrictions contained in section 11(c)").

capacious delegation, it knows how. *See, e.g.*, 29 U.S.C. § 653(b)(4); *Texas Pipeline Ass'n v. FERC*, 661 F.3d 258, 261-62 (5th Cir. 2011) (rejecting agency interpretation of the phrase "any market participant," because a separate provision explicitly stated that the statute "shall not apply" to the market participant in question).

This leaves Plaintiffs with a heavy burden at *Chevron* step one. They must show that section 11(c) "clearly"—but implicitly—bars OSHA from regulating retaliation against employees who report injuries, *even when necessary* to carry out OSHA's duty to require accurate recordkeeping. *Am. Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1111 (D.C. Cir. 1993) (step-one resolution requires that Congress "'clearly' decided for or against the agency interpretation"). They offer no compelling reason to read such a drastic limitation into the statute.

For one thing, the Fifth Circuit has already held that section 11(c) does not implicitly bar overlapping administrative action when OSHA deems it necessary. *See United Steelworkers, AFL-CIO v. St. Joe Resources*, 916 F.2d 294 (5th Cir. 1990). In *United Steelworkers*, the Court of Appeals considered whether OSHA could, through administrative citations, seek back pay for workers who were punished for exercising their rights under the agency's medical removal program.[11] Section 11(c)(2) already provided for back pay in federal district court under the same circumstances, so any administrative back pay award would duplicate that relief. *See id.* at 298 (noting this argument). The Fifth Circuit rejected the same exclusivity argument Plaintiffs advance here. It explained that "'the remedial purposes of OSHA would be undermined by a presumption of exclusivity'" as to section 11(c). *Id.* (quoting *Herman & MacLean v.*

---

[11] The medical removal program "protects workers who have high lead levels in their blood from continued exposure to lead in the workplace." *United Steelworkers*, 916 F.2d at 296. Under the program, "an employer must remove such workers to a workplace of lower lead exposure." *Id.* (citing 29 C.F.R. § 1910.1025(k)).

*Huddleston*, 459 U.S. 375, 387 n.23 (1983) (alteration omitted)).   Reading section 11(c) to prohibit overlapping administrative remedies would have impaired a "central goal" of the medical removal program: "to secure worker-cooperation" in reporting lead-related health issues. *Id.* (quoting *United Steelworkers v. Schuylkill Metals Corp.*, 828 F.2d 314, 320 (5th Cir. 1987)). Because OSHA deemed this overlap necessary to carry out one of its statutory mandates, the Fifth Circuit agreed that "Congress could not have intended to leave [OSHA] powerless to carry out the goals of the Act." *Id.* at 299; *see id.* ("We conclude that the Secretary's interpretation of her abatement authority is a reasonable reading of OSHA.   And we defer to the Secretary when her interpretation is reasonable.").   The same holds true here.   When OSHA determines that a partially overlapping enforcement mechanism is necessary to carry out the Act's injury-reporting goals, nothing in section 11(c) requires exclusivity.[12]   It is not "powerless" to ensure accurate records simply because an employee fails to file a timely complaint under section 11(c).   *Id.*[13]

Plaintiffs cite one piece of legislative history, which they claim establishes that OSHA was not meant to enforce section 11(c), in its entirety, through administrative citations.   *See* PI

---

[12] The overlap is only partial because section 11(c) protects more rights using more remedies than the Rule's anti-retaliation provision.   As the preamble explains, section 11(c) provides a "broader range of equitable relief and punitive damages."   81 Fed. Reg. at 29671.   It also protects *all* rights in the OSH Act, *see Perez v. Postal Service*, 76 F.Supp.3d 1168, 1184 (W.D. Wash. 2015), not just the right to report injuries and illnesses.

[13] Plaintiffs attempt to distinguish *United Steelworkers* by pointing out that it did not involve rulemaking. PI mem. 17 n.11.   But OSHA in that case was enforcing a rule.   It makes no difference that the Fifth Circuit rejected section 11(c)'s exclusivity in an enforcement context, rather than a facial challenge.   And the fact that OSHA's present interpretation of its authority went through notice and comment increases the amount of deference owed.   *See United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001); 81 Fed. Reg. at 29627 (analysis of legal authority).   More fundamentally, Plaintiffs ignore the Fifth Circuit's explicit rejection of "exclusivity" as to section 11(c)(2).   *United Steelworkers*, 916 F.2d at 298; *contra* PI Mem. 5 (arguing that section 11(c)(2) *does* "establish[] an exclusive process").   They also overlook the analogous facts of that case.   The back pay at issue could have equally been claimed in a section 11(c)(2) proceeding, because the citation enforced a regulatory prohibition on reducing the "earnings, seniority," or "other employment rights and benefits" of employees who exercised their medical removal rights—in other words, retaliation.   *Id.* at 296 (quoting 29 C.F.R. § 1910.1025(k)(2)(ii)).   The Fifth Circuit nonetheless upheld OSHA's reasonable interpretation of its authority to seek back pay through administrative citations, not just section 11(c).

Mem. 6-7, 17 (citing Conf. Rep. No. 91-1765, 91st Cong., 2d Sess. (1970)).  But that is not what the Rule does.  It merely overlaps in the limited context where the Act's anti-retaliation goals dovetail with the Act's injury-reporting goals.  In that context, OSHA has determined that existing statutory procedures are not sufficient to ensure accurate injury records.  *See* 81 Fed. Reg. at 29671.  The legislative history says nothing about that situation, where effectuating a *separate* statutory mandate necessitates some overlap.[14]

In short, while the OSH Act is explicit and repetitive about OSHA's authority to ensure accurate injury records, "the statute is silent," and at the very least "ambiguous[,] with respect to the specific issue" presented here: whether OSHA, after making a reasonable necessity determination, can use a regulation to proscribe that retaliation which deters  reporting.  *City of Arlington*, 133 S. Ct. at 1868 (quoting *Chevron*, 467 U.S. at 843).  "Congress knows to speak in plain terms when it wishes to circumscribe" agency discretion.  *Id.*  It has clearly not done so here.  Plaintiffs' claim that section 11(c) excludes all overlapping prohibitions therefore fails under step one of *Chevron*.

3. Because agencies receive *Chevron* deference when interpreting "a statutory ambiguity that concerns the scope of the agency's statutory authority," *id.*, the Rule's anti-retaliation provision must be reviewed under *Chevron* step two.  Plaintiffs have not argued that the anti-retaliation provision fails at step two.  *See* PI Mem. 16-18 (entire argument against OSHA's authority to enact an anti-retaliation rule).  At any rate, no such argument could succeed.  Review at *Chevron* step two is "narrow and deferential."  *Alenco Comm., Inc. v. FCC*, 201 F.3d 608, 620

---

[14] Neither does the treatise Plaintiffs cite.  PI Mem. 7 (only discussing enforcement of section 11(c)(1) writ large, without mentioning what happens when other statutory goals partially overlap).  Indeed, the treatise describes the Conference Report to "requir[e] that the Secretary seek . . . back pay . . . in the district court, not through the administrative process."  *Id.*  That may be true as to section 11(c) generally, but it cannot be true when specific programs are best served by allowing the Secretary to seek back pay through the administrative process, without contradicting the specific holding of *United Steelworkers*.

