IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TEXO ABC/AGC, INC.,** *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. **3:16-CV-1998-L** |
| | § | |
| **THOMAS E. PEREZ, SECRETARY** | § | |
| **OF LABOR, UNITED STATES** | § | |
| **DEPARTMENT OF LABOR,** *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiffs' Motion for Preliminary Injunction ("Motion") (Doc. 8), filed

July 12, 2016.[1]  After considering the Motion, response, reply, supplemental briefs, evidence, record,

and applicable law, the court **denies** Plaintiffs' Motion for Preliminary Injunction ("Motion") (Doc.

8).

### I.    Procedural and Factual Background

On July 8, 2016, Plaintiffs TEXO ABC/AGC, Inc. ("TEXO"); Associated Builders and

Contractors, Inc. ("ABC"); National Association of Manufacturers ("NAM"); American Fuel &

Petrochemical Manufacturers; Great American Insurance Company ("Great American"); Atlantic

Precast Concrete, Inc. ("APC"); Owen Steel Company ("OSC"); and Oxford Property Managment,

---

[1] Plaintiffs' Motion was initially filed as an emergency motion and included a request for an expedited briefing schedule and hearing.  In a Consent Motion to amend and extend the briefing schedule, Defendants informed the court of their decision to stay enforcement of the challenged rule until November 1, 2016. Subsequently, on October 18, 2016, Defendants agreed to further extend the stay of the challenged rule until December 1, 2016, to give the parties an opportunity to file supplemental briefs. Accordingly, Plaintiffs' request for an expedited briefing schedule is moot and **denied as moot**. The court also determines that a hearing on Plaintiffs' Motion is not necessary and **denies** the request for a hearing.  Sufficient evidence exists in the record for it to rule on the Motion without a hearing.

**Memorandum Opinion and Order - Page 1**

LLC ("OPM") (collectively, "Plaintiffs") brought this action against Defendants Thomas E. Perez,

in his official capacity as Secretary of Labor, United States Department of Labor; David Michaels,

in his official capacity as Assistant Secretary of Labor; and the United States Department of Labor,

Occupational Safety and Health Administration ("OSHA"), seeking declaratory and injunctive relief.

Plaintiffs consist of trade associations (TEXO, ABC, NAM, and AFPM), a workers compensation

insurance provider (Great American), and companies that have purchased workers compensation

insurance from Great American (APC, OSC, OPM).

> Plaintiffs request entry of an order declaring that:
>
> Subparagraphs 1904.35(b)(1)(I), (iii), and (iv) of the final rule issued by [OSHA], titled "Improve Tracking Workplace Injuries and Illnesses", 81 Fed. Reg. 29,624 (May 12, 2016), as revised at 81 Fed. Reg. 31,854 (May 20, 2016), hereinafter referred to as "the New Rule," are unlawful to the extent that they prohibit or otherwise limit incident-based employer safety incentive programs and/or routine mandatory post-accident drug testing programs.

Pls.' Compl. 2.  In Counts One through Five of their Complaint, Plaintiffs assert that the new OSHA

Rule ("Rule") is unlawful because it exceeds OSHA's statutory authority and violates the

Administrative Procedure Act ("APA") and Occupational Safety and Health Act ("OSH Act").  In

addition to declaratory relief, Plaintiffs seek a nationwide preliminary injunction to enjoin

Defendants from implementing the Rule under 29 C.F.R. § 1904.35(b)(1), until after the court rules

on the merits of Plaintiffs' Complaint.

## II.    Standard for Preliminary Injunction

There are four prerequisites for the extraordinary relief of a preliminary injunction.  A court

may grant such relief only when the movant establishes that:

> (1) there is a substantial likelihood that the movant will prevail on the
> merits; (2) there is a substantial threat that irreparable harm will result

if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*).  The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a preliminary injunction can be granted.  *Mississippi Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993.  Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the preliminary injunction.

In considering these four requirements and deciding whether to grant injunctive relief, courts must keep in mind that a preliminary injunction is a "drastic remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *Callaway*, 489 F.2d at 573 (concluding that the granting of a preliminary injunction "is an extraordinary and drastic remedy [that] should not be granted unless the movant clearly carries the burden of persuasion.").  Thus, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light Co.*, 760 F.2d at 621; *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996).  As the movants, Plaintiffs have the burden of submitting sufficient evidence to justify imposition of a preliminary injunction.  *PCI Trans., Inc. v. Fort Worth & W. RR Co.*, 418 F.3d 535, 546 (5th Cir. 2005).  For the reasons that follow, the court focuses on the irreparable harm and disservice to the public interest requirements, as it determines that Plaintiffs have failed to carry their burden in demonstrating that

there is a substantial threat that irreparable harm will result or that the public interest will not be disserved if a preliminary injunction is granted to enjoin implementation of the Rule pending resolution of this action.

### III.   Analysis

#### A.   Irreparable Harm

Plaintiffs' Complaint challenges the following three additions to 29 C.F.R. § 1904.35(b)(1): (1) the requirement that employer procedures for employee reporting of workplace injury-reporting be reasonable; (2) the requirement that employers inform employees of their right to report work-related injuries free from retaliation; and (3) the requirement that employers not retaliate.  29 C.F.R. § 1904.35(b)(1)(i), (iii), (iv).  Plaintiffs' Motion also references all three requirements, but their accompanying memorandum focuses only on the third anti-retaliation provision. Plaintiffs do not dispute that, prior to the Rule, employers were already under an obligation not to retaliate against employees for reporting work-related injuries. They instead take issue with the illustrative examples listed in the preamble and the following language that deals with incentive programs:

> It is a violation of paragraph (b)(1)(iv) for an employer to take adverse action against an employee for reporting a work-related injury or illness, whether or not such adverse action was part of an incentive program. Therefore, it is a violation for an employer to use an incentive program to take adverse action, including denying a benefit, because an employee reports a work-related injury or illness, such as disqualifying the employee for a monetary bonus or any other action that would discourage or deter a reasonable employee from reporting the work-related injury or illness.

Pls.' Mem. 11 (quoting Improve Tracking of Workplace Injuries and Illnesses, 81 Fed. Reg. 29,624, 29,674 (May 12, 2016) (to be codified at 29 C.F.R. pt. 1904.35(b)(1)). Plaintiffs also oppose language in the preamble of the Rule that deals with post-incident drug testing:

Memorandum Opinion and Order - Page 4

> [D]rug testing policies should limit post-incident testing to situations in which
> employee drug use is likely to have contributed to the incident, and for which the
> drug test can accurately identify impairment caused by drug use. For example, it
> would likely not be reasonable to drug-test an employee who reports a bee sting, a
> repetitive strain injury, or an injury caused by a lack of machine guarding or a
> machine or tool malfunction. Such a policy is likely only to deter reporting without
> contributing to the employer's understanding of why the injury occurred, or in any
> other way contributing to workplace safety. Employers need not specifically suspect
> drug use before testing, but there should be a reasonable possibility that drug use by
> the reporting employee was a contributing factor to the reported injury or illness in
> order for an employer to require drug testing. In addition, drug testing that is
> designed in a way that may be perceived as punitive or embarrassing to the employee
> is likely to deter injury reporting.

Pls.' Mem. 11-12 (footnote omitted) (quoting 81 Fed. Reg. 29,624, 29,673).

According to Plaintiffs, these examples specifically target and declare to be unlawfully

retaliatory for the first time incident-based safety incentive and mandatory post-accident drug testing

programs[2] relied on by many employers to promote workplace safety.  Plaintiffs believe that (1) these

programs significantly reduce the overall number of workplace injuries, and (2) they, their members,

and insureds will be irreparably harmed if the Rule is implemented because their ability to reduce

workplace injuries will be significantly impaired or limited if they cannot continue to rely on

mandatory post-accident drug testing and incident-based safety incentive programs.  In addition,

Plaintiffs contend that eliminating these programs could have a negative impact on employee

relations and good will because employees have come to see the Safety Programs as a benefit to their

---

[2] Plaintiffs refer to "incident-based safety incentive programs" as those that offer benefits to employees that are conditioned on the absence of incidents of workplace injury during a specified period of time.  Pls.' Mem. 1 n.1. Plaintiffs define "routine mandatory post-incident drug testing program" as "one in which employees are routinely tested for drugs or alcohol after any workplace accident, regardless of whether drug use is suspected of being the cause of the accident, and regardless of whether the test measures actual impairment at the time of the accident."  *Id.*  Plaintiffs refer to incident-based safety incentive and mandatory post-accident drug testing programs collectively as "Safety Programs." *Id.* at 11.

employment.  In sum, Plaintiffs assert that implementation of the Rule will cause irreparable harm

because they will face a "Hobson's choice" of having to eliminate or restrict their Safety Programs

or incur increased OSHA citations, penalties, and inspections if they continue using the programs

in contravention of the Rule.  Pls.' Mem. 3-4.

Defendants respond that Plaintiffs cannot establish irreparable harm because they have not

shown that the threat of alleged injury is real, substantial, and immediate, as opposed to speculative

or conjectural:

> The Rule incorporates only "the existing prohibition on retaliating against employees
> for reporting work-related injuries or illnesses that is already imposed on employers
> under section 11(c) of the OSH Act." In other words, with regard to retaliation, "the
> final rule does not change the substantive obligations of employers." The same
> primary conduct is proscribed both before and after the Rule's effective date. Such
> a rule cannot cause irreparable harm.  The harms Plaintiffs claim rest on legally
> incorrect premises. For instance, they claim that they will have to "eliminate or
> drastically reduce their safety incentive and/or post-accident drug testing programs."
> But as the preamble makes clear, there are numerous ways such programs can be
> structured to ensure that they do not violate well-established retaliation principles.
> The Rule, like section 11(c), leaves plenty of room to offer incentives that do not
> punish injury reporting, to drug test outside the injury-reporting context, and to drug
> test after injuries that might have been caused by drug use.
>
> Plaintiffs improbably claim that, if they must ensure that such programs do
> not retaliate, the "immediate and likely outcome[]" will be "increased employee
> injuries and even fatalities." That prediction is completely speculative. Plaintiffs cite
> no evidence to suggest that practices dependent on retaliation against workers who
> report injuries are somehow necessary to stem a flood of new injuries and fatalities.
> They merely offer summaries of their own records, which indicate that reported
> injuries decreased after company-wide workplace safety overhauls. That is not
> enough to establish that irreparable harm will result from whatever limited
> adjustments (if any) may be required by the Rule's incorporation of the existing
> prohibition on retaliation.
>
> To establish irreparable harm, Plaintiffs would have to establish that
> workplace practices that violate the Rule—*i.e.*, those that would dissuade a
> reasonable employee from reporting an injury, with no legitimate non-discriminatory
> basis, are currently preventing injuries and illnesses. Their declarations establish no

such thing. As mentioned, high-level reported-injury numbers do not distinguish between decreased injuries and decreased reporting. And the decreases Plaintiffs identify do not isolate the effect of any particular incentive or drug-testing policy. To take one example, Oxford Management states that reported injuries decreased after it implemented a "comprehensive safety and health program," which included an incentive program and "other changes." From so little information, it is impossible to know whether any decrease in reported injuries stemmed from (1) less reporting, (2) the incentive program, (3) the other components of the "comprehensive safety and health program," or (4) other manifestations of the company's increased safety focus. Oxford offers no reason to think that a similar incentive program, structured not to retaliate, would not achieve the same effect—whatever that may be. As for drug testing, Oxford maintained a blanket post-injury drug-testing policy throughout the period when it experienced "a high frequency and severity of workers compensation claims." The other Plaintiffs report similar patterns. In short, they have offered no credible evidence to suggest that they face any immediate threat of increased workplace injuries. "[S]imply alleging some possibility of irreparable injury does not support the issuance of a preliminary injunction, which is an extraordinary remedy never awarded as of right."

Nor is there any reason to suspect that the Rule will cause "increased OSHA inspections" or that any future inspection will be unauthorized. The Third Circuit case on which Plaintiffs rely for this argument, involved a challenge to the legality of an inspection procedure, not a challenge to a substantive rule.

Defs.' Resp. 34-36 (internal citations and footnote omitted).

The court agrees that Plaintiffs have not met their burden of establishing that they are likely to suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs submitted six declarations of witnesses on behalf of TEXO, Great American, ABC, OPM, OSC, and APC. Based on a survey of its members, Meloni McDaniel ("McDaniel"), the president and chief executive officer of TEXO, states that 95 percent of survey respondents have mandatory post-accident drug testing programs and 81 percent of survey respondents have safety incentive programs that condition benefits on reduced workplace injuries. McDaniel further states that 89 percent of survey respondents "believe" that these programs help their companies reduce workplace injuries, and 91 percent of survey respondents believe that workplace injuries will increase and their workplaces will

be less safe if they are forced to eliminate these programs.  In addition, McDaniel states that good will among employees will be lost if the programs are eliminated, and that all of the foregoing constitutes irreparable harm.

ABC similarly surveyed an unspecified number of its members.  Based on ABC's survey, ABC vice president Greg Sizemore ("Sizemore") states in his declaration that 82 percent of survey respondents have mandatory post-accident drug testing; 37 percent of survey respondents have safety incentive programs that condition benefits on reduced incidents of injuries, but the programs vary from company to company; and 92 percent of survey respondents believe that these programs reduce workplace injuries.  Sizemore states that 96 percent of survey respondents believe that the number of workplace incidents will increase, the workplace will be less safe, and good will among employees will be lost if the Rule is implemented and they are required to eliminate these programs or face increased OSHA citations, penalties, and inspections.

There is no factual basis in either declaration to support McDaniel's or Sizemore's conclusory statements regarding the unsupported beliefs of survey respondents.  Potential future injury based on unfounded fear and speculation of this sort is insufficient to establish a substantial threat that irreparable harm will occur if a preliminary injunction is not granted. *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) (citation and footnote omitted). Moreover, McDaniel and Sizemore reference percentages of respondents surveyed, but they do not state the total number of members surveyed from which the court can determine the number of survey respondents based on the percentages referenced.  As a result, the percentages referenced in their declarations do not

assist the court in understanding the magnitude of the harm alleged by Plaintiffs.[3]  Additionally,

neither McDaniels nor Sizemore attempts to explain why the existing safety programs used by

TEXO's and ABC's members cannot be modified to comply with the Rule.

The remaining declarations submitted by Plaintiffs are likewise insufficient to establish

irreparable harm.  Jason Cohen ("Cohen"), the executive vice president for the Strategic Comp

Division of Great American ("Strategic Comp"), states in his declaration that it is Strategic Comp's

belief that its Employer Safety Incentive Program significantly reduces the frequency and severity

of workplace accidents at its insureds' companies.  According to Cohen, this belief is based on

Strategic Comp's comparison of workplace injuries before and after its insureds implemented its

particular model of an Employer Safety Incentive Program, as well as the fact that most of Strategic

Comp's insureds have no safety incentive program in place before obtaining insurance from Strategic

Comp.

Cohen also notes that many of Strategic Comp's insureds have adopted drug-free and

alcohol-free policies, including mandatory drug and alcohol post-accident testing. Cohen

acknowledges that Strategic Comp does not have any specific data on the effect of these programs

on workplace safety but nevertheless states that "Strategic Comp believes these programs benefit our

insureds workplace safety initiatives by dramatically reducing the incidence of significant work-

related injuries." Pls.' App. 13.  Based on Strategic Comp's belief that its Employer Safety Incentive

Program and mandatory post-accident drug testing decrease the number and severity of workplace

---

[3] Sizemore states in his declaration that ABC has "nearly 21,000 members."  McDaniel does not specify the total number of members of TEXO, and neither Sizemore nor McDaniel states whether all of their members were surveyed or the total number of members surveyed.

injuries, Cohen concludes that Strategic Comp's insureds would be irreparably harmed because elimination or modification of these programs would result in a recurrence of workplace injuries. In addition, Cohen concludes that employee good will and relations will suffer.

For the reasons already explained, Strategic Comp's unsupported belief that (1) its insureds' use of mandatory post-accident drug testing programs dramatically reduce workplace injuries, and (2) workplace injuries will increase if its insureds are required to eliminate or modify such programs is insufficient to demonstrate irreparable harm. "[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. Thus, the district court can accept evidence in the form of deposition transcripts and affidavits." *Sierra Club, Lone Star Chapter v. F.D.I.C*, 992 F.2d 545, 551 (5th Cir. 1993) (citations omitted). Despite this relaxed standard, "courts have shown appropriate reluctance to issue such orders where the moving party substantiates his side of a factual dispute on information and belief." *Marshall Durbin Farms, Inc. v. National Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971). Thus, while the court can consider Plaintiffs' declarations and hearsay contained in those declarations, their unsupported belief that irreparable harm will result if the two types of safety programs are eliminated or modified will not support issuance of a preliminary injunction. *See id.*

Further, although Strategic Comp strongly believes that its own Employer Safety Incentive Program model reduces workplace injuries, Cohen acknowledges that not all safety incentive programs are created equal. Pls.' App. 4. According to Cohen, to be "truly effective," safety incentive programs must follow certain criteria advocated by Strategic Comp. This acknowledgment by Strategic Comp undercuts Plaintiffs' request for a nationwide injunction of the Rule based on the

**Memorandum Opinion and Order - Page 10**

alleged overall efficacy of safety incentive programs generally.  Simiarly, evidence that APC had a "significantly less effective comprehensive safety and health program that included an [e]mployer [s]afety [i]ncentive [p]rogram and a post-accident drug and alcohol program" before implementing Strategic Comp's Employer Safety Incentive Program model may provide some proof that the safety incentive program advocated and implemented by Strategic Comp's insureds is effective in reducing workplace injuries, but it does not support Plaintiffs' contention that a nationwide injunction is necessary because elimination or modification of all safety incentive programs, including less effective ones, will result in increased injuries.

Cohen also acknowledges that, to be effective, its Employer Safety Incentive Program must be implemented in combination with other changes, including a company's commitment to culture change, management support, and "broader focus on accountability—i.e., an organizational focus on making sure that: employees do things the right way; managers properly train and monitor their employees; incidents are throughly investigated; and claims are reported on a timely basis." *Id.* at 4.  Cohen concludes that, "without Strategic Comp's Employer Safety Incentive Program, the other efforts [by its insureds with respect to safety] would be significantly less effective.  With the Employer Safety Incentive Program, [Strategic Comp] see[s] an immediate and dramatic improvement in our insureds' safety culture and a large reduction in the frequency of serious accidents" *Id*. at 12.  Cohen, however, fails to provide any factual basis for this conclusory statement to explain why Strategic Comp believes that its Employer Safety Incentive Program, as opposed to the other comprehensive safety changes made by its insureds, is responsible for its insureds' improved safety culture, improved employee relations, and decrease in workplace injuries.

**Memorandum Opinion and Order - Page 11**

The declarations submitted by Lynn Honsey ("Honsey"), Scott A. Ditcher ("Ditcher"), and David Zalesne ("Zalesne") on behalf of OPM, APC, and OSC, all of which have workers compensation insurance through Strategic Comp, likewise attribute a decrease in workplace injuries to their implementation of Strategic Comp's Employer Safety Incentive Program model. Each company acknowledges that they implemented this program as part of a "comprehensive safety and health program" that included "other changes," but they fail to explain why they believe that their companies' decrease in employee injuries and increase in employee morale is due to their implementation of Strategic Comp's Employer Safety Incentive Program model, rather than their other efforts to improve safety. *Id.* at 23, 24, 32, 39, 40. Like the other declarations submitted by Plaintiffs, Honsey, Ditcher, and Zalesne all state in their declarations that they believe elimination or modification of their safety incentive and mandatory post-accident drug testing programs will increase workplace injuries, but they do not explain why they cannot modify these programs to comply with the Rule, if it turns out they do not comply with the Rule as currently implemented. Plaintiffs dispute Defendants' contention that the Rule "leaves plenty of room" for employees to change their safety incentive and drug testing programs to comply with the Rule" and contend that this argument "is refuted by Plaintiffs' sworn declarations, the only evidence on point in the record, establishing that their safety programs cannot be effective without the provisions that the New Rule prohibits." Pls.' Reply 14 (internal quotation marks omitted) (quoting Defs.' Resp. 34). Contrary to Plaintiffs' assertion, none of the declarations submitted by them explains why these programs cannot be modified to comply with the Rule without losing their effectiveness.

The declarations submitted by Plaintiffs are similarly devoid of facts to support the belief that mandatory post-accident drug testing is more effective than other forms of drug testing or why the elimination or modification of post-accident drug testing would necessarily result in increased injuries if other drug testing remained in place.  For example, Ditcher states in his declaration that APC applies its routine mandatory post-accident drug testing as part of a larger drug testing program that includes pre-employment drug testing, "pre-employment screen[ing], randomized testing of all employees on a quarterly basis, and routine mandatory post-incident testing." *Id.* at 35.  He attributes, without explanation, APC's decrease in workplace injuries and employee morale solely to its mandatory post-incident drug testing rather than the other forms of drug testing used by APC. Ditcher's statement that he observed a "marked improvement in workplace safety" after ACP implemented routine mandatory post-incident drug testing also appears to be at odds with his statement that APC's prior comprehensive safety and health program, which included its drug-free program and mandatory post-incident drug testing, was significantly less effective than the new comprehensive safety and health program that APC implemented after obtaining insurance from Strategic Comp because, according to Ditcher, APC's drug-free program has been in place for the past fifteen years and has remained unchanged.

Moreover, the court agrees with Defendants that the Rule simply incorporates the existing prohibition on employer retaliation against employees for reporting work–related injuries and employer procedures that would discourage a reasonable employee from reporting an injury. Although the preamble to the Rule references the types of safety programs that Plaintiffs seek to maintain, the Rule does not include a per se ban on post-accident drug testing or incident-based safety incentive programs, and it is not entirely clear whether any of the programs currently

**Memorandum Opinion and Order - Page 13**

implemented by Plaintiffs would violate the Rule. Regardless, any such determination would require a case-by-case analysis of the specific programs used by Plaintiffs, and Plaintiffs' members and insureds because it is apparent from Plaintiffs' evidence that their safety programs share some similarities but are not identical in nature.

Plaintiffs contend that Defendants have not offered any evidence to show that employees will be harmed if the Rule is not implemented. Pls.' Reply 15. Plaintiffs misapprehend the parties' respective burdens. Plaintiffs, not Defendants, have the burden of proof as the movant seeking a preliminary injunction, and the burden of persuasion as to all four requirements for a preliminary injunction remains at all time with them. *See Canal Authority*, 489 F.2d at 573 (holding that the district court erred in shifting burden to the defendant because "[u]nder the proper view of the law, it should not have been incumbent upon the defendants to prove by a preponderance of the evidence, much less to a probable environmental and ecological certainty, that the interests they represent would suffer irreparable harm. The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff.") (internal quotation marks omitted).

Finally, Plaintiffs' argument that irreparable harm will result because there is an increased likelihood of inspections, citations, and severe penalties is without merit. Plaintiffs do not explain why they believe that employers will be subjected to inspections, citations, or penalties that exceed those under existing regulations, which Plaintiffs refer to as "duplicative" in nature. Pls.' Reply 13.

For all of these reasons, the court concludes that Plaintiffs have not demonstrated a likelihood of irreparable harm necessary for issuance of a preliminary injunction. Plaintiffs' evidence is based almost entirely on unsupported beliefs, unfounded fear, and speculation regarding the general efficacy of mandatory post-accident drug testing and incident-based safety incentive programs, which

are insufficient to establish a substantial threat that irreparable harm will occur if a preliminary

injunction is not granted.  *Emerson*, 270 F.3d at 262 (citation and footnote omitted). Moreover,

Plaintiffs' belief that elimination or modification of mandatory post-accident drug testing and

incident-based safety incentive programs will significantly and detrimentally affect workplace safety

does not account for the effect of the other safety measures that Plaintiffs acknowledge play a strong

role in workplace safety. This undermines Plaintiffs' evidence and argument that the reduction in

workplace injuries is a direct result of their implementing mandatory post-accident drug testing or

Strategic Comp's model of Employer Safety Incentive Program. It also undercuts their argument that

workplace injuries will significantly increase if they are not able to use mandatory post-accident drug

testing and incident-based safety incentive programs as currently implemented. Given the drastic and

extraordinary nature of a preliminary injunction, the court determines that such evidence is

insufficient to establish "*by a clear showing*" that irreparable harm will result if the court does not

enter a nationwide injunction enjoining implementation of the Rule at issue as requested by

Plaintiffs. *Mazurek*, 520 U.S. at 972 (citation omitted).

## B.      Effect on Public Interest

Plaintiffs devote only two short paragraphs to this requirement and contend that the public

interest will be furthered or served by entry of a preliminary injunction because "the evidence

provided by Plaintiffs establishes that Safety Program Components prevent injuries and illnesses

furthering the interests of both OSHA and the public." Pls.' Motion 33.  Plaintiffs further assert that

they have shown that the requested injunctive relief is necessary to protect the public interest,

whereas Defendants have not identified any harm to the public interest other than the supposed

viability of the broader  record[-]keeping rule." Pls.' Reply 15.

Defendants respond that the court need not consider the balance of equities or public interest because Plaintiffs have not established a likelihood of success on the merits or irreparable harm. Defendants contend that, even if considered, this requirement weighs in favor of denial of the requested injunctive relief because an injunction would cause the precise harm that OSHA studied and seeks to avoid by implementation of the Rule, that is, to prevent employers from taking action that would discourage or deter a reasonable employee from reporting work-related injuries or illnesses.  In addition, Defendants contend that "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." Defs.' Resp. 37 (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).

Plaintiffs' public interest argument is essentially the same as its irreparable harm argument, that is, implementation of the Rule will increase the likelihood of workplace injuries and reduce safety, whereas allowing employers to continue with their existing safety programs will reduce workplace injuries and safety.  As the court has already determined that Plaintiffs' evidence is insufficient to establish that irreparable harm will result if the court does not enter a nationwide injunction enjoining implementation of the Rule, Plaintiffs' related contention, that injunctive relief is necessary to protect the public interest because workplace injuries will increase if the Rule is implemented, likewise falls short.  Thus, the balancing of equities and public interest weigh against entry of the injunctive relief requested by Plaintiffs or, at best, is neutral.

As Plaintiffs have failed to meet their burden of establishing the first and third requirements for a preliminary injunction, the court need not address the second and fourth requirements necessary

for it to grant injunctive relief.  For the same reason, the court need not address the parties'
contentions regarding the appropriate scope of any preliminary injunction entered by the court.

## IV.    Conclusion

For the reasons herein stated, the court **denies** Plaintiffs' Motion for Preliminary Injunction
(Doc. 8) for failure to meet their burden with respect to the second and fourth requirements for a
preliminary injunction. That the court has denied injunctive relief requested by Plaintiffs is not a
comment or indication as to whether Defendants will ultimately prevail on the merits. This
determination is left for another day.

**It is so ordered** this 28th day of November, 2016.

_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge