**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| TEXO ABC/AGC, INC.; ASSOCIATED BUILDERS AND CONTRACTORS, INC.; NATIONAL ASSOCIATION OF MANUFACTURERS; AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS; GREAT AMERICAN INSURANCE COMPANY; ATLANTIC PRECAST CONCRETE, INC.; OWEN STEEL COMPANY; and OXFORD PROPERTY MANAGEMENT, LLC;<br><br>           Plaintiffs,<br><br>      v.<br><br>THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor; DAVID MICHAELS, Assistant Secretary of Labor, Occupational Safety and Health Administration; and OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, United States Department of Labor,<br><br>           Defendants. | Civil Action No. 3:16-cv-1998 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR,**
**IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

   I.   Statutory and Regulatory Background ........................................................... 3

   II.   Procedural Background................................................................................... 8

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT ............................................................................................................... 10

   I.   Plaintiffs Lack Standing to Challenge the Rule ............................................ 10

   II.   Defendants Are Entitled to Summary Judgment on Plaintiffs' OSH Act Claim .............. 13

   III.   Plaintiffs' Challenges to the Preamble Should Be Dismissed Because They Are Not Justiciable .............................................................................................. 22

        A.   Plaintiffs' Preamble Challenges Are Not Reviewable .......................... 22

        B.   Plaintiffs' Preamble Challenges Are Not Ripe .................................... 25

   IV.   Even If the Preamble Claims Are Subject to Review, the Court Should Grant Defendants Summary Judgment as to All of Them ............................................ 28

        A.   The Preamble's Interpretation of the Retaliation Bar Is Reasonable.................. 28

        B.   The Rule Does Not Affect State Workers' Compensation Laws ......................... 31

        C.   OSHA Gave Adequate Notice to Regulated Parties ............................................. 33

        D.   The Preamble's Discussions Are Not Arbitrary or Capricious............................. 37

        E.   The Rule Complies with the Regulatory Flexibility Act ...................................... 44

   V.   Plaintiffs' Challenges to Other Parts of the Rule Are Without Merit............................... 44

CONCLUSION.............................................................................................................. 45

# TABLE OF AUTHORITIES

## <u>Cases</u>

*10 Ring Precision, Inc. v. Jones*, 722 F.3d 711 (5th Cir. 2013).....................................................37

*Ace Sheeting v. OSHA*, 555 F.2d 439 (5th Cir. 1977)......................................................................33

*Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161 (D.C. Cir. 2007).........................33

*AFL-CIO v. Chao*, 409 F.3d 377 (D.C. Cir. 2005) .................................................................16, 29

*Alenco Comm., Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) ...........................................21, 28, 44

*Alto Dairy v. Veneman*, 336 F.3d 560 (7th Cir. 2003)....................................................................35

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001)............................................10

*Am. Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993)...............18

*Am. Petrol. Inst. v. EPA*, 661 F.2d 340 (5th Cir.1999) ..................................................................37

*Am. Petrol. Inst. v. EPA*, 684 F.3d 1342 (D.C. Cir. 2012)................................................22, 24, 25

*Assoc. Builders & Contractors of Texas, Inc. v. NLRB*, 2016 WL 3228174 (5th Cir. June 10, 2016) .........................................................................................................................................30

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979)....................................................................11, 12

*BNSF Railway Co. v. United States*, 775 F.3d 743 (5th Cir. 2015)...............................................28

*Brazos Elec. Power Co-op, Inc. v. Southwestern Power Admin.*, 819 F.2d 537 (5th Cir. 1987) . 33

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1996) .....................................23

*Brown v. Peterson*, 2006 WL 349805 (N.D. Tex. Feb. 3, 2006) ....................................................9

*Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006)...........................7, 12, 25

*Camp v. Pitts*, 411 U.S. 138 (1973) ...............................................................................................10

*Central & South West Servs., Inc. v. EPA*, 220 F.3d 683 (5th Cir. 2000) .............................25, 27

*Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177 (5th Cir. 1989).........................................................36

*Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984) ...................................................14, 17, 21, 29

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) .................................................................14, 21

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ......................................................10, 12, 13

*Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991) ................................................ 41

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ................................................ 14, 39

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................ 37, 39, 40, 42

*First American Discount Corp. v. CFTC*, 222 F.3d 1008 (D.C. Cir. 2000) ............................... 35

*Fleming Co. v. USDA*, 322 F.Supp.2d 744 (E.D. Tex. 2004)...................................................... 30

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ..................................................... 32

*Gulf Restoration Network v. McCarthy*, 783 F.3d 227 (5th Cir. 2015) .................................. 37, 43

*Hayward v. Dep't of Labor*, 536 F.3d 376 (5th Cir. 2008).......................................................... 38

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ......................................................... 18

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................................... 11

*Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191 (D.C. Cir. 1996) .. 23, 24, 26, 27

*La. Chemical Assoc. v. Bingham*, 550 F. Supp. 1136 (W.D. La. 1982) ...................................... 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................. 11

*Markle Interests, LLC v. U.S. Fish & Wildlife Service*, 2016 WL 3568093 (5th Cir. 2016).. 37, 38

*Martin v. PepsiAmericas, Inc.*, 628 F.3d 738 (5th Cir. 2010) ..................................................... 10

*McCardell v. U.S. Dep't of Hous. & Urban Dev.*, 794 F.3d 510 (5th Cir. 2015)......................... 10

*Milena Ship Mgmt. v. Newcomb*, 804 F. Supp. 859 (E.D. La. 1992)........................................... 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 37

*Mourning v. Family Publication Serv., Inc.*, 411 U.S. 356 (1973)......................................... 15, 29

*Nat'l Oilseed Processors Assoc. v. OSHA*, 769 F.3d 1174 (D.C. Cir. 2014) .............................. 36

*Nat'l Tele. Co-op Assoc. v. FCC*, 563 F.3d 536 (D.C. Cir. 2009) ............................................... 44

*NRDC v. EPA*, 559 F.3d 561 (D.C. Cir. 2009) ......................................................... 22, 23, 24, 25

*NRDC v. EPA*, 571 F.3d 1245 (D.C. Cir. 2009) ........................................................................ 23

*Peoples Nat'l Bank v. Comptr. of the Currency*, 362 F.3d 333 (5th Cir. 1999) .......................... 24

*Perez v. Postal Service*, 76 F. Supp. 3d 1168 (W.D. Wash. 2015)............................................. 19

*Personal Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540 (D.C. Cir. 1995) ............ 41

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) ............................................................. 10

*Redeemed Christian Church of God v. USCIS*, 2016 WL 3017135 (S.D. Tex. May 26, 2016) ... 10

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................................... 12

*Stuttering Found. of Am. v. Spring*, 498 F. Supp. 2d 203 (D.D.C. 2007) ...................................... 10

*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014) .................................................. 11, 13

*Texas Clinical Labs., Inc. v. Sebelius*, 612 F.3d 771 (5th Cir. 2010) ........................................... 37

*Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ..................... passim

*Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313 (5th Cir. 2001) ............................. 15

*Texas Pipeline Ass'n v. FERC*, 661 F.3d 258 (5th Cir. 2011) ...................................................... 17

*Texas v. Dep't of the Interior*, 497 F.3d 491 (5th Cir. 2007) .................................................. 16, 27

*Texas v. EEOC*, 827 F.3d 372 (5th Cir. 2016), *withdrawn and remanded*, 838 F.3d 511 (Mem.) (5th Cir. Sept. 23, 2016) ........................................................................................................ 23, 28

*Texas v. United States*, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016) ....................................... 23

*U.S. Telecom. Ass'n v. FCC*, 2016 WL 3251234 (D.C. Cir. 2016) .............................................. 36

*United Steelworkers v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1980) ......................................... 15, 33

*United Steelworkers v. Schuylkill Metals Corp.*, 828 F.2d 314 (5th Cir. 1987) ......... 18, 33, 34, 35

*United Steelworkers, AFL-CIO v. St. Joe Resources*, 916 F.2d 294 (5th Cir. 1990).............. 18, 19

*Whirlpool Corp. v. Marshall*, 445 U.S. 1 (1980) ......................................................................... 14

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ............................................................................... 11

*Younger v. Harris*, 401 U.S. 37 (1971) ........................................................................................ 13

## **Statutes**

16 U.S.C. § 2904 .......................................................................................................................... 31

25 U.S.C. § 293b ........................................................................................................................... 31

29 U.S.C. § 651 ....................................................................................................................... 15, 41

29 U.S.C. § 653 ............................................................................................................. 17, 32, 33, 45

iv

29 U.S.C. § 655 ................................................................................................ 31

29 U.S.C. § 657 ........................................................................................... passim

29 U.S.C. § 658 ............................................................................................ 3, 20

29 U.S.C. § 660 .......................................................................... 6, 14, 17, 27

29 U.S.C. § 673 ........................................................................................... passim

35 U.S.C. § 209 ................................................................................................ 31

5 U.S.C. § 553 ................................................................................................. 33

5 U.S.C. § 706 .......................................................................................... 37, 41, 43

50 U.S.C. § 4329 ............................................................................................. 31

**Other Authorities**

Conf. Rep. No. 91-1765, 91st Cong., 2d Sess. (1970) ................................................. 20

David Michaels, Ass't Sec., *Memorandum for Regional Administrators*, Aug. 14, 2014 ............ 6

Dorothy Dougherty, Deputy Ass't Sec., *Delay of Enforcement of the Employee Rights Provisions Under 29 CFR 1904.35*, July 13, 2016 .................................................................... 8

Glenn Pransky, et al., *Under-Reporting of Work-Related Disorders in the Workplace: A Case Study and Review of the Literature*, 42 Ergonomics 171 (1999) ............................................... 40

H.R Rep. No. 91-1291, 91st Congress., 2d Sess. (1970) .............................................. 41

Hester J. Lipscomb, et al., *Safety, Incentives, and the Reporting of Work-Related Injuries Among Union Carpenters: "You're Pretty Much Screwed If You Get Hurt at Work"*, 56 Am. J. Industrial Medicine 389 (2013) ................................................................................. 40

Richard E. Fairfax, Deputy Ass't Sec., Memorandum to Regional Administrators, *Employer Safety Incentive and Disincentive Policies and Practices*, Mar. 12, 2012 .............. 6, 36, 39, 41

**Regulations**

29 C.F.R. § 1904.35 ............................................................................. 6, 8, 44, 45

29 C.F.R. § 1904.36 ........................................................................................ 27

29 C.F.R. § 1910.1025 ..................................................................................... 18

29 C.F.R. part 1904 ......................................................................................... 4

66 Fed. Reg. 6050 (Jan. 19, 2001) ....................................................................... 41

*Improve Tracking of Workplace Injuries and Illnesses*, 81 Fed. Reg. 29624 (May 12, 2016) ................................................................................................................................. passim

Proposed Rule, *Improve Tracking of Workplace Injuries and Illnesses*, 78 Fed. Reg. 67254 (Nov. 8, 2013) .......................................................................................................................... 4

Supplemental NPRM, *Improve Tracking of Workplace Injuries and Illnesses*, 79 Fed. Reg. 47605 (Aug. 14, 2014) ................................................................................................ passim

## INTRODUCTION

To protect worker safety, Congress has charged the Occupational Safety and Health Administration ("OSHA") with ensuring that employers keep accurate records of workplace injuries and illnesses.   Using this authority, OSHA recently promulgated a Recordkeeping Modernization Rule, which requires employers to submit injury and illness data to OSHA electronically.   During the Modernization Rule's period of notice and comment, numerous commenters raised concerns that the Modernization Rule would cause employers to adopt policies and practices that could discourage workers from reporting workplace injuries.   After soliciting additional feedback on those policies and practices, OSHA promulgated the anti-retaliation provision that Plaintiffs are now challenging.   The anti-retaliation provision simply prohibits employers from retaliating against workers for reporting injuries—a prohibition that OSHA determined the Modernization Rule required in order to be fully effective.   Plaintiffs allege that the provision and the Rule's preamble violate several provisions of the Administrative Procedure Act ("APA").   The Court denied Plaintiffs' request for a preliminary injunction, concluding that the Rule does not harm them, as it merely incorporates a preexisting standard of conduct that Plaintiffs were already required to follow.   The Court should now dismiss the Complaint or grant summary judgment for Defendants.   Plaintiffs lack standing to challenge the Rule, because it does not harm them; Plaintiffs' challenges to the preamble are neither reviewable nor ripe; and none of their claims is correct on the merits.

At the very outset, Plaintiffs lack standing to challenge the Rule, because the Rule does not impose any new obligations on them, it simply incorporates a pre-existing statutory ban on retaliating against employees who report workplace injuries.   Because employers' obligations are no different than before, the Rule has not injured them at all.   Nor can Plaintiffs satisfy the specific

1

standing requirements for pre-enforcement review.  They cannot show that they intend to engage in activity that would violate the Rule's anti-retaliation provision, because the OSH Act already proscribed the same activity.  And they have not shown that enforcement against them is imminent: they have not even alleged, much less carried their burden to demonstrate, that OSHA has enforced the rule or taken any investigative or enforcement steps against Plaintiffs or their members or insureds.  Lacking any new compliance burdens and lacking any threat of imminent enforcement, Plaintiffs do not have the injury in fact necessary for this Court to have jurisdiction under Article III.

On the merits, Plaintiffs maintain that OSHA's expansive recordkeeping authority is cabined by a separate statutory bar on retaliation—section 11(c) of the OSH Act.  But nothing about section 11(c) purports to restrict OSHA in carrying out its recordkeeping duties.  Congress explicitly instructed OSHA to do whatever it deems "necessary" to ensure accurate injury records. And the Fifth Circuit has expressly held that section 11(c) is no bar to regulations that impose overlapping remedies.  *See United Steelworkers, AFL-CIO v. St. Joe Resources*, 916 F.2d 294, 298-99 (5th Cir. 1990).  Plaintiffs offer no reason why that authority should be limited simply because recordkeeping goals dovetail with anti-retaliation goals.

Apart from their challenge to OSHA's ability to enact an anti-retaliation rule in the first place, Plaintiffs also challenge statements in the Rule's preamble about how long-established retaliation principles could apply to certain workplace policies.  These statements are not reviewable at all, because they do not purport to bind the agency or regulated parties, but rather speak in hypothetical and conditional terms.  These claims are also not ripe, because the preamble's abstract discussions have not yet been applied to any concrete set of facts.

In any case, Plaintiffs' preamble challenges are meritless.  OSHA provided explicit notice that it was considering a regulatory ban on retaliation in the recordkeeping context; it asked commenters to identify specific workplace practices that might discourage injury reporting, and it received voluminous comments about two of them: injury-based incentive programs and post-injury drug testing.  In promulgating the final Rule, OSHA discussed how the anti-retaliation provision might apply to those and other potentially retaliatory practices.  That discussion relied upon ample evidence, in many forms, from many sources.  It responded to counterarguments, struck a balance between a variety of competing interests, and articulated reasonable conclusions about which types of practices might violate the Rule.

As a result, the Court should either dismiss the Complaint or grant Defendants summary judgment as to all claims.

## BACKGROUND

### I.       Statutory and Regulatory Background

The Occupational Safety and Health Act of 1970 ("OSH Act"), Pub. L. No. 91-596, *codified at* 29 U.S.C. § 651 *et seq.*, created OSHA and established a statutory framework for tracking and regulating workplace health and safety.  The Act delegates the Secretary of Labor, through OSHA, broad authority to "prescribe such rules and regulations as [it] may deem necessary to carry out [its] responsibilities" under the statute.  29 U.S.C. § 657(g)(2).  All "regulations prescribed pursuant to this chapter" can be enforced by investigating violations and issuing citations.  *Id.* § 658(a).

One of OSHA's primary responsibilities is to ensure that employers collect and report accurate data on workplace injuries and illnesses.  The Act requires OSHA to "compile accurate

statistics on work injuries and illnesses." *Id.* § 673(a).[1]   To that end, the Act directs OSHA to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries." *Id.* § 657(c)(2).[2]

In pursuit of those statutory goals, OSHA has long required employers to keep records of work-related injuries and illnesses at their establishments. *See* 29 C.F.R. part 1904.  On November 8, 2013, OSHA issued a Notice of Proposed Rulemaking ("NPRM") to amend its recordkeeping rules to require certain employers to periodically submit injury and illness data to OSHA electronically. *See* Proposed Rule, *Improve Tracking of Workplace Injuries and Illnesses*, 78 Fed. Reg. 67254 (Nov. 8, 2013).  Upon receiving that data, OSHA proposed "to make the injury and illness data public," to allow "employees and potential employees, researchers, employers, and workplace safety consultants, to use and benefit from the data." *Id.* at 67276.

OSHA received numerous comments on this proposal, both in written form and at a public meeting held on January 9 and 10, 2014.  Commenters expressed concerns that "the increased visibility of establishment injury and illness data under the proposal would lead to an increase in the number of employers who adopt practices that have the effect of discouraging employees from reporting recordable injuries and illnesses."   Supplemental NPRM, *Improve Tracking of Workplace Injuries and Illnesses*, 79 Fed. Reg. 47605, 47606 (Aug. 14, 2014) ("Supplemental NPRM").  OSHA was therefore concerned "that the accuracy of the data collected under the new proposal could be compromised if employers adopt these practices." *Id.*

---

[1] Similarly, OSHA must "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics." 29 U.S.C. § 673(a).

[2] The Act similarly requires employers to "keep and preserve, and make available to [OSHA] such records regarding his activities" as OSHA "may prescribe by regulation as necessary or appropriate for the enforcement of this chapter or for developing information regarding the causes and prevention of occupational accidents and illnesses." 29 U.S.C. § 657(c)(1).

To address that concern, OSHA issued a Supplemental NPRM to expand its proposed changes to the recordkeeping rules. *See id* at 47605 (summarizing). Specifically, OSHA considered amending the proposed rule to

(1) require that employers inform their employees of their right to report injuries and illnesses;
(2) require that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome; and
(3) prohibit employers from taking adverse action against employees for reporting injuries and illnesses.

*Id.* at 47606. To aid its consideration of the proposed anti-retaliation provision, OSHA asked commenters to identify employer practices that had the effect of discouraging injury reporting. *See, e.g.*, *id.* at 47607 ("describe any techniques, practices, or procedures used by employers that you are aware of"); *id.* at 47608 ("What kinds of adverse actions might lead an employee to decide not to report an injury or illness?"). It also asked commenters to identify any practices that might discourage reporting to some degree, but that should nonetheless be excluded from the anti-retaliation provision "to ensure that employers are able to run an effective workplace safety program." *Id.* at 47608. OSHA noted several types of potentially retaliatory practices in the Supplemental NPRM itself. *See, e.g.*, *id.* ("requiring an employee who reported an injury to undergo drug testing where there was no reason to suspect drug use"). Recent public guidance had similarly identified practices that OSHA considered potentially retaliatory. *See, e.g.*, Richard E. Fairfax, Deputy Ass't Sec., Memorandum to Regional Administrators, *Employer Safety Incentive and Disincentive Policies and Practices*, Mar. 12, 2012 ("Fairfax Memo") (describing "[i]ncentive programs that discourage employees from reporting their injuries").[3]

---

[3] *Available at* https://www.osha.gov/as/opa/whistleblowermemo.html. *See also* David Michaels, Ass't Sec., *Memorandum for Regional Administrators*, Aug. 14, 2014 ("Michaels Memo"), *available at* https://www.osha.gov/dcsp/vpp/policy_memo5.html.

On May 12, 2016, OSHA issued its final Rule. *See* OSHA, *Improve Tracking of Workplace Injuries and Illnesses*, 81 Fed. Reg. 29624 (May 12, 2016). The Rule contains the automatic-reporting provisions announced in the NPRM.[4] It also contains the three additional policies proposed in the Supplemental NPRM. First, the Rule requires employers to "establish a reasonable procedure for employees to report work-related injuries and illnesses promptly and accurately," and provides that "[a] procedure is not reasonable if it would deter or discourage a reasonable employee from accurately reporting." *Id.* at 29691, *amending* 29 C.F.R. § 1904.35(b)(1)(i). Second, the Rule requires employers to "inform each employee" that their employer cannot retaliate "against employees for reporting work-related injuries or illnesses." *Id.* at 29691, *amending* 29 C.F.R. § 1904.35(b)(1)(iii). Third, to ensure that employers do not discourage reporting, the Rule provides that employers "must not discharge or in any manner discriminate against any employee for reporting a work-related injury or illness." 82 Fed. Reg. at 29692, *amending* 29 C.F.R. § 1904.35(b)(1)(iv).

The Rule's preamble provides additional background on the anti-retaliation provision. It explains why OSHA concluded that, to ensure accurate recordkeeping, it was necessary to incorporate a preexisting statutory bar on retaliation into its final recordkeeping Rule. *See* 81 Fed. Reg. at 29671 (discussing 29 U.S.C. § 660(c)).[5] The Rule's anti-retaliation provision "does not

---

[4] Employers were already required to record the information covered by the Rule. *See* 29 C.F.R. § 1904.4.

[5] The preamble gives a number of reasons. For instance, it explains that "[s]ome employees may not have the time or knowledge necessary to file a section 11(c) complaint or may fear additional retaliation from their employer if they file a complaint." 81 Fed. Reg. at 29671. To ensure accurate injury reporting in those workplaces, the Rule "allows OSHA to issue citations to employers for retaliating" based on injury-reporting "even if no employee has filed a section 11(c) complaint." *Id.* The Rule thus addresses recordkeeping failures outside the narrow confines of section 11(c). In addition, the Rule allows the agency to "provide[] clear notice to employers of what actions are prohibited, which will help to prevent retaliatory acts from occurring in the first place. In other words, the final rule serves a preventive purpose as well as a remedial one." *Id.*

6

change the substantive obligations of employers." *Id.* Rather, as the preamble explains, it prohibits the same type of conduct as other anti-retaliation provisions in federal law: any "adverse action that 'could well dissuade' a reasonable employee from reporting a work-related injury or illness." 81 Fed. Reg. at 29672 (quoting *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006)).

Finally, the preamble discusses how the Rule's anti-retaliation provision might apply in a few general contexts. It explains that an employer who disciplines employees for reporting injuries might violate the *Burlington Northern* retaliation standard, if the discipline would dissuade a reasonable employee from reporting. 81 Fed. Reg. at 29672 ("[A]pproximately 50 percent of workers reported that [certain discipline] polic[ies] deterred reporting."). Similarly, it described certain types of drug-testing practices that "may inappropriately deter reporting," such as "drug testing that is designed in a way that may be perceived as punitive or embarrassing to the employee," or drug testing in response to an injury that "is very unlikely to have been caused by employee drug use." *Id.* at 29673.[6] Finally, the preamble acknowledges commenters' concerns that certain incentive programs—namely, those that reward employees for not reporting injuries— "have the potential to discourage reporting of work-related injuries and illnesses without improving workplace safety." *Id.* It therefore encourages employers to "carefully design[]" such programs, lists a few illustrative examples, but grants that "[t]he specific rules and details of . . . any given incentive program must be considered to determine whether" its application could violate the anti-retaliation provision. *Id.* at 29674 (quotation marks omitted). In general, the preamble makes clear that "the final rule prohibits employers only from taking adverse action

---

[6] For instance, the preamble states that, depending on the circumstances, "it would likely not be reasonable to drug-test an employee who reports a bee sting, a repetitive strain injury, or an injury caused by a lack of machine guarding or a machine or tool malfunction." 81 Fed. Reg. at 29673.

against an employee *because the employee reported* an injury or illness." *Id.* at 29672 (emphasis in original).  But "[n]othing in the final rule prohibits employers from disciplining employees for violating legitimate safety rules."  *Id.*

The original effective date for the anti-retaliation provision was August 1, 2016.  *See* 81 Fed. Reg. at 29624.  On July 13, 2016, however, OSHA decided to postpone the enforcement date until November 1, 2016, in order to develop guidance for itself and the regulated community as to how OSHA plans to enforce the Rule's anti-retaliation provision.  *See* ECF No. 13, at 2; Dorothy Dougherty, Deputy Ass't Sec., *Delay of Enforcement of the Employee Rights Provisions Under 29 CFR 1904.35*, July 13, 2016.  Following a query from the Court, OSHA postponed enforcement until December 1, 2016.  ECF No. 33.  Leading up to the enforcement date, OSHA has issued multiple pieces of enforcement guidance to inform workers and employers how OSHA interprets and plans to enforce the Rule.  *See, e.g.*, Memorandum from Dorothy Dougherty, Dep'y Ass't Sec., to Regional Admins., *Implementation of 1904.35(b)(1)(i) and (iv)*, at 5 (Oct. 19, 2016)[7]; Occ. Safety & Health Admin., *Improve Tracking of Workplace Injuries and Illnesses—Employee's Right to Report Injuries and Illnesses Free from Retaliation*.[8]

## II.      Procedural Background

Plaintiffs filed their Complaint on July 8, 2016, challenging all three additions to 29 C.F.R. § 1904.35(b)(1)—the requirements that injury-reporting procedures not be unduly burdensome, *id.* § 1904.35(b)(1)(i), that employers inform employees of their right to report injuries free from retaliation, *id.* § 1904.35(b)(1)(iii), and that employers not retaliate against employees for reporting, *id.* § 1904.35(b)(1)(iv).  ECF No. 1, at 3.  The Complaint raises several challenges to

---

[7] *Available at* https://www.osha.gov/recordkeeping/finalrule/interp_recordkeeping_101816.html.

[8] *Available at* https://www.osha.gov/recordkeeping/modernization_guidance.html.

the anti-retaliation provision.[9]   It contends that the anti-retaliation provision exceeds OSHA's statutory authority.   *See id.* at 31-32.   Plaintiff also challenge various aspects of the Rule's preamble.   They maintain that its discussion of particular employer practices was adopted with insufficient notice to regulated parties, *id.* at 32-33, that the preamble does not contain the analysis required by the Regulatory Flexibility Act, *id.* at 33, that the preamble's discussion of drug-testing policies impermissibly interferes with state workers' compensation statutes, *id.* at 33, and that its discussions of drug-testing and incentive policies were arbitrary and capricious, *id.* at 33-35.   On July 12, 2016, Plaintiffs moved for preliminary relief.   ECF No. 8.   *See also* ECF No. 23 (Defendants' opposition to preliminary injunction); ECF No. 29 (reply).   The Court denied Plaintiffs' motion for preliminary injunction on November 28, 2016, ECF No. 39.   It explained that the Rule's anti-retaliation provision does not harm the Plaintiffs, because "the Rule simply incorporates the existing prohibition on employer retaliation against employees for reporting work-related injuries."   *Id.* at 13.

## STANDARD OF REVIEW

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."   *Brown v. Peterson*, 2006 WL 349805, at *4 (N.D. Tex. Feb. 3, 2006).   "When challenging a 12(b)(1) motion, the party asserting jurisdiction bears the burden of proof."   *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 740 (5th Cir. 2010).   It is therefore Plaintiffs' burden to establish that the Court has jurisdiction over their claims. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

---

[9] The Complaint also purports to challenge the requirement that employers inform employees about their right to report injuries and the requirement that reporting procedures be reasonable.  But as explained below, in Part V, the Complaint generally does not explain why Plaintiffs think those provisions are illegal, and Plaintiffs did not seek preliminary relief as to those provisions.

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  For a challenge brought under the APA, "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law." *Redeemed Christian Church of God v. USCIS*, 2016 WL 3017135, at *10 (S.D. Tex. May 26, 2016) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The factual record thus consists of the administrative record, which contains the documents the agency considered in reaching its decision.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence.").  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Redeemed Christian Church of God*, 2016 WL 3017135, at *10 (quoting *Stuttering Found. of Am. v. Spring*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)).

## ARGUMENT

### I.      Plaintiffs Lack Standing to Challenge the Rule

To establish standing under Article III, plaintiffs must show that they have suffered an injury that is "(1) concrete, particularized, and actual or imminent (so-called injury 'in fact'); (2) fairly traceable to the challenged action, and (3) redressable by a favorable ruling." *McCardell v. U.S. Dep't of Hous. & Urban Dev.*, 794 F.3d 510, 517 (5th Cir. 2015).  For a future injury to satisfy this standard, the injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143, 1147 (2013).  "Allegations of *possible* future injury are not sufficient." *Id.* at 1147 (italics in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Plaintiffs bear the burden of establishing standing, and "at the summary judgment stage," they "can no longer rest on

mere allegations, but must set forth by affidavit or other evidence specific facts" to demonstrate that they face a "certainly impending" injury.  *Id.* at 1148-49 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

None of the Plaintiffs can satisfy this standard.  As the Court concluded in denying them a preliminary injunction, "the Rule simply incorporates the existing prohibition on employer retaliation against employees for reporting work-related injuries."  Op. 13; *see also id.* at 4 ("[P]rior to the Rule, employers were already under an obligation not to retaliate against employees for reporting work-related injuries.").  The Rule does not change the substantive obligations faced by Plaintiffs, their members, or their insureds.  There is nothing they could do before the Rule that they cannot do now.

Nor does any of the Plaintiffs face a credible threat of imminent enforcement.  For a plaintiff to have standing to bring a pre-enforcement challenge, the plaintiff must show that "the threatened enforcement [is] sufficiently imminent."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).  This requires a showing that the plaintiff "inten[ds] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  Pre-enforcement plaintiffs, like the Plaintiffs in this case, must therefore make two showings: (1) that they would like to do what the challenged provision proscribes, and (2) that if they do so, enforcement is likely.  *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15-16 (2010) (plaintiffs had given the proscribed support "before the enactment" of the material support prohibition, and "would provide similar support again if the statute's allegedly unconstitutional bar were lifted"; the government had charged "about 150 persons" under the provision already); *Babbitt*, 442 U.S. at 301-02 (plaintiffs had "actively engaged" in potentially

11

violative conduct in the past and alleged "an intention to continue" in the future); *Steffel v. Thompson*, 415 U.S. 452, 454, 459 (1974) (plaintiff "desired to return to" the proscribed activity, but had "been twice warned" that he would be prosecuted if he did so).

Plaintiffs cannot make either part of the required showing.  They cannot show that they intend to engage in a course of conduct proscribed by the Rule, unless they are prepared to argue that they intend to violate section 11(c) of the OSH Act, which the Rule incorporates.  *See* Op. 13; 81 Fed. Reg. at 29671.  And they cannot show that there is a credible threat of prosecution, because they have identified no prosecutable conduct, pattern of enforcement against similar entities, specific warnings from the agency, or imminent enforcement actions against themselves.  For Plaintiffs to make the showing required by *Driehaus*, they would have to set forth "specific facts," either "by affidavit or other evidence," *Clapper*, 133 S. Ct. at 1149, demonstrating that they plan to retaliate against an employee—that is, to take an action that "could well dissuade" a reasonable employee from reporting an injury, with no legitimate non-discriminatory basis, *Burlington Northern*, 548 U.S. at 57; *Postal Service*, 76 F. Supp. 3d at 1183—and that there is a credible threat that OSHA would then cite them for the retaliation.

Plaintiffs cannot make the *Driehaus* showing simply by pointing to existing incentive or drug-testing programs, because the Rule does not bar such programs outright, it simply prohibits employers from using them in a way that violates the pre-existing statutory retaliation standards. *See* 81 Fed. Reg. at 29674 ("The specific rules and details of . . . any given incentive program must be considered."); *id.* at 29672-73 ("[T]his final rule does not ban [post-injury] drug testing of employees" altogether.); Op. 14 (concluding that the applying the Rule will "require a case-by-case analysis of the specific programs"); Op. 13-14 (explaining that "it is not entirely clear whether *any* of the programs currently implemented by Plaintiffs would violate the Rule") (emphasis

added).  Rather, Plaintiffs would need to show that they intend to adopt or already have in place policies whose application could violate the retaliation principles laid out in *Burlington Northern* and *Postal Service*.

Similarly, bare citations to existing policies cannot establish that enforcement against the application of those policies is likely.  The Supreme Court has required more to establish standing for a pre-enforcement challenge.  *See, e.g.*, *Driehaus*, 134 S. Ct. at 2345-46 (relying on "a history of past enforcement . . . against the same conduct," a recent probable cause finding against the plaintiff, and the frequency of enforcement action in the past); *compare Younger v. Harris*, 401 U.S. 37, 42 (1971) (denying pre-enforcement review where there was no indication that prosecution was imminent or likely), *cited approvingly*, *Driehaus*, 134 S. Ct. at 2346.

Plaintiffs thus lack standing to challenge the Rule's anti-retaliation provision.  As this Court has explained, their purported injuries are "based almost entirely on unsupported beliefs, unfounded fear, and speculation."  Op. 14.  They have failed to carry their burden to "set forth by affidavit or other evidence specific facts" to demonstrate that they face a "certainly impending" injury.  *Clapper*, 133 S. Ct. at 1148-49.  The Court should therefore dismiss or grant summary judgment as to the entire Complaint.

## II. Defendants Are Entitled to Summary Judgment on Plaintiffs' OSH Act Claim

Even if Plaintiffs had standing, the Rule's anti-retaliation provision is a reasonable exercise of authority under the statute OSHA administers.  The OSH Act gives OSHA broad power to ensure that workplace injuries and illnesses are accurately reported.  *See* 29 U.S.C. §§ 657(c)(1), 657(c)(2), 657(g)(2), 673(a), 673(e).  To carry out that mandate, the Rule prohibits employers from discouraging injury reporting through retaliation.  As Congress and the agency have long recognized, such reporting is a cornerstone of workplace safety.  Plaintiffs argue that the Rule is

13

barred by a separate statutory provision banning retaliation generally. *See id.* § 660(c). But that provision does not purport to limit OSHA's otherwise-broad recordkeeping authority. And the Fifth Circuit has already held that the statutory retaliation provision is not an exclusive remedy. Plaintiffs therefore have raised no serious doubt as to the Rule's consistency with the statute.

At the outset, OSHA receives ample deference when interpreting the OSH Act in general, and in particular when exercising its recordkeeping authority. *See Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980) (OSH Act); *La. Chemical Assoc. v. Bingham*, 550 F. Supp. 1136, 1138-40 (W.D. La. 1982), *aff'd*, 731 F.2d 280 (5th Cir. 1984) (recordkeeping). "[A] court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority (that is, its jurisdiction)." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013). That deference involves two steps. "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.'" *Id.* (quoting *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 842 (1984)). Second, "'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).[10]

1. The OSH Act repeatedly instructs OSHA and employers to collect accurate information on injuries and illnesses. The Act directs the agency to "compile accurate statistics on workplace

---

[10] In their preliminary injunction motion, Plaintiffs appeared to maintain that *Chevron* might not actually apply, citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016). PI Mem. 14, 23-24. But *Encino* merely reiterated the established rule that "*Chevron* deference is not warranted where the regulation is 'procedurally defective,'" *id.* at 2125—in that case, where "the Department offered barely any explanation" for its rule and "said almost nothing" about a change in policy, *id.* at 2126; *see id.* at 2128 (Ginsburg, J., concurring) ("I write separately to stress that nothing in today's opinion disturbs well-established law."). Plaintiffs claim several procedural defects in this case, which are discussed below. But if the Court rejects those separate challenges, *Encino* provides no reason to withhold *Chevron* deference.

injuries and illnesses," and to "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics."  29 U.S.C. § 673(a). Employers, in turn, must "file such reports with the Secretary as he shall prescribe by regulation, as necessary to carry out his functions under this chapter," *id.* § 673(e), and they must "make, keep and preserve, and make available" information requested by the agency "regarding the causes and prevention of occupational accidents and illnesses," *id.* § 657(c)(1).  Accurate injury reporting is thus one of the Act's primary concerns.  *See also id.* § 651(b)(12).

The Act does not specify the means that OSHA can or cannot use to ensure accurate injury reporting.  Instead, it delegates broad rulemaking authority to the agency to accomplish the task. *See United Steelworkers v. Marshall*, 647 F.2d 1189, 1230 (D.C. Cir. 1980) ("A number of terms of the statute give OSHA almost unlimited discretion to devise means to achieve the congressionally mandated goal.").  For instance, the Act provides that OSHA "shall prescribe regulations requiring employers to maintain accurate [injury] records." *Id.* § 657(c)(2).  Even more expansively, the Act confers authority to "prescribe such rules and regulations as [the agency] may deem necessary to carry out [its] responsibilities under this chapter." *Id.* § 657(g)(2).  Such "lofty and expansive" delegations are analyzed under *Chevron* step two. *Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313, 321 (5th Cir. 2001) (such provisions "hardly constitute a series of specific commands," but rather "reflect congressional intent to delegate difficult policy choices to the [agency's] discretion"); *see Mourning v. Family Publication Serv., Inc.*, 411 U.S. 356, 369 (1973) (holding that agencies' interpretations of "necessary" in a statute must be sustained if "reasonably related to the purposes of the enabling legislation"); *AFL-CIO v. Chao*, 409 F.3d 377,

15

393 (D.C. Cir. 2005) (reviewing "necessary" standard at *Chevron* step two because it is "inherently discretionary").[11]

The Rule's anti-retaliation provision is plainly permissible under these provisions. It "requir[es] employers to maintain accurate [injury] records" by prohibiting actions that decrease the accuracy of injury records. 29 U.S.C. § 657(c)(2). And OSHA—to whose necessity determination the statute defers—has "deem[ed]" the Rule's prohibition on retaliation "necessary to carry out his responsibilit[y]" to require accurate injury records.[12] *Id.* § 657(g)(2); 81 Fed. Reg. 29671 (explaining the anti-retaliation provision's necessity). The Fifth Circuit has instructed courts to defer in these circumstances. *See Texas Office of Public Utility Counsel v. FCC ("TOPUC")*, 183 F.3d 393, 426 (5th Cir. 1999) ("[B]ecause the FCC has offered reasonable explanations of why it thinks the funds will still be 'sufficient' to support high-cost areas, we defer to the agency's judgment of what is 'sufficient.'").

---

[11] By contrast, in *Texas v. Dep't of the Interior*, 497 F.3d 491 (5th Cir. 2007) (cited PI Reply 1, 4-5), the court found a lack of agency authority based on a deeply dissimilar statutory scheme. Congress had enacted a detailed procedure to govern certain state-tribal gaming disputes, which imposed a specific and circumscribed role for the agency. *See id.* at 500 (describing the procedure). The Fifth Circuit ruled that the statutory provision imposing that circumscribed role did not implicitly empower the agency to devise an entirely new set of procedures to govern the same disputes. *Id.* at 502-03. That analysis might be apposite if OSHA were claiming authority under section 11(c). But it has never done that. Instead, as OSHA has made clear, its authority to prohibit retaliation in the recordkeeping context comes from its recordkeeping authorities. *See* 29 U.S.C. §§ 657(c)(1), 657(c)(2), 657(g)(2), 673(a), 673(e). The statute in *Department of Interior* contained nothing of the sort. And while the court did address the general Indian trust statutes, *see* 25 U.S.C. §§ 2, 9 ("The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs."), courts have long concluded that those provisions confer no authority to enact regulations "without a statutory antecedent." *Dep't of Interior*, 497 F.3d at 510. OSHA's recordkeeping authorities, by contrast, clearly do confer broad substantive authority to regulate recordkeeping.

[12] Those responsibilities also include "developing information" about workplace injuries, 29 U.S.C. § 657(c)(1), and "develop[ing] and maintain[ing] an effective program" to collect and analyze injury data, *id.* § 673(a).

2. Plaintiffs have argued that the Rule's anti-retaliation provision is not "authorized by Section 11(c) of the OSH Act." PI Mem. 16.  But OSHA's authority for that provision comes from its recordkeeping authorities, *see* 29 U.S.C. §§ 657(c)(1), 657(c)(2), 657(g)(2), 673(a), 673(e), not section 11(c), *see id.* § 660(c).

Moreover, nothing about section 11(c) cabins OSHA's discretion under its recordkeeping authorities.  PI Mem. 16-18.  The text of section 11(c) does not purport to limit OSHA's options for ensuring accurate recordkeeping.  Section 11(c) prohibits discrimination against employees for exercising "any right afforded by this chapter," *id.* § 660(c)(1), and provides an enforcement procedure whereby an employee may file a complaint, which OSHA may investigate and enforce in federal district court, *id.* § 660(c)(2).  The provision says nothing about recordkeeping.  It contains no limiting language of any kind.  In other words, it does not "directly sp[eak] to the precise question at issue" here—whether OSHA may exercise its recordkeeping authority where anti-retaliation and recordkeeping goals overlap.[13]  *Chevron*, 467 U.S. at 842.  When Congress wants to circumscribe an agency's discretion under an otherwise-capacious delegation, it knows how.  *See, e.g.*, 29 U.S.C. § 653(b)(4); *Texas Pipeline Ass'n v. FERC*, 661 F.3d 258, 261-62 (5th Cir. 2011) (rejecting agency interpretation of the phrase "any market participant," because a separate provision explicitly stated that the statute "shall not apply" to the market participant in question).

This leaves Plaintiffs with a heavy burden at *Chevron* step one.  They must show that section 11(c) "clearly"—but implicitly—bars OSHA from regulating retaliation against employees

---

[13] It also goes without saying that the Rule does not otherwise *conflict* with section 11(c), because the Rule does not disturb the broader set of rights and enforcement mechanisms available under section 11(c).  *See* 81 Fed. Reg. at 29671 (explaining that "[t]he final rule does not abrogate or interfere with the rights or restrictions contained in section 11(c)").

who report injuries, *even when necessary* to carry out OSHA's duty to require accurate injury reporting. *Am. Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1111 (D.C. Cir. 1993) (step-one resolution requires that Congress "'clearly' decided for or against the agency interpretation"). Plaintiffs can offer no compelling reason to read such a drastic limitation into the statute.

For one thing, the Fifth Circuit has already held that section 11(c) does not implicitly bar overlapping administrative action when OSHA deems it necessary. *See United Steelworkers, AFL-CIO v. St. Joe Resources*, 916 F.2d 294 (5th Cir. 1990). In *United Steelworkers*, the Court of Appeals considered whether OSHA could, through administrative citations, seek back pay for workers who suffered retaliation for exercising their rights under the agency's medical removal program.[14] Section 11(c)(2) already provided for back pay in federal district court under the same circumstances, so any administrative back pay award under the lead regulation would have duplicated the relief available under section 11(c). *See id.* at 298 (noting this argument). The Fifth Circuit rejected the same exclusivity argument Plaintiffs advance here. It explained that "the remedial purposes of OSHA would be undermined by a presumption of exclusivity" as to section 11(c). *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 n.23 (1983) (alteration omitted)). Reading section 11(c) to prohibit overlapping administrative remedies would have impaired a "central goal" of the medical removal program: "to secure worker-cooperation" in reporting lead-related health issues. *Id.* (quoting *United Steelworkers v. Schuylkill Metals Corp.*,

---

[14] *See United Steelworkers*, 916 F.2d at 296 (describing regulatory ban against reducing the "earnings, seniority," or "other employment rights and benefits" of employees who exercise their medical removal rights) (quoting 29 C.F.R. § 1910.1025(k)(2)(ii)). The medical removal program "protects workers who have high lead levels in their blood from continued exposure to lead in the workplace." *United Steelworkers*, 916 F.2d at 296. Under the program, "an employer must remove such workers to a workplace of lower lead exposure." *Id.* (citing 29 C.F.R. § 1910.1025(k)).

828 F.2d 314, 320 (5th Cir. 1987)).  Because OSHA deemed this overlap necessary to carry out one of its statutory mandates, the Fifth Circuit agreed that "Congress could not have intended to leave [OSHA] powerless to carry out the goals of the Act." *Id.* at 299; *see id.* ("We conclude that the Secretary's interpretation of her abatement authority is a reasonable reading of OSHA.  And we defer to the Secretary when her interpretation is reasonable.").

The same holds true here.  When OSHA determines that a partially overlapping enforcement mechanism is necessary to carry out the Act's injury-reporting goals, nothing in section 11(c) requires exclusivity.[15]  It is not "powerless" to ensure accurate injury records—or to ensure the efficacy of the Modernization Rule—simply because an employee fails to file a timely complaint under section 11(c).  *Id.*

Plaintiffs have attempted to distinguish *United Steelworkers* by pointing out that it did not involve a pre-enforcement challenge to a regulation, but rather a defense against a citation issued for violating a regulation.  PI Mem. 17 n.11.  But the timing of the challenge makes no difference. In that case, as in this one, the exact same contention—that section 11(c)'s remedies were exclusive—could have just as easily been used to challenge OSHA's authority to *enact* the retaliation ban as it could have been used to challenge OSHA's authority to *enforce* that ban. Regardless of the timing, that contention is answered by the Fifth Circuit's conclusion that section 11(c) does not prevent OSHA from enforcing partially overlapping regulatory bans on retaliation. *Compare United Steelworkers*, 916 F.2d at 298 (rejecting "exclusivity" argument as to section 11(c)(2)), *with* PI Mem. 5 (arguing that section 11(c)(2) *does* "establish[] an exclusive process").

---

[15] The overlap is only partial because section 11(c) protects more rights using more remedies than the Rule's anti-retaliation provision.  As the preamble explains, section 11(c) provides a "broader range of equitable relief and punitive damages."  81 Fed. Reg. at 29671.  It also applies to all rights in the OSH Act, *see Perez v. Postal Service*, 76 F. Supp. 3d 1168, 1184 (W.D. Wash. 2015), not just the right to report injuries and illnesses.

19

Plaintiffs further claim that OSHA has enacted what Plaintiffs call "a new enforcement process." PI Reply 1; *see id.* at 3 ("[T]he New Rule creates an entirely new enforcement scheme."); *id.* at 4 (describing a "newly created OSHA enforcement process").  It is not clear what Plaintiffs mean by this.  The challenged portion of the Rule simply contains a ban on one type of retaliation. As with all of OSHA's regulations, the OSH Act makes this regulation enforceable through the citation process.  *See* 29 U.S.C. § 658(a) (authorizing citations for violations "of any regulations prescribed pursuant to this chapter").  This is not a new enforcement process; it is the exact same enforcement process that attaches to every regulation OSHA has ever promulgated.  And OSHA did not enact it anew in this Rule; the process comes from the statute.  The only question, then, is whether OSHA had authority to enact the underlying ban.  If it did, there is no question OSHA can enforce the ban through citations.

Plaintiffs have cited one piece of legislative history, which they claim establishes that OSHA was not meant to enforce section 11(c), in its entirety, through administrative citations.  *See* PI Mem. 6-7, 17 (citing Conf. Rep. No. 91-1765, 91st Cong., 2d Sess. (1970)).  But that is not what the Rule does.  It merely overlaps in the limited context where the Act's anti-retaliation goals dovetail with the Act's injury-reporting goals.  In that context, OSHA has determined that existing statutory procedures are not sufficient to ensure accurate injury records.  *See* 81 Fed. Reg. at 29671. The legislative history says nothing about that situation, where effectuating a *separate* statutory mandate necessitates some overlap.

Nor does the treatise Plaintiffs cited in their preliminary injunction brief.  *See* PI Mem. 7 (only discussing enforcement of section 11(c)(1) writ large, without mentioning what happens when other statutory goals partially overlap).  Indeed, the treatise describes the Conference Report to "requir[e] that the Secretary seek . . . back pay . . . in the district court, not through the

administrative process." *Id.* That may be true as to section 11(c) generally, but it cannot be true when specific programs are best served by allowing the Secretary to seek back pay through citations, without contradicting the specific holding of *United Steelworkers*: that the Secretary could seek back pay through a citation, despite the fact that section 11(c) provided for back pay in district court.

In short, while the OSH Act is explicit and repetitive about OSHA's authority to ensure accurate injury records, "the statute is silent," and at the very least "ambiguous[,] with respect to the specific issue" presented here: whether OSHA, after making a reasonable necessity determination, can use a regulation to proscribe the retaliation that deters reporting. *City of Arlington*, 133 S. Ct. at 1868 (quoting *Chevron*, 467 U.S. at 843). "Congress knows to speak in plain terms when it wishes to circumscribe" agency discretion. *Id.* It has clearly not done so here. Plaintiffs' claim that section 11(c) excludes all overlapping prohibitions therefore fails under step one of *Chevron*.

3. Because agencies receive *Chevron* deference when interpreting "a statutory ambiguity that concerns the scope of the agency's statutory authority," *id.*, the Rule's anti-retaliation provision must be reviewed under *Chevron* step two. Plaintiffs have never argued that the anti-retaliation provision fails at step two. *See* PI Mem. 16-18 (entire argument against OSHA's authority to enact an anti-retaliation rule); PI Reply 2-5 (*Chevron* step one only). At any rate, no such argument is possible. Review at *Chevron* step two is "narrow and deferential." *Alenco Comm., Inc. v. FCC*, 201 F.3d 608, 620 (5th Cir. 2000); *infra* Part IV.A (responding to step-two claim). OSHA cogently explained why its recordkeeping rule needed to include an anti-retaliation provision. *See* 81 Fed. Reg. at 29671. Numerous commenters had expressed concern that the Modernization Rule's new transparency would spur more employers to "adopt practices that have

the effect of discouraging employees from reporting recordable injuries and illnesses."
Supplemental NPRM, 79 Fed. Reg. at 47606; *see id.* at 29625 (describing Rule's transparency
provisions).  If that happened, as OSHA explained, "[s]ome employees may not have the time or
knowledge necessary to file a section 11(c) complaint or may fear additional retaliation from their
employer if they file a complaint."  81 Fed. Reg. at 29671.  It also explained that the provision
would "provide[] clear notice to employers of what actions are prohibited, which will help to
prevent retaliatory acts from occurring in the first place."  *Id.*  This explanation more than satisfies
"the reasonableness requirement of *Chevron* step-two."  *TOPUC*, 183 F.3d at 412.

## III.  Plaintiffs' Challenges to the Preamble Should Be Dismissed Because They Are Not Justiciable

The rest of Plaintiffs' claims do not challenge the anti-retaliation provision itself.  Instead,
they challenge statements in the preamble about how the provision might apply to certain
workplace policies.  *See* PI Mem. 18-28 (incentive program and drug testing claims).  The Court
should not reach the merits of these preamble claims, because the challenged preamble statements
impose no new binding obligations, and even if they did, their application to the facts of specific
workplace policies is too uncertain for pre-enforcement review.

### A.  *Plaintiffs' Preamble Challenges Are Not Reviewable*

In the rulemaking context, preambles are generally not subject to judicial review.  As the
D.C. Circuit has explained, "[w]hile preamble statements may in some unique cases constitute
binding, final agency action susceptible to judicial review, this is not the norm."  *NRDC v. EPA*,
559 F.3d 561, 564-65 (D.C. Cir. 2009) (quotation marks omitted); *accord Am. Petrol. Inst. v. EPA*,
684 F.3d 1342, 1353-54 (D.C. Cir. 2012).  "The question of reviewability hinges upon whether
the preamble has independent legal effect, which in turn is a function of the agency's intention to
bind either itself or regulated parties."  *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d

1191, 1223 (D.C. Cir. 1996).  In evaluating whether an agency intends a preamble to be binding, courts generally give "decisive weight to the agency's [word] choice between 'may' and 'will'"; the former is "nonbinding and unreviewable." *NRDC*, 559 F.3d at 565 (quoting *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537-38 (D.C. Cir. 1996)).

This is not the "unique case[]" in which preamble statements are "susceptible to judicial review." *NRDC*, 559 F.3d at 564-65.  The preamble discusses drug testing and incentive programs in purely conditional terms.  *See* 81 Fed. Reg. at 29673 (describing when "requiring the employee to be drug tested *may* inappropriately deter reporting"); *id.* (listing scenarios where "it would *likely* not be reasonable to drug-test an employee"); *id.* ("[I]f the [incentive] programs are not structured carefully, they have the *potential* to discourage reporting."); *id.* (describing incentive programs that "*may* be prohibited by section 11(c)" and thus by the Rule's anti-retaliation provision) (emphases added).  These statements speak "in the conditional, suggesting that events in the various categories 'may'" violate the Rule "provided that all other requirements of the [R]ule are met." *NRDC*, 559 F.3d at 565.[16]  Indeed, the types of programs discussed in the preamble can only violate the Rule when they meet all the retaliation elements—protected activity, "materially adverse" action, and causation—laid out in *Burlington Northern*.  *See* 81 Fed. Reg. at 29672.[17]

---

[16] Plaintiffs have attempted to distinguish *NRDC* by pointing out that in a *different* case, challenging a *different* regulation, which obviously involved a *different* preamble, the D.C. Circuit held that less equivocal preamble statements were reviewable.  *See* PI Reply 7 (citing *NRDC v. EPA*, 571 F.3d 1245 (D.C. Cir. 2009)).  It is not clear why this is "[i]ronic[]," *id.*, why it matters that the two disputes were "between the same parties," *id.*, or how Plaintiffs think the second case's reviewability analysis relates to the present case.  Plaintiffs also describe *Texas v. United States*, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016), as being "[t]o the same effect" as the latter *NRDC* case, PI Reply 7, even though *Texas* did not involve a challenge to—or discussion of—a preamble.  Moreover, that opinion's finality analysis relied extensively on the Fifth Circuit's now-withdrawn opinion in *Texas v. EEOC*, 827 F.3d 372 (5th Cir. 2016), *withdrawn and remanded*, 838 F.3d 511 (Mem.) (5th Cir. Sept. 23, 2016).

[17] *See also Postal Service*, 76 F.Supp.at 1183 (employer may "defend by showing that it possessed a legitimate, non-discriminatory reason for taking the adverse actions").

Moreover, the preamble acknowledges that OSHA will have to proceed case by case. *See* 81 Fed. Reg. at 29674 ("The specific rules and details of . . . any given incentive program must be considered."); *id.* at 29672-73 (acknowledging that "drug testing of employees may be a reasonable workplace policy in some situations" and making clear that "this final rule does not ban [post-injury] drug testing of employees" altogether); *see also NRDC*, 559 F.3d at 565 (rejecting reviewability because of "equivocal" statements "that certain events are to be evaluated on a case-by-case basis") (quotation marks omitted). This Court has likewise concluded that applying the Rule will "require a case-by-case analysis of the specific programs." Op. 14. "By acknowledging it had not yet, but would need to, carefully evaluate the effect of" particular incentive programs and drug-testing policies, "the [agency] made clear it was not making a final decision." *Am. Petrol. Inst.*, 684 F.3d at 1354 (quotation marks omitted).

The preamble thus does not independently impose any binding rules. It simply discusses how general retaliation principles may apply in particular workplace contexts. Because "[t]he question of reviewability hinges" on "the agency's intention[s]," *Kennecott*, 88 F.3d at 1223, OSHA's use of "conditional" and "equivocal" language in the preamble must be afforded "decisive weight." *NRDC*, 559 F.3d at 565 (holding preamble's list of illustrative examples not reviewable). This Court therefore "lacks subject matter jurisdiction" over Plaintiffs' preamble challenges. *Peoples Nat'l Bank v. Comptroller of the Currency*, 362 F.3d 333, 336 (5th Cir. 1999).

In their preliminary injunction briefing, Plaintiffs argued that two sentences in the preamble established independent, binding requirements, and are therefore subject to judicial review. *See* PI Reply 7-8. But those statements simply restate the Rule's basic retaliation standard. *See* 81 Fed. Reg. at 29674 ("It is a violation of paragraph (b)(1)(iv) for an employer to take *adverse action* against an employee for reporting a work-related injury or illness, whether or not such adverse

24

action was part of an incentive program.") (emphasis added); *id.* at 29673 ("[T]he final rule does prohibit employers from using drug testing (or the threat of drug testing) as a form of *adverse action* against employees who report injuries or illnesses.") (emphasis added).  To say that the Rule prohibits "adverse action" for reporting injuries or illnesses—as these two sentences do—is simply to say that the Rule prohibits retaliation, whose definition requires "adverse action" in response to a protected activity.  *See Burlington Northern*, 548 U.S. at 57; 81 Fed. Reg. at 29672 (incorporating *Burlington Northern*'s "adverse action" standard); Memorandum from Dorothy Dougherty, Dep'y Ass't Sec., to Regional Admins., *Implementation of 1904.35(b)(1)(i) and (iv)*, at 2-3, (Oct. 19, 2016).  In other words, to the extent these sentences describe binding rules, they are simply describing the rule contained in the enacted regulatory text.  *See* 29 C.F.R. § 1904.35(b)(1)(iv).  They add no new rules of their own.  *Cf. Am. Petrol. Inst.*, 684 F.3d at 1354 (refusing to review an "isolated statement" that "one could reasonably read as mandatory," because context showed that the statement did not add binding requirements to the enacted rule).

### B.    *Plaintiffs' Preamble Challenges Are Not Ripe*

Even if the preamble were reviewable, Plaintiffs' challenges are not ripe for review. "Typically, in the context of rulemaking," courts "wait until a rule has been applied before granting review."  *Central & South West Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000) (quotation marks omitted).  Here, the preamble identifies some general principles that may apply to incentive programs and drug testing, but it does not actually apply them to any particular case.  This abstraction cuts against ripeness.  *See NRDC*, 559 F.3d at 565 ("How [the agency] will use or rely on or interpret what it said in the preamble is uncertain.").  Any determinations about whether Plaintiffs' varying practices violate the Rule "would require a case-by-case analysis of the specific programs."  Op. at 14.

In neither of the challenged preamble discussions did OSHA spell out which factual scenarios would satisfy all the elements of retaliation, and thus lead to citations.  For instance, in the incentive-program context, the preamble does not address how significant a withheld benefit must be to constitute "materially adverse" action under *Burlington Northern*.  81 Fed. Reg. at 29672.  In the drug-testing context, the preamble does not lay out any categorical rules to determine when drug use "is likely to have contributed" to an injury, or what kind of drug testing is "designed in a way that may be perceived as punitive or embarrassing."  *Id.* at 29673.  These broad principles will be fleshed out in the concrete setting of actual enforcement.  OSHA has an institutional interest in using the experience it gains in enforcing the Rule to apply those principles in the case-by-case manner envisioned by the preamble.  *See, e.g.*, *id.* at 29674 ("The specific rules and details of . . . any given incentive program must be considered.").

These statements are thus too "hypothetical and non-specific" to be ripe for review outside of any concrete factual context.  *Kennecott*, 88 F.3d at 1223.  The preamble "is not crafted as a concrete rule that can be applied under identified circumstances."  *Id.*  Plaintiffs misstate the scope of the Rule—and the function of the preamble—when they claim that the preamble imposes a complete "ban" on "incident-based safety incentive programs and post-incident testing programs."  PI Mem. 2.  Those practices only violate the rule when they satisfy the standard elements of retaliation.  In fact, the preamble describes types of incentive programs and post-incident drug testing whose application likely would *not* constitute retaliation.  *Id.* at 29674 (non-retaliatory incentives); *id.* at 29673 (non-retaliatory drug testing).

As a result, Plaintiffs' claims of hardship are premature.  *See* PI Mem. 14-15.  The OSH Act already prohibited them from taking materially adverse action against employees for reporting injuries.  *See* 29 U.S.C. § 660(c); 29 C.F.R. § 1904.36.  Without knowing exactly how OSHA will

enforce the Rule's anti-retaliation provision, it is too early to judge whether—and if so, to what extent—Plaintiffs or their members will have to change any particular workplace policy. *Accord* Op. at 13-14 ("[I]t is not entirely clear whether any of the programs currently implemented by Plaintiffs would violate the Rule."). Because "any hardship that [Plaintiffs] could suffer is conjectural, . . . the issue is not ripe for review." *Central & South West Servs.*, 220 F.3d at 690. Judicial review should "await a concrete case where [a court] can prove the limits of the rule in the context of a live controversy involving actual events." *Kennecott*, 88 F.3d at 1223. As the D.C. Circuit has explained, "[u]nless and until [the agency] . . . invokes the preamble in an attempt to affect the outcome of a real dispute, there is little need for and no factual basis to inform our inquiry into its validity." *Id.*

In its preliminary injunction briefing, Plaintiffs argued that their preamble challenges were, in fact, ripe, because they were challenging the preamble statements "on purely legal grounds." PI Reply, ECF No. 29, at 6; *see also Central & South West Servs.*, 220 F.3d at 690 (recognizing an exception to the general ripeness rule against pre-enforcement challenges for "purely legal" claims); *Texas v. Dep't of the Interior*, 497 F.3d at 498. But the preamble challenges are not purely legal, because they rely on assumptions about how the Rule will apply to particular workplace programs. The Court does not have the facts of any particular policy before it, nor does it have a record of how OSHA has interpreted and enforced the Rule. Moreover, Plaintiffs cannot claim that their challenge is ripe because they will be "forced to modify their behavior in order to avoid future adverse consequences." PI Reply 6 (quoting *Texas v. Dep't of the Interior*, 497 F.3d at 498-99). As the Court has held, "it is not entirely clear whether *any* of the programs currently implemented by Plaintiffs would violate the Rule." Op. 13-14. Because the Rule adopts the same

27

retaliation standard as the OSH Act, the only behavior the Rule could force Plaintiffs to modify is one that already violates section 11(c).

Finally, Plaintiffs' reliance on *Texas v. EEOC*, 827 F.3d 372 (5th Cir. 2016), is misplaced. *See* PI Reply 6 (relying on *EEOC*).  The en banc Fifth Circuit subsequently withdrew the panel's decision and remanded the case to the district court.  838 F.3d 511 (Mem.) (5th Cir. Sept. 23, 2016).  The panel opinion is no longer good law.

## IV.  Even If the Preamble Claims Are Subject to Review, the Court Should Grant Defendants Summary Judgment as to All of Them

### A.  *The Preamble's Interpretation of the Retaliation Bar Is Reasonable*

Plaintiffs appear to challenge certain preamble statements under *Chevron* step two.  *See* Compl. at 31; PI Mem. 18-21; PI Reply 8.  In particular, they claim that it would be impermissible, under the OSH Act, for the agency to apply the anti-retaliation provision to post-injury drug testing, or injury-based incentive programs, without making certain very specific findings.  *See, e.g.*, PI Mem. 19 (arguing that Defendants were required to demonstrate "a significant widespread problem of inaccuracy"); Compl. at 30 (describing certain "required regulatory analyses").  These claims are wholly divorced from the actual scope of *Chevron*-step-two review, which is "narrow and deferential."  *Alenco*, 201 F.3d at 620.  The Fifth Circuit has instructed courts, at step two, to "remember the limitations of our task: The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."  *BNSF Railway Co. v. United States*, 775 F.3d 743, 755-56 (5th Cir. 2015).  Instead, a court may only reject an interpretation that is "manifestly contrary to the statute."  *TOPUC*, 183 F.3d at 410 n.10. If "the agency has offered reasonable justifications for its" conclusion, the inquiry is over.  *Id.* at

412; *see id.* (holding that two single-sentence reasons "suffice[d] to survive the reasonableness requirement of *Chevron* step-two").

OSHA "offered reasonable justifications for its" conclusion that applying the Rule to incentive programs and drug-testing policies was "necessary" for "compil[ing] accurate statistics on work injuries and illnesses" and "requiring employers to maintain accurate records." *TOPUC*, 183 F.3d at 412; 29 U.S.C. § 657(c)(2), 657(g)(2), 673(a). The agency concluded, based on copious evidence from numerous sources, that both types of practices could dissuade reasonable employees from reporting injuries. *See* 81 Fed. Reg. at 29673-74 (explanation for application to injury-based incentives); *id.* at 29672-73 (explanation for application to post-injury drug testing); *infra* Part IV.D (detailing evidence). The agency responded to counterarguments in the record and struck a balance between the competing interests at issue. *See id.* at 29674 (responding to "commenters [who] expressed satisfaction with existing safety incentive programs"); *id.* at 29673 (responding to "commenters [who] stated their belief that drug testing of employees is important for a safe workplace"). These determinations are clearly not "manifestly contrary to" anything in the statute. *Chevron*, 467 U.S. at 843. And "nothing in the statute defines" any of the operative standards—"necessary," "accurate," "effective," "appropriate"—in a way that precludes OSHA's interpretation. *TUPOC*, 183 F.3d at 412. Because OSHA "has offered reasonable explanations" for its necessity determination, the Court should "defer to the agency's judgment of what is '[necessary].'" *Id.* at 426; *see Mourning*, 411 U.S. at 369 (holding that necessity determinations must be sustained where the regulation is "reasonably related to the purposes of the enabling legislation"); *Chao*, 409 F.3d at 393 (explaining that "necessary" is "an inherently discretionary standard that clearly invites further definition by the Secretary"); *Fleming Co. v. USDA*, 322 F.Supp.2d 744, 756 (E.D. Tex. 2004) ("The court's review under *Chevron*'s second step becomes

29

more deferential if the statute at issue allows an administrative agency to 'make such rules and regulations as may be necessary to carry out the provisions of this Act.') (citation and alteration omitted).

Plaintiffs' contrary arguments misapply the standard of review. One set of objections asks this Court to re-weigh the evidence that was presented to the agency. *See, e.g.*, PI Mem. 19 (arguing that the record did not demonstrate "a significant widespread problem of inaccuracy"); *id.* (other "evidence in the record establishes that" these programs have "no adverse impact on timely or accurate reporting"). But "it is not the role of the court 'to weigh the evidence pro and con.'" *Assoc. Builders & Contractors of Texas, Inc. v. NLRB*, 2016 WL 3228174, at *9 (5th Cir. June 10, 2016) (quotes omitted). To the extent these arguments challenge OSHA's understanding of the administrative record, they are wrong for the reasons explained below in the section that responds to Plaintiffs' arbitrary-and-capricious challenge. *See infra* Part IV.D; *TOPUC*, 183 F.3d at 410 & n.10 (explaining the relationship between the *Chevron*-step-two and arbitrary-and-capricious standards).

Another set of objections rely on requirements that are nowhere to be found in the statute. For instance, Plaintiffs have claimed that "the OSH Act does not permit OSHA to adopt regulations that go beyond a mandate to employ due diligence to keep accurate records of work-related injuries." PI Mem. 19. It provided no citation or explanation. No part of the statute limits OSHA to a "mandate to employ due diligence." As explained above, the text of the Act unmistakably confers authority to enact regulations that OSHA deems "necessary" for "requiring employers to maintain accurate records" and for "compil[ing] accurate statistics on work injuries and illnesses," 29 U.S.C. §§ 657(c)(2), 657(g)(2), 673(a), and under *Chevron* and its progeny, courts must defer to OSHA's necessity determinations. Along the same lines, Plaintiffs listed several specific

30

determinations that OSHA supposedly was required to make.  *See* PI Mem. 19-20.  Again, none

appears in the statute.  Congress knows how to require specific determinations when it wants to.

*E.g.* 29 U.S.C. § 655(b)(5).[18]   To the extent these arguments question the sufficiency of the

agency's explanation, they are properly raised as arbitrary-and-capricious claims.  *See* PI Mem.

23-28 (raising the same arguments but in more detail); Compl. at 34-35 (arbitrary-and-capricious

allegations); *infra* Part IV.D (describing the preamble's extensive evidence and explanations).

Finally, Plaintiffs list several outside sources that supposedly disagree with the anti-

retaliation policies OSHA has adopted, as a general matter.  PI Mem. 20.[19]   These sources say

nothing about recordkeeping under the OSH Act, and so have nothing to do with the *Chevron* step-

two question, which is whether the agency's interpretation of the OSH Act's recordkeeping

provisions was reasonable.

## B.      The Rule Does Not Affect State Workers' Compensation Laws

Plaintiffs allege that the preamble's discussion of drug-testing violates Section 4(b)(4) of

the Act, which provides that "nothing in this Act shall be construed to supersede or in any manner

affect any workers' compensation law."  29 U.S.C. § 653(b)(4); *see* Compl. at 34.  But OSHA

---

[18] *See also, e.g.*, 50 U.S.C. § 4329(a) (requiring five specific determinations before action can occur); 25 U.S.C. § 293b (directing agency action "whenever [it] shall determine" that a specific condition is met); 35 U.S.C. § 209 (authorizing agency action where four specific determinations are made); 16 U.S.C. § 2904(a)(3)(A), (B).  There are countless examples.  The only determination required here is that the regulation be "necessary" or "appropriate" for achieving one of the stated purposes. 29 U.S.C. §§ 657(c)(1), 657(g)(2), 673(e).

[19] It is not clear that the sources Plaintiffs cite actually disagree with the Rule or agree with Plaintiffs. Plaintiffs provide almost no explanation.  *See* PI Mem. 20.  But, for instance, the document produced by the Substance Abuse Mental Health Services Administration contains a "Model Plan" for workplace drug testing, which recommends that post-accident testing occur only "when, based upon the circumstances of the accident, th[e] [employee's] actions are reasonably suspected of having caused or contributed."  *See* Model Plan for a Comprehensive Drug-Free Workplace Program, at 3.  The Drug-Free Workplace Advisor website similarly encouraged employers "to establish objective criteria that will trigger a post-accident test."  Ex. 1, at 4 (terminated in 2010).  These statements are consistent with the preamble and inconsistent with the blanket post-injury drug testing Plaintiffs appear to advocate.

explicitly stated that the Rule does not "supersed[e] or affect[] workers' compensation laws." 81 Fed. Reg. at 29673. Wherever the Rule conflicts with a workers' compensation law, the compensation law controls. *See* Memorandum from Dorothy Dougherty, Dep'y Ass't Sec., to Regional Admins., *Implementation of 1904.35(b)(1)(i) and (iv)*, at 4-5 (Oct. 19, 2016).

Plaintiffs attempt to parse the language of the preamble to suggest that, in the adjacent sentence, the preamble contradicts itself and professes to supersede workers' compensation laws. PI Mem. 22 (maintaining that the Rule only limits its application "where the state law 'require[s]' post-accident drug testing"). That is not what the preamble says. The preamble first responds to commenters who worried that "the final rule will conflict with drug testing *requirements* contained in workers' compensation laws." 81 Fed. Reg. at 29673 (emphasis added). In response, the preamble assures those commenters that they will not be liable under the Rule. It then goes on to state a broader principle, which is that the Rule must comply with Section 4(b)(4), and so cannot be applied to "supersede" or "affect" worker's compensation laws. 29 U.S.C. § 653(b)(4). That statement necessarily refers to *all* of Section 4(b)(4), including its language that the OSH Act does not "enlarge or diminish" the "rights, duties, or liabilities of employers and employees." *Id.* Thus, if a state workers' compensation law provides an employer the "right[]" to conduct a certain drug test, the Rule does not say otherwise.[20] *Id.*; *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96 (1992) (explaining that Section 4(b)(4) "save[s] t[his] area from federal pre-emption"); *Marshall*, 647 F.2d at 1236 ("OSHA cannot legally preempt state compensation law."). Because

---

[20] Plaintiffs relatedly argue that tests capable of measuring impairment do not exist for most drugs. *See* PI Mem. 20-21. But the preamble does not claim to ban drug tests that cannot measure impairment; it simply acknowledges that where a drug test can measure impairment, it is less likely to constitute retaliation. Impossibility also will be taken into account in making enforcement decisions, *cf. Ace Sheeting v. OSHA*, 555 F.2d 439, 439 (5th Cir. 1977), and the Rule permits drug tests that are authorized or mandated by state or federal law. *See* 29 U.S.C. § 653(b)(1), (4); 81 Fed. Reg. at 29673.

the Rule explicitly does not preempt state workers' compensation laws, it complies with Section 4(b)(4).

### C.  OSHA Gave Adequate Notice to Regulated Parties

The Court should also grant summary judgment to Defendants on Plaintiffs' notice claim. For starters, if the Court holds that the preamble is not binding, *supra* Part III.A, then this claim must fail, because the Supplemental NPRM clearly announced OSHA's proposal to "prohibit employers from taking adverse action against employees for reporting injuries and illnesses."  79 Fed. Reg. at 47606.  That is exactly what the final Rule does.

Even if the preamble were binding, Plaintiffs' notice claim still fails.  Under the APA, an NPRM must state "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).  The Fifth Circuit has interpreted this requirement to mean that the final rule must be a "logical outgrowth" of the NPRM.  *Brazos Elec. Power Co-op, Inc. v. Southwestern Power Admin.*, 819 F.2d 537, 543 (5th Cir. 1987).  "The notice need not specifically identify every precise proposal which [the agency] may ultimately adopt as a rule." *Schuylkill Metals*, 828 F.2d at 317 (quotes omitted).  "Rather, the proper test is whether the notice would fairly appraise interested persons of the subjects and issues the agency was considering." *Id.* (quotes omitted).

The Supplemental NPRM in this case clearly stated "the subjects and issues the agency was considering."[21]  *Id.*; *see* Supplemental Notice of Proposed Rulemaking, *Improve Tracking of*

---

[21] Plaintiffs imply that it was somehow improper for OSHA to issue a Supplemental NPRM.  *See* PI Mem. 9 (calling this an "unusual procedure not specifically identified in the APA").  But this kind of supplemental notice is extremely common.  *See, e.g.*, *Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 165, 171 (D.C. Cir. 2007) (reviewing and relying on SNPRM without complaint); *Schuykill Metals*, 828 F.2d at 317-18 (rejecting notice claim based on SNPRM).  In any case, Plaintiffs have never actually asserted that this supplemental notice impairs the Rule's legality.  *See* PI Mem. 22-23 (notice argument).

*Workplace Injuries and Illnesses*, 79 Fed. Reg. 47605 (Aug. 14, 2014).  It explained that, in response to comments, the agency was considering how to address "practices that have the effect of discouraging employees from reporting recordable injuries and illnesses." *Id.* at 47606; *see id.* ("[T]he Agency is seeking comment on whether to amend the proposed rule to . . . prohibit employers from taking adverse action against employees for reporting injuries and illnesses."). The agency thus made clear that it was thinking about polices that "have the *effect* of discouraging" injury reporting.  *Id.* (emphasis added).  It also made clear that it sought information about particular policies and practices.  *See, e.g.*, *id.* at 47607 (asking commenters to identify specific "practices or policies that discourage employees from reporting their injuries").  Such statements abound in the Supplemental NPRM.[22]  This put employers on notice that if their policies might discourage reporting, they should submit comments defending those policies.  The agency made this explicit:  It noted that "OSHA encourages employers to enforce safety rules as part of a well-functioning workplace safety program," and so it asked, "Are there any employer practices that OSHA should explicitly exclude under this provision to ensure that employers are able to run an effective workplace safety program?"  *Id.* at 47608.

Commenters plainly understood what OSHA meant.  They submitted copious comments regarding policies that discouraged reporting, including arguments both for and against the precise policies at issue here.  *See* Admin. Dkt., OSHA-2013-0023-1488, -1654, -1661, -1667, -1674, -

---

[22] *See, e.g.*, 79 Fed. Reg. at 47606 ("What other actions can OSHA take to address the issue of employers who discourage employees from reporting injuries and illnesses?"); *id.* at 47607 ("OSHA seeks any information stakeholders might have about such practices and policies, and their effect on injury and illness records"); *id.* ("Are you aware of situations where employers have discouraged the reporting of injuries and illnesses? If so, describe any techniques, practices, or procedures used by employers that you are aware of."); *id.* (seeking comment on "any additional information on employer practices that may discourage employees from reporting injuries or and illnesses"); *id.* at 47608 ("What kinds of adverse actions might lead an employee to decide not to report an injury or illness?"); *id.* (seeking comment on *all* practices "that might dissuade a reasonable employee from reporting an injury").

1675, -1695, -1698.[23]   On top of the Supplemental NPRM's clear text, these comments provide further evidence that notice was sufficient.  *See Schuylkill Metals*, 828 F.2d at 318 ("At least one party . . . saw fit to comment on precisely this issue."); *id.* ("other parties provided extensive comments" urging similar policies).

Plaintiffs respond that "OSHA did not identify what types of programs" it was planning to address.  PI Mem. 9.  They argue that it violated the APA for the Supplemental NPRM not to announce that the agency "was considering a ban on incident-based safety incentive programs or routine, mandatory post-accident drug testing programs."  *Id.* at 22-23.  For starters, Plaintiffs mischaracterize the Rule, which "does not include a per se ban on post-accident drug testing or incident-based incentive programs."  Op. 13; *see* 81 Fed. Reg. at 29672-73.  Instead, the preamble simply analyzes how those kinds of policies could be used to violate long-established anti-retaliation principles.  The Fifth Circuit has held that "[t]he notice need not specifically identify every precise proposal which [the agency] may ultimately adopt as a rule."  *Schuylkill Metals*, 828 F.2d at 317; *id.* at 318 (rejecting notice challenge even though the "notice did not propose any particular MRP benefit provision").  Rather, the notice need only apprise interested parties of the "subjects and issues" under consideration, which the Supplemental NPRM clearly did.  An agency is entitled to "learn from the comments on its proposals" without re-opening notice and comment.  *First American Discount Corp. v. CFTC,* 222 F.3d 1008, 1015 (D.C. Cir. 2000).  "The purpose of a rulemaking proceeding is not merely to vote up or down the specific proposals advanced before the proceeding begins."  *Alto Dairy v. Veneman*, 336 F.3d 560, 569 (7th Cir. 2003).  The purpose, instead, is "to refine, modify, and supplement the proposals in the light of evidence and arguments

---

[23] The administrative record is available at
https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=0&D=OSH A-2013-0023.

presented in the course of the proceeding." *Id.* As the Fifth Circuit has explained, "[r]ulemaking proceedings would never end if an agency's response to comments must always be made the subject of additional comments." *Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 201 (5th Cir. 1989). OSHA was not obligated to reopen the rulemaking process for a second time for comment on the proposals it received in response to its supplemental notice.

Regardless, OSHA *did* announce that it was concerned with these precise policies. It stated that one "[a]dverse action[] mentioned by participants in the public meeting" was "requiring an employee who reported an injury to undergo drug testing where there was no reason to suspect drug use." 79 Fed. Reg. at 47608. It is hard to imagine a clearer statement.

As to injury-based incentive programs, the agency had recently issued Guidance explicitly stating that such programs could violate section 11(c). *See* Fairfax Memo, *supra*.[24] The Supplemental NPRM made perfectly clear that the contemplated Rule would overlap with section 11(c). *See* 79 Fed. Reg. at 47607 ("[M]uch of the primary conduct that would be prohibited by the new provision is likely already proscribed by 11(c)."). As the D.C. Circuit has explained, when an NPRM identifies an issue, interested parties are on notice that the agency might adopt a recent authority's resolution of that issue. *See U.S. Telecom. Ass'n v. FCC*, 2016 WL 3251234, at *10 (D.C. Cir. 2016) (holding that notice was adequate because "interested parties" could have anticipated "the possibility that the Commission would follow *Brand X*" on one issue, even though the NPRM did not mention that possibility) (quotes omitted); *Nat'l Oilseed Processors Assoc. v.*

---

[24] *See id.* ("Incentive programs that discourage employees from reporting their injuries are problematic because, under section 11(c), an employer may not 'in any manner discriminate' against an employee because the employee exercises a protected right, such as the right to report an injury."). *See also* Michaels Memo, *supra* (explaining that injury-based incentive programs "often ha[ve] the effect of discouraging workers from reporting an injury or illness").

*OSHA*, 769 F.3d 1174, 1179 (D.C. Cir. 2014) (holding that, in 2009 rulemaking, notice was adequate based on OSHA guidance letters from 1986, 1987, and 1994).

### D.       The Preamble's Discussions Are Not Arbitrary or Capricious

Finally, Plaintiffs allege that the Rule's applications to incentive programs and drug testing are arbitrary and capricious.  5 U.S.C. § 706(2)(A); Compl. at 34-35; PI Mem. 23-28.  "Review under the arbitrary-and-capricious standard is 'extremely limited and highly deferential.'"  *Markle Interests, LLC v. U.S. Fish & Wildlife Service*, 2016 WL 3568093, at *3 (5th Cir. 2016) (quoting *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243 (5th Cir. 2015)).  "In reviewing an agency's decision under the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption."  *Texas Clinical Labs., Inc. v. Sebelius*, 612 F.3d 771, 774 (5th Cir. 2010).

Because of this "highly deferential standard of review, the agency's burden is slight."  *Gulf Restoration Network*, 783 F.3d at 244.  Once the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,' . . . 'a court is not to substitute its judgment for that of the agency.'"  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Rather, as the Fifth Circuit has put it, courts must "uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality."  *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013); *see Am. Petrol. Inst. v. EPA.*, 661 F.2d 340, 349 (5th Cir.1999) (requiring "minimal consideration to the relevant facts as contained in the record."); *Milena Ship Mgmt. v. Newcomb*, 804 F. Supp. 859, 861 (E.D.La. 1992) ("[E]ven if [a] Court disagrees with the agency's decision, the judicial role is relegated to affirming the agency's decision so long as a rational basis is presented for the decision reached.").

37

The challenged portions of the preamble easily clear this low hurdle.  OSHA is statutorily charged with ensuring that employers accurately report workplace injuries.  *See* 29 U.S.C. §§ 657(c)(1), (c)(2), (g)(2); *id.* § 673(a).  As the preamble explains, retaliation against employees for reporting injuries deters reporting, which in turn decreases the accuracy of injury logs.  81 Fed. Reg. at 29671 (explaining that "retaliating against employees for reporting work-related injuries or illnesses" decreases "the accuracy of employer injury and illness logs").  After considering both "myriad examples" in the record and a number of surveys and studies—from commenters, congressional committees, and academic experts—OSHA concluded that workers were dissuaded from reporting injuries by some programs that deny benefits, or that impose intrusive drug testing, for those who reported injuries.  *See Id.* at 29673-74 (injury-based incentives); *id.* at 29672-73 (post-injury drug testing).  The agency considered the counterarguments in the record, and responded by describing as potentially retaliatory only the incentive programs and drug testing that would be most likely to decrease reporting and least likely to help employers understand the cause of injuries.  *Id.* at 29674 (explaining that the Rule does not "categorically ban all incentive programs" and listing some permissible examples); *id.* at 29673 ("strik[ing] the appropriate balance" for drug testing); Op. 13 ("[T]he Rule does not include a per se ban on post-accident drug testing or incident-based safety incentive programs.").  Thus, there is no question that OSHA "examine[d] the relevant data," or that its explanation "satisf[ied] minimum standards of rationality."  *Markle Interests*, 2016 WL 3568093, at *3 (quotation marks and alterations omitted); *see Hayward v. Dep't of Labor*, 536 F.3d 376, 380 (5th Cir. 2008) (limiting review to "whether the agency articulated a rational connection between the facts found and the decision made") (quotation marks omitted).  Nothing more is required.

Plaintiffs have advanced a litany of reasons why they think the preamble is arbitrary and capricious. Besides conflating the preamble with the Rule, their arguments misconceive both the narrow scope of arbitrary-and-capricious review and the evidence before the agency.

First, Plaintiffs allege that OSHA "reversed longstanding policy" while "disregarding facts and circumstances that underlay" previous policy, without accounting for reliance interests. PI Mem. 23-24; *see* Compl. ¶ 87. This criticism fails for several reasons. For one, Plaintiffs have identified no particular reliance interests, beyond the use of workplace programs they allege may now have to be revised (which routinely occurs when an agency adopts a new rule). More importantly, it is not clear what "longstanding policy" Plaintiffs are referring to, or what "facts and circumstances" might have supported it. OSHA has never taken the position that all injury-based incentive programs and blanket post-injury drug testing *do not violate* section 11(c) of the OSH Act. In fact, just the opposite. *See* Fairfax Memo, *supra*. It is true that OSHA had not previously issued *regulatory* limits on retaliation. But the agency "forthrightly acknowledged that its recent actions have broken new ground." *Fox*, 556 U.S. at 517; 81 Fed. Reg. at 29671 (noting that "[t]he final rule *adds* paragraph (b)(1)(iv) to § 1904.35" and explaining the reasons) (emphasis added); *supra* n.5 (quoting those reasons). "Nothing prohibits federal agencies from moving in an incremental manner." *Id.* at 522; *see also Encino*, 136 S. Ct. at 2125-26.

Second, Plaintiffs assert that "OSHA has cited no scientific evidence" to support its conclusion that incident-based incentive programs "discourage employees from accurately reporting injuries and illnesses." PI Mem. 24-25; *see* Compl. at 25. This contention is both beside the point and wrong. It is beside the point because the APA does not demand "scientifically certain criteria." *Fox*, 556 U.S. at 520. The Supreme Court in *Fox* made clear that an agency need not conduct "a multiyear controlled study" before it acts, *id.* at 519, and that an agency's "predictive

39

judgment . . . merits deference," "even in the absence of evidence," *id.* at 521.[25]  Nor is there any

bar on the use of "anecdotal evidence," as Plaintiffs imply.  PI Mem. 24; *see Assoc. Builders &*

*Contractors of Texas*, 2016 WL 3228174, at *9 (agency can rely on "a small number of cases").

The contention is wrong because OSHA relied on overwhelming evidence that injury-

based incentive programs discourage injury reporting.  The American College of Occupational and

Environmental Medicine explained that many of its 4,000 members had reported that "bonuses or

incentives for a certain number of 'injury free days' could lead to peer pressure upon an employee

not to report."  OSHA-2013-0023-1661, at 2 (cited and discussed, 81 Fed. Reg. at 29673).  In a

survey conducted by the United Steelworkers Union ("USW"), 66% of respondents reported that

such programs "discouraged workers from reporting work-related injuries and illnesses."  OSHA-

2013-0023-1675, at 18 (cited and discussed, 81 Fed. Reg. at 29673).  USW also identified a

number of academic studies and other reports that concluded the same.[26]  An AFL-CIO survey of

1,300 safety and health representatives found that 46 percent "believed that the program

discouraged the reporting of injuries, illnesses, near misses or accidents."  OSHA-2013-0023-

1695, at 12-13 (cited and discussed, 81 Fed. Reg. at 29673).  In accordance with such large surveys,

profuse individual cases, and common sense, OSHA was entitled to conclude that denying benefits

to workers who report injuries will discourage workers from reporting injuries.  Plaintiffs do not

attempt to argue that this conclusion was unsupported by substantial evidence.  *See* 5 U.S.C. §

---

[25] The Court further explained that such predictive judgments need merely be rational, not clearly correct. *See Fox*, 556 U.S. at 518 ("It is certainly rational (if not inescapable) to believe that a safe harbor for single words would likely lead to more widespread use of the offensive language.").

[26] *E.g.*, Hester J. Lipscomb, et al., *Safety, Incentives, and the Reporting of Work-Related Injuries Among Union Carpenters: "You're Pretty Much Screwed If You Get Hurt at Work"*, 56 Am. J. Industrial Medicine 389 (2013); Glenn Pransky, et al., *Under-Reporting of Work-Related Disorders in the Workplace: A Case Study and Review of the Literature*, 42 Ergonomics 171 (1999).

40

706(2)(E).  And while Plaintiffs point to comments that argued otherwise,[27] "it is not the role of the court to weigh the evidence pro and con."  *Assoc. Builders & Contractors of Texas*, 2016 WL 3228174, at *9 (quotes omitted).

Third, Plaintiffs complain that OSHA did not establish a link "between incident-based safety incentive programs and decreased workplace safety."  PI Mem. 24.  But it is *Congress* that chose accurate recordkeeping as a vital part of ensuring workplace safety.  *See, e.g.*, 29 U.S.C. §§ 651(b), 657(c), 673(a), 673(e).  As the OSH Act's legislative history declares, "[a]dequate information is a precondition for responsive administration of *all* sections of this bill."  H.R Rep. No. 91-1291, 91st Congress., 2d Sess. (1970), at 860 (emphasis added).[28]  The Supreme Court

---

[27] Plaintiffs cite their own comments to OSHA as evidence of the safety benefits of incident-based programs.  PI Mem. 25 (citing Strategic Comp comments submitted in January and April 2016, *see* Admin. Dkt., OSHA-2013-0023, -1836, -1837, -1838).  But these comments were submitted after the close of the comment period, so they cannot now be used to impugn the rationality of the Rule.  *See* 79 Fed. Reg. at 47605 ("Comments must be submitted by October 14, 2015."); *cf. Personal Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 543 (D.C. Cir. 1995) ("Agencies are free to ignore such late filings."); *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1212 (5th Cir. 1991) (vacating rule because "evidence on which the [agency] relies was only made public after the period for public comment on the standard had closed") (quotes omitted).

The evidence Plaintiffs have cited is also far from conclusive.  Strategic Comp's data reflects only that its insureds report fewer serious injuries than actuarial predictions.  *See* PI Mem. 25.  Those insureds implement a "comprehensive safety program" which includes other safety measures.  *See* OSHA-2013-0023-1836, Ex. 1b, at 2, 7-8 ("Incentive Programs were implemented in conjunction with other measures designed to strengthen safety culture."); Op. 11, 12 (acknowledging that these multiple policy changes confound attempts to assign causal significance to any one change).  Strategic Comp's data do not report how other kinds of incentive programs, or other insurance companies' insureds, fare compared to actuarial predictions.  Likewise, the studies mentioned in the GAO report, *see* PI Mem. 24-25, considered multiple kinds of incentive programs, not just injury-based ones, and they did not "quantify the programs' effect on injury and illness reporting."  GAO-12-329, *Workplace Safety and Health*, at 6, 8.  More importantly, the GAO found numerous indications that injury-based programs deterred reporting.  *Id.* at 7-10.

[28] *See also id.* at 156 ("Full and accurate information is a fundamental precondition for the meaningful administration of an occupational safety and health program.").  OSHA has long recognized that "free and frank reporting by employees is the cornerstone of the system."  66 Fed. Reg. 6050 (Jan. 19, 2001).  As it recently explained, "[i]f employees do not feel free to report injuries or illnesses, the employer's entire workforce is put at risk.  Employers do not learn of and correct dangerous conditions that have resulted in injuries, and injured employees may not receive the proper medical attention, or the workers' compensation benefits to which they are entitled."  Fairfax Memo, *supra*.

rejected a similar argument in *Fox*.  In that case, the court of appeals had struck down an FCC ban on fleeting expletives for a lack of evidence that they were "harmful and serious enough to warrant government regulation."  *Fox*, 556 U.S. at 519.  The Supreme Court reversed, explaining that, by statute, "*Congress* has made the determination that indecent material is harmful to children," and so the agency did not need to independently "adduce[] [a] quantifiable measure of the harm."  *Id.* (emphasis added).  Likewise, OSHA was not required to quantify the ultimate safety impact of improved reporting.

Fourth, Plaintiffs list what they claim to be evidence that post-incident drug testing leads to fewer reported injuries.[29]  PI Mem. 25-28.  This, too, fails to meet their high burden under the APA.  OSHA provided ample support for its conclusion that some post-injury drug testing deters injury reporting.  *See* 81 Fed. Reg. at 29673 (citing evidence from three academic studies, OSHA recordkeeping data, and a report by the House of Representatives Committee on Education and Labor).  Furthermore, under the Rule, employers retain multiple ways to test for workplace drug use.  The Rule does not affect drug testing that is *not* specifically a consequence for reporting an injury.  Nor does it prohibit post-injury testing that might identify a cause of the reported injury.  *See* 81 Fed. Reg. at 29673.  The preamble only addresses post-injury testing that *cannot possibly* identify the cause of the injury, because the injury is not the kind that drug use could cause.[30]  In

---

[29] Again, most of this evidence was not presented to OSHA.  *See* PI Mem. 25-26.  Nor does it establish much.  The poll that Plaintiffs cite, *see id.* at 27 & n.20, refers to *pre-employment* drug testing, which reinforces that, under the Rule, employers retain numerous options for drug testing their employees.  The evidence that was before the agency—like the Morantz and Mas study—was addressed in the preamble *See* 81 Fed. Reg. at 29673.  Plaintiffs' attempt to parse that study's findings as to different testing methods illustrates how divorced their challenge is from the narrow scope of arbitrary-and-capricious review.  *See* PI Mem. 26 n.19.

[30] Indeed, the preamble simply encourages employers to use testing that can "contribut[e] to the employer's understanding of why the injury occurred."  81 Fed. Reg. at 29673.  As mentioned above, the technological availability of impairment testing will be taken into account when setting enforcement policy.  *See supra* n.20; Memorandum from Dorothy Dougherty, Dep'y Ass't Sec., to Regional Admins., *Implementation of 1904.35(b)(1)(i) and (iv)*, at 5 (Oct. 19, 2016) ("OSHA will only consider whether the drug test is capable

this way, OSHA has accommodated competing desires to deter drug use but not unreasonably deter injury reporting. *See Gulf Restoration Network*, 783 F.3d 227, 244 (5th Cir. 2015) ("[W]hen a statute sets out competing considerations, agencies are generally given discretion to choose how to best give effect to those mandates.").

Finally, unable to seriously dispute that OSHA's determination was supported by substantial evidence, *see* 5 U.S.C. § 706(2)(E), Plaintiffs have briefly advanced a number of non-sequitur lack-of-explanation claims.  For instance, they claim that "OSHA did not provide any evidence that" blanket post-injury testing "was in fact retaliatory."  PI Mem. 27.  That is not the relevant question, because retaliation has a more specific definition.  The question is whether the practice would deter a reasonable employee from reporting an injury.  OSHA reasonably concluded that, in some cases, it would.  Nor did the preamble address drug testing simply "to protect[] worker privacy."  PI Mem. 27.  The Rule's purpose is to ensure accurate injury records, which is indisputably a valid goal for OSHA to pursue.  A valid rule may serve other interests incidentally.  *See TOPUC*, 183 F.3d at 412.  Lastly, Plaintiffs improbably suggest that the latitude OSHA has left employers—to drug-test when there is "a reasonable possibility that drug use by the reporting employee was a contributing factor to the reported injury or illness"—will somehow lead to "the surveillance of a trained police force."  PI Mem. 28.  Employers set workplace policies all the time.  They are perfectly capable of determining which injuries might have been caused by worker impairment from drug use.  The preamble even gives some examples of injuries that are not typically caused by drug impairment.  *See* 81 Fed. Reg. at 29673.

---

of measuring impairment at the time the injury or illness occurred where such a test is available.  Therefore, at this time, OSHA will consider this factor for tests that measure alcohol use, but not for tests that measure the use of any other drugs.").

### E.      The Rule Complies with the Regulatory Flexibility Act

Under the Regulatory Flexibility Act ("RFA"), courts review only "whether an agency has made a reasonable, good-faith effort to carry out the mandate of the RFA."  *Alenco*, 201 F.3d at 625; *see Nat'l Tele. Co-op Assoc. v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("[T]he Act's requirements are purely procedural.") (quotes omitted).  In the preamble, OSHA certified that the Rule would "not have a significant economic impact on a substantial number of small entities." *See* 81 Fed. Reg. at 29687; *id.* at 29674-87 (analysis of Rule's economic impact).  Plaintiffs claim that OSHA should have analyzed the Rule's anti-retaliation provision in more detail.  Compl. at 33; PI Mem. 29.  But as the preamble explains, that provision "add[s] no new rights to employees" beyond the requirement that employers inform them of their right to report injuries.  81 Fed. Reg. at 29680.

## V.      Plaintiffs' Challenges to Other Parts of the Rule Are Without Merit

In their Complaint, Plaintiffs also purport to challenge two other parts of the Rule: the requirement that procedures for reporting workplace injuries and illnesses be reasonable, *see* 29 C.F.R. § 1904.35(b)(1)(i), and the requirement that employers inform their employees of the right to report workplace injuries and illnesses free from retaliation, *see id.* § 1904.35(b)(1)(iii).  *See* Compl., ECF No. 1, at 3, ¶¶ 4, 67, 72, 75, 77, 88.  It is not clear whether Plaintiffs intend to continue pressing these two challenges.  They did not seek to enjoin these provisions in their Motion for Preliminary Injunction.  *See* ECF No. 9-1, at 15-34 (entire argument section); ECF No. 23, at 7 (Defendants' opposition); ECF No. 29 (Plaintiffs' reply, not even mentioning these provisions). And while the Complaint purports to challenge these additional provisions, it provides almost no explanation for why they conflict with the APA or OSH Act.  Virtually all the allegations in the Complaint pertain to the anti-retaliation provision, *see* 29 C.F.R. § 1904.35(b)(1)(iv).

44

Nevertheless, in an abundance of caution, the Court should grant summary judgment against these two challenges. As explained above, OSHA has broad authority to require that employers take steps to ensure the accurate reporting of workplace injuries. *See supra* Parts II & II.1. In promulgating the Rule, OSHA explained why subsections (i) and (iii) would serve those goals. *See* 81 Fed. Reg. at 29669-70 (explaining § 1904.35(b)(1)(iii)); *id.* 29670-71 (explaining § 1904.35(b)(1)(i)). Plaintiffs have not explained why either the APA or the OSH Act should require that they be allowed to impose unreasonable injury-reporting procedures, or how either statute could shield them from notifying their employees about the right to report injuries free from discrimination. Subsections (i) and (iii) could not conceivably "supersede" or "affect" state workers' compensation laws. 29 U.S.C. § 653(b)(4). The Supplemental NPRM explicitly mentioned both subsections. *See* 79 Fed. Reg. 47605, 47607 (Aug. 14, 2014) ("[T]he Agency is seeking comment on whether to amend the proposed rule to (1) require that employers inform their employees of their right to report injuries and illnesses; (2) require that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome."). And the final Rule's Regulatory Flexibility Act analysis explicitly considered both provisions. *See* 81 Fed. Reg. 29624, 29680 (May 12, 2016).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Defendants.

Dated: January 18, 2016

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOHN R. PARKER
United States Attorney

JUDRY L. SUBAR
Assistant Director, Federal Programs Branch

45

_/s/ Spencer E. Amdur_
SPENCER E. AMDUR (PA Bar # 322007)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-7420
Facsimile: (202) 616-8470

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2016, I electronically filed a copy of the foregoing.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ Spencer E. Amdur
SPENCER E. AMDUR