## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| TEXO ABC/AGC, INC., <br><br> ASSOCIATED BUILDERS AND CONTRACTORS, INC., <br><br> NATIONAL ASSOCIATION OF MANUFACTURERS, <br><br> AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, <br><br> GREAT AMERICAN INSURANCE COMPANY, <br><br> ATLANTIC PRECAST CONCRETE, INC., <br><br> OWEN STEEL COMPANY, and <br><br> OXFORD PROPERTY MANAGEMENT LLC, <br><br> PLAINTIFFS, <br> v. <br><br> EDWARD HUGLER, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, in his official capacity, <br><br> JORDAN BARAB, ACTING  ASSISTANT SECRETARY OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, in his official capacity, and <br><br> UNITED STATES DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, <br><br> DEFENDANTS. | CIVIL ACTION NO. 3:16-CV-1998 |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW, Plaintiffs, TEXO ABC/AGC, Inc. ("TEXO"), Associated Builders and Contractors, Inc. ("ABC"), the National Association of Manufacturers ("the NAM"), American Fuel & Petrochemical Manufacturers ("AFPM"), the Great American Insurance Company ("Great American"), Atlantic Precast Concrete, Inc. ("Atlantic Precast Concrete"), Owen Steel Company ("Owen Steel"), and Oxford Property Management ("Oxford"), by and through their undersigned counsel, and for their Amended Complaint against the Defendants, herein state as follows:

## NATURE OF THE ACTION

1.      Plaintiffs seek a declaratory judgment challenging the final rule issued by the Occupational Safety and Health Administration ("OSHA"), titled "Improve Tracking Workplace Injuries and Illnesses", 81 Fed. Reg. 29,624 (May 12, 2016), as revised at 81 Fed. Reg. 31,854 (May 20, 2016), hereinafter referred to as "the New Rule," as unlawful because it prohibits or otherwise limits incident-based employer safety incentive programs and/or routine mandatory post-accident drug testing programs, and requires employers to permit unwarranted delays in employee reporting of injuries, and because it unlawfully requires employers to electronically submit confidential and controversial information to an online database that will be made available for public dissemination.

2.      Incident-based safety incentive programs and routine, mandatory post-accident drug testing programs (collectively the "Safety Programs") help employers to promote workplace safety, which is supposed to be OSHA's primary mission also. Instead, out of a misguided zeal to improve accuracy of reporting on workplace injuries (albeit with no evidence that injuries are not already being accurately reported), OSHA has lost sight of the importance of reducing the number and severity of injuries themselves. Similarly, the undefined new

requirement that procedures for employees to report work-related injuries be "reasonable," and the New Rule's declaration that "reasonableness" requires employers to allow unwarranted delays in such reporting, are harmful to workplace safety, arbitrary and capricious.

3.      Plaintiffs assert that the challenged provisions are unlawful and must be vacated because they exceed OSHA's statutory authority; because they were adopted without observance of the procedures required by law; and because the challenged provisions, and their underlying findings and conclusions, are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. In addition, since the effective date of the challenged provisions on December 1, 2016, OSHA has further demonstrated by its attempted enforcement of them that the rule is unlawful and should be vacated. OSHA's published guidance on the new rule is similarly unlawful and should also be vacated.

4.      Plaintiffs likewise assert that the public, electronic reporting provisions of the New Rule exceeded OSHA's statutory authority by ordering the creation of an online database with the intent of publicly disseminating employers' injury and illness records. The New Rule further unlawfully infringes upon Plaintiffs' constitutional rights pursuant to the First Amendment of the United States Constitution by compelling employers to engage in speech concerning confidential and controversial business matters without any sufficient justification or other rationale from OSHA as to its consideration of the reputational harm employers will face from such public disclosure.

## SUMMARY OF CLAIMS

5.      Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule are not in accordance with law because they exceed the statutory authority Congress granted to OSHA

under the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 651 *et seq.* (1970) in the following ways:

a.   Congress specified in Section 11(c) of the Act an exclusive mechanism for protecting workers who are allegedly subject to discrimination or retaliation in connection with reporting work-related injuries or illnesses, and Congress expressly declined to delegate authority to OSHA to independently regulate outside Section 11(c)'s exclusive mechanism. Contrary to OSHA's contentions, the New Rule does not merely incorporate existing prohibitions under section 11(c) of the Act but instead creates an entirely new enforcement regime imposing new procedural and substantive obligations on employers, without any statutory authorization;

b.   In promulgating the New Rule, OSHA did not provide interested parties with legally adequate notice of its intent to adopt a rule that would ban or limit the Safety Programs and therefore failed to comply with Section 4 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553;

c.   OSHA did not sufficiently demonstrate that Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule are reasonably necessary or appropriate for ensuring accurate injury and illness reporting, enforcement of the OSH Act, or for developing information on the causes and prevention of occupational accidents and illnesses, and therefore failed to comply with Section 8(c)(1) of the OSH Act; and,

d.   OSHA failed to demonstrate that Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule do not, directly or indirectly, impose an

unreasonable burden on employers as required by Section 8(d) of the OSH Act.

e.     The New Rule violates Section 4(b)(4) of the Act by "affecting" state workers compensation laws that require and/or encourage incident-based safety incentive programs and/or post-accident drug testing programs.

6.     The New Rule is also arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law under Section 10(e) of the APA, 5 U.S.C. § 706(2)(A) for the following reasons:

a.     OSHA has relied on factors which Congress did not intend it to consider, entirely failed to consider important aspects of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, and is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Automobile Mutual Ins.*, 463 U.S. 29, 43 (1983). In addition, OSHA has failed to display awareness that it is changing its position nor shown that there are any good reasons for the new policy; nor has OSHA taken cognizance that its longstanding policies "may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 1538 (June 20, 2016). Finally, OSHA has failed to explain numerous inconsistencies in its New Rule. *Id*. More specifically:

b.     There is no reliable evidence to support OSHA's assertion that any category of safety incentive programs or post-accident drug testing

5

programs lead to materially inaccurate reporting or underreporting of workplace injuries and illnesses;

c.     OSHA failed to consider how an OSHA rule prohibiting or otherwise limiting these longstanding types of safety programs would impact workplace safety and health;

d.     OSHA failed to consider strong available evidence demonstrating that the widely used safety programs improperly characterized as "retaliatory" in the New Rule, do in fact significantly reduce work-related injuries, illnesses, and deaths in a manner consistent with the OSH Act's ultimate goal of assuring "safe and healthful working conditions for working men and women;"

e.     OSHA also failed to consider strong available evidence that any prohibition or other limitation on the safety programs improperly characterized as "retaliatory" in the New Rule will result in a significant increase in work-related injuries, illnesses, and deaths;

f.     OSHA failed to demonstrate that the unquantified and speculative benefits of the purported increase in recordkeeping accuracy through more complete employee reporting outweigh the benefits to workplace safety and health (a reduction in serious incidents) provided by the safety programs improperly characterized as "retaliatory" in the new Rule;

g.     OSHA failed to consider any of the record evidence submitted by Plaintiffs and others demonstrating the value of these safety incentives and post-accident drug testing to workplace safety and health;

h.  OSHA prejudged the essential issues related to the safety programs improperly characterized as "retaliatory" in the new Rule; relied on non-safety related factors Congress did not intend it to consider, and ignored all available evidence contradicting its biased assertion that the safety incentives and post-accident drug testing somehow lead to materially inaccurate reporting or underreporting of workplace injuries or illnesses;

i.  OSHA failed to conduct legally required regulatory impact analyses weighing the full costs associated with the regulation, including increased worker injuries and illnesses and corresponding costs, against the benefit of the New Rule's purported effect of improving recordkeeping accuracy and therefore failed to fulfill its obligations under the Regulatory Flexibility Act and Executive Order 12866.

j.  OSHA changed its position with respect to the confidentiality of the information it is requiring companies to produce on its online database, without providing a reasoned justification; and

k.  OSHA failed to provide evidence that publication of employers' information from its online database will have any effect on workplace safety and health; rather, the intent of the Rule is to allow employers' confidential and proprietary information to be misused and misinterpreted by the public and special interest groups, thereby exposing businesses to significant reputational harm and loss of goodwill.

7.  Section 1904.41 of the New Rule violates OSHA's statutory authority and the First Amendment to the Constitution.  The Rule violates the First Amendment by compelling

7

companies to submit their confidential and controversial proprietary information for publication on a publicly available online database. Once again, OSHA failed to proffer any evidence that publication of employers' information will positively impact, let alone have any effect on, workplace safety and health. In addition, Congress's limited grant of authority to OSHA allowed it only to collect and maintain injury and illness data from employers; and this limited grant of authority cannot be interpreted as forcing employers to make public such controversial and confidential information in violation of their constitutional rights.

## PARTIES

8.      Plaintiff TEXO is a non-profit trade association of hundreds of construction industry employers and related firms operating in North Texas and around the country. Headquartered in this judicial district at 11101 N Stemmons Fwy, Dallas, TX 75229, TEXO is a separately incorporated affiliate of the national construction industry trade association Plaintiff Associated Builders and Contractors, Inc., which represents nearly 21,000 member contractors and related firms throughout the country, from its headquarters in Washington, D.C.  TEXO, ABC and their members take very seriously their obligation to provide safe workplaces for their employees. To achieve that objective, many of TEXO's and ABC's members rely on incident-based safety incentive programs and routine, mandatory post-accident drug testing and safety incentive programs, of the type that the new Rule declares for the first time to be unlawfully "retaliatory," to maintain safe workplaces.  TEXO's and ABC's members want to continue to use such programs, but if they do so, according to the Preamble to the New Rule and other guidance from OSHA purporting to explain the new Rule, enforcement of the New Rule against them is likely. The members will thereby be irreparably harmed in their ability to reduce workplace injuries and illnesses by the new rule for the reasons stated in greater detail below. TEXO's and

8

ABC's members will be further harmed by being compelled to disclose publicly their confidential and controversial injury information under the new Section 1904.41, which will expose them to reputational harm and loss of goodwill.

9.      Plaintiff the NAM, headquartered in Washington, D.C., is the largest manufacturing association in the United States.  It is a national not-for-profit trade association representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs nearly 12 million men and women, contributes more than $2.17 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for three-quarters of private-sector research and development.  The NAM is the powerful voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States. Many manufacturers rely on incident-based safety incentive programs and/or routine, mandatory post-accident drug testing programs to reduce the number of injuries in their workplaces, and many such manufacturers will be harmed in their ability to reduce injuries and illnesses by the New Rule for the reasons stated in greater detail below. NAM's members want to continue to use such programs, but if they do so, according to the Preamble to the New Rule and other guidance from OSHA purporting to explain the new Rule, enforcement of the New Rule against them is likely. NAM's members will be further harmed by being compelled to disclose publicly their confidential and controversial injury information Section 1904.41, which will expose them to reputational harm and loss of goodwill.

10.     Plaintiff AFPM, headquartered in Washington, D.C., is a national trade association of approximately 400 companies, including virtually all U.S. refiners and petrochemical manufacturers. AFPM represents high-tech American manufacturers of nearly the

entire U.S. supply of gasoline, diesel, jet fuel, and home heating oil. AFPM members employ thousands of individuals to use high-tech machinery to manufacture petrochemicals used in a wide variety of products, including plastic, medicines and medical devices, cosmetics, televisions and radios, computers, solar power panels, and parts used in every mode of transportation. Many AFPM members rely on incident-based safety incentive programs and/or routine, mandatory post-accident drug testing programs to reduce the number of injuries in their workplaces. AFPM members want to continue to use such programs, but if they do so, according to the Preamble to the New Rule and other guidance from OSHA purporting to explain the new Rule, enforcement of the New Rule against them is likely. Many such AFPM members will be irreparably harmed in their ability to reduce workplace injuries and illnesses by the New Rule for the reasons stated in greater detail below. AFPM's members will be further harmed by being compelled to disclose publicly their confidential and controversial injury information Section 1904.41, which will expose them to reputational harm and loss of goodwill.

11.     TEXO, ABC, NAM, and AFPM, as trade associations representing thousands of employers in Texas and around the country, each have standing to bring this action on behalf of their members under the three-part test of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (1) Plaintiffs' members would otherwise have standing to sue in their own right; (2) the interests at stake in this case are germane to Plaintiffs' organizational purposes; and (3) neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members.

12.     Plaintiff Great American is incorporated under the laws of the State of Ohio and has its principal place of business in Cincinnati, Ohio. Great American through its Strategic Comp Division ("Strategic Comp") has provided workers compensation insurance to more than

1,000 companies over the past 23 years and has gained a reputation in the insurance market as having expertise in working with employers to implement comprehensive workplace safety and health programs that prevent workplace accidents, improve safety cultures, and significantly reduce the costs of work-related injuries, illnesses, and deaths.   Great American specifically assists its insureds in implementing incident-based safety incentive programs of the types that are for the first time improperly declared to be "retaliatory" under the New Rule. Great American's ability to provide such insurance and assist its insureds in implementing safety programs preventing workplace injuries will be seriously jeopardized by the New Rule's unprecedented prohibition against such programs.

13.    Plaintiff Atlantic Precast Concrete is incorporated under the laws of the State of Pennsylvania and has its principal place of business in Tullytown, Pennsylvania.   Atlantic Precast Concrete purchases workers' compensation insurance from Great American through Strategic Comp and relies significantly on an incident-based safety incentive program, of the type declared to be "retaliatory" under the New Rule, to reduce its incidents of workplace injuries. Atlantic Precast Concrete also relies on a routine, mandatory post-accident drug testing program, of a type again prohibited by the new Rule, to reduce the incidents of workplace injuries. Atlantic Precase Concrete wants to continue to use such programs, but if they do so, according to the Preamble to the New Rule and other guidance from OSHA purporting to explain the new Rule, enforcement of the New Rule against them is likely.

14.    Plaintiff Owen Steel is incorporated under the laws of Delaware and has its principal place of business in Columbia, South Carolina.   Owen Steel purchases workers' compensation insurance from Great American through Strategic Comp and relies significantly on an incident-based safety incentive program, of the type declared to be "retaliatory" under the

New Rule, to reduce its incidents of workplace injuries. Owen Steel also relies on a routine, mandatory post-accident drug testing program, of a type again prohibited by the new Rule, to reduce the incidents of workplace injuries. Owen Steel wants to continue to use such programs, but if they do so, according to the Preamble to the New Rule and other guidance from OSHA purporting to explain the new Rule, enforcement of the New Rule against them is likely

15.    Plaintiff Oxford is incorporated under the laws of the State of Minnesota and has its principal place of business in Rochester, Minnesota. Oxford purchases workers' compensation insurance from Great American through Strategic Comp and relies significantly on an incident-based safety incentive program, of the type declared to be "retaliatory" under the new Rule, to reduce its incidents of workplace injuries.  Oxford also relies on a routine, mandatory post-accident drug testing program, of a type again prohibited by the new Rule, to reduce the incidents of workplace injuries. Oxford wants to continue to use such programs, but if they do so, according to the Preamble to the New Rule and other guidance from OSHA purporting to explain the new Rule, enforcement of the New Rule against them is likely

16.    Edward Hugler  is the Acting Secretary of the United States Department of Labor (the "Secretary").  The Department of Labor ("DOL") published the New Rule in the Federal Register and is responsible for its enforcement.  Acting Secretary Hugler is sued in his official capacity and the relief sought extends to all of his successors and all DOL employees, officers, and agents.

17.    Jordan Barab is the Acting Assistant Secretary for the Occupational Safety and Health Administration of the United States Department of Labor.  The New Rule was published in the Federal Register under OSHA's authority, and Mr. Barab and OSHA are responsible for

its enforcement.  Assistant Secretary Barab is sued in his official capacity, and the relief sought extends to all his successors and to all employees, officers, and agents of OSHA.

18.     OSHA is a federal agency within DOL charged with implementing health and safety regulations under the OSH Act, 29 U.S.C. § 651 *et seq*. (1970).

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) because the Plaintiffs' causes of action arise under and allege violations of federal law, including:  the OSH Act, 29 U.S.C. § 651 *et seq*. (1970); the APA, 5 U.S.C. §§ 701-706 (APA jurisdiction to review agency actions); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief).

20.     This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and the provisions of the APA, 5 U.S.C. §§ 701-06.

21.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because one or more of the Plaintiffs are based in Dallas, Texas, within the judicial district of this Court.


## FACTUAL BACKGROUND

### OSHA's Statutory Authority To Promulgate Injury and Illness Recordkeeping Regulations, But Not Anti-Retaliation or Public Disclosure Regulations

22.     OSHA is authorized to adopt injury and illness recordkeeping requirements by Sections 8 and 24 of the OSH Act, which provide:

> [Section 8(c)(1):] Each employer shall make, keep and preserve, and make available to the [OSHA] … such records regarding his activities relating to this Act as [OSHA] … may prescribe by regulation as necessary or appropriate for the enforcement of this Act or for developing information regarding the causes and prevention of occupational accidents and illnesses . . .

[Section 8(c)(2):] [OSHA shall] prescribe regulations requiring employers to maintain accurate records of and to make periodic reports on, work-related deaths, injuries and illnesses …

[Section 8(d):] Any information obtained by the [OSHA] under this Act shall be obtained with a minimum burden upon employers, especially small employers.

[Section 24(a):] [OSHA] … shall develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics… and … compile accurate statistics on work injuries and illnesses which shall include all disabling, serious, or significant injuries and illnesses . . ."

23.     Section 11(c) of the OSH Act states, in relevant part, that "[n]o person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act . . . ." 29 U.S.C. § 660(c). OSHA acknowledges in the Preamble to the New Rule that "Section 11(c) only authorizes the Secretary to take action against an employer for retaliating against an employee for reporting a work-related illness or injury if the employee files a complaint with OSHA within 30 days of the retaliation. 29 U.S.C. 660(c)." 81 Fed. Reg. 29,671. Neither Section 11(c) nor any other provision of the OSH Act grants the Secretary (OSHA) the authority to adopt substantive anti-discrimination or anti-retaliation rules for any other purpose.

24.     The legislative history of the OSH Act makes clear that Congress considered, and rejected, administrative enforcement of the antidiscrimination provision of the kind now included in the New Rule. The final Conference Report stated:

The Senate bill[1] provided for administrative action to obtain relief for an employee discriminated against for asserting rights under this

---

[1] Section 10(f) of S. 2193 contained the following language:

10(f). This subsection prohibits discharge or discrimination against an employee because of the exercise by the employee, on behalf of himself or others, of any

Act, including reinstatement with back pay. The House bill[2] contained no provision for obtaining such administrative relief; rather it provided civil and criminal penalties for employers who discriminate against employees in such cases. With respect to the first matter, the House receded with an amendment making specific jurisdiction of the district courts for proceedings brought by the Secretary to restrain violations and other appropriate relief. With respect to the second matter dealing with civil and criminal penalties for employers, the House receded.

---

rights under this act. Any employee who believes he has been discharged or discriminated against by any person in violation of this subsection may apply to the Secretary for a review of such discrimination. The Secretary shall investigate and provide the opportunity for a public hearing on the record and in accordance with title 5, United States Code 554 (Administrative Procedure Act). If the Secretary finds a violation, lie shall issue a decision and order requiring the person committing the violation to take such affirmative action as may be appropriate to abate the violation, including but not limited to, rehiring or reinstatement with back pay. Judicial review of proceedings under this subsection may be obtained pursuant to subsection 10(d) or (e) of this section.

*See Legislative History of the Occupational Safety and Health Act of 1970 (S. 2193, P.L. 91-596)*, U.S. Government Printing Office, pg. 180 (1971).

[2] Section 15(d)(6) of H.R. 19200 contained the following language:
Any person who discharges or in any other manner discriminates against any employee because such employee has filed a complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, shall be assessed a civil penalty by the Commission of up to $10,000. Such person may also be subject to a fine of not more than $10,000 or imprisonment of a period not to exceed ten years, or both.

Section 15(f) of H.R. 16785 contained the following language:

(f) Any person who discriminates against any employee because of any action such employee has taken on behalf of himself or others, to secure the protection afforded by this Act shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Conference Report No. 91-1765 (December 16, 1970), 91st Cong., 2d Sess. (1970), *reprinted in* Subcommittee on Labor and Public Welfare, Legislative History of the Occupational Safety and Health Act of 1970 (Committee Print 1971) at 1192.[3]

25.     In other words, Congress explicitly withheld from OSHA the authority to initiate enforcement actions or issue citations for unlawful discriminatory conduct or retaliation prohibited by Section 11(c); and it implicitly withheld from OSHA the authority to prescribe substantive anti-discrimination rules.

26.     Through its approach to unlawful discrimination in Section 11(c) in the OSH Act, Congress clearly established the exclusive remedy for unlawful discrimination under the OSH Act – an employee complaint made within 30 days of the allegedly unlawful discriminatory action of the employer. Congress further determined the elements that OSHA (or the complaining employee if OSHA declined to pursue the case) would have to establish to prove a cause of action for discrimination.

27.     Thus, the OSH Act does not permit OSHA to adopt regulations that go beyond a mandate to employ due diligence to keep accurate records of work-related injuries. If an employer fails to perform that obligation, the employer is subject to citation, and OSHA has clearly demonstrated the ability to discover violations of those requirements and impose

---

[3] This interpretation is acknowledged and confirmed in the following quote from *Occupational Safety and Health Law*, ABA Section of Labor and Employment Law, Randy S. Rabinowitz, Editor-in-Chief (2nd ed. 2002):

> The Senate bill authorized administrative action to obtain relief for an employee discriminated against for asserting rights under the statute, including reinstatement with back pay.  The House measure, however, called for criminal and civil penalties against employers who discriminated against employees in such circumstances.  The conferees compromised; requiring that the Secretary seek relief (reinstatement with back pay) but that this be done in the district courts, not through administrative process. [footnote omitted.]

substantial sanctions. The OSH Act does not provide OSHA with the authority to arbitrarily determine that the applicable legal mechanism for preventing discriminatory or retaliatory conduct will no longer be the one Congress fashioned as part of a balanced compromise following extensive legislative action. Nor does the Act authorize OSHA to require public disclosure of the reports received.

**OSHA's Injury and Illness Recordkeeping Regulations Prior to the New Rule**

28.     OSHA's previous Injury and Illness Recordkeeping and Reporting Rule, codified in 29 C.F.R. Part 1904, hereinafter "the previous Recordkeeping Rule," established broadly applicable requirements for the identification, recording, and reporting, to OSHA and the Bureau of Labor Statistics ("BLS"), of all work-related injuries and illnesses other than minor conditions that do not require more than first aid treatment.

29.     OSHA's previous Recordkeeping Rule generally applied to all employers in most industries, including, for example, manufacturing, construction, and transportation, with establishments that employ ten or more employees at any time during the calendar year.

30.     OSHA has explained the purpose of the previous Recordkeeping Rule as follows:

> Injury and illness statistics are used by OSHA … to help direct its programs and measure its own performance. Inspectors also use the data during inspections to help direct their efforts to the hazards that are hurting workers. The records are also used by employers and employees to implement safety and health programs at individual workplaces. Analysis of the data is a widely recognized method for discovering workplace safety and health problems and for tracking progress in solving those problems. The records provide the base data for the BLS Annual Survey of Occupational Injuries and Illnesses, the Nation's primary source of occupational injury and illness data.

*See 29 C.F.R. 1904.0 Purpose Frequently Asked Questions, Question 0-1,* https://www.osha.gov/recordkeeping/entryfaq.html. OSHA is, therefore, using injury and illness data to identify and respond to national workplace safety trends, rather than localized or

individualized trends, and allocate resources to develop new regulations, training, or emphasis programs. For those uses, the impact of under-reporting would be negligible and there are available safeguards against under-reporting, which OSHA chose to ignore in the New Rule.

31.     Since 1971 when OSHA promulgated its first recordkeeping rule, employers have been required to keep track of workplace injuries and illnesses on designated recordkeeping forms. 66 Fed. Reg. 5,916, 6,130 (Jan. 19, 2001). However, prior to the New Rule, employers have never been required to publicly report any of the information on these forms or post them on any publicly accessible site on the Internet. Indeed, in *New York Times Co. v. U.S. Dep't of Labor*, 340 F. Supp. 2d 394, 402 (S.D.N.Y. 2004), OSHA specifically stated that information from Form 300A was exempt from disclosure under the Freedom of Information Act because such disclosure "can cause substantial competitive injury."

32.     OSHA revised its recordkeeping requirements in 2001 and created three different recordkeeping forms: (1) Form 300 "Log of Work-related Injuries and Illnesses"; (2) Form 301 "Injury and Illness Report;" and (3) Form 300A. *Id*. Form 300 explicitly states at the top: "Attention: This form contains information relating to employee health and must be used in a manner that protects the confidentiality of employees to the extent possible while the information is being used for occupational safety and health purposes." *Id*. Form 301 similarly warns employers to protect the confidentiality of the Form's information to the extent possible. *Id*. Form 300A includes no personally identifiable information about individual injuries and illnesses that occurred at the worksite but does contain information about the number of employee hours worked. Id. Certain employers are required to submit their Forms 300A to OSHA annually for OSHA's Data Initiative, a program established by OSHA to collect information to use to develop enforcement targeting. 29 C.F.R. Part 1904.41.

33.     The 2001 rule also specifically acknowledged the need to maintain the confidentiality and privacy interests of injured and ill employees. "OSHA agrees that confidentiality of injury and illness records should be maintained except for those persons with a legitimate need to know the information. This is a logical extension of the agency's position that a balancing test is appropriate in determining the scope of access to be granted employees and their representatives." 66 Fed. Reg. at 6,057.

34.     In accordance with this policy, OSHA previously required employers to redact the names of certain employees from the Form 300 reports and limited employers' ability to share injury and illness information with third parties not identified in the rule. 29 C.F.R. §§ 1904.29(b)(7), (b)(10).

### OSHA's Revision of the Recordkeeping Rule

#### A.  The Rulemaking

35.     On November 8, 2013, OSHA published a Notice of Proposed Rulemaking ("NPRM") titled "Improve Tracking of Workplace Injuries and Illnesses," 78 Fed. Reg. 67,254 (Nov. 8, 2013) ("NPRM"). The NPRM proposed modifications to OSHA's Recordkeeping Rule that would require approximately 400,000 employers to electronically submit injury and illness recordkeeping data to OSHA. In previous years, OSHA had collected only a portion of this data, in hard copy, from approximately 80,000 employers.

36.     The NPRM called for certain employers to electronically submit their Form 300 reports and Forms 301 and 300A to OSHA via an online database for posting on a publicly available website. *Id*. The NPRM cited no evidence or data to support OSHA's assertion that any purported health and safety benefits would directly result from making employer data available online.

19

37.     There was no mention in the NPRM of any concerns regarding employer policies or programs that might discourage employees from reporting injuries and illnesses, much less an explicit reference to employer safety incentive programs or routine mandatory post-incident testing.

38.     Nevertheless, on August 14, 2014, OSHA issued a Supplemental Notice of Proposed Rulemaking ("Supplemental NPRM") to the Federal Register on August 14, 2014 at 79 Fed. Reg. 47,605 (Aug. 14, 2014), asserting the unsubstantiated concern that the underlying proposal "could promote an increase in workplace policies and procedures that deter or discourage employees from reporting work related injuries and illnesses." More specifically, OSHA purported to identify two basic categories of employer policies or procedures that it asserted presented this concern: (1) "unreasonable requirements for reporting injuries and illnesses"; and (2) "retaliating against employees who report injuries and illnesses," which OSHA clarified to mean situations where "an employer disciplines or takes [other] adverse action against an employee for reporting an injury or illness."

39.     OSHA then concluded the Supplemental NPRM by stating that it was "considering adding provisions [to the proposed rule] that will make it a violation for an employer to discourage employee reporting in these ways." In other words, under the misleading title of "Improve Tracking of Workplace Injuries and Illnesses," OSHA issued a supplemental notice of proposed rulemaking indicating that it was considering adopting a new recordkeeping provision allegedly designed to address alleged retaliatory conduct by employers, which has nothing to do with improving the tracking of workplace injuries and illnesses.

### B.  The Final Rule

40.     OSHA's Final New Rule was issued on May 12, 2016, 81 Fed. Reg. 29,624 and revised at 81 Fed. Reg. 31,854 on May 20, 2016.   In the Preamble to the Final Rule, OSHA stated that the New Rule has two primary objectives: (1) improve the tracking and reporting of work-related injuries and illnesses, and (2) forbid discrimination or retaliation against an employee for reporting a work-related injury. *See* 81 Fed. Reg. 29,663, 29,670.

41.     The New Rule amended 29 C.F.R. Part 1904.41 by requiring employers that have 250 or more employees at any time during the previous calendar year, to electronically submit once a year information from Forms 300, 301, and 300A. *See* 81 Fed. Reg. at 29,692. For employers with 20 or more but fewer than 250 employees in designated industries, employers are required to electronically submit Form 300A Summary of Work-Related Injuries and Illnesses once a year to OSHA. *Id*. The New Rule also explains that some employers that are not automatically covered by the requirements above may be notified separately to submit certain records to the Agency. *Id*.

42.     The New Rule's Preamble states that work-related injury and illness information received electronically will be posted online for viewing by the public. 81 Fed. Reg. at 29,624-25. This includes confidential business information from Form 300A, such as the total number of employees and total number of employee hours worked.

43.     The New Rule also added what it described as the anti-discrimination and anti-retaliation provisions in Sections 1904.35, titled "Employee involvement." Revised Section 1904.35(b) states:

>      (b) Implementation—(1) What must I do to make sure that employees
>      report work-related injuries and illnesses to me?

21

(i) **You must establish a reasonable procedure for employees to report work-related injuries and illnesses promptly and accurately. A procedure is not reasonable if it would deter or discourage a reasonable employee from accurately reporting a workplace injury or illness;**

(ii) You must inform each employee of your procedure for reporting work-related injuries and illnesses;

(iii) **You must inform each employee that: (A) Employees have the right to report work-related injuries and illnesses; and (B) Employers are prohibited from discharging or in any manner discriminating against employees for reporting work-related injuries or illnesses; and**

(iv) **You must not discharge or in any manner discriminate against any employee for reporting a work-related injury or illness.** [emphasis added].

44.    In its Preamble discussion of the New Rule, OSHA further stated that incident-based employer safety incentive programs, which are designed to promote safety through a procedure of offering rewards to employees who have avoided workplace accidents through use of safe work practices and behaviors, somehow violate the New Rule. Thus, according to OSHA:

> It is a violation of paragraph (b)(1)(iv) for an employer to take adverse action against an employee for reporting a work-related injury or illness, whether or not such adverse action was part of an incentive program. Therefore, it is a violation for an employer to use an incentive program to take adverse action, including denying a benefit, because an employee reports a work-related injury or illness, such as disqualifying the employee for a monetary bonus or any other action that would discourage or deter a reasonable employee from reporting the work-related injury or illness.

81 Fed. Reg. at 29,674.

> If an employer retaliates against an employee for reporting a work-related illness or injury by denying a bonus to a group of employees, feasible means of abatement could include revising the bonus policy to correct its retaliatory effect and providing the bonus retroactively to all of the employees who would have received it absent the retaliation.

81 Fed. Reg. at 29,671.

45.     In the Preamble to the new Rule, OSHA also stated that the well settled practice of routine mandatory post-incident testing would also violate the new Rule:

> [D]rug testing policies should limit post-incident testing to situations in which employee drug use is likely to have contributed to the incident, and for which the drug test can accurately identify impairment caused by drug use. [4] For example, it would likely not be reasonable to drug-test an employee who reports a bee sting, a repetitive strain injury, or an injury caused by a lack of machine guarding or a machine or tool malfunction. Such a policy is likely only to deter reporting without contributing to the employer's understanding of why the injury occurred, or in any other way contributing to workplace safety. Employers need not specifically suspect drug use before testing, but there should be a reasonable possibility that drug use by the reporting employee was a contributing factor to the reported injury or illness in order for an employer to require drug testing. In addition, drug testing that is designed in a way that may be perceived as punitive or embarrassing to the employee is likely to deter injury reporting.

81 Fed. Reg. 29,673.

46.     By thus asserting that post-accident drug testing must be limited to those tests which can accurately identify impairment caused by drug use, OSHA effectively prohibited all post-accident drug testing. This is so because, aside from alcohol tests, there are no generally recognized and accepted drug tests showing actual impairment that are available at this time. *See* http://www.nhtsa.gov/people/injury/research/job185drugs/technical-page.htm.   On October 29, 2016, OSHA unilaterally announced that it would "not enforce" the above referenced impairment requirement as set forth in the New Rule. *See* Oct. 29, 2016 Dougherty Memorandum. www.osha.gov/recordkeeping/finalrule/interp_recordkeeping_101816.htm.

---

[4] Although the language in the Preamble to OSHA's Final Rule focuses solely on "automatic post-injury drug testing," OSHA has since clarified that the Rule applies to both post-incident drug testing and post-incident alcohol testing. *See* Oct. 29, 2016 Interpretive Memorandum for Regional Directors from Deputy Assistant Secretary Dorothy Dougherty, https://www.osha.gov/recordkeeping/finalrule/interp_recordkeeping_101816.html, n.5. (hereafter "Dougherty Memorandum").

47.     OSHA has identified no basis for asserting that "it would likely not be reasonable to drug-test an employee who reports a bee sting, a repetitive strain injury, or an injury caused by a lack of machine guarding or a machine or tool malfunction." In reality, the impaired judgment resulting from drug use could contribute to or exacerbate any of the injuries described by OSHA as "likely not reasonable to drug-test" under the New Rule. Further, OSHA failed to provide any analysis of: (1) how employers would be in a position to determine there was a reasonable possibility that drug use by the injured employee was a contributing factor to the reported injury or illness; (2) the cost of finding and training personnel qualified to perform those tasks; (3) the cost of implementing such a system; (4) the impact on employee morale of having the worksite under the oversight or surveillance of such personnel and (5) the problems created by having a program that gives supervisors and others the discretion to require drug and alcohol testing.

48.     OSHA noted in the Preamble to the New Rule that otherwise prohibited mandatory post-incident testing would be permitted if required by state or federal law, or regulation, particularly if such law or regulation arises from a workers' compensation law.  81 Fed. Reg. at 29,673.  OSHA rationalized that these testing programs would be permissible because compliance with such a requirement demonstrates that "the employer's motive would not be retaliatory…" Significantly, Section 4(b)(4) of the OSH Act prohibits OSHA from superseding or "affecting" workers' compensation laws.  29 U.S.C. § 653(b)(4).  For drug and alcohol testing programs that are not required by another law, OSHA implies that any such program would, by OSHA's definition, be retaliatory without citing any basis for that conclusion.  Furthermore, OSHA makes no claim that the presence of federal or state drug and alcohol testing requirements will not result in systemic underreporting of workplace injuries.

**The Record Evidence That Incident-based Safety Incentive Programs Reduce Workplace Injuries and Illnesses.**

49.     Properly designed incident-based employer safety incentive programs are the most effective tool getting employees and supervisors immediately invested in workplace safety. Through these programs, employees are continuously motivated to improve their environment and to look out for their safety and the safety of others, and to eliminate unsafe behaviors.  The result is a dramatic decrease in accident frequency and severity.  Without these incident-based safety incentive programs, Plaintiffs have found that culture change is much more slow and difficult and seldom leads to the same dramatic reductions in serious accidents.

50.     Incident-based employer safety incentive programs are designed to invest a company's employees, including supervisors, in workplace safety.  They motivate supervisors and non-management employees to improve their work-place environment and to engage in a mutually supportive approach to workplace safety in which employees "watch each other's backs" to eliminate unsafe behaviors.  By encouraging all employees, including supervisors, to improve workplace safety, incident-based safety incentive programs jump start a change in culture that results in a prompt and sustained decrease in accident frequency and severity.

51.     A 2012 GAO report reviewed a number of studies evaluating incident-based employer safety incentive programs and found that three of those studies concluded that such incentive programs reduced injuries.  *See* United States Government Accountability Office Report to Congressional Requesters on Workplace Safety and Health, GAO-12-329 (April 2012) ("2012 GAO Report").

52.     In data submitted to OSHA during the present rulemaking, Plaintiff Great American showed that the incidence of indemnity claims (*i.e.*, serious claims that cause an employee to either lose time from work, have a permanent impairment, or both) made by its

insureds fell 39% in their first year in the Strategic Comp insurance program.  Most of these companies implemented an incident-based safety incentive program during that first year. *See* Strategic Comp's Comments to OSHA Docket No. OSHA-2013-0023, available at www.regulations.gov.

53.    Additionally, evidence was presented to OSHA demonstrating that, over the last five years, insureds' accident costs were 39% less than predicted by the National Council of Compensation Insurance ("NCCI") actuaries.  The data also showed that insureds had 58% fewer catastrophic claims than actuarially predicted.

54.    Many employers, including members of the Plaintiff associations and specifically Plaintiffs Atlantic Precast Concrete, Oxford, and Owens Steel, have implemented comprehensive incident-based safety incentive programs that encourage worker participation and interest in workplace safety.   If these safety incentive programs are eliminated by implementation of Section 1904.35(b)(1) as they must be according to OSHA's statements in the New Rule, then Plaintiffs' workplace safety will be significantly jeopardized and workplace injuries and illnesses will significantly increase in both frequency and severity, causing irreparable harm to the Plaintiffs' members and insureds, and their employees. The elimination of these safety programs will also cause Plaintiffs to experience a significantly higher number and a significantly greater severity of workers compensation claims, resulting in significantly increased premiums to the Plaintiff insureds, and potentially eliminating the ability of insurers such as Great American to write worker compensation policies for certain high risk businesses.

**The Federal Government and Many States Have Recognized the Value of Routine Mandatory Post-Incident Testing in Addressing Substance Abuse, Which is a Major Threat to Workplace Safety and Health in the U.S.**

55.     The United States Department of Health and Human Services (DHHS) reported in 2014 that "most illicit drug users were employed.  Of the 22.4 million current users aged 18 or older in 2013, 15.4 million (68.9 percent) were employed either full-time or part-time."  U.S. Dep't of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Behavioral and Health Statistics and Quality, *Results from the 2013 National Survey on Drug Use and Health:  Summary of National Findings, Highlights*, at 2 (Sep. 25, 2014).  Among full-time employed adults, 9.5 % were substance-dependent while 9.3% of part-time employed adults were substance-dependent.  *Id*. at 88.

56.     DHHS reported that the situation for alcohol abusers is increasingly dire.  DHHS reported that "[a]mong adults in 2013, most binge and health alcohol users were employed.  Among 58.5 million adults who were binge drinkers, 44.5 million (76.1%) were employed either full-time or part-time.  Among the 16.2 million adults who were heavy drinkers, 12.4 million (76.0 %) were employed."  *Id*. at 41.

57.     Alcohol abuse has also been linked to workplace injuries and workplace safety.  For instance, Dawson showed a positive relationship between drinking five or more drinks daily in the past year and having an on-the-job injury among respondents. *See* Dawson, D.A.*, Heavy drinking and the risk of occupational injury*, Accident Analysis and Prevention 26(5):655–665 (1994). Similarly, researchers who examined rates of drinking in the past 30 days and self-reported injuries while working for pay among high school–aged workers in Texas found that the likelihood of occupational injuries substantially increased in relative proportion to the amount of alcohol consumed on a regular basis. *See* Shipp, et al., *Substance Use and Occupational Injuries Among High School Students in South Texas*, American Journal of Drug and Alcohol Abuse, Vol. 31, No. 2, pp. 253–265 (2005). Heavy drinkers therefore had the highest likelihood of

occupational injuries. *Id.* The National Council on Alcoholism and Drug Dependence ("NCADD") also reported in 2015 that (1) workers with alcohol problems were "2.7 times more likely" than those without drinking problems to have injury-related absences; (2) "35% of patients with an occupational injury" that report to a hospital emergency department were at-risk drinkers; (3) breathalyzer tests used on emergency room patients injured at work detected alcohol 16% of the time; (4) a survey of workplace fatalities has demonstrated that 11% of the victims had been drinking; and (5) "one-fifth of workers and managers across a wide range of industries and company sizes report that a coworker's on-or off-the-job- drinking jeopardized their own productivity and safety." *Drugs and Alcohol in the Workplace*, NCADD, https://www.ncadd.org/about-addiction/addiction-update/drugs-and-alcohol-in-the-workplace. (last modified Apr. 26, 2015).

58.     Many states have workers' compensation premium reduction statutes that <u>encourage</u> post-accident and post-injury drug testing. For example, Minnesota's Workers Compensation Act, which permits employers to conduct drug and alcohol testing in four limited circumstances (1) pre-employment, (2) routine physical examination testing, (3) random, and (4) on a reasonable suspicious basis, provides employers with a discount on workers' compensation premiums for implementing and maintaining drug free workplaces in compliance with the Act. *See* Minn. Stat. Ann. § 176.0001 *et seq.*; Minn. Stat. Ann. § 181.950 *et seq.* Notably, even though Minnesota's workers compensation and drug and alcohol testing laws limit an employers' right to conduct testing to only specific employment scenarios or upon a reasonable suspicious basis, reasonable suspicion testing under Minnesota's Drug and Alcohol Testing in the Workplace Act explicitly includes situations wherein an employee "has sustained a personal

injury," or "has caused another employee to sustain a personal injury." Minn. Stat. Ann. §
181.950 *et seq*.

59.    Some states also <u>require</u> routine post-accident and post-injury drug testing in
certain job classifications or for certain types of workplace accidents. For example, Alabama's
Workers Compensation statute requires post-accident testing when an employee has caused or
contributed to an on-the-job injury that resulted in lost time. *See* Ala. Code §§ 25-5-330 *et seq*.
(2012).

60.    A number of states have further developed model drug free workplace programs
for employers to use, which incorporate mandatory, routine post-accident and post-injury drug
testing. For example, Ohio's Bureau of Workers Compensation has provided guidance to
employers titled "Drug Free Safety Program Guide," which <u>advises</u> employers to conduct post-
accident alcohol and or/other drug testing of any employees who have caused or contributed to
an   accident.   *See*   Drug   Free   Safety   Program   (DFSP)   information,   BWC,
https://www.bwc.ohio.gov/employer/programs/dfspinfo/dfspdescription.asp (last visited Jun. 3,
2016).

**There is No Scientific Data in the Record Showing that Incident-Based Safety Incentive
Programs or Routine, Mandatory, Post-Incident Testing Programs Result in Significant
Under-Reporting of Injuries**

61.    Not long before issuing the Supplemental NPRM leading to the New Rule,
OSHA for the first time asserted that some types of employer safety incentive programs may
have the effect of "discouraging workers from reporting an injury or illness." *See Revised VPP
Policy Memorandum #5: Further Improvements to the Voluntary Protection Programs (VPP),*
OSHA,  (Aug. 14, 2014), https://www.osha.gov/dcsp/vpp/policy_memo5.html [hereinafter "VPP

Memo"]; *Memorandum on Employer Safety Incentive and Disincentive Policies and Practices,* Deputy Assistant Secretary Richard E. Fairfax, (Mar. 12, 2012), https://www.osha.gov/as/opa/whistleblowermemo.html [hereinafter "Fairfax Memo"]. However, none of these assertions have ever been directly, or even indirectly, supported by data or studies showing that incident-based safety incentive programs actually result in underreporting or inaccurate reporting of workplace injuries and illnesses. Instead, OSHA has merely asserted that "there are better ways to encourage safe work practices" and that the agency has received anecdotal reports of employees being discouraged by these types of programs. *See generally,* Fairfax Memo *supra* at ¶¶ 3-4.

62.   In the one reported decision where OSHA claimed that an incentive program discouraged reporting, that contention was rejected because OSHA's evidence was not credible. *See Secretary v. Trico Tech. Corp.*, OSHRC Docket No. 9100110 (1993).  For instance, while one witness testified, "he was afraid to report injuries," he did in fact report a hernia. *Id.*

63.   A 2009 ERG report on an audit of OSHA recordkeeping in 2006 also found that

> [t]he percent of establishments classified with accurate recordkeeping (at-or-above the 95 percent threshold) is above 96 percent for both total recordable and DART injury and illness cases.  Based on 95 percent confidence intervals for the two estimates, the percentages of 98.34 percent for total recordable cases and 27 percent for DART cases are not statistically different.  Overall, the universe estimates for this year are consistent with the level of accuracy observed for employer injury and illness recordkeeping over previous years of the audit program.

OSHA Data Initiative Collection Quality Control: Analysis of Audits on CY 2006 Employer Injury and Illness Recordkeeping, Final Report, ERG (November 25, 2009).

64.   In 2009, OSHA implemented a Recordkeeping National Emphasis Program ("NEP") instructing OSHA inspectors to conduct recordkeeping audits and interview employees,

supervisors, and medical personnel to determine, among other things, whether company incentives or disciplinary programs discouraged employees from reporting work-related injuries. *See* OSHA Directive No. 10-02, CPL 02, Injury and Illness Recordkeeping National Emphasis Program, February 19, 2010 ("NEP").  The program began in 2010 and continued for two years.

65.     The NEP resulted in 550 federal and state recordkeeping inspections. *Analysis of OSHA's National Emphasis Program on Injury and Illness Recordkeeping*, ERG, pg. 3 (Nov. 1, 2013).  A report on the NEP showed that almost three times as many of the interviewed workers felt that incentive programs encouraged reporting than those who felt they discouraged it. *Id.* The vast majority of workers felt that such programs neither encouraged nor discouraged reporting. *Id.*  Notably, the analysis of the NEP program did not conclude that incentives caused under-reporting. OSHA also did not cite the NEP – the only study they have conducted on the topic – as support for the New Rule or as demonstrating that incentive and/or drug testing programs deter the reporting of workplace injuries.

66.     In its 2012 report, the GAO identified six studies assessing the effect of safety incentive programs.  GAO found that only two of those studies "analyzed the potential effect on workers' reporting of injuries and illnesses, but they concluded that there was no relationship between the programs and injury and illness reporting." *See* 2012 GAO Report.

67.     Nevertheless, in its 2014 Supplemental NPRM, OSHA asked commenters, "[a]re you aware of any studies or reports on practices that discourage injury and illness reporting?  If so, please provide them." 79 Fed. Reg. 47607 (Aug. 14, 2014). Plaintiff Great American through Strategic Comp submitted data to OSHA that shows the incident-based safety incentive programs implemented by its insureds do not impact the reporting of workplace accidents or injuries. According to the data, the ratio of indemnity claims to total claims was reduced by 17% among

first year insureds.   If safety incentives caused under-reporting, Strategic Comp would have expected to find evidence in their data that their insureds were suppressing the smaller (*i.e.,* more easily suppressible) claims, thereby inflating the ratio of indemnity to overall claims.   The data shows the exact opposite, and the decrease in the ratio is evidence that the reporting has become more robust.   Other data showed that 94% of indemnity claims were reported within two weeks of the accident date, which is better than the industry average of 82%, and which indicates that claims are not being ignored until they become so serious that they cannot be hidden but are being promptly reported.

68.   Many of the categories of recordable injuries or illnesses covered by OSHA's Recordkeeping Rule would be difficult or nearly impossible for an employee to hide from his/her employer due to the injury's nature, the likelihood of witnesses to the accident or incident that caused the injury, and/or the involvement of medical professionals.   The universal availability of workers' compensation benefits, which cover lost wages and indemnify the worker for all medical expenses without deductibles or co-pays, also militates in favor of informing the employer of most of the recordable injuries. To ensure employers are made aware of work-related injuries and illnesses, most employers have instituted workplace policies requiring employees to report work-related injuries and illnesses and appropriately discipline employees for failing to report such incidents. Finally, laws such as mail and wire fraud discourage medical professionals as well as workers from hiding the true nature of an injury because false communications with the employer or the employee's insurance company would form the basis of criminal liability.

69.   The New Rule is also inconsistent in allowing routine mandatory post-incident testing in instances where an individual (typically a supervisor) without any forensics or law

enforcement training has determined there is "a reasonable possibility that drug use by the reporting employee was a contributing factor to the reported injury or illness."  OSHA failed to provide any analysis of (1) how employers, as distinguished from forensics experts or trained police forces, would be in a position to make the "reasonable possibility" determinations, (2) the cost of finding and training personnel qualified to perform those tasks, (3) the cost of implementing such a system,  (4) the impact on employee morale of having the worksite under the oversight or surveillance of such personnel, and (5) the problems created by placing such discretionary authority in the hands of supervisors and other personnel.

**OSHA's Failure to Perform the Required Regulatory Analyses to Assess the Impact of the Final Rule on Workplace Safety and Health**

70.     OSHA did not provide any evidence that the implementation of safety incentive programs and routine mandatory post-incident testing of injured employees when not required by federal or state law was retaliatory or otherwise adversely impacted workplace safety. In particular, OSHA failed to distinguish between the anecdotal impact of such programs on employee reporting of injuries, and the injuries themselves. As to safety incentive programs, OSHA cited no study connecting such programs to reduced reporting of injuries and cited no study refuting the clear evidence that safety incentive programs reduce the number of workplace injuries.

71.     With regard to drug testing, OSHA cited perceived invasions of privacy as the reason why employees purportedly chose not to report workplace injuries or illnesses. *See* 81 Fed. Reg. 29,663.  OSHA claimed that requiring automatic post-accident drug and alcohol testing "is often perceived as an invasion of privacy, so if an injury or illness is very unlikely to have been caused by employee drug use, or if the method of drug testing does not identify

33

impairment but only use at some time in the recent past, requiring the employee to be drug tested may inappropriately deter reporting." 81 Fed. Reg. at 29,673. However, protecting worker privacy in this context is not within OSHA's authority and therefore does not provide a rationale for the New Rule. Even if OSHA were authorized to protect workers' privacy in this fashion, it would be arbitrary and capricious and a clear abuse of discretion to allow speculative considerations of employee privacy to outweigh the prevention of injuries, illnesses, and deaths. OSHA's apparent prohibition in the New Rule against routine mandatory post-incident testing of any employee who gets injured on the job, unless mandated by federal or state law, was made without any assessment of the relative costs and benefits of those practices. As discussed above, there is a substantial body of proof that drug testing practices prevent injuries, illnesses and deaths.

72.     Section 8(c)(1) of the OSH Act required OSHA to weigh the value of incident-based safety incentive programs and routine, mandatory post-accident drug testing in terms of lives and limbs saved by preventing future workplace incidents against the speculative costs of that testing on the accuracy of OSHA recordkeeping. OSHA was also required to assign a value to the speculative and quite possibly *de minimis* reduction in the accuracy of injury and illness records that would result if the safety programs were permitted.

73.     In other words, OSHA was required to determine that the number of individuals who would not report accidents or injuries was significant enough to affect the accuracy of the required reports. OSHA was further required to determine that the alleged improvement in the accuracy of recordkeeping justifies the sacrifice in lives and limbs from work-related incidents that clearly will result from banning the incident-based safety incentive programs and drug testing and allowing substance abuse to go undetected. Instead of carrying out this essential

analysis, as required by the OSH Act, OSHA merely declared that the impact of its New Rule on safety and health is irrelevant, while focusing instead on recordkeeping accuracy at the expense of workplace safety.

## COUNT ONE

### (Violation of the APA – The Final Rule is Unlawful because it Exceeds OSHA's Statutory Authority)

74.    Paragraphs 1 through 73 are incorporated by reference as if set forth fully herein.

75.    Congressional delegation of rulemaking authority to an administrative agency is delimited by the literal language of its enabling statute.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  OSHA's rulemaking authority is prescribed within the confines of the OSH Act, which establishes the limited rulemaking power within which OSHA must operate.  No such delegation of authority can be presumed by the agency. *State of Texas v. U.S. Dept. of Interior,* 497 F. 3d 491, 502 (2007).

76.    In promulgating Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule, OSHA has ignored the boundaries of the authority Congress delegated it in the OSH Act; and invalidly seeks and exercises authority Congress explicitly refused to grant Defendants.

77.     Such action exceeds the OSHA's statutory authority and is therefore contrary to law and invalid.

## COUNT TWO

### (Violation of the APA – Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) Fail to Follow Required Procedures)

78.    Paragraphs 1 through 77 are incorporated by reference as if set forth fully herein.

79.    The New Rule is final agency action for purposes of 5 U.S.C. § 706(2)(A).

80.     Section 4 of the APA generally requires substantive regulations, such as OSHA's New Rule, to provide adequate notice to interested parties and permit sufficient time for comment consistent with the notice and comment provisions of the APA. 5 U.S.C. § 553.

81.     OSHA's regulation of the Safety Program Components through Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the Final Rule is unlawful because OSHA failed to provide interested parties with legally adequate notice of its intent to adopt a rule that would for the first time prohibit incident-based safety incentive programs and/or routine, mandatory post-accident drug testing.

## COUNT THREE

**(Violation of the OSH Act – OSHA Failed to Conduct the Required Regulatory Analysis with respect to Subparagraphs 1904.35(b)(1)(i), (iii), and (iv))**

82.     Paragraphs 1 through 81 are incorporated by reference as if set forth fully herein.

83.     Section 8(c)(1) provides that any recordkeeping prescribed by regulation must be necessary or appropriate for the enforcement of the OSH Act or for developing information regarding the causes and prevention of occupational accidents and illnesses.

84.     OSHA's regulation of the Safety Program Components through Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the Final Rule is unlawful because OSHA failed to demonstrate that those provisions are reasonably necessary or appropriate for the enforcement of the OSH Act or for developing information regarding the causes and prevention of occupational accidents and illnesses as required by Section 8(c)(1) of the OSH Act.

85.     In addition, under Section 8(c)(1) and 8(d) of the OSH Act, OSHA is prevented from enacting recordkeeping regulations that directly, or indirectly, impose unreasonable burdens on employers. *See* OSH Act Section 8(d), 29 U.S.C. 657(d) (1970); U.S. Senate Labor

and Public Welfare Committee Report on the Occupational Safety and Health Act of 1970, (P.L. 91-596), No. 91-1282, 5193-51.

86.     OSHA's regulation of the Safety Programs through Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule is unlawful because OSHA failed to demonstrate that those provisions did not, directly or indirectly, impose unreasonable burdens on employers as required by Section 8(c)(1) and 8(d) of the OSH Act.

## COUNT FOUR

### (Violation of the OSH Act - Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) Interfere with State Workers Compensation Laws)

87.     Paragraphs 1 through 86 are incorporated by reference as if set forth fully herein.

88.     Section 4(b)(4) of the OSHA Act prohibits OSHA from "affecting" workers compensation laws. As noted above, many state workers compensation laws either require or encourage employers to routinely conduct post-accident drug testing. The New Rule interferes with, and clearly "affects" state workers compensation laws by prohibiting or otherwise limiting routine, post-incident drug testing programs that are encouraged by such laws.

## COUNT FIVE

### (Violation of the APA – Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) are Arbitrary and Capricious)

89.     Paragraphs 1 through 88 are incorporated by reference as if set forth fully herein.

90.     The New Rule is final agency action for purposes of 5 U.S.C. § 706(2)(A).

91.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

92.       The New Rule is arbitrary, capricious, and an abuse of discretion because it is without any basis in fact in that there is no reliable evidence to support OSHA's assertion that safety incentive programs or post-accident drug testing programs lead to materially inaccurate reporting or underreporting, and ignores available evidence to the contrary.

93.       The New Rule is arbitrary, capricious, and an abuse of discretion, because it regulates programs that improve workplace safety, without any consideration of how the revised rule would impact workplace safety and health. The Rule's  requirement that employers adopt "reasonable" reporting procedures  is so vague and ambiguous as to deprive employers of notice of their obligations under the Rule. The further declaration in the Rule that requiring immediate reporting of injuries is itself "unreasonable" constitutes an unjustified burden on employers without support in the Administrative Record.

94.       The New Rule is arbitrary, capricious, and an abuse of discretion, because the literal language of the New Rule gives no adequate notice of what constitutes retaliatory activity, and the Rule's preamble and subsequent guidance from OSHA purporting to explain what the Rule requires and prohibits are contradictory, arbitrary, and confusing.

95.       The New Rule is arbitrary and capricious, and an abuse of discretion, because OSHA failed to conduct required regulatory impact analyses demonstrating that the purported increase in recordkeeping accuracy and employee reporting outweighs the overall workplace safety benefits provided from the Safety Program Components.

96.       The New Rule also fails adequately to acknowledge or explain OSHA's reversal of longstanding policy regarding the enforcement of the Act or to be cognizant that such longstanding policies have engendered serious reliance interests that must be taken into account. *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 1538 (2016). It is also evident that OSHA relied

on factors which Congress did not intend it to consider; failed to consider important aspects of the problem; and offered explanations for its New Rule that run counter to the evidence. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43 (1983).

## COUNT SIX

### (Violation of the APA – Subparagraph 1904.41 Exceeds OSHA's Statutory Authority)

97.     Paragraphs 1 through 96 are incorporated by reference as if set forth fully herein.

98.     Ass noted above, Congressional delegation of rulemaking authority to an administrative agency is delimited by the literal language of its enabling statute.  In promulgating Subparagraph 1904.41 of the New Rule authorizing public dissemination of employee work-related injury and illness reports, OSHA has ignored the boundaries of the authority Congress delegated it in the OSH Act; and invalidly seeks and exercises authority Congress explicitly refused to grant Defendants by attempting to publish injury and illness data and confidential business information.

99.      Such action exceeds the OSHA's statutory authority and is therefore contrary to law and invalid.

## COUNT SEVEN

### (Violation of the APA – Subparagraph 1904.41 is Arbitrary and Capricious)

100.    Paragraphs 1 through 99 are incorporated by reference as if set forth fully herein.

101.    The New Rule is final agency action for purposes of 5 U.S.C. § 706(2)(A).

102.   The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

103.   An agency acts arbitrarily and capriciously if it ignores significant evidence in the  record, draws conclusions that conflict with the record evidence, relies on contradictory assumptions or conclusions, or fails to consider an important aspect of the problem it purports to be remedying. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "consider [all] important aspect[s] of the problem," and may not "offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. An agency also must acknowledge and offer a reasoned explanation for any change in its position, and must demonstrate its cognizance of the impact of change on the reliance interests of those regulated by the previous rule or policy. *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 1538;  *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

104.   In promulgating Subparagraph 1904.41 of the New Rule authorizing public dissemination of employee work-related injury and illness reports in a publicly-available online database, OSHA acted arbitrarily, capriciously, and abused its discretion when it failed to articulate any discernible health and safety benefits that would flow from the public dissemination of employers' confidential business information via the work-related injury and illness reports.  There is also no evidence that OSHA examined the harm employers would suffer by making injury and illness reports available in a public database. Subparagraph 1904.41 of the

New Rule also fails to adequately acknowledge or explain its reversal in OSHA's longstanding treatment of confidential business information.

105.    For these reasons, Subparagraph 1904.41 is arbitrary, capricious, and an abuse of discretion and should be set aside.

## COUNT EIGHT

**(Violation of the APA – Subparagraph 1904.41 Violates the First Amendment of the United States Constitution)**

106.    Paragraphs 1 through 105 are incorporated by reference as if set forth fully herein.

107.    Pursuant to the APA, agency action shall be vacated and set aside where it violates a constitutional right or privilege. 5 U.S.C. § 706(2)(B).

108.    The First Amendment protects against compelled speech. *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359 (D.C. Cir. 2014), *adhered to on reh'g*, 800 F.3d 518 (D.C. Cir. 2015) (vacating SEC's public disclosure rule); *see also  Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (plurality op.).

The posting and publication of employer injury and illness data in an online database will disclose controversial and confidential business information, including the total number of employees and total number of employee hours listed on each employer's Form 300A. As noted above, OSHA has previously declared that public disclosure of this sort of information may cause substantial  competitive  injury to employers. *New York Times Co. v. U.S. Dep 't of Labor*, 340 F. Supp. 2d 394, 402 (S.D.N.Y. 2004). For this reason, Subparagraph 1904.41 of the New Rule is unlawful as it violates the First Amendment of the United States Constitution and should be set aside.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

109.    WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

      a.     An order vacating and setting aside Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule generally, or at least insofar as these provisions prohibit incident-based Employer Safety Incentive Programs and Routine Mandatory Post-Incident Testing, and/or prohibit immediate reporting of injuries;

      b.     A declaratory judgment and Order that Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule are unlawful because they are:

      c.     in excess of OSHA's statutory jurisdiction and authority,

      d.     not adopted in accordance with OSHA's statutory authority,

      e.     not adopted in accordance with applicable procedural requirements, and

      f.     arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

      g.     An Order vacating and setting aside permanently any aspect of Subparagraphs 1904.35(b)(1)(i), (iii), and (iv) of the New Rule generally, or at least as they relate to incident-based employer safety incentive programs and routine mandatory post-incident testing;

      h.     An Order vacating and setting aside permanently the public disclosure requirements of the new 1904.41.

      h.     An Order awarding Plaintiffs their reasonable costs and attorneys' fees in connection with this action; and

42

i.      An Order granting such other and further relief as this Honorable Court deems just and proper.

Respectfully submitted,

Dated:  February 8, 2017

Of Counsel:

Linda E. Kelly
Patrick N. Forrest
Leland P. Frost
Manufacturers' Center for Legal Action
733 10th Street, NW, Suite 700
Washington, DC 20001
(202) 637-3000
*Counsel for the National
  Association of Manufacturers*

Richard Moskowitz
General Counsel
American Fuel & Petrochemical
Manufacturers
1667 K Street NW, Suite 700
Washington, DC 20006
202.552.8474

Lawrence P. Halprin
Douglas Behr
Keller and Heckman, LLP
1001 G St., N.W.
Suite 500 West
Washington, D.C. 20001
202-434-4177

*/s/ Steven R. McCown*
Steven R. McCown
TX Bar 13466500
Maurice Baskin*
DC Bar 248898
Thomas Benjamin Huggett
PA Bar 80538
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX 75201-2931
(214) 880-8100

Attorneys for Plaintiffs

*pro hac vice motion pending

43