(5th Cir. 2000); *infra* Part III.A (responding to a step-two claim).  OSHA cogently explained why its recordkeeping rule needed to include an anti-retaliation provision.  *See* 81 Fed. Reg. at 29671.[15]  This explanation more than satisfies "the reasonableness requirement of *Chevron* step-two."  *TOPUC*, 183 F.3d at 412.

## II.    Plaintiffs' Challenges to the Preamble Are Not Justiciable

The rest of Plaintiffs' claims do not challenge the anti-retaliation provision itself. Instead, they challenge statements in the preamble about how the provision might apply to certain workplace policies.  *See* PI Mem. 18-28 (incentive program and drug testing claims).

### A.    *Plaintiffs' Preamble Challenges Are Not Reviewable*

In the rulemaking context, preambles are generally not subject to judicial review.  As the D.C. Circuit has explained, "[w]hile preamble statements may in some unique cases constitute binding, final agency action susceptible to judicial review, this is not the norm."  *NRDC v. EPA*, 559 F.3d 561, 564-65 (D.C. Cir. 2009) (quotation marks omitted); *accord Am. Petrol. Inst. v. EPA*, 684 F.3d 1342, 1353-54 (D.C. Cir. 2012).  "The question of reviewability hinges upon whether the preamble has independent legal effect, which in turn is a function of the agency's intention to bind either itself or regulated parties."  *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996).  In evaluating whether an agency intends a preamble to be binding, courts generally give "decisive weight to the agency's [word] choice between 'may' and 'will'"; the former is "nonbinding and unreviewable."  *NRDC*, 559 F.3d at 565 (quoting *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537-38 (D.C. Cir. 1996)).

---

[15] *See supra* n.5.  Its concerns were especially pressing in light of the Rule's new mandate to report injury data to OSHA for publication.  *Id.* at 29625.  Commenters expressed concern that this new transparency would spur more employers to "adopt practices that have the effect of discouraging employees from reporting recordable injuries and illnesses."  Supplemental NPRM, 79 Fed. Reg. at 47606.

This is not the "unique case[]" in which preamble statements are "susceptible to judicial review." *NRDC*, 559 F.3d at 564-65. The preamble discusses drug testing and incentive programs in purely conditional terms. *See* 81 Fed. Reg. at 29673 (describing when "requiring the employee to be drug tested *may* inappropriately deter reporting"); *id.* (listing scenarios where "it would *likely* not be reasonable to drug-test an employee"); *id.* ("[I]f the [incentive] programs are not structured carefully, they have the *potential* to discourage reporting."); *id.* (describing incentive programs that "*may* be prohibited by section 11(c)" and thus by the Rule's anti-retaliation provision) (emphases added). These statements speak "in the conditional, suggesting that events in the various categories 'may'" violate the Rule "provided that all other requirements of the [R]ule are met." *NRDC*, 559 F.3d at 565. Indeed, the types of programs discussed in the preamble can only violate the Rule when they meet all the retaliation elements—protected activity, "materially adverse" action, and causation—laid out in *Burlington Northern*. *See* 81 Fed. Reg. at 29672.[16]

Moreover, the preamble acknowledges that OSHA will have to proceed case by case. *See* 81 Fed. Reg. at 29674 ("The specific rules and details of . . . any given incentive program must be considered."); *id.* at 29672-73 (acknowledging that "drug testing of employees may be a reasonable workplace policy in some situations" and making clear that "this final rule does not ban [post-injury] drug testing of employees" altogether); *see also NRDC*, 559 F.3d at 565 (rejecting reviewability because of "equivocal" statements "that certain events are to be evaluated on a case-by-case basis") (quotation marks omitted). "By acknowledging it had not yet, but would need to, carefully evaluate the effect of" particular incentive programs and drug-

---

[16] *See also Postal Service*, 76 F.Supp.at 1183 (employer may "defend by showing that it possessed a legitimate, non-discriminatory reason for taking the adverse actions").

testing policies, "the [agency] made clear it was not making a final decision." *Am. Petrol. Inst.*, 684 F.3d at 1354 (quotation marks omitted).

The preamble thus does not independently impose any binding rules.  It simply discusses how general retaliation principles may apply in particular workplace contexts.  Because "[t]he question of reviewability hinges" on "the agency's intention[s]," *Kennecott*, 88 F.3d at 1223, OSHA's use of "conditional" and "equivocal" language in the preamble must be afforded "decisive weight."  *NRDC*, 559 F.3d at 565 (holding preamble's list of illustrative examples not reviewable).  This Court therefore "lacks subject matter jurisdiction" over Plaintiffs' preamble challenges.[17]  *Peoples Nat'l Bank v. Comptr. of the Currency*, 362 F.3d 333, 336 (5th Cir. 1999).

### B.    Plaintiffs' Preamble Challenges Are Not Ripe

Even if the preamble were reviewable, Plaintiffs' challenges are not ripe for review.  "Typically, in the context of rulemaking," courts "wait until a rule has been applied before granting review."  *Central & South West Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000) (quotation marks omitted).  Here, the preamble identifies some general principles that may apply to incentive programs and drug testing, but it does not actually apply them to in any particular case.  This abstraction cuts against ripeness.  *See NRDC*, 559 F.3d at 565 ("How [the agency] will use or rely on or interpret what it said in the preamble is uncertain.").

---

[17] The only unconditional and unequivocal statements in the preamble merely restate the Rule's basic retaliation standard: "It is a violation of paragraph (b)(1)(iv) for an employer to take adverse action against an employee for reporting a work-related injury or illness, whether or not such adverse action was part of an incentive program."  81 Fed. Reg. at 29674; *see also id.* at 29673 ("[T]he final rule does prohibit employers from using drug testing (or the threat of drug testing) as a form of adverse action against employees who report injuries or illnesses.").  As the Rule and preamble make clear, the Rule simply incorporates the OSH Act's preexisting statutory prohibition on retaliation in the specific context of injury reporting.  *See* 81 Fed. Reg. at 29671.  *Cf. Am. Petrol. Inst.*, 684 F.3d at 1354 (refusing to review an "isolated statement" that "one could reasonably read as mandatory," because context showed that the statement did not add binding requirements to the enacted rule).

In neither of the challenged preamble discussions did OSHA spell out which factual scenarios would satisfy all the elements of retaliation, and thus lead to citations. For instance, in the incentive-program context, the preamble does not address how significant a withheld benefit must be to constitute "materially adverse" action under *Burlington Northern*. 81 Fed. Reg. at 29672. In the drug-testing context, the preamble does not lay out any categorical rules to determine when drug use "is likely to have contributed" to an injury, or what kind of drug testing is "designed in a way that may be perceived as punitive or embarrassing." *Id.* at 29673. These broad principles will be fleshed out in the concrete setting of actual enforcement. OSHA has an institutional interest in using the experience it gains in enforcing the Rule to apply those principles in the case-by-case manner envisioned by the preamble. *See, e.g.*, *id.* at 29674 ("The specific rules and details of . . . any given incentive program must be considered.").

These statements are thus too "hypothetical and non-specific" to be ripe for review outside of any concrete factual context. *Kennecott*, 88 F.3d at 1223. The preamble "is not crafted as a concrete rule that can be applied under identified circumstances." *Id.* Plaintiffs misstate the scope of the Rule—and the function of the preamble—when they claim that the preamble imposes a complete "ban" on "incident-based safety incentive programs and post-incident testing programs." PI Mem. 2. Those practices only violate the rule when they satisfy the standard elements of retaliation. In fact, the preamble describes types of incentive programs and post-incident drug testing whose application likely would *not* constitute retaliation. *Id.* at 29674 (non-retaliatory incentives); *id.* at 29673 (non-retaliatory drug testing).

As a result, Plaintiffs' claims of hardship are premature. *See* PI Mem. 14-15. The OSH Act already prohibited them from taking materially adverse action against employees for reporting injuries. *See* 29 U.S.C. § 660(c); 29 C.F.R. § 1904.36. Without knowing how OSHA

will enforce the Rule's anti-retaliation provision, it is too early to judge whether—and if so, to what extent—Plaintiffs or their members will have to change any particular workplace policy. Because "any hardship that [Plaintiffs] could suffer is conjectural, . . . the issue is not ripe for review." *Central & South West Servs.*, 220 F.3d at 690. Judicial review should "await a concrete case where [a court] can prove the limits of the rule in the context of a live controversy involving actual events." *Kennecott*, 88 F.3d at 1223.   As the D.C. Circuit has explained, "[u]nless and until [the agency] . . . invokes the preamble in an attempt to affect the outcome of a real dispute, there is little need for and no factual basis to inform our inquiry into its validity." *Id.*

## III.    Even If Subject to Review, None of the Preamble Challenges Is Likely to Succeed

### A.    *The Preamble's Interpretation of the Retaliation Bar Is Reasonable*

Plaintiffs challenge certain preamble statements under *Chevron* step two.  PI Mem. 18-21.  In particular, they claim that it would be impermissible, under the OSH Act, for the agency to apply the anti-retaliation provision to post-injury drug testing, or injury-based incentive programs, without making certain very specific findings.  These claims are wholly divorced from the actual scope of *Chevron*-step-two review, which is "narrow and deferential."  *Alenco*, 201 F.3d at 620.  The Fifth Circuit has instructed courts, at step two, to "remember the limitations of our task: The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."  *BNSF Railway Co. v. United States*, 775 F.3d 743, 755-56 (5th Cir. 2015).   Instead, a court may only reject an interpretation that is "manifestly contrary to the statute."  *TOPUC*, 183 F.3d at 410 n.10.  If "the agency has offered reasonable justifications for its" conclusion, the inquiry is over.  *Id.* at 412;

*see id.* (holding that two single-sentence reasons "suffice[d] to survive the reasonableness requirement of *Chevron* step-two").

OSHA "offered reasonable justifications for its" conclusion that applying the Rule to incentive programs and drug-testing policies was "necessary" for "compil[ing] accurate statistics on work injuries and illnesses" and "requiring employers to maintain accurate records." *TOPUC*, 183 F.3d at 412; 29 U.S.C. § 657(c)(2), 657(g)(2), 673(a).   The agency concluded, based on copious evidence from numerous sources, that both types of practices could dissuade reasonable employees from reporting injuries.   *See* 81 Fed. Reg. at 29673-74 (explanation for application to injury-based incentives); *id.* at 29672-73 (explanation for application to post-injury drug testing); *infra* Part III.D (detailing evidence).   The agency responded to counterarguments in the record and struck a balance between the competing interests at issue.   *See id.* at 29674 (responding to "commenters [who] expressed satisfaction with existing safety incentive programs"); *id.* at 29673 (responding to "commenters [who] stated their belief that drug testing of employees is important for a safe workplace").   These determinations are clearly not "manifestly contrary to" anything in the statute.   *Chevron*, 467 U.S. at 843.   And "nothing in the statute defines" any of the operative standards—"necessary," "accurate," "effective," "appropriate"—in a way that precludes OSHA's interpretation.   *TUPOC*, 183 F.3d at 412. Because OSHA "has offered reasonable explanations" for its necessity determination, the Court should "defer to the agency's judgment of what is '[necessary].'"   *Id.* at 426; *see Mourning*, 411 U.S. at 369 (holding that necessity determinations must be sustained where the regulation is "reasonably related to the purposes of the enabling legislation"); *Chao*, 409 F.3d at 393 (explaining that "necessary" is "an inherently discretionary standard that clearly invites further definition by the Secretary"); *Fleming Co. v. USDA*, 322 F.Supp.2d 744, 756 (E.D. Tex. 2004).

Plaintiffs' contrary arguments misapply the standard of review. One set of objections asks this Court to re-weigh the evidence that was presented to the agency. *See* PI Mem. 19 (arguing that the record did not demonstrate "a significant widespread problem of inaccuracy"); *id.* (other "evidence in the record establishes that" these programs have "no adverse impact on timely or accurate reporting"). But "it is not the role of the court 'to weigh the evidence pro and con.'" *Assoc. Builders & Contractors of Texas, Inc. v. NLRB*, 2016 WL 3228174, at *9 (5th Cir. June 10, 2016) (quotes omitted). To the extent these arguments challenge OSHA's understanding of the administrative record, they are wrong for the reasons explained below in the section that responds to Plaintiffs' arbitrary-and-capricious challenge. *See TOPUC*, 183 F.3d at 410 & n.10 (explaining the two standards).

Another set of objections rely on requirements that are nowhere to be found in the statute. For instance, Plaintiffs claim that "the OSH Act does not permit OSHA to adopt regulations that go beyond a mandate to employ due diligence to keep accurate records of work-related injuries." PI Mem. 19. It provides no citation or explanation. No part of the statute limits OSHA to a "mandate to employ due diligence." As explained above, the text of the Act unmistakably confers authority to enact regulations that OSHA deems "necessary" for "requiring employers to maintain accurate records" and for "compil[ing] accurate statistics on work injuries and illnesses," 29 U.S.C. §§ 657(c)(2), 657(g)(2), 673(a), and under *Chevron* and its progeny, courts must defer to OSHA's necessity determinations. Along the same lines, Plaintiffs list several specific determinations that OSHA supposedly was required to make. *See* PI Mem. 19-20. Again, none appears in the statute. Congress knows how to require specific determinations when it wants to. *E.g.* 29 U.S.C. § 655(b)(5).[18] To the extent these arguments question the sufficiency

[18] *See also, e.g.*, 50 U.S.C. § 4329(a) (requiring five specific determinations before action can occur); 25 U.S.C. § 293b (directing agency action "whenever [it] shall determine" that a specific condition is met);

of the agency's explanation, they are properly raised as arbitrary-and-capricious claims.  *See* PI

Mem. 23-28 (raising the same arguments but in more detail); *infra* Part III (responding).

Finally, Plaintiffs list several outside sources that supposedly disagree with the anti-

retaliation policies OSHA has adopted, as a general matter.  PI Mem. 20.[19]  These sources say

nothing about recordkeeping under the OSH Act, and so have nothing to do with the *Chevron*

step-two question, which is whether the agency's interpretation of the OSH Act's recordkeeping

provisions was reasonable.  At any rate, the Rule will have to be enforced in harmony with other

applicable regulatory provisions.  *See* 29 U.S.C. § 653(b)(1), (4).[20]

### B.      The Rule Does Not Affect State Workers' Compensation Laws

Plaintiffs claim that the preamble's discussion of drug-testing violates Section 4(b)(4) of

the Act, which provides that "nothing in this Act shall be construed to supersede or in any

manner affect any workers' compensation law."  29 U.S.C. § 653(b)(4); *see* PI Mem. 21-22.  But

OSHA explicitly stated that the Rule does not "supersed[e] or affect[] workers' compensation

_____

35 U.S.C. § 209 (authorizing agency action where four specific determinations are made); 16 U.S.C. § 2904(a)(3)(A), (B).  There are countless examples.  The only determination required here is that the regulation be "necessary" or "appropriate" for achieving one of the stated purposes.  29 U.S.C. §§ 657(c)(1), 657(g)(2), 673(e).

[19] It is not clear that the sources Plaintiffs cite actually disagree with the Rule or agree with Plaintiffs. Plaintiffs provide almost no explanation.  *See* PI Mem. 20.  But, for instance, the document produced by the Substance Abuse Mental Health Services Administration contains a "Model Plan" for workplace drug testing, which recommends that post-accident testing occur only "when, based upon the circumstances of the accident, th[e] [employee's] actions are reasonably suspected of having caused or contributed."  *See* Model Plan for a Comprehensive Drug-Free Workplace Program, at 3.  The Drug-Free Workplace Advisor website similarly encouraged employers "to establish objective criteria that will trigger a post-accident test."  Ex. 1, at 4 (terminated in 2010).  These statements are consistent with the preamble and inconsistent with the blanket post-injury drug testing Plaintiffs appear to advocate.

[20] Plaintiffs argue that tests capable of measuring impairment do not exist for most drugs.  *See* PI Mem. 20-21.  But the preamble does not claim to ban drug tests that cannot measure impairment, it simply acknowledges that where a drug test *can* measure impairment, it is less likely to constitute retaliation. Further, the Rule permits any drug tests that are authorized or mandated by state or federal law.  *See* 29 U.S.C. § 653(b)(1), (4); 81 Fed. Reg. at 29673.  And the feasibility of testing for impairment will be taken into account in making enforcement decisions.  *Cf. Ace Sheeting v. OSHA*, 555 F.2d 439, 439 (5th Cir. 1977).

laws." 81 Fed. Reg. at 29673.  Wherever the Rule conflicts with a workers' compensation law, the compensation law controls.

Plaintiffs attempt to parse the language of the preamble to suggest that, in the adjacent sentence, the preamble contradicts itself and professes to supersede workers' compensation laws. PI Mem. 22 (maintaining that the Rule only limits its application "where the state law 'require[s]' post-accident drug testing").  That is not what the preamble says.  The preamble first responds to commenters who worried that "the final rule will conflict with drug testing *requirements* contained in workers' compensation laws."  81 Fed. Reg. at 29673 (emphasis added).  In response, the preamble assures those commenters that they will not be liable under the Rule.  It then goes on to state a broader principle, which is that the Rule must comply with Section 4(b)(4), and so cannot be applied to "supersede" or "affect" worker's compensation laws.  29 U.S.C. § 653(b)(4).  That statement necessarily refers to *all* of Section 4(b)(4), including its language that the OSH Act does not "enlarge or diminish" the "rights, duties, or liabilities of employers and employees."  *Id.*  Thus, if a state workers' compensation law provides an employer the "right[]" to conduct a certain drug test, the Rule does not say otherwise.  *Id.*; *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96 (1992) (explaining that Section 4(b)(4) "save[s] t[his] area from federal pre-emption"); *Marshall*, 647 F.2d at 1236 ("OSHA cannot legally preempt state compensation law.").  Because the Rule explicitly does not preempt state workers' compensation laws, it complies with Section 4(b)(4).  Plaintiffs are therefore not likely to succeed on this claim.

### C.    *OSHA Gave Adequate Notice to Regulated Parties*

Plaintiffs are not likely to succeed in their notice claim.  For starters, if the Court holds that the preamble is not binding, *supra* Part II, then this claim must fail, because the

Supplemental NPRM clearly announced OSHA's proposal to "prohibit employers from taking adverse action against employees for reporting injuries and illnesses."  79 Fed. Reg. at 47606. That is exactly what the final Rule does.

Even if the preamble were binding, Plaintiffs' notice claim still fails.  Under the APA, an NPRM must state "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).   The Fifth Circuit has interpreted this requirement to mean that the final rule must be a "logical outgrowth" of the NPRM.  *Brazos Elec. Power Co-op, Inc. v. Southwestern Power Admin.*, 819 F.2d 537, 543 (5th Cir. 1987).  "The notice need not specifically identify every precise proposal which [the agency] may ultimately adopt as a rule."  *Schuylkill Metals*, 828 F.2d at 317 (quotes omitted).  "Rather, the proper test is whether the notice would fairly appraise interested persons of the subjects and issues the agency was considering."  *Id.* (quotes omitted).

The Supplemental NPRM in this case clearly stated "the subjects and issues the agency was considering."[21]  *Id.*; *see* Supplemental Notice of Proposed Rulemaking, *Improve Tracking of Workplace Injuries and Illnesses*, 79 Fed. Reg. 47605 (Aug. 14, 2014).  It explained that, in response to comments, the agency was considering how to address "practices that have the effect of discouraging employees from reporting recordable injuries and illnesses."  *Id.* at 47606; *see id.* ("[T]he Agency is seeking comment on whether to amend the proposed rule to . . . prohibit employers from taking adverse action against employees for reporting injuries and illnesses.").

---

[21] Plaintiffs imply that it was somehow improper for OSHA to issue a Supplemental NPRM.  *See* PI Mem. 9 (calling this an "unusual procedure not specifically identified in the APA").  But this kind of supplemental notice is extremely common.  *See, e.g.*, *Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 165, 171 (D.C. Cir. 2007) (reviewing and relying on SNPRM without complaint); *Schuylkill Metals*, 828 F.2d at 317-18 (rejecting notice claim based on SNPRM).  In any case, Plaintiffs do not actually assert that this supplemental notice impairs the Rule's legality.  *See* PI Mem. 22-23 (entirety of notice argument).

The agency thus made clear that it was considering a prohibition on polices that "have the *effect* of discouraging" injury reporting.   *Id.* (emphasis added).   It also made clear that it sought information about particular policies and practices.   *See, e.g.*, *id.* at 47607 (asking commenters to identify specific "practices or policies that discourage employees from reporting their injuries"). Such statements abound in the Supplemental NPRM.[22]   This put employers on notice that if their policies might discourage reporting, they should submit comments defending those policies.   The agency made this explicit:   It noted that "OSHA encourages employers to enforce safety rules as part of a well-functioning workplace safety program," and so it asked, "Are there any employer practices that OSHA should explicitly exclude under this provision to ensure that employers are able to run an effective workplace safety program?"   *Id.* at 47608.

Commenters plainly understood what OSHA meant.   They submitted copious comments regarding policies that discouraged reporting, including arguments both for and against the precise policies at issue here.   *See* Admin. Dkt., OSHA-2013-0023-1488, -1654,   -1661, -1667, -1674, -1675, -1695, -1698.[23]   On top of the Supplemental NPRM's clear text, these comments provide further evidence that notice was sufficient.   *See Schuylkill Metals*, 828 F.2d at 318 ("At least one party . . . saw fit to comment on precisely this issue."); *id.* ("other parties provided extensive comments" urging similar policies).

---

[22] *See, e.g.*, 79 Fed. Reg. at 47606 ("What other actions can OSHA take to address the issue of employers who discourage employees from reporting injuries and illnesses?"); *id.* at 47607 ("OSHA seeks any information stakeholders might have about such practices and policies, and their effect on injury and illness records"); *id.* ("Are you aware of situations where employers have discouraged the reporting of injuries and illnesses? If so, describe any techniques, practices, or procedures used by employers that you are aware of."); *id.*(seeking comment on "any additional information on employer practices that may discourage employees from reporting injuries or and illnesses"); *id.* at 47608 ("What kinds of adverse actions might lead an employee to decide not to report an injury or illness?"); *id.* (seeking comment on *all* practices "that might dissuade a reasonable employee from reporting an injury").

[23] All comments submitted to OSHA in the course of this rulemaking are available at https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=0&D=OSH A-2013-0023.

Plaintiffs respond that "OSHA did not identify what types of programs" it was planning to regulate.  PI Mem. 9.  They argue that it violated the APA for the Supplemental NPRM not to announce that the agency "was considering a ban on incident-based safety incentive programs or routine, mandatory post-accident drug testing programs."  *Id.* at 22-23.  But the Fifth Circuit has held that "[t]he notice need not specifically identify every precise proposal which [the agency] may ultimately adopt as a rule."  *Schuylkill Metals*, 828 F.2d at 317; *id.* at 318 (rejecting notice challenge even though the "notice did not propose any particular MRP benefit provision").  Rather, the notice need only apprise interested parties of the "subjects and issues" under consideration, which the Supplemental NPRM clearly did.  An agency is entitled to "learn from the comments on its proposals" without re-opening notice and comment.  *First American Discount Corp. v. CFTC,* 222 F.3d 1008, 1015 (D.C. Cir. 2000).  "The purpose of a rulemaking proceeding is not merely to vote up or down the specific proposals advanced before the proceeding begins."  *Alto Dairy v. Veneman*, 336 F.3d 560, 569 (7th Cir. 2003).  The purpose, instead, is "to refine, modify, and supplement the proposals in the light of evidence and arguments presented in the course of the proceeding."  *Id.*  As the Fifth Circuit has explained, "[r]ulemaking proceedings would never end if an agency's response to comments must always be made the subject of additional comments."  *Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 201 (5th Cir. 1989).  OSHA was not obligated to reopen the rulemaking process for a second time for comment on the proposals it received in response to its supplemental notice.

Regardless, OSHA *did* announce that it was concerned with these precise policies.  It stated that one "[a]dverse action[] mentioned by participants in the public meeting" was "requiring an employee who reported an injury to undergo drug testing where there was no reason to suspect drug use."  79 Fed. Reg. at 47608.  It is hard to imagine a clearer statement.

As to injury-based incentive programs, the agency had recently issued Guidance explicitly stating that such programs could violate section 11(c).  *See* Fairfax Memo, *supra*.[24] The Supplemental NPRM made perfectly clear that the contemplated Rule would overlap with section 11(c).  *See* 79 Fed. Reg. at 47607 ("[M]uch of the primary conduct that would be prohibited by the new provision is likely already proscribed by 11(c).").  As the D.C. Circuit has explained, when an NPRM identifies an issue, interested parties are on notice that the agency might adopt a recent authority's resolution of that issue.  *See U.S. Telecom. Ass'n v. FCC*, 2016 WL 3251234, at *10 (D.C. Cir. 2016) (holding that notice was adequate because "interested parties" could have anticipated "the possibility that the Commission would follow *Brand X*" on one issue, even though the NPRM did not mention that possibility) (quotes omitted); *Nat'l Oilseed Processors Assoc. v. OSHA*, 769 F.3d 1174, 1179 (D.C. Cir. 2014) (holding that, in 2009 rulemaking, notice was adequate based on OSHA guidance letters from 1986, 1987, and 1994).

### D.        The Preamble's Discussions Are Not Arbitrary or Capricious

Finally, Plaintiffs allege that the Rule's applications to incentive programs and drug testing are arbitrary and capricious.  5 U.S.C. § 706(2)(A); PI Mem. 23-28.  "Review under the arbitrary-and-capricious standard is 'extremely limited and highly deferential.'"  *Markle Interests, LLC v. U.S. Fish & Wildlife Service*, 2016 WL 3568093, at *3 (5th Cir. 2016) (quoting *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243 (5th Cir. 2015)).  "In reviewing an agency's decision under the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption." *Texas Clinical Labs., Inc. v. Sebelius*, 612 F.3d 771, 774 (5th Cir. 2010).

---

[24] *See id.* ("Incentive programs that discourage employees from reporting their injuries are problematic because, under section 11(c), an employer may not 'in any manner discriminate' against an employee because the employee exercises a protected right, such as the right to report an injury."). *See also* Michaels Memo, *supra* (explaining that injury-based incentive programs "often ha[ve] the effect of discouraging workers from reporting an injury or illness").

Because of this "highly deferential standard of review, the agency's burden is slight." *Gulf Restoration Network*, 783 F.3d at 244. Once the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,' . . . 'a court is not to substitute its judgment for that of the agency.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Rather, as the Fifth Circuit has put it, courts must "uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013); *see Am. Petrol. Inst. v. EPA.*, 661 F.2d 340, 349 (5th Cir.1999) (requiring "minimal consideration to the relevant facts as contained in the record."); *Milena Ship Mgmt. v. Newcomb*, 804 F. Supp. 859, 861 (E.D.La. 1992) ("[E]ven if [a] Court disagrees with the agency's decision, the judicial role is relegated to affirming the agency's decision so long as a rational basis is presented for the decision reached.").

The challenged portions of the preamble easily clear this low hurdle. OSHA is statutorily charged with ensuring that employers accurately report workplace injuries. *See* 29 U.S.C. §§ 657(c)(1), (c)(2), (g)(2); *id.* § 673(a). As the preamble explains, retaliation against employees for reporting injuries deters reporting, which in turn decreases the accuracy of injury logs. 81 Fed. Reg. at 29671 (explaining that "retaliating against employees for reporting work-related injuries or illnesses" decreases "the accuracy of employer injury and illness logs"). After considering both "myriad examples" in the record and a number of surveys and studies—from commenters, congressional committees, and academic experts—OSHA concluded that workers were dissuaded from reporting injuries by some programs that deny benefits, or that impose intrusive drug testing, for those who reported injuries. *See Id.* at 29673-74 (injury-based incentives); *id.* at 29672-73 (post-injury drug testing). The agency considered the

counterarguments in the record, and responded by describing as potentially retaliatory only the incentive programs and drug testing that would be most likely to decrease reporting and least likely to help employers understand the cause of injuries.  *Id.* at 29674 (explaining that the Rule does not "categorically ban all incentive programs" and listing some permissible examples); *id.* at 29673 ("strik[ing] the appropriate balance" for drug testing).  Thus, there is no question that OSHA "examine[d] the relevant data," or that its explanation "satisf[ied] minimum standards of rationality."  *Markle Interests*, 2016 WL 3568093, at *3 (quotation marks and alterations omitted).  Nothing more is required.

Plaintiffs advance a litany of reasons why they think the preamble is arbitrary and capricious.  Besides conflating the preamble with the Rule, their arguments misconceive both the narrow scope of arbitrary-and-capricious review and the evidence before the agency.

First, Plaintiffs allege that OSHA "reversed longstanding policy" while "disregarding facts and circumstances that underlay" previous policy, without accounting for reliance interests.  PI Mem. 23-24.  This criticism fails for several reasons.  For one, Plaintiffs have identified no particular reliance interests, beyond the use of workplace programs they allege may now have to be revised (which routinely occurs when an agency adopts a new rule).  More importantly, it is not clear what "longstanding policy" Plaintiffs are referring to, or what "facts and circumstances" might have supported it.  OSHA has never taken the position that all injury-based incentive programs and blanket post-injury drug testing *do not violate* section 11(c) of the OSH Act.  In fact, just the opposite.  *See* Fairfax Memo, *supra*.  It is true that OSHA had not previously issued *regulatory* limits on retaliation.  But the agency "forthrightly acknowledged that its recent actions have broken new ground."  *Fox*, 556 U.S. at 517; 81 Fed. Reg. at 29671 (noting that "[t]he final rule *adds* paragraph (b)(1)(iv) to § 1904.35" and explaining the reasons)

(emphasis added); *supra* n.5 (quoting those reasons).  "Nothing prohibits federal agencies from moving in an incremental manner." *Id.* at 522; *see also Encino*, 136 S. Ct. at 2125-26.

Second, Plaintiffs assert that "OSHA has cited no scientific evidence" to support its conclusion that incident-based incentive programs "discourage employees from accurately reporting injuries and illnesses."  PI Mem. 24-25.  This contention is both beside the point and wrong.  It is beside the point because the APA does not demand "scientifically certain criteria." *Fox*, 556 U.S. at 520.  The Supreme Court in *Fox* made clear that an agency need not conduct "a multiyear controlled study" before it acts, *id.* at 519, and that an agency's "predictive judgment . . . merits deference," "even in the absence of evidence," *id.* at 521.[25]  Nor is there any bar on the use of "anecdotal evidence," as Plaintiffs imply.  PI Mem. 24; *see Assoc. Builders & Contractors of Texas*, 2016 WL 3228174, at *9 (agency can rely on "a small number of cases").

The contention is wrong because OSHA relied on overwhelming evidence that injury-based incentive programs discourage injury reporting.  The American College of Occupational and Environmental Medicine explained that many of its 4,000 members had reported that "bonuses or incentives for a certain number of 'injury free days' could lead to peer pressure upon an employee not to report."  OSHA-2013-0023-1661, at 2 (cited and discussed, 81 Fed. Reg. at 29673).  In a survey conducted by the United Steelworkers Union ("USW"), 66% of respondents reported that such programs "discouraged workers from reporting work-related injuries and illnesses."  OSHA-2013-0023-1675, at 18 (cited and discussed, 81 Fed. Reg. at 29673).  USW also identified a number of academic studies and other reports that concluded the same.[26]  An

---

[25] The Court further explained that such predictive judgments need merely be rational, not clearly correct. *See Fox*, 556 U.S. at 518 ("It is certainly rational (if not inescapable) to believe that a safe harbor for single words would likely lead to more widespread use of the offensive language.").

[26] *E.g.*, Hester J. Lipscomb, et al., *Safety, Incentives, and the Reporting of Work-Related Injuries Among Union Carpenters: "You're Pretty Much Screwed If You Get Hurt at Work"*, 56 Am. J. Industrial

AFL-CIO survey of 1,300 safety and health representatives found that 46 percent "believed that the program discouraged the reporting of injuries, illnesses, near misses or accidents."  OSHA-2013-0023-1695, at 12-13 (cited and discussed, 81 Fed. Reg. at 29673).  In accordance with such large surveys, profuse individual cases, and common sense, OSHA was entitled to conclude that denying benefits to workers who report injuries will discourage workers from reporting injuries. Plaintiffs do not attempt to argue that this conclusion was unsupported by substantial evidence. *See* 5 U.S.C. § 706(2)(E).[27]  In any case, "it is not the role of the court to weigh the evidence pro and con."  *Assoc. Builders & Contractors of Texas*, 2016 WL 3228174, at *9 (quotes omitted).

Third, Plaintiffs complain that OSHA did not establish a link "between incident-based safety incentive programs and decreased workplace safety."  PI Mem. 24.  But it is *Congress* that chose accurate recordkeeping as a vital part of ensuring workplace safety.  *See, e.g.*, 29 U.S.C. §§ 651(b), 657(c), 673(a), 673(e).  As the OSH Act's legislative history declares, "[a]dequate

---

Medicine 389 (2013); Glenn Pransky, et al., *Under-Reporting of Work-Related Disorders in the Workplace: A Case Study and Review of the Literature*, 42 Ergonomics 171 (1999).

[27] Plaintiffs cite their own comments to OSHA as evidence of the safety benefits of incident-based programs.  PI Mem. 25 (citing Strategic Comp comments submitted in January and April 2016, *see* Admin. Dkt., OSHA-2013-0023, -1836, -1837, -1838).  But these comments were submitted after the close of the comment period, so they cannot now be used to impugn the rationality of the Rule.  *See* 79 Fed. Reg. at 47605 ("Comments must be submitted by October 14, 2015.");  *cf. Personal Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 543 (D.C. Cir. 1995) ("Agencies are free to ignore such late filings.");  *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1212 (5th Cir. 1991) (vacating rule because "evidence on which the [agency] relies was only made public after the period for public comment on the standard had closed") (quotes omitted).

The evidence Plaintiffs cite in their brief is also far from conclusive.  Strategic Comp's data reflects only that its insureds report fewer serious injuries than actuarial predictions.  *See* PI Mem. 25. Those insureds implement a "comprehensive safety program" which includes other safety measures.  *See* OSHA-2013-0023-1836, Ex. 1b, at 2, 7-8 ("Incentive Programs were implemented in conjunction with other measures designed to strengthen safety culture.").  Strategic Comp's data do not report how other kinds of incentive programs, or other insurance companies' insureds, fare compared to actuarial predictions.  Likewise, the studies mentioned in the GAO report, *see* PI Mem. 24-25, considered multiple kinds of incentive programs, not just injury-based ones, and they did not "quantify the programs' effect on injury and illness reporting."  GAO-12-329, *Workplace Safety and Health*, at 6, 8.  More importantly, the GAO found numerous indications that injury-based programs deterred reporting.  *Id.* at 7-10.

information is a precondition for responsive administration of *all* sections of this bill." H.R Rep. No. 91-1291, 91st Congress., 2d Sess. (1970), at 860 (emphasis added).[28] The Supreme Court rejected a similar argument in *Fox*. In that case, the court of appeals had struck down an FCC ban on fleeting expletives for a lack of evidence that they were "harmful and serious enough to warrant government regulation." *Fox*, 556 U.S. at 519. The Supreme Court reversed, explaining that, by statute, "*Congress* has made the determination that indecent material is harmful to children," and so the agency did not need to independently "adduce[] [a] quantifiable measure of the harm." *Id.* (emphasis added). Likewise, OSHA was not required to quantify the ultimate safety impact of improved reporting.

Fourth, Plaintiffs list what they claim to be evidence that post-incident drug testing leads to fewer reported injuries.[29] PI Mem. 25-28. This, too, fails to meet their high burden under the APA. OSHA provided ample support for its conclusion that some post-injury drug testing deters injury reporting. *See* 81 Fed. Reg. at 29673 (citing evidence from three academic studies, OSHA recordkeeping data, and a report by the House of Representatives Committee on Education and

---

[28] *See also id.* at 156 ("Full and accurate information is a fundamental precondition for the meaningful administration of an occupational safety and health program."). OSHA has long recognized that "free and frank reporting by employees is the cornerstone of the system." 66 Fed. Reg. 6050 (Jan. 19, 2001). As it recently explained, "[i]f employees do not feel free to report injuries or illnesses, the employer's entire workforce is put at risk. Employers do not learn of and correct dangerous conditions that have resulted in injuries, and injured employees may not receive the proper medical attention, or the workers' compensation benefits to which they are entitled." Fairfax Memo, *supra*.

[29] Again, most of this evidence was not presented to OSHA. *See* PI Mem. 25-26. Nor does it establish much. The poll that Plaintiffs cite, *see id.* at 27 & n.20, refers to *pre-employment* drug testing, which reinforces that, under the Rule, employers retain numerous options for drug testing their employees. The evidence that was before the agency—like the Morantz and Mas study—was addressed in the preamble *See* 81 Fed. Reg. at 29673. Plaintiffs' attempt to parse that study's findings as to different testing methods illustrates how divorced their challenge is from the narrow scope of arbitrary-and-capricious review. *See* PI Mem. 26 n.19.

Labor).[30]   Furthermore, under the Rule, employers retain multiple ways to test for workplace drug use.   The Rule does not affect drug testing that is *not* specifically a consequence for reporting an injury.   Nor does it prohibit post-injury testing that might identify a cause of the reported injury.   *See* 81 Fed. Reg. at 29673.   The preamble only addresses post-injury testing that is unlikely to identify the cause of the injury, because the injury is not the kind that drug use could cause.[31]   In this way, OSHA has accommodated competing desires to deter drug use but not deter injury reporting.   *See Gulf Restoration Network*, 783 F.3d 227, 244 (5th Cir. 2015) ("[W]hen a statute sets out competing considerations, agencies are generally given discretion to choose how to best give effect to those mandates.").

### E.     The Rule Complies with the Regulatory Flexibility Act

Under the Regulatory Flexibility Act ("RFA"), courts review only "whether an agency has made a reasonable, good-faith effort to carry out the mandate of the RFA."   *Alenco*, 201 F.3d at 625; *see Nat'l Tele. Co-op Assoc. v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("[T]he Act's requirements are purely procedural.") (quotes omitted).   In the preamble, OSHA certified that the

---

[30] Unable to dispute that this determination was supported by substantial evidence, *see* 5 U.S.C. § 706(2)(E), Plaintiffs advance a number of non-sequitur lack-of-explanation claims.   For instance, they claim that "OSHA did not provide any evidence that" blanket post-injury drug testing "was in fact retaliatory."   PI Mem. 27.   That is not the relevant question.   The question is whether the practice would deter a reasonable employee from reporting an injury.   OSHA reasonably concluded that, in some cases, it would.   This is a fact-specific inquiry that will need to be resolved on a case-by-case basis.

Nor did the preamble address drug testing simply "to protect[] worker privacy."   PI Mem. 27. The Rule's purpose is to ensure accurate injury records, which is indisputably a valid goal for OSHA to pursue.   A valid rule may serve other interests incidentally.   *See TOPUC*, 183 F.3d at 412.

Finally, Plaintiffs improbably suggest that the latitude OSHA has left employers—to drug-test when there is "a reasonable possibility that drug use by the reporting employee was a contributing factor to the reported injury or illness"—will somehow lead to "the surveillance of a trained police force."   PI Mem. 28.   Employers set workplace policies all the time.   They are perfectly capable of determining which injuries might have been caused by worker impairment from drug use.   The preamble even gives some examples of injuries that are not typically caused by drug impairment.   *See* 81 Fed. Reg. at 29673.

[31] Indeed, the preamble simply encourages employers to use testing that can "contribut[e] to the employer's understanding of why the injury occurred."   81 Fed. Reg. at 29673.   As mentioned above, the technological availability of impairment testing will be taken into account when setting enforcement policy.   *See supra* n.20.

Rule would "not have a significant economic impact on a substantial number of small entities." *See* 81 Fed. Reg. at 29687; *id.* at 29674-87 (analysis of Rule's economic impact). Plaintiffs claim that OSHA should have analyzed the Rule's anti-retaliation provision in more detail.  PI Mem. 29.  But as the preamble explains, that provision "add[s] no new rights to employees" beyond the requirement that employers inform them of their right to report injuries.  81 Fed. Reg. at 29680.

## IV.    Plaintiffs Cannot Show a Likelihood of Irreparable Harm

To obtain a preliminary injunction, a plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. NRDC*, 555 U.S. 7, 22 (2008).  The threat of irreparable injury must be "real," "substantial," and "immediate," not speculative or conjectural. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983); *see Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011).  In short, "an injunction . . . should only issue when essential to prevent an otherwise irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 221 (5th Cir. 2016).

Plaintiffs cannot carry this burden.  The Rule incorporates only "the *existing* prohibition on retaliating against employees for reporting work-related injuries or illnesses that is *already* imposed on employers under section 11(c) of the OSH Act."  81 Fed. Reg. at 29671 (emphasis added).  In other words, with regard to retaliation, "the final rule does not change the substantive obligations of employers." *Id*.  The same primary conduct is proscribed both before and after the Rule's effective date.  Such a rule cannot cause irreparable harm.

The harms Plaintiffs claim rest on legally incorrect premises.  For instance, they claim that they will have to "eliminate or drastically reduce their safety incentive and/or post-accident drug testing programs."  PI Mem. 30.  But as the preamble makes clear, there are numerous ways such programs can be structured to ensure that they do not violate well-established retaliation

principles. *See Postal Service*, 76 F. Supp. 3d at 1183. The Rule, like section 11(c), leaves plenty of room to offer incentives that do not punish injury reporting, to drug test outside the injury-reporting context, and to drug test after injuries that might have been caused by drug use.

Plaintiffs improbably claim that, if they must ensure that such programs do not retaliate, the "immediate and likely outcome[]" will be "increased employee injuries and even fatalities." PI Mem. 31. That prediction is completely speculative. Plaintiffs cite no evidence to suggest that practices dependent on retaliation against workers who report injuries are somehow necessary to stem a flood of new injuries and fatalities. They merely offer summaries of their own records, which indicate that reported injuries decreased after company-wide workplace safety overhauls. *Id.* That is not enough to establish that irreparable harm will result from whatever limited adjustments (if any) may be required by the Rule's incorporation of the existing prohibition on retaliation.

To establish irreparable harm, Plaintiffs would have to establish that workplace practices that violate the Rule—*i.e.*, those that would dissuade a reasonable employee from reporting an injury, with no legitimate non-discriminatory basis, *Postal Service*, 76 F. Supp. 3d at 1183—are currently preventing injuries and illnesses. Their declarations establish no such thing. As mentioned, high-level reported-injury numbers do not distinguish between decreased injuries and decreased reporting. And the decreases Plaintiffs identify do not isolate the effect of any particular incentive or drug-testing policy. To take one example, Oxford Management states that reported injuries decreased after it implemented a "comprehensive safety and health program," which included an incentive program and "other changes." Honsey Decl. ¶¶ 8, 10, App. 23-24. From so little information, it is impossible to know whether any decrease in reported injuries stemmed from (1) less reporting, (2) the incentive program, (3) the other components of the

"comprehensive safety and health program," or (4) other manifestations of the company's increased safety focus, *id.* ¶ 7.  Oxford offers no reason to think that a similar incentive program, structured not to retaliate, would not achieve the same effect—whatever that may be.  As for drug testing, Oxford maintained a blanket post-injury drug-testing policy throughout the period when it experienced "a high frequency and severity of workers compensation claims."  *Id.* ¶¶ 7, 16.  The other Plaintiffs report similar patterns.[32]  In short, they have offered no credible evidence to suggest that they face any immediate threat of increased workplace injuries.  "[S]imply alleging some possibility of irreparable injury does not support the issuance of a preliminary injunction, which is an extraordinary remedy never awarded as of right."  *Aquifer Guardians*, 779 F. Supp. 2d at 556.

Nor is there any reason to suspect that the Rule will cause "increased OSHA inspections," PI Mem. 31, or that any future inspection will be unauthorized, *id.* at 32.  The Third Circuit case on which Plaintiffs rely for this argument, *Cerro Metal Products v. Marshall*, 620 F.2d 964 (3d Cir. 1980), involved a challenge to the legality of an inspection procedure, not a challenge to a substantive rule.

## V.     An Injunction Would Harm Defendants, Workers, and the Public Interest

Because Plaintiffs have not established a likelihood of success or irreparable harm, the Court need not consider the balance of equities or public interest.  *See, e.g.*, *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).  Even if it did, though, they tip sharply against injunctive

---

[32] Atlantic Concrete adopted a "comprehensive safety and health program" alongside its incentive program.  Ditcher Decl. ¶ 7, App. 32.  So did Owens Steel, and all companies insured by Strategic Comp.  Zalesne Decl. ¶ 4-5, App. 39; Cohen Decl. ¶ 15, App. 12.  Atlantic Concrete's drug-testing policy was in place, unchanged, both before and after it adopted those programs.  *Id.* ¶ 16.  Owens Steel does not say when it adopted its testing policy.  *See* Zalesne Decl. ¶ 18.  It does report that lost-time injuries *increased* dramatically the year it adopted its incentive program, and that its other injuries went unchanged in the three years after.  *See id.* ¶ 11.  Nothing about these reports suggests that the Rule's modest anti-retaliation provision is likely to cause any immediate injuries.

relief in this case.  Plaintiffs have established no harm at all, much less irreparable harm.  OSHA, by contrast, has determined that the anti-retaliation provision is necessary for the viability of its broader recordkeeping Rule, which takes effect January 1, 2017.  *See* 81 Fed. Reg. at 29624 (effective date), 29671-74 (necessity).  Numerous commenters echoed this concern.  *Id.* at 29669 (citing such comments).  An injunction would cause the precise harm that OSHA studied during the rulemaking and sought to avoid.  And "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce."  *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008).

## CONCLUSION

For the foregoing reasons, the motion for preliminary injunction should be denied.

Dated: August 19, 2016

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOHN R. PARKER
United States Attorney

JUDRY L. SUBAR
Assistant Director, Federal Programs Branch

  */s/ Spencer E. Amdur*
SPENCER E. AMDUR (PA Bar # 322007)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-7420
Facsimile: (202) 616-8470