IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXO ABC/AGC, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 3:16-CV-1998-L |
| | ) | |
| THOMAS E. PEREZ, SECRETARY | ) | |
| OF LABOR, UNITED STATES | ) | |
| DEPARTMENT OF LABOR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## APPENDIX IN SUPPORT OF MOTION TO INTERVENE

In accordance with Local Rule 7.1(i), Movants American Federation of Labor and

Congress of Industrial Organizations ("AFL-CIO") and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,

AFL-CIO/CLC ("USW") (collectively, "Union Intervenors") submit the following documentary

evidence in support of their "MOTION TO INTERVENE," filed contemporaneously herewith:

| **TAB** | **DOCUMENT** | **PAGE(S)** |
|---|---|---|
| **Tab A** | Memorandum for the Heads of Executive Departments and Agencies from Reince Priebus, Assistant to the President and Chief of Staff (Jan. 20, 2017) | APP 001-3 |
| **Tab B** | Presidential Executive Order on Enforcing the Regulatory Reform Agenda (Feb. 24, 2017) | APP 004-8 |
| **Tab C** | Movants' Submissions in the Rulemaking | APP 009-84 |

Respectfully submitted,

  s/Jeremiah A. Collins
JEREMIAH A. COLLINS*
DC Bar No.  241935
THOMAS W. PEREZ-LOPEZ*
DC Bar No.  1019172
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St NW, Suite 1000
Washington, D.C.  20005
Tele.: (202) 842-2600
Fax: (202) 842-1888
E-mail:  jcollins@bredhoff.com
tplopez@bredhoff.com


RANDY S. RABINOWITZ*
DC Bar No.  335935
OSH Law Project, LLC
P.O. Box 3769
Washington, DC  20027
Tele.: 202-256-4080
E-mail:  randy@oshlaw.org

  s/Sanford R. Denison
SANFORD R. DENISON
TX Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Avenue, Suite 550
Dallas, TX 75214
Tel.: (214) 637-0750
Fax: (214) 637-0730
E-mail: denison@baabdenison.com

Date: February 27, 2017

*Application for Admission
  *Pro Hac Vice* to be Filed

*Counsel for Movants
for Intervention AFL-CIO and USW*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 27th day of February, 2017, the above and foregoing document was served on all counsel of record electronically or by another means authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>   s/Sanford R. Denison           </u>
SANFORD R. DENISON

# TAB A

 ꞁhe WHITE HOUSE   PRESIDENT DONALD J. TRUMP



≡

## From the Press Office

Speeches & Remarks

Press Briefings

Statements & Releases

Presidential Actions

Executive Orders

**Presidential Memoranda**

Proclamations

Related OMB Material

Legislation

Nominations & Appointments

Disclosures

**The White House**
Office of the Press Secretary

For Immediate Release                                    January 20, 2017

# Memorandum for the Heads of Executive Departments and Agencies

FROM:          Reince Priebus
                    Assistant to the President and Chief of Staff

APP 001

SUBJECT:        Regulatory Freeze Pending Review

The President has asked me to communicate to each of you his plan for managing the Federal regulatory process at the outset of his Administration. In order to ensure that the President's appointees or designees have the opportunity to review any new or pending regulations, I ask on behalf of the President that you immediately take the following steps:

1. Subject to any exceptions the Director or Acting Director of the Office of Management and Budget (the "OMB Director") allows for emergency situations or other urgent circumstances relating to health, safety, financial, or national security matters, or otherwise, send no regulation to the Office of the Federal Register (the "OFR") until a department or agency head appointed or designated by the President after noon on January 20, 2017, reviews and approves the regulation. The department or agency head may delegate this power of review and approval to any other person so appointed or designated by the President, consistent with applicable law.

2. With respect to regulations that have been sent to the OFR but not published in the Federal Register, immediately withdraw them from the OFR for review and approval as described in paragraph 1, subject to the exceptions described in paragraph 1. This withdrawal must be conducted consistent with OFR procedures.

3. With respect to regulations that have been published in the OFR but have not taken effect, as permitted by applicable law, temporarily postpone their effective date for 60 days from the date of this memorandum, subject to the exceptions described in paragraph 1, for the purpose of reviewing questions of fact, law, and policy they raise. Where appropriate and as permitted by applicable law, you should consider proposing for notice and comment a rule to delay the effective date for regulations beyond that 60-day period. In cases where the effective date has been delayed in order to review questions of fact, law, or policy, you should consider potentially proposing further notice-and-comment rulemaking. Following the delay in effective date

    a. for those regulations that raise no substantial questions of law or policy, no further action needs to be taken; and

    b. for those regulations that raise substantial questions of law or policy, agencies should notify the OMB Director and take further appropriate action

**APP 002**

in consultation with the OMB Director.

4. Exclude from the actions requested in paragraphs 1 through 3 any regulations subject to statutory or judicial deadlines and identify such exclusions to the OMB Director as soon as possible.

5. Notify the OMB Director promptly of any regulations that, in your view, should be excluded from the directives in paragraphs 1 through 3 because those regulations affect critical health, safety, financial, or national security matters, or for some other reason. The OMB Director will review any such notifications and determine whether such exclusion is appropriate under the circumstances.

6. Continue in all circumstances to comply with any applicable Executive Orders concerning regulatory management.

As used in this memorandum, "regulation" has the meaning given to "regulatory action" in section 3(e) of Executive Order 12866, and also includes any "guidance document" as defined in section 3(g) thereof as it existed when Executive Order 13422 was in effect. That is, the requirements of this memorandum apply to "any substantive action by an agency (normally published in the Federal Register) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking," and also covers any agency statement of general applicability and future effect "that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue."

This regulatory review will be implemented by the OMB Director. Communications regarding any matters pertaining to this review should be addressed to the OMB Director.

The OMB Director is authorized and directed to publish this memorandum in the Federal Register.

REINCE PRIEBUS



# TAB B

Presidential Executive Order on Enforcing the Regulatory Reform A...        https://www.whitehouse.gov/the-press-office/2017/02/24/presidential...

 *the WHITE HOUSE*   *PRESIDENT DONALD J. TRUMP*



≡

## From the Press Office

Speeches & Remarks

Press Briefings

Statements & Releases

Presidential Actions

**Executive Orders**

Presidential Memoranda

Proclamations

Related OMB Material

Legislation

Nominations & Appointments

Disclosures

**The White House**
Office of the Press Secretary

For Immediate Release                                   February 24, 2017

# Presidential Executive Order on Enforcing the Regulatory Reform Agenda

EXECUTIVE ORDER

- - - - - - -

APP 004

ENFORCING THE REGULATORY REFORM AGENDA

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to lower regulatory burdens on the American people by implementing and enforcing regulatory reform, it is hereby ordered as follows:

Section 1.  Policy.  It is the policy of the United States to alleviate unnecessary regulatory burdens placed on the American people.

Sec. 2.  Regulatory Reform Officers.  (a)  Within 60 days of the date of this order, the head of each agency, except the heads of agencies receiving waivers under section 5 of this order, shall designate an agency official as its Regulatory Reform Officer (RRO).  Each RRO shall oversee the implementation of regulatory reform initiatives and policies to ensure that agencies effectively carry out regulatory reforms, consistent with applicable law.  These initiatives and policies include:

> (i)  Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs), regarding offsetting the number and cost of new regulations;

> (ii)  Executive Order 12866 of September 30, 1993 (Regulatory Planning and Review), as amended, regarding regulatory planning and review;

> (iii)  section 6 of Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), regarding retrospective review; and

> (iv)  the termination, consistent with applicable law, of programs and activities that derive from or implement Executive Orders, guidance documents, policy memoranda, rule interpretations, and similar documents, or relevant portions thereof, that have been rescinded.

(b)  Each agency RRO shall periodically report to the agency head and regularly consult with agency leadership.

Sec. 3.  Regulatory Reform Task Forces.  (a)  Each agency shall establish a Regulatory Reform Task Force composed of:

> (i)  the agency RRO;

> (ii)  the agency Regulatory Policy Officer designated under section 6(a)(2) of Executive Order 12866;

(iii)  a representative from the agency's central policy office or equivalent central office; and

(iv)  for agencies listed in section 901(b)(1) of title 31, United States Code, at least three additional senior agency officials as determined by the agency head.

(b)  Unless otherwise designated by the agency head, the agency RRO shall chair the agency's Regulatory Reform Task Force.

(c)  Each entity staffed by officials of multiple agencies, such as the Chief Acquisition Officers Council, shall form a joint Regulatory Reform Task Force composed of at least one official described in subsection (a) of this section from each constituent agency's Regulatory Reform Task Force.  Joint Regulatory Reform Task Forces shall implement this order in coordination with the Regulatory Reform Task Forces of their members' respective agencies.

(d)  Each Regulatory Reform Task Force shall evaluate existing regulations (as defined in section 4 of Executive Order 13771) and make recommendations to the agency head regarding their repeal, replacement, or modification, consistent with applicable law.  At a minimum, each Regulatory Reform Task Force shall attempt to identify regulations that:

(i)  eliminate jobs, or inhibit job creation;

(ii)  are outdated, unnecessary, or ineffective;

(iii)  impose costs that exceed benefits;

(iv)  create a serious inconsistency or otherwise interfere with regulatory reform initiatives and policies;

(v)  are inconsistent with the requirements of section 515 of the Treasury and General Government Appropriations Act, 2001 (44 U.S.C. 3516 note), or the guidance issued pursuant to that provision, in particular those regulations that rely in whole or in part on data, information, or methods that are not publicly available or that are insufficiently transparent to meet the standard for reproducibility; or

(vi)  derive from or implement Executive Orders or other Presidential directives that have been subsequently rescinded or substantially modified.

(e)  In performing the evaluation described in subsection (d) of this section, each

Regulatory Reform Task Force shall seek input and other assistance, as permitted by law, from entities significantly affected by Federal regulations, including State, local, and tribal governments, small businesses, consumers, non-governmental organizations, and trade associations.

(f)  When implementing the regulatory offsets required by Executive Order 13771, each agency head should prioritize, to the extent permitted by law, those regulations that the agency's Regulatory Reform Task Force has identified as being outdated, unnecessary, or ineffective pursuant to subsection (d)(ii) of this section.

(g)  Within 90 days of the date of this order, and on a schedule determined by the agency head thereafter, each Regulatory Reform Task Force shall provide a report to the agency head detailing the agency's progress toward the following goals:

   (i)  improving implementation of regulatory reform initiatives and policies pursuant to section 2 of this order; and

   (ii)  identifying regulations for repeal, replacement, or modification.

Sec. 4.  Accountability.  Consistent with the policy set forth in section 1 of this order, each agency should measure its progress in performing the tasks outlined in section 3 of this order.

(a)  Agencies listed in section 901(b)(1) of title 31, United States Code, shall incorporate in their annual performance plans (required under the Government Performance and Results Act, as amended (see 31 U.S.C. 1115(b))), performance indicators that measure progress toward the two goals listed in section 3(g) of this order.  Within 60 days of the date of this order, the Director of the Office of Management and Budget (Director) shall issue guidance regarding the implementation of this subsection.  Such guidance may also address how agencies not otherwise covered under this subsection should be held accountable for compliance with this order.

(b)  The head of each agency shall consider the progress toward the two goals listed in section 3(g) of this order in assessing the performance of the Regulatory Reform Task Force and, to the extent permitted by law, those individuals responsible for developing and issuing agency regulations.

Sec. 5.  Waiver.  Upon the request of an agency head, the Director may waive compliance with this order if the Director determines that the agency generally issues very few or no regulations (as defined in section 4 of Executive Order 13771).  The

Presidential Executive Order on Enforcing the Regulatory Reform A...          https://www.whitehouse.gov/the-press-office/2017/02/24/presidential...

Director may revoke a waiver at any time.  The Director shall publish, at least once every 3 months, a list of agencies with current waivers.

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.


DONALD J. TRUMP

THE WHITE HOUSE,
    February 24, 2017



**HOME**   **BRIEFING ROOM**   **ISSUES**   **THE ADMINISTRATION**   **PARTICIPATE**

**1600 PENN**

USA.gov  |  Privacy Policy  |  Copyright Policy

**APP 008**

# TAB C

**Comments of the AFL-CIO on The Occupational Safety and Health
Administration's Proposed Rule on Improve Tracking of Workplace Injuries and
Illnesses, Docket No. OSHA - 2013-0023**

**March 10, 2014**

The AFL-CIO, a federation of 56 national unions, representing 12.5 million working
people in this country, welcomes the opportunity to present its views on OSHA's
proposed rule on Improve Tracking of Workplace Injuries and Illnesses. (78 Fed. Reg.,
November 8, 2013, pp 67254-83).

The AFL-CIO has a long and deep involvement with the injury recording and reporting
requirements under the Occupational Safety and Health Act. The federation advocated
for the inclusion of injury and illness recording and reporting requirements in the 1970
statute and participated in the development of the original recordkeeping requirements
and the Bureau of Labor Statistics injury and illness statistical programs. Since the early
1970's we have participated in every major initiative to improve the workplace injury
recordkeeping and reporting system and workplace injury and illness data including the
1986 National Academy of Sciences Panel on Counting Injuries and Illnesses in the
Workplace: Proposals for a Better System, the Keystone National Policy Dialogue on
Work-Related Illness and Injury Recordkeeping and the resulting OSHA rulemakings on
injury recording and reporting.[1,2] The AFL-CIO is also a major user of the injury and
illness data that is collected through the injury recordkeeping and reporting system for
policy and research purposes. In particular, we make extensive use of this data in the
preparation of our annual report *Death on the Job: The Toll of Neglect. A National and
State-by-State Profile of Worker Safety and Health in the United States*, which we have
produced since 1992.[3]

We support OSHA's proposed rule that will require employers to electronically report to
OSHA injury and illness data that is collected at the workplace and OSHA's plans to
make this data publicly available on its website. The collection of this data and its public
availability will provide information to workers, employers, the government and
researchers on the extent, and for some employers the types, of injuries and illnesses
occurring in individual workplaces that will greatly aid efforts to address the hazards and
exposures responsible for job injuries, illnesses and deaths.

Our comments below outline in more detail our support for the proposal, why and how
the standard must be strengthened to address employer efforts to suppress injury

---

[1] Counting Injuries and Illnesses in the Workplace: Proposals for a Better System, Panel on Occupational
Safety and Health Statistics, National Academy Press, Washington, DC. 1987
[2] Keystone National Policy Dialogue on Work-Related Illness and Injury Recordkeeping: Final Report, The
Keystone Center, Colorado, January 31, 1989
[3] The 2013 "Death on the Job" Report can be accessed at: http://www.aflcio.org/Issues/Job-Safety/Death-
on-the-Job-Report.

**APP 009**

reporting that may arise due to the rule, enterprise-wide reporting and other issues related to the proposed rule.

**The Proposed Injury Tracking Rule Builds on the Department of Labor's Decades Long Efforts to Improve and Utilize Workplace Injury and Illness Data for Prevention Purposes.**

Complete and accurate recording and reporting of work-related injury and illness data is one of the cornerstones of the OSH Act. The Act includes specific provisions on the work-related injuries and illnesses that must be recorded by employers and directs and authorizes the Secretary of Labor, in cooperation with and Secretary of Health and Human Services, to require the reporting of such information and to develop a program of occupational safety and health statistics.  At the Department of Labor, OSHA and the Bureau of Labor Statistics (BLS) have jointly shared these responsibilities, with OSHA focusing on workplace injury recording and reporting and the BLS collecting and producing injury, illness and fatality statistics.

Since the initial implementation of the Act in the 1970's, there have been a series of efforts to improve the system of occupational injury and recording and reporting and the accuracy and completeness and utility of this information for prevention purposes. In the 1980's, in response to Congressional concerns that the injury and illness data collected and statistics generated by the BLS were extremely limited, incomplete and insufficient for prevention purposes, the National Academy of Sciences conducted an in depth review of the injury recording and reporting system. The 1986 NAS panel report recommended significant changes in the data collection and reporting systems, including more extensive reporting of work-related injury and illness data for prevention purposes. The Keystone Dialogue Group on Work-Related Injuries and Illnesses, comprised of representatives of employers, unions, government agencies convened in the late 1980's to examine injury recordkeeping and reporting, also made numerous recommendations on how the system should be improved to provide more accurate, complete and useful information.

In response to these reviews and resulting recommendations, several initiatives were launched to improve the system. These included BLS initiatives to conduct a full census of traumatic workplace fatalities and a new survey to collect and report case and demographic information on serious work-related injuries and illnesses. At OSHA, these recommendations led to the development of the OSHA Data Initiative (ODI) and proposed and then final revisions to OSHA's injury and illness recordkeeping rules (29 CFR 1904.)

The ODI, initiated in 1995, required the reporting of establishment level injury and illness information from employers in selected high hazard industry sectors. This information has been collected and utilized by OSHA since that time to target inspections under its site specific targeting program. OSHA has also made this information available to the public on its website, initially as downloadable files, and

APP 0010

more recently also in a searchable website. In recent years the ODI has required the reporting of summary injury data from approximately 160,000 firms in high hazard industries in general industry.

The ODI has provided establishment specific information that has been useful for OSHA inspection purposes, helping the agency target it resources to workplaces with higher reported injury rates. Targeting inspections to higher hazard workplaces is critical given the agency's limited inspection resources – about 1,000 federal OSHA inspectors to cover the millions of workplaces under the agency's jurisdiction. This information has also been useful to workers, unions and others as a means to compare the reported injury experiences of different employers, identify worksites that may be particularly hazardous and work to address these safety and health problems.

But the ODI has been quite limited in the number of establishments covered (160,000 establishments), the type of information that is gathered and the timeliness of the data, which have limited the utility of the information. Each year data from only 80,000 establishments, out of the more than 1.5 million establishments required to keep OSHA injury records, is collected under the ODI, with construction and other hazardous industries excluded. Only summary data on injury numbers and rates is collected, there is no case data from the OSHA Form 300 injury log or more detailed data from the Form 301 case reports. And there is a two year lag from the time when the injuries occur and when the data is available for use by OSHA in its inspection programs, meaning that it may no longer reflect current workplace conditions.

The proposed injury reporting and tracking rule builds on and improves OSHA's Data Initiative. The proposal will expand the current injury summary reporting requirements to cover establishments in more industries. In addition, establishments with 250 or more employees will be required to submit quarterly reports of current OSHA 300 injury logs and the Form 301's with the detailed information on these injuries. This information will be submitted electronically, providing more timely and up-to-date information, and be available on OSHA website making it accessible to workers, employers, researchers and others for prevention purposes.

**The Injury and Illness Data Collected under the Rule will Greatly Assist Prevention Efforts**

Workplace injury and illness data is one of the basic elements that is used in injury prevention efforts, both at individual workplaces, and for addressing safety and health issues at the corporate, state, national and even global level. At the workplace this information is used by employers, workers and unions to identify hazardous jobs, operations and conditions and to address them. Corporations use this information to provide oversight of establishments under their control, the resources and investments needed to ensure safe workplaces and to ensure compliance with regulations and corporate policies. This information is also used to benchmark the performance of firms against other employers in the same industry.

3

Workers and their unions use this information both at individual worksites and across companies to identify particular problems and address them through collective bargaining or government intervention.

The government relies upon and utilizes injury and illness information to help identify and set priorities for regulations and programs, to target enforcement efforts to industries and workplaces that are hazardous and/or have particular problems and to track overall progress and effectiveness.

And injury and illness data is used by researchers to identify the association between exposure and injury and disease, the degree or risk and the particular populations and groups of workers that may be at increased risk.

As noted above, since the OSH Act was enacted, the availability of job injury and illness data through the BLS statistical programs has greatly expanded to provide more detailed information on the nature and sources of injuries and a more complete count of workplace fatalities. But access to injury and illness data at the workplace and company level remains extremely limited, available only upon request by employees and their representatives at individual workplaces or in summary form from a limited number of establishments under the OSHA Data Initiative.

The proposed injury reporting and tracking rule will greatly expand the availability of injury and illness data from individual workplaces. This information can be used by workers and family members to assess the injury records of particular employers in making employment decisions. It will assist unions in their efforts to collect injury and illness information from employers to assess conditions in individual workplaces and across employers and industries where they represent workers. Many unions already collect this information under their rights of access under the recordkeeping rule. But currently, this information must be requested and collected establishment by establishment, making the collection and analysis of this data difficult and time consuming and hindering prevention efforts.

The proposed reporting and tracking rule will also provide useful and important information to OSHA, particularly for identifying hazards of concern and high hazard workplaces or employers with widespread problems at multiple establishments.

In addition, the reporting and public availability of the information itself can greatly assist in prevention and injury reduction. This type of reporting hopefully will lead to greater corporate attention to workplace safety and health and spur action to address problems and prevent injuries and illnesses.

At the same time, there is a real concern that the reporting requirements may lead some employers to suppress injury reporting as a means to reduce reported injuries. As we discuss below, this very real concern and very real problem must be addressed by OSHA in the final rule by including enforceable provisions to prohibit such actions by employers.

4

**The Information Must be Publicly Available and Accessible**

A number of industry groups and others have argued that the injury and illness data collected from individual employers should be treated as confidential information and that releasing this information will be detrimental to employers, safety and health and violate workers' privacy. The AFL-CIO strongly disagrees.

The type of information that OSHA is collecting has been available to workers and their representatives since the passage of the Act. Under OSHA recordkeeping rules, employers are required to annually post summary information on injury and illness in the workplace, and copies of the complete OSHA log and case specific information on the cause of the injury from the Form 301 must be made available upon request. Certain personal information has been treated as private and may be withheld from disclosure, but most of the information has no confidential status. Similarly, workplace injury logs collected by OSHA in its inspection process are subject to public disclosure under the Freedom of Information Act, as is the establishment level injury and illness information that is collected by OSHA under the OSHA Data Initiative. As noted above, the ODI establishment level injury information has been posted on OSHA website for years and more recently has been accessible through a searchable data base.

At the Mine Safety and Health Administration (MSHA), OSHA's sister agency responsible for safety and health in mining, there has been a requirement for decades under 30 CFR Part 50 for mine operators to report detailed case data for every injury and illness to MSHA within a 10 day period. The data is required to be reported to MSHA using MSHA's Form 7000-1 which may be reported to MSHA manually or electronically through a secure website. The data base containing that detailed information on every individual mining injury since 1983 is available to be downloaded and searched on the government's data portal, www.data.gov (http://catalog.data.gov/dataset/accident-injuries-data-set). Injury and illness information collected by OSHA must be similarly available.

The AFL-CIO agrees that there may be certain information related to workers privacy that should not be released through a public website. This includes the details of certain cases that have privacy concerns that already are allowed to be withheld from entry on the log under 1904.29(b)(6)-(9), the names of employees and other personal identifiers that may be included on the Form 301s. The rule as proposed makes provisions to exempt this information from broad public disclosure and for keeping this information private.

For the information to be useful for safety and health purposes, it must not only be publicly available, but accessible for a variety of uses by employers, workers, unions, researchers, government agencies and others. To this end, it is important that the information not only be accessible through a searchable web page with limited search terms, it must be available for download so it can be fully searched, analyzed, manipulated and utilized. According to the proposal and other information OSHA has

APP 0013

provided on the rule, this is the approach that the agency intends to take and one that the AFL-CIO strongly supports.

In the interest of making workplace injury and illness data more accessible and useable, the AFL-CIO also urges OSHA to include a requirement in the final rule that employers who keep or report their injury records electronically be required to provide workplace access to the covered records (Log 300, Form 300A and Form 301's) in an electronic format to employees and their representatives. While employees and their representatives currently have a right to receive copies of this information upon request, there is no requirement that the information be provided in electronic format. It is the experience of many unions that some employers refuse to provide workers and unions access to OSHA injury and illness records in an electronic format even when the information is kept in this manner. Instead, they provide only handwritten copies or pdfs of files making it difficult to analyze the information for injury prevention purposes.  This injury reporting and tracking rule should address this problem and make information that is maintained by an employer in an electronic format available to workers and their representatives in an electronic searchable file.

**The Final Rule Must Include Prohibitions on Policies, Practices and Programs that Discourage Reporting of Workplace Injuries and Retaliation Against Workers Who Report Injuries and Illnesses**

The AFL-CIO fully supports the proposed reporting of work-related injuries and illnesses. At the same time we have real concerns that in response to the rule, some employers may try to suppress the reporting of work-related injuries as a means to keep their reported injuries low. Indeed at the OSHA public meeting on the proposed rule, a number of employer groups and other witnesses including the American College of Occupational and Environmental Medicine expressed a similar concern.[4]

Employer efforts to keep reported injury rates low may include practices and programs that discipline workers, including termination, for work-related injuries or incentive programs that award prizes for low injury rates. As OSHA is well aware such programs and practices are already utilized by some employers as has been documented by the GAO, congressional committees and researchers in numerous reports and studies.[5,6,7] In response to such practices in 2012, OSHA issued a memorandum outlining its policy on how such programs and practices may violate the section 11(c) anti-discrimination

---

[4] Comments of Pat O'Connor on Behalf of the American College of Occupational and Environmental Medicine (ACOEM), OSHA Public Meeting on Improve Tracking of Workplace Injuries and Illnesses, January 9, 2014, (TR p. 67).
[5] Workplace Safety and Health: Enhancing OSHA's Records Audit Process Could Improve the Accuracy of Worker Injury and Illness Data, GAO-10-10, Oct. 15, 2009, www.gao.gov/new.items/d1010.pdf.
[6] Workplace Safety and Health: Better OSHA Guidance Needed on Safety Incentive Programs:GAO-12-329, April 2012, http://www.gao.gov/products/GAO-12-329
[7] Majority Staff Report, House of Representatives, Committee on Education and Labor. *Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses,* June 2008.

provisions of the Act.[7] And OSHA has taken numerous actions to enforce against employers who have discriminated against workers for reporting injuries and illnesses. For example, in February, the Department of Labor filed suit against AT&T under section 11(c) for numerous cases of terminating workers for reporting injuries. These individual cases were the result of established corporate practices to discipline workers for reporting injuries.

The AFL-CIO applauds OSHA for its enforcement actions under 11(c) for retaliation against workers who report injuries. However, this action is insufficient to address the widespread problems that exist related to injury discipline and discouraging injury reporting. Section 11(c) enforcement applies to individual cases of discrimination, after the fact when a worker has been harmed. The enforcement tools under 11(c) are weak, cumbersome and resource intensive requiring OSHA to file suit in U.S. District Court to enforce the protections.

To address the widespread employer utilization of programs and practices that discourage injury reporting and retaliate against workers for reporting, OSHA must have regulations in place that systemically address the problem and bar these practices.

The AFL-CIO urges OSHA to add provisions to the recordkeeping rule that expressly bars incentive programs, discipline programs or other employer programs, policies or practices that discourage workers from reporting injuries and bars any adverse action against an employee who reports an injury or illness. These provisions need to be included as a regulatory requirement that can be enforced as violations of the rule, in addition to under section 11(c). The failure to include such a prohibition and enforcement mechanism in the final rule has the real potential to lead to increased actions to suppress injury reporting. This will not only hurt workers, it will undermine the integrity of injury and illness data and the prevention goals that the injury tracking rule is trying to achieve.


## Comments on Specific Provisions of the Rule and Issues Raised by OSHA

### Enterprise-Wide Reporting

OSHA has requested comments on an alternative to the rule (Alternative I) that would add a provision to the rule to require some enterprises with multiple establishments to report injury and illnesses data for those establishments. This would not require employers to combine data across all covered establishments, but rather to have the

---

[7] Memorandum for Regional Administrators, Whistleblower Managers from Richard E. Fairfax, OSHA Deputy Assistant Secretary, *Employer Safety Incentive and Disincentive Policies and Practices*, March 12, 2012. https://www.osha.gov/as/opa/whistleblowermemo.html.

APP 0015

individual establishment data submitted by the corporate entity, instead of by the individual establishments themselves.

This enterprise-wide approach to reporting will greatly aid in injury and illness prevention efforts, and the AFL-CIO strongly supports the inclusion of such a requirement in the final standard. This corporate-wide approach will help bring corporate level oversight to safety and health activities at the different entities and establishments of the employer. It will also be of great benefit to OSHA, workers, unions and others attempting to address safety and health problems at multiple establishments under the control of the same corporate entity. As was well-documented in a recent report on labor law violators by the Senate Committee on Health, Education and Pensions, current DOL enforcement data does not identify parent companies of inspected establishments, and it is not possible from available data or reporting to identify a corporation that may be responsible for multiple violations at different establishments.[8]

The concept of corporate level responsibility under the OSH Act is well-established. While the majority of OSHA's enforcement efforts are focused at the establishment level, the OSH Act itself and its obligations, including the recordkeeping requirements, apply to employers. For decades, OSHA has utilized corporate-wide settlements as a means to bring about compliance on a corporate-wide basis, and recently OSHA has attempted to utilize this corporate-wide approach in its initial enforcement actions. Under the current Severe Violator Enforcement Program (SVEP), violations at one establishment trigger expansion of oversight to other establishments of the same employer. Enterprise-wide reporting will greatly aid OSHA in its efforts to address safety and health at the corporate level and across the multiple establishments under that employer's control. In a time of limited and possibly declining inspection resources, this type of information and this type of approach are even more important for effective safety and health oversight.

OSHA has also requested comments on the scope of coverage for enterprise-wide reporting. In the draft regulatory text provided in the preamble (78 FR 67270), OSHA has suggested that all enterprises with 5 or more establishments under their control be required to report the summary Form 300A on an annual basis.

The AFL-CIO believes that the 5 establishment threshold for corporate-wide reporting is appropriate. However, for such enterprises, reporting of the smallest establishments under an employer's control may not be necessary at least on a routine basis. In the preliminary economic analysis, OSHA's has provided estimates of the scope of coverage for different thresholds of establishment size employment for corporate level reporting (78 FR 67278). Setting the establishment size cut-off at 20 or more employees for enterprise-wide reporting would not extend the coverage of the rule to additional establishments, but simply require employers to report the required summary data at

---

[8] Majority Committee Staff Report, United States Senate Health Education, Labor and Pensions Committee. *Acting Responsibly? Federal Contractors Frequently Put Workers' Lives and Livelihoods at Risk.* December 11, 2013.

APP 0016

the corporate level. Setting the establishment size threshold at one or more employees (the same as coverage under the recordkeeping requirements for employers with 10 or more employees) would cover 584,662 establishments, adding 361,070 establishments to the scope of the reporting rule. A third alternative of covering establishments with more than 11 or more employees under the enterprise-wide recording provisions would cover 291,425 establishments, extending reporting coverage to an additional 67,833 establishments.

The AFL-CIO believes that a size threshold of 11 employees for establishment coverage for enterprise wide reporting is appropriate. Given that OSHA already uses an 11 employee threshold for employers covered by the recordkeeping rule, using a similar size threshold for establishments covered by the enterprise-wide reporting requirements makes sense. This threshold will provide useful additional information to corporate officials and to OSHA for injury prevention purposes, while excluding the smallest size establishments from the reporting requirements.

<u>Scope of Coverage</u>

The proposal requires that establishments of 20 or more employees in industries with higher than average DART injury rates electronically report the summary information from the Log 300s annually to OSHA and that all establishments of 250 or more employees, provide quarterly reports of the Log 300 and Form 301 individual case data in addition to the annual summary reports. In addition, the proposal provides OSHA the authority to require the reporting of other data on a targeted basis.

The AFL-CIO believes that scope of coverage and the requirements for "smaller" establishments is appropriate. The 20 employee threshold for reporting of summary injury information is the same as that currently employed in the ODI. The only difference under the proposal is that it covers more industries and it requires electronic reporting.

The AFL-CIO also supports the proposal for more detailed and frequent reporting for larger establishments of 250 or more employees. Under the proposal, 38,000 establishments would be required to report more detailed injury and illness data on a quarterly basis, which OSHA estimates would annually capture information on 890,000 injuries and illnesses. OSHA has requested comments whether the threshold for reporting should be lowered to establishments of 100 employees or raised to establishments of 500 employees. The AFL-CIO believes that the 250 employee cut-off should be the maximum cut-off for such reporting. We encourage the agency to examine the effect of lowering the establishment threshold to 200 employees to determine and assess the additional information that would be captured by such as change, particularly information from higher hazard industries that are of greater concern.

OSHA has also requested comments on narrowing the scope of covered industries subject to reporting by using a 4 digit DART rate to identify hazardous industries as opposed to the proposal that utilizes a 2 digit level to determine coverage for

9

agriculture, utilities, construction, manufacturing and whole trade and a 4 digit level for other industry sectors. Specifically OSHA has asked whether the rule should utilize a threshold of a DART rate of 2.0/100 or 3.0/100 DART rate at the 4 digit industry level.

According to the data provided by OSHA in the preamble, both of these alternative thresholds would significantly reduce the coverage of the rule, reducing the number of establishments covered to 335,000 (DART rate of 2.0) or 152,000 (DART rate of 3.0).

The AFL-CIO believes these thresholds are too restrictive and limited. Indeed, according to the preamble, employing a DART threshold of 3.0 would cover fewer establishments (152,000) than are covered under the current ODI (160,000). The current ODI has employed a combination of 2 digit and 4 digit thresholds similar to the proposed rule.[9] There is no reason to change this approach.

## Mandatory Electronic Reporting

As proposed, the rule requires that all employers report information to OSHA in an electronic format. OSHA has requested comment on whether employers should be given the option of mandatory reporting.

The AFL-CIO strongly supports the electronic reporting requirement. This type of reporting will not only facilitate the collection and timely access and use of information, it will facilitate employers' transition to electronic recordkeeping in the workplace, making evaluation of workplace injury data much easier for employers.

The AFL-CIO points out that DOL requirements for mandatory electronic reporting are not new. DOL has required unions to electronically report extensive financial information under the Labor Management Reporting-Disclosure Act (LMRDA) since 2004.[10] This information must be filed annually using software and forms provided by DOL. These reports are then posted on the DOL website in a searchable data base. (http://kcerds.dol-esa.gov/query/getOrgQry.do)  If unions can report this kind of information electronically, surely employers can do the same for workplace injury and illness data.

To assist smaller employers in reporting workplace injury and illness data electronically, it would helpful for OSHA to provide basic software for workplace injury and illness recordkeeping from which the data can be easily uploaded/reported to OSHA through a secure website as OSHA envisions.

## Phasing-In of Reporting Requirements

OSHA has also requested comments on whether there should be a phase-in of the standard's requirements. Specifically the agency has asked whether the requirements

---

[9] OSHA Directive Number 13-01 (CPL 02), Site Specific Targeting 2012 (SST-12),  Effective Date, January 4, 2013, Appendix A, https://www.osha.gov/OshDoc/Directive_pdf/CPL_02-13-01.pdf
[10] Labor Organization Annual Financial Reports, 29 CFR Parts 403 and 408, 68 Fed. Reg. Oct. 9, 2003, p. 58374.

for mandatory electronic reporting should be phased in with establishments of 250 employees allowed to report manually for the first year, and establishments of 20 or more allowed the option of manual reporting for the first three years.

The AFL-CIO believes that establishments of 250 or more employees should be able to report electronically immediately. Smaller establishments may need additional time and the AFL-CIO believes a two year phase-in of this requirement is reasonable.

OSHA has also suggested a phase-in of reporting requirements through a three step process, where the initially the requirements would apply to a smaller universe of establishments, after which the program would be assessed, and possibly expanded to a larger universe.

The AFL-CIO does not support this type of phase-in of the requirements. As outlined above, we believe the current scope of coverage of industries and thresholds proposed by OSHA is generally appropriate, and if anything may need to be expanded for larger establishments (i.e. the establishment size threshold reduced).

However, we do believe that one area where a phase-in could be considered is the reporting of individual case data from the OSHA 301s. The more detailed data in the Form 301s present a greater challenge to the agency in collecting data and evaluating and scrubbing the data to ensure the privacy of workers. It is important that the agency address these potential privacy issues appropriately. Therefore, the AFL-CIO suggests that for larger establishments, that the requirement for the reporting of the Form 301 information go into effect 2 years after the promulgation of the final standard, with the requirements for the reporting of the Form 300A summary data and the Form 300 log injury data going into effect as proposed.

## Updating of Injury Information

OSHA has requested comments on whether employers should be obligated to update their submissions to reflect changes in injury classification/information that is recorded on their workplace records. As the proposed rule is designed requiring periodic, rather than real time, reporting of injury and illness information, updating the status of previously reported injuries could be cumbersome and confusing. The AFL-CIO does not believe that updating of past reports to OSHA should be required. Rather, the existing requirement for employers to update workplace injury records should be maintained, and the information reported to OSHA should reflect the status of those injuries at the time the report is made.

## Quality Assurance and Accuracy of Information

As discussed above in our comments, there are significant issues with the accuracy and completeness of workplace injury and illness records. Having information publicly available will allow greater scrutiny of employer reports and help improve the accuracy. But there are also real concerns that the rule could result in some employers to try to suppress injury reports as a way to lower reported injuries.

11

It is the AFL-CIO's view that one of the most important tools to help ensure that injury records reflect the true extent and nature of workplace injuries and illnesses in the workplace is a specific prohibition on employer programs, policies and practices that discourage the reporting of injuries in the recordkeeping rule which we have outlined above.

But such a provision, and other provisions of the recordkeeping rule to be effective, they must be backed up by strong enforcement. Unfortunately, OSHA's current enforcement policy on recordkeeping violations is weak and ineffective. Except in egregious cases, violations of the recordkeeping requirements are treated as a single "other-than-serious" violation, with a maximum penalty of $1,000. This type of enforcement policy sends the wrong message to employers that injury recordkeeping is not important, and violations of these requirements will not be treated seriously by the agency.

The AFL-CIO believes that OSHA must change its enforcement policy on the 1904 recordkeeping regulation to treat some violations such as discrimination against workers who report injuries, policies that discourage reporting of injuries or a pattern of underreporting, as serious or willful violations under the Act. Similarly, OSHA must use the enforcement and penalty provisions under Section 17 (g) to criminally prosecute employers who willfully make false injury and illness reports. Only with an enforcement policy that treats injury reporting as important and significant, will the proposed injury tracking and reporting rule provide data that is complete, accurate and useful for injury and illness prevention.

APP 0020

**Comments of the AFL-CIO on The Occupational Safety and Health Administration's Proposed Rule on Improve Tracking of Workplace Injuries and Illnesses, Docket No. OSHA - 2013-0023**

**Supplemental Notice (79 Fed. Reg.  Aug. 14, 2014, pp. 47605 - 10)**

The AFL-CIO, a federation of 56 national unions, representing 12.5 million working people in this country, welcomes OSHA's supplemental notice regarding the incorporation of specific regulatory provisions into OSHA's recordkeeping regulation (29 CFR 1904) to help address barriers and disincentives to injury reporting.

As the AFL-CIO outlined in our earlier March 10, 2014 comments on the proposed rule, we strongly support the inclusion of specific provisions in OSHA's record keeping rule to prohibit employer actions, practices and policies that discourage workers from reporting work-related injuries or retaliate against workers for injury reporting. Over the years, we have seen such employer policies and practices grow in numbers and scope, chilling the reporting of work-related injuries. This has resulted in the underreporting of injuries, hindering efforts to identify and correct hazards at the workplace and efforts at the state and national level to identify hazardous conditions and to take action to prevent future exposures, injuries and illnesses. While we strongly support OSHA's proposal to require employer injury reporting to OSHA and the public availability of this information, we believe that this requirement may result in more widespread employer efforts to lower their reported injury rates by erecting more barriers and disincentives to injury reporting by employees.

The incorporation of specific provisions in the recordkeeping rule (29 CFR 1904) that encourage workers to report injuries, as well as prohibit employer retaliation against workers who report injuries and policies or practices that discourage reporting or discriminate against workers for injury reporting are critical to ensure more complete injury reporting for the purposes of prevention.

Our detailed comments on the need for anti-retaliation provisions in OSHA's 1904 recordkeeping rules and recommendations for regulatory language are outlined below.

**Complete and Accurate Injury Reporting is a Prerequisite for Effective Worker Protection Efforts and Achieving the Goals of the Occupational Safety and Health Act.**

The collection of accurate and complete information on work-related injuries and illnesses was one of the key goals in the enactment of the Occupational Safety and Health Act of 1970. To this end, section 8(a)(2) of the Act directs the Secretary of Labor to "prescribe regulations requiring employers to maintain accurate records of, and make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of

1

consciousness, restriction of work or motion or transfer to another job. In addition, section 24 of the Act requires that "In order to further the purposes of the Act, the Secretary, in consultation with the Secretary of Health and Human Services, shall develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics." Section 24 of the Act directs the Secretary of Labor to "compile accurate statistics on work related injuries and illnesses which shall include all disabling, serious, or significant injuries and illnesses, whether or not involving loss of time from work, other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job."

OSHA and the Bureau of Labor Statistics have worked cooperatively to implement these requirements. Specifically, OSHA has adopted regulations requiring the recording of occupational injury and illnesses at the workplace and the reporting of fatalities and other injuries to OSHA (29 CFR 1904). The injury recordkeeping requirements were updated and revised in 2001. These regulations also included a requirement for employers to respond to OSHA's annual injury and illness survey (which OSHA has proposed to expand through the proposed rule on "Improve Tracking of Workplace Injuries and Illnesses) and to report fatalities and other catastrophic injuries to OSHA, which OSHA recently revised and expanded through a final rule issued on September 18, 2014.

The Bureau of Labor Statistics has been responsible for compiling the occupational injury and illness statistics required by the Act. The injury and illness statistics are compiled through an annual survey of employers based on the injury and illness records maintained by employers under the 1904 recordkeeping regulations. This survey produces the BLS Annual Survey of Occupational Injuries and Illnesses (SOII) and a supplemental survey with more detailed case and demographic injury and illness data. In addition, the BLS conducts a separate Census of Fatal Occupational Injuries (CFOI) to gather information on the extent and nature of fatal occupational injuries.

The injury and illness data recorded and maintained at the workplace, the injury and fatality information reported to OSHA and the occupational injury and illness statistics collected by BLS serve a broad range of purposes as is integral to the effective implementation of the Occupational Safety and Health Act. Indeed, as the legislative history of the Act noted: "Adequate information is a precondition for responsive administration of all sections of this bill." House Report No. 91-1291, 91st Congress. 2d Sess. 2 (1970) reprinted in Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, Legislative History of the Occupational Safety and Health Act of 1970 (Committee Print 1971) at 860 (Leg. Hist.).

Specifically, the injury and illness data is used by federal and state agencies to establish priorities, in the development of occupational safety and health standards,

2

targeting enforcement, surveillance, evaluation and for research purposes.[1]  The data is also used by employers, unions and workers at the workplace to identify hazardous conditions and take corrective action to prevent future injuries and exposures. As OSHA explained in the preamble of the 2001 recordkeeping rule revision (29 CFR 1904):

> "Occupational injury and illness records have several distinct functions or uses. One use is to provide information to employers whose employees are being injured or made ill by hazards in their workplace. The information in OSHA records makes employers more aware of the kinds of injuries and illnesses occurring in the workplace and the hazards that cause or contribute to them.  When employers analyze and review the information in their records, they can identify and correct hazardous workplace conditions on their own. Injury and illness records are also an essential tool to help employers manage their safety and health programs effectively.

> "Employees who have information about the occupational injuries and illnesses occurring in their workplace are also better informed about the hazards they face. They are therefore more likely to follow safe work practices and to report workplace hazards to their employers. When employees are aware of workplace hazards and participate in the identification and control of hazards, the overall level of safety and health in the workplace improves." (66 Fed. Reg., Jan. 19, 2001, pp. 5916-7).

In drafting and adopting the injury and illness recording and reporting requirements of the Act, the Congress was most concerned that the data collected be complete and accurate:

> "Full and accurate information is a fundamental precondition for the meaningful administration of an occupational safety and health program. At the present time, however, the federal government and most of the states have inadequate information on the incidence, nature or causes of occupational injuries, illnesses and deaths. Not only are the serious deficiencies in the present data collection procedures, but adherence to the commonly used method of work injury measurement –the Z16.1 standard of the American National Standards Institute—thwarts the collection of information regarding many significant work related injuries and occupational illnesses. This an essential first action under the bill should be the institution of adequate statistical programs.

> "Section 8(c) of the bill directs the Secretary of Labor to cooperate with the Secretary of Health Education and Welfare in devising regulations which

---

[1] National Research Council, Panel on Occupational Safety and Health Statistics, *Counting Injuries and Illnesses in the Workplace: Proposals for a Better System*, National Academy Press, Washington, DC. 1987.

will implement *the goal of completeness in the recording and reporting of pertinent data*." (Emphasis added). Leg. Hist. at 156.

Moreover, the legislative history shows that the Congress had great concern that the statutory requirements not result in the underreporting of injuries, and opted for broader injury reporting requirements:

"The committee recognizes the fact that some work-related injuries or ailments may involve only a minimal loss of work time or perhaps none at all, and may not be of sufficient significance to the government to require their being recorded or reported. However, the committee was also unwilling to adopt statutory language which in practice might result in underreporting." (Leg. Hist. at 157).

**Collection of Complete and Accurate Work-related Injury and Illness Data and Underreporting of Injuries and Illnesses Have Been and Remain a Serious Problem.**

Unfortunately, since the Act was passed, the accuracy and completeness of the injury and illness information recorded by employers and collected by BLS has remained a major concern and problem. Over the years there have been a number of efforts to address the problem and to improve injury and illness data. In 1986, in response to Congressional concerns about injury underreporting and the accuracy of the national statistics, the National Academy of Sciences convened an expert panel and conducted a major study on the issue: Counting Injuries and illnesses in the Workplace: Proposals for a Better System, which made major recommendations for improving the accuracy and completeness of data and the injury and illness data system.[2] Those recommendations led to the development of BLS' Census of Fatal Occupational Injuries (CFOI) and survey on case and demographic data. They also supported the establishment of an OSHA administrative system for the collection of establishment specific injury and illness data for use in standard setting, enforcement and evaluation, similar to what OSHA has implemented through the OSHA Data Initiative and what the agency is proposing in the proposed rule on Improve Tracking of Workplace Injuries and Illnesses.

In 1987, The Keystone Center convened representatives from unions, employers, health and safety professionals, government agencies and academia for a dialogue about how to improve occupational injury and illness reporting and data. That dialogue group produced a report with numerous recommendations on how to improve injury recordkeeping as well as the injury and illness data system.[3] Those recommendations helped guide OSHA in the development of its revised and updated

---

[2] National Research Council, *Counting Injuries and Illnesses in the Workplace: Proposals for a Better System, op. cit.*
[3] The Keystone Center, *Keystone National Policy Dialogue on Work-Related Illness and Injury Recordkeeping: Final Report,* Colorado, January 31, 1989.

recordkeeping regulations (29 CFR 1904) which were proposed in 1996 and finalized in January 2001.

Despite these efforts to improve injury reporting and date, underreporting of work-related injuries and illnesses remains a significant and wide spread problem.

In response to concerns about the underreporting of injuries and illnesses, numerous studies have been conducted to assess the extent of the problem. Many of these studies have examined the completeness of the Bureau of Labor Statistics (BLS) Survey on Occupational Injuries and Illnesses (SOII), and have found that the survey fails to accurately capture the true toll of work-related injuries and illnesses.

In research conducted by Boden and Ozonoff (2008), BLS' Survey of Occupational Injuries and Illnesses (SOII), which is based on OSHA 300 logs from employers, detected between 51 percent and 76 percent of lost-time injury cases in West Virginia, Washington, Oregon, Wisconsin, New Mexico and Minnesota, when compared to the worker compensation records.[4] Research by Nestoriak and Pierce found that almost 30 percent of recordable cases were not captured by BLS, and that reporting was more likely for some injuries and illnesses than others.[5] Whereas amputations and fractures seemed to be captured more completely by BLS (80-90%), the system failed to capture one-quarter to one-half of the injuries and illnesses reported through workers compensation for sprains, strains, respiratory disorders and carpal tunnel. Hearing loss was not captured at all by BLS.[6]

When comparing BLS with a greater number of surveillance systems, other studies found a large number of cases not captured by the BLS reporting system. Rosenman et al. (2006) matched case-level SOII data with data from four other Michigan databases: workers' compensation, OSHA Annual Survey, OSHA Integrated Management Information System, and the Occupational Disease Report.[7] The researchers found that only one third of OSHA recordable cases in the other four databases were captured by BLS. This study's estimates are consistent with results by Leigh, Marcin and Miller (2004) who estimated that the annual U.S. BLS estimates based on OSHA logs miss between 33 percent and 69 percent of all injuries.[8]

---

[4] Boden L, and Ozonoff A, Capture-recapture estimates of nonfatal workplace injuries and illnesses. *Ann Epidemiol.* 2008 Jun;18(6):500-6. Epub 2008 Feb 20.
[5] Nestoriak N and Pierce B. Comparing Workers' Compensation claims with establishments' responses to the SOII. *Monthly Labor Review.* 2009 May, 57-64.
[6] Boden L , Nestoriak N and Pierce B. Using Capture-Recapture Analysis to Identify Factors Associated with Differential Reporting of Workplace Injuries and Illnesses. 2010 October. Section on Survey Research Methods – *JSM.*
[7] Rosenman, KD, Kalush A, Reilly MJ, Gardiner JC, Reeves M, Luo Z. How much work-related injury and illness is missed by the national surveillance system? *J Occup Environ Med.* 2006 Apr;48(4):357-65.
[8] Leigh JP, Marcin JP, Miller TR. An Estimate of the U.S. Government's Undercount of Nonfatal Occupational Injuries. 2004 Jan. *J Occup Environ Med,* 46(1):10-18.

Similar trends have been reported in the health care, construction and service sectors. After examining underreporting of occupational injuries in four health care facilities, Galizzi et al. (2010) reported that two-thirds of health care sector injuries in workers' compensation records were found to be missing from BLS reports.[9] In small construction companies, BLS SOII data missed more than 42,000 injuries resulting in days away from work, when compared to other nationally representative databases.[10] Among 135 unionized plumbers, pipefitters and steamfitters, 27% had not reported a construction work-related injury.[11] Of the reasons for not reporting (not mutually exclusive), 25% percent of these workers feared they would not be hired by the same contractor, 22% were afraid they would lose their current job, 14% wanted to receive a safety incentive for no lost work time, 8% feared contractor management retaliation, 8% reported that contractor management discourages injury reporting, and 3% feared they would prevent their coworkers from receiving incentives. Upon interviewing unionized hotel workers about reporting injuries, other researchers discovered that 67% of hotel room cleaners with work-related pain said they did not report their pain to management due to common reporting barriers discussed below.[12]

It is important to point out that none of these studies addressed the number of injuries and illnesses that are not reported to any reporting system in the first place. The AFL-CIO's 2014 report, *Death on the Job: The Toll of Neglect*, cited that exclusions built into OSHA's reporting system already excludes more than one in six workers from the BLS Annual Survey.[13] But limitations in the OSHA reporting system and BLS survey only account for part of the undercount of injuries and illnesses. Barriers to workers reporting injuries represent an even larger and more serious problem.

### The Barriers to Injury Reporting Are Significant Particularly for Vulnerable Workers

There are a range of reasons that injuries go unreported on the OSHA log. According to researchers who have examined the issue, these reasons include work pace and production pressures, perceived severity of the injury not serious enough to report, workers and employers not knowing they should report, concern over their

---

[9] Galizzi M, Miesmaa P, Punnett L, Slatin C, and The Phase in Healthcare Research Team. Injured Workers' Underreporting in the Health Care Industry: An Analysis Using Quantitative, Qualitative, and Observational Data. *Industrial Relations A Journal of Economy and Society.* 12/2009; 49(1):22 - 43.

[10] Dong XS, Fujimoto A, Ringen K. Stafford E, Platner JW, Gittleman JL, Wang X. Injury underreporting among small establishments in the construction industry. *Am J Ind Med* 2011 May; 54(5):339-349.

[11] Moore JT, Cigularov KP, Sampson JM, Rosecrance JC, Chen PY. Construction workers' reasons for not reporting work-related injuries: An exploratory study. 2013. *JOSE*, 19(1):97-105.

[12] Scherzer T, Rugulies R, Krause N. Work-related pain and injury and barriers to workers' compensation among Las Vegas Hotel Room Cleaners. 2005 March. *Am J Public Health* 95(3): 483-88.

[13] AFL-CIO, Safety and Health Department. *Death on the Job: The Toll of Neglect, A National and State-by-State Profile of Worker Safety and Health in the United States.* 2014 May. 23rd ed,

reputation, fear of retaliation, fear of being fired, post injury drug testing policies, absenteeism policies, reward policies, and disincentive policies.[14],[15], [16], [17]

For vulnerable workers, barriers to report injuries go even further. These include a lack of knowledge or information about the connection between the reporting system and work-related health issues, language barriers, lack of sick leave benefits or financial resources which make workers reluctant to seek care, fear of deportation, a tradition of stoicism, and pressures of family responsibilities. According to a report on *Barriers to Occupational Health Services for Low Wage Workers* prepared for the Commission on Health and Safety and Workers' Compensation, California Department of Industrial Relations, fear of retaliation and actual retaliation were the most common barriers to low-wage workers for filing workers compensation claims and reporting work-related injuries.[18] Employees often fear that reporting will mean the loss of promotional opportunities or preferred assignments, harassment, firing or physical abuse, blacklisting from the industry. This fear often combines with a normalization of pain and injury, perceived personal cost of not working due to injury, enormous pressure to work through pain, and perceived employer indifference to worker injury to discourage reporting. These concerns are not uncommon and are very real:[19]

RETALIATION

> *They say if I get sick, they will take it out of my pay. One time I did take a day off because of feeling sick due to the [floor stripping] chemicals. Sometimes these chemicals make me get nose bleeds and sick to my stomach and my vision gets blurry. I try to work anyway but one day I was too sick and I couldn't come into work. My supervisor threatened to fire me if I stayed home again.* **Janitor**

BLACKLISTING

> *I was told that every time you apply for a job as soon as they get your social security number and they see you have had an injury, they are not going to give you a job.*
> **Injured Sales Worker**

FIRING

---

[14] Lipscomb HJ, Nolan J, Patterson D, Sticca V, Myers DJ. Safety, incentives, and the reporting of work-related injuries among union carpenters: "You're pretty much screwed if you get hurt at work." 2013 April. *Am J Ind Med* 56(4):389-99.

[15] Galizzi et al., 2010.

[16] Scherzer et al., 2005.

[17] Ruser J. Examining evidence on whether BLS undercounts workplace injuries and illnesses. 2008 August. *Monthly Labor Review.* 20-32.

[18] Lashuay N and Harrison R. *Barriers to Occupational Health Services for Low-Wage Workers in California*, A Report to the Commission on Health and Safety and Workers' Compensation, California Department of Industrial Relations. 2006.

[19] Ibid.

APP 0027

*One garment industry supervisor testified [in a wrongful firing case] that
the company policy was to "tell workers how to file unemployment claims"
if they complained about injuries or illnesses.* **Community Legal Clinic**

*I would refer the janitors I supervised to the doctor if they were injured but
then I would receive instructions from the company to fire them. It wasn't
everybody— mostly older people or people who might complain a lot. One
time an older woman slipped and fell and my instructions were to get rid of
her or they would get rid of me. The reason they wanted her fired was that
she went to her own doctor instead of the clinic they used. Another case
was a woman who got chemical in her eyes. I sent her to the doctor and
she spent two days in the hospital. My boss wanted her fired because he
said she should have washed out her eye when she got injured. He said
she was injuring herself on purpose to collect benefits.* **Former
Supervisor**

Many times, workers do not report injuries because of issues related to
employers' handling of medical care after reporting. Workers report a lack of adequate
medical treatment by employers, company doctor or clinics trivializing worker injuries,
being dropped off at emergency rooms to pay on their own, being provided small
amounts of cash or token to prevent worker from leaving worksite, and cost-shifting to
primary care insurers or employees all as reasons injuries go unreported.[20]

*I was standing on a forklift to unload some stuff when the driver
accidentally stepped on the gas and I fell off. I was up pretty high when I
fell. I broke some ribs. The boss refused to take me to the emergency
room. He sent me home and gave me $4 to buy some medicine and said
call me when you are feeling better. I didn't even get paid for working.* **Day
Laborer**

*We use propane gas in the floor stripper machine. It flamed up and burned
me. It took a long time to heal. You could see all the way down to the bone
for about a year. I didn't file for workers' compensation because the boss
told me not to. He kept giving me this ointment. "Here use this ointment,"
he said. But he never offered to pay medical costs for me.* **Supermarket
Janitor**

In research conducted by Scherzer et al. (2005), low-wage hotel room cleaners,
one service sector that is known to have higher rates of occupational injury and illness,
did not report injuries to management because they thought it would get better (44%),
they didn't know they should report (35%), it took too many steps to report (23%),
they feared getting in trouble (13%) or being fired (13%).[21] In some cases, several of these
reasons applied to the same case. These workers viewed work injuries as part of aging,

---

[20] Ibid.
[21] Scherzer et al., 2005.

perceived that management didn't care, and that they would lose work time if they reported.[22] It is well documented elsewhere that poultry and meatpacking workers, one of the most vulnerable workforces, commonly face intimidation and retaliation by employers.[23]

Low-wage workers often only report injuries when the injury is severe enough to prevent them from working, and chronic pain and non-acute injuries are the injury most infrequently reported to employers.[24] By Leigh's 2010 estimates, there were 31 million low-wage workers in the U.S. – or 22% of the country's workforce – employed in 65 occupations.[25]

Research conducted by Dong et al. (2010) showed that BLS injury data obtained through SOII captured only one quarter of nonfatal injuries among Hispanic workers employed in small construction companies, compared to 60% among white workers in the same companies.[26] During OSHA's silica rulemaking hearings in March 2014, many Hispanic, immigrant and other workers testified to their fear of raising silica-related illness concerns to their employer for fear of firing, retaliation, and industry-wide blacklisting.[27] AFL-CIO documented many of these concerns in our final brief.[28]

Young workers also are especially vulnerable in facing significant barriers to reporting injuries. These workers often are not explained their rights to report injuries or how reporting injuries actually affects the safety and health of their workplace. Youth are also intimidated about speaking up about injuries, like many other vulnerable workers. Research by Tucker et al. (2010) concluded that 27% of young workers did not report their serious (lost work time) injury to their employers or doctors.[29] Many young workers, such as those studied here, did not report injuries due to perceived negative reactions by their employers and lack of knowledge about reporting injuries. Examples of each are included below:

NEGATIVE REACTIONS

*"Was afraid to tell my employer ... might get fired"*
*"My employer dismissed the injury"*
*"Because i don't want to  endanger my job"*

---

[22] Ibid.

[23] Southern Poverty Law Center et al. Letter to the Department of Labor and Department of Agriculture. September 3, 2013.

[24] Lashuay N and Harrison R., 2006.

[25] Leigh JP. Economic Burden of Occupational Injury and Illness in the United States. *The Milbank Quarterly*. 2011 December. 89(4):728-72.

[26] Dong et al., 2011.

[27] See OSHA's docket on "Occupational Exposure to Crystalline Silica," testimony at OSHA-2010-0034-3583.

[28] See OSHA's docket on "Occupational Exposure to Crystalline Silica," testimony at OSHA-2010-0034-4204.

[29] Tucker S, Diekrager D, Turner N, Kelloway EK (2014). Work-related injury underreporting among young workers: Prevalence, gender differences, and explanations for underreporting. *Journal of Safety Research*, Vol. 50, pp 67–73.

APP 0029

## LACK OF KNOWLEDGE

*"I didn't know that I had too"*
*"It never occurred to me"*
*"Don't know where to report it"*

Incentives for employers not to report injuries are many. Employers have concerns about increased workers' compensation costs for increased reports of injuries; fears of being denied government contracts due to high injury rates; and concerns about being targeted by OSHA for inspection if a high injury rate is reported. This negligence in reporting is illegal and detracts from the value of complete and accurate records, but employers have continued to grow and implement programs that discourage workers from reporting injuries and illnesses.

**Employer Policies, Programs and Practices that Discourage Workers from Reporting Injuries or Retaliate Against Workers for Injury Reporting are Widespread.**

Over the years, the AFL-CIO and our unions have seen an expansion and growth in employer policies that either discourage workers from reporting injuries or retaliate or discriminate against workers for reports of injuries. These policies vary in their form and scope but generally fall into four categories: 1) disciplinary policies or programs under which employees suffer some kind of adverse action, such as negative points or suspension, with subsequent injuries or events resulting in termination regardless of the cause of the injury; 2) disciplinary action against a worker who reports an injury where the employer asserts that a work rule or safety rule was violated or that the injury was not reported in a timely manner; 3) incentive programs that award prizes or cash awards for an individual worker or group of workers that report no or few work-related injuries or supervisors who maintain a low reported injury rate; and 4) drug testing programs where all employees who report a work-related injury are subject to a mandatory drug test, regardless of the type or cause of the injury.

The AFL-CIO has collected examples of these types of programs and cases which we are submitting to the record as evidence.[30] One of these outlined in a safety message to employees at a refinery states that in response to a level of injuries that the employer finds unacceptable, that employer is instituting a policy suspending any worker who has a recordable injury requiring medical treatment from working on the

---

[30] See attachment, Examples of Employer Policies, Programs and Practices that Discourage Injury Reporting or Retaliate Against Workers for Injury Reporting. The United Steelworkers have also submitted numerous examples of these types of policies and programs in its earlier submission on OSHA's proposed injury reporting rule.

APP 0030

project pending review. In addition, foremen who have more than one recordable injury on their crew will also be suspended. At another company, under the employer's discipline policy, a worker who reported OSHA recordable injuries was sent a warning notice that the number of injuries was unacceptable, and that the worker was being suspended for three days and would be terminated if they reported any further recordable injuries.

In a case that was reported by one of our unions, a worker experienced a sharp pain in his wrist while doing his job that was momentary. But the next day his wrist was swollen and sore and he reported the injury to his supervisor and was sent to the company nurse who told the worker he had a mild sprain. Several days after the incident the supervisor asked the worker why he not reported the injury to his wrist on the day it occurred. The worker explained that he only realized he was injured the day after he first experienced a momentary pain. The next day the supervisor discharged the worker stating that the worker had violated the company's rule that work-related injuries be reported immediately.

At another workplace, the employer instituted a safety incentive program – Safety Bank Account - to provide a financial incentive for employees as a reward for safe behaviors. The employer contributed $1.50 to the "safety bank" for each employee for each day without a recordable injury. After 100 days, employees could withdraw money from the bank, with the amount reduced for recordable injuries or doctor's visits. Each successive phase of the program increased the amount of contributions for days without injuries as well as the penalties for injuries that were reported.

The extent of such injury discipline and incentive programs has not been fully assessed. But there are several studies and surveys that indicate such programs are present in a large number of workplaces. A 2010 survey conducted by GAO as part of a study on safety incentive programs reported that 22 percent of the manufacturing employers surveyed had rate based incentive programs, 14 percent had behavior-based incentive programs; 56 percent had post-incidence drug and alcohol testing policies, and 69 percent had programs that involved demerits or discipline for workplace injuries.[31]  Overall, 75 percent of the surveyed employers reported one or more types of such policies or programs related to workplace injuries and illnesses.

An earlier 2009 GAO study that examined OSHA's records audit process for employer injury and illness records also examined the factors that could discourage the reporting of injuries and illnesses and affect the accuracy of injury and illness data. That study identified workers' fear of disciplinary action and job loss for reporting work-related injuries as a key factor in injury underreporting.[32]  A survey of more than 1,000

---

[31] GAO, *Workplace Safety and Health: Better OSHA Guidance Needed on Safety Incentive Programs,* GAO-12-329, (Washington, D.C. April 2012), p. 21.  http://www.gao.gov/products/GAO-12-329
[32] GAO, *Workplace Safety and Health: Enhancing OSHA's Records Audit Process Could Improve the Accuracy of Worker Injury and Illness Data,* GAO-10-10, (Washington, D.C. Oct. 15, 2009). www.gao.gov/new.items/d1010.pdf

health care professionals that GAO conducted as part of this study reinforced this finding. Sixty-seven percent of the health professionals surveyed reported observing worker fear of disciplinary action for reporting a work-related injury and 46 percent said that this fear had an impact on the accuracy of employer injuries and illness records. Moreover, the GAO survey also found that employer pressure not to report injuries also extended to health professionals. Fifty-three (53) percent of health care professionals reported that they experienced pressure from company officials to "downplay injuries and illnesses" and 44 percent felt that this had an impact on whether the injuries and illnesses were accurately reported.  Even more disturbing, more than one-third of all health professionals were asked by company officials to provide treatment that resulted in an injury or illness not being reported, and that in some cases employers would seek out alternative diagnosis so that the injury or illness was not recordable. According to the GAO report, one practitioner reported a case where an injured workers' manager took the injured employee to multiple health providers until he found one who would certify that the injury required only first aid so it was not recorded.[33]

The American College of Occupational and Environmental Medicine reported similar experiences among ACOEM members. Testifying at a 2008 House Education and Labor Committee hearing on "Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses," Dr. Robert McLellan, appearing on behalf of ACOEM, reported that some employers have pressured physicians not to prescribe medication in order to avoid recording the work-related injury. At one workplace, the safety team without an on-site medical office inappropriately controlled access to health care providers due to incentive programs that rewarded the absence of injuries. In other cases employers questioned the physician's decision to sew up a wound or requested Steri-Strips in order to prevent recordability.[34] These kind of practices documented by the GAO survey and reported by ACOEM, not only results in the underreporting of injuries, but also results in injured workers not receiving the appropriate or necessary treatment for their injuries, putting workers at further risk.

Unions have also conducted surveys in order to assess the extent of employer policies, programs and practices that may create disincentives to workers reporting injuries and illnesses. In 2009, ten unions participated in a survey prepared by the AFL-CIO Safety and Health Department. The survey was completed by 1,300 local union safety and health representatives. The majority of participants were from the manufacturing sector (53 percent), followed by the trade, transportation and utilities sector (25 percent) and construction (14 percent). Fifty-one percent of individuals reported that their workplace had a safety incentive program that offered prizes or rewards for low or no injury reporting, and 46 percent of those responded that they believed that the program discouraged the reporting of injuries, illnesses, near misses

---

[33] GAO, 2010 p.19
[34] McLellan, Robert K., MD, MPH, FACOEM, representing the American College of Occupational and Environmental Medicine, Statement to the U.S. House of Representatives, Committee on Education and Labor. *Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses*, Hearing, June 19, 2008.

APP 0032

or accidents. The results were similar for injury discipline policies or practices where 50 percent of respondents reported the existence of such policies and practices, with 55 percent responding that such policies discouraged reporting; and for absenteeism policies that assign points for days away from work, including work-related injuries, with 56 percent reporting such policies and 49 percent responding that such policies discourage reporting. The most widespread policies or practices involved post-injury drug testing for injuries or illnesses which 72 percent of respondents reported were present in their workplace with 51 percent responding that such policies discouraged injury and illness reporting.[35]

In 2007 – 2008, the Federal Railroad Administration (FRA) conducted a year-long investigation of union complaints that the CSX Transportation was engaged in "targeted, selective stalking and harassment and intimidation (H/I) of its train and service employees who had reported on-duty injuries."[36] FRA found numerous practices by CSXT that discouraged the reporting of injuries. According to the report of the investigation:

> "The consensus of the investigation team was that certain CSXT officials had created an atmosphere or culture that tends to have a chilling effect on employee injury/illness reporting and that ultimately sends a message to employees that if they report an on-duty injury they will be subject to adverse consequences."[37]

The FRA investigation of CSXT resulted in the recommendation to the Office of Chief Counsel of the assessment of 30 civil penalty violations against CSXT and 1 individual liability action with a civil penalty against a CSTX officer.

OSHA also conducted a limited evaluation of the extent of employer programs or policies that could create a disincentive to reporting injuries as part of the agency's National Emphasis Program on Injury and Illness Recordkeeping (RK NEP) conducted in 2010 – 2011.[38] According to the final report on the program prepared by ERG for the OSHA Office of Statistical Analysis, 63 percent of workplaces inspected had some kind of safety incentive program (192/303); 17 percent some kind of discipline program (52/303); and 73 percent a post-injury drug testing program (222/303). (Table 1-6). OSHA also conducted employee interviews to assess the possible impact of such programs on injury reporting. According to these interviews, 44 percent of workers reported that disciplinary programs discouraged injury reporting, followed by absenteeism programs (30 percent), drug testing programs (17 percent) and incentive

---

[35] Union Leader Injury and Illness reporting Survey, Results, May 5, 2010.
[36] Federal Railroad Administration, U.S. Department of Transportation, *CSX Transportation Harassment and Intimidation Investigation,* March 2008, p. 1.
[37] Federal Railroad Administration, p. 4.
[38] Analysis of OSHA's National Emphasis Program on Injury and Illness Recordkeeping (RK NEP), Task Order No. 10, Option Year2, Contract No. J-009-F-2-8441, Final Report, Prepared for: Office of Statistical Analysis, Occupational Safety and Health Administration by ERG, Lexington, MA, Nov.1, 2013.

programs (8 percent for employee incentives and 12 percent for manager incentives). (Table 1-7.1).

According to the report, the RK NEP found some type of recordkeeping problem with cases not recorded or under-recorded at close to half of the workplaces inspected (Table 1.1). Many of these cases were concentrated at a limited number of establishments. For about 43 percent of the establishments, OSHA found more DART cases during the onsite inspection, than had been reported to OSHA by the establishment in its OSHA Data Initiative (ODI) submission to the agency.

While the RK NEP provides some information about recordkeeping practices and the presence of policies and programs that could impact injury reporting, it – like other reviews – is limited. According to the GAO's 2012 report on safety incentive programs, OSHA inspectors received inadequate guidance on how to assess incentive programs for enforcement purposes. In addition, the NEP did not select a nationally representative sample of worksites for the inspections, and according to GAO "OSHA cannot use the results to determine the effectiveness of safety incentive programs and other workplace safety and health policies on injury and illness reporting nationwide." [39]

**OSHA's Current Efforts to Address Disincentives to and Retaliation for Injury Reporting are Useful and have Identified Significant and Serious Cases of Retaliation for Injury Reporting, but Additional Measures are Needed to Address the Problem.**

In 2012 OSHA issued a memorandum to OSHA regional administrators and whistleblower protection managers on employer safety incentive and disincentive policies and practices.[40] The memo, from OSHA Deputy Assistant Secretary Richard E. Fairfax, (the "Fairfax memo"), was issued in response to a growing number of retaliation cases related to injury reporting, both under section 11(c) of the OSH Act and the Federal Railroad Safety Act (FRSA).[41]

The memo makes clear that Section 11(c) of the OSH Act prohibits an employer from discriminating against an employee for reporting an injury or illness, as does section 20109 of the Federal Railroad Safety Act (FRSA). It emphasizes that in order to protect health and safety, employees must be able to freely report injuries and illnesses without fear of retaliation. The memo outlines the types of workplace policies and practices that could discourage injury reporting and constitute unlawful discrimination and possible violations of OSHA's recordkeeping regulation (29 CFR 1904). According

---

[39] GAO, 2012, p. 21

[40] Memorandum for Regional Administrators, Whistleblower Managers from Richard E. Fairfax, Deputy Assistant Secretary, Occupational Safety and Health Administration, *Employer Safety Incentive and Disincentive Policies and Practices*, March 12, 2012.

[41] The 2008 amendments to the Federal Rail Safety Act included specific provisions prohibiting retaliation against employees for reporting work-related injuries or seeking medical treatment for these injuries. 49 U.S.C. §20109. OSHA has responsibility for enforcing the anti-retaliation provisions of FRSA and 21 other statutes in addition to the 11(c) anti-retaliation provisions of the OSH Act.

APP 0034

to the memo, OSHA views discipline against an employee imposed under a policy that disciplines all employees who report work-related injuries, regardless of fault, as a "direct violation of 11(c) and FRSA. Such policies are also deemed to be inconsistent with OSHA's recordkeeping regulations which require employers to establish a way for employees to report work-related injuries. (29 CFR 1904.35(b))".

The memo also outlines other types of employer policies and actions related to injury reporting that may constitute a violation of 11(c), FRSA or OSHA's recordkeeping rules. These include cases involving discipline of an injured employee who the employer claims violated work rules, where discipline is unequally applied; unreasonable injury reporting requirements or incentive programs which discourage reporting and discriminate or disadvantage workers who report injuries. OSHA directs investigators to examine such cases closely to determine if the employer's action constitutes discrimination.

Data and information from OSHA Whistleblower Protection Program (WPP) show that OSHA's concerns about adverse action by employers against workers who report injuries and illnesses are well-founded. WPP Investigation data for FY 2013 report that 292 of the federal OSHA 11(c) cases investigated were related to retaliation for injury/accident reporting. Of these 142 cases were found by investigators to have merit. Retaliation cases for injury reporting represented 15 percent of all 11(c) cases (292/1946; there were more 11(c) cases filed for injury reporting than for participation in safety and health activities (255 cases).

Cases involving retaliation for injury reporting constituted the majority of anti-retaliation cases filed under FRSA. Of a total of 399 FRSA cases investigated in FY 2013, 255 cases (64 percent) involved retaliation for injury reporting. Thirty-nine (39) percent of these FRSA cases were found to have merit by OSHA.[42]

OSHA whistleblower enforcement data is not maintained in a manner that allows for a full review of the details of cases filed. However, information that is available on 11(c) and FRSA cases involving retaliation for injury reporting show that the adverse actions taken against workers for reporting injuries are significant and serious, and many involve established employer policies and practices that retaliate or discriminate against workers for reporting injuries.

For example, in February, 2014, the Department of Labor filed a complaint under Section 11(c) against the Ohio Bell Telephone Company, which operates as AT&T on behalf of 13 workers who were suspended without pay after reporting workplace injuries and illnesses.[43] In each of these 13 cases, the company claimed that the employee had violated a safety rule and was at fault, but the Department of Labor's investigation found no evidence that a specific safety rule had been violated. Instead the Department of

---

[42] Occupational Safety and Health Administration, Whistleblower Investigation Data, Report Period: 10/01/2012 to 09/30/2013, page 3 of 4.

[43] Perez v. The Ohio Bell Tel. Co., No. 1:14-cv-269 (N.D. Ohio. filed, Feb. 10, 2014).

Labor found that the workers were retaliated against for reporting their work-related injuries.

The Department of Labor filed a similar complaint against Southwestern Bell Telephone in May 2014, on behalf of four workers, who had been disciplined or suffered a poor performance review following reporting a work-related injury.[44] OSHA's investigation found that these adverse actions were a result of workers reporting their injuries, not because a specific safety rule had been violated as the company claimed. Both of these cases are still pending.

The State of Michigan, which operates its own approved state OSHA plan, has also found that AT&T retaliated against workers for injury reporting. In at least four separate cases, an administrative law judge has upheld MIOSHA's findings, ruling that the employer used vague safety policies as a pretext for retaliating against workers for reporting job injuries.[45]

As noted above, there have been a substantial number of federal OSHA 11(c) cases filed related to injury reporting and many have been found to have merit. But very few 11(c) cases are litigated; most are settled or resolved without litigation. The AFL-CIO requested information from OSHA's Whistleblower Protection Program for detailed information on 11(c) cases related to injury reporting.[46] However, due to the manner in which whistleblower investigation data is maintained, OSHA was unable to provide the requested information. The agency did provide some examples of 11(c) cases related to injury reporting that were settled by the agency or resolved by the parties. These cases show a range of adverse actions and employer policies and programs related to injury reporting.

In one case, seven employees, all truck drivers, alleged that they had been disciplined for vague work rules after reporting injuries. OSHA determined that the cases had merit and was able to get the company to change their policy and remedy all employees who were illegally retaliated against over the last one and half years.

Another case involved 47 complainants who alleged that the employer utilized an incentive program – a quarterly "gain sharing" award pool under which OSHA recordable injuries were counted as a negative factor in determining awards. The complainants believed that this program was a disincentive to reporting injuries. DOL shared the "Fairfax memo" on "Employer Incentive and Disincentive Policies and

---

[44] Perez v. Southwestern Bell Telephone Co., No.: 1:14-cv-00398-SWH (W.D. Mo.) (Complaint filed May 2, 2014).

[45] AT&T Servs. Inc. and Chris Aggeler, No. D-11-242-1 (Mich. Occ. Health and Safety Admin., Jan. 13, 2013); AT&T Servs. Inc. and Dale Wright, No. D-11-101-1 (Mich. Occ. Health and Safety Admin., Apr. 8, 2013); AT&T Servs. Inc. and Duane Swift, No. D-11-200-1 (Mich. Occ. Health and Safety Admin., Mar. 6, 2013) and AT&T Servs. Inc. and Harry West, No. D-11-311-1 (Mich. Occ. Health and Safety Admin., Apr. 23, 2013).

[46] Oral Communication with Anthony Rosa, Deputy Director, OSHA Whistleblower Protection Program, October 2014.

APP 0036

Practices" with the employer, and an agreement was reached to remove OSHA recordable injuries as a criteria used in the gain sharing program. In addition OSHA negotiated payment for past gain sharing awards that had not been paid due to the injury criteria.

A third case involved a number of workers who were terminated after reporting job related injuries as a result of an employer attendance policy which assigned points for absences, including work-related injuries. The company agreed to change the policy so that cases where there was medical evidence that the injury was work-related would not be subject to negative points.  The workers were reinstated.

These were the only cases reported by OSHA that involved multiple workers and systematic policies by employers. The other cases involved retaliation against workers for injury reporting where OSHA found merit, but there was insufficient information provided to determine whether the adverse action was isolated or related to systemic policies.

Over the past several years, OSHA has taken a number of significant enforcement actions against rail companies under the Federal Railroad Safety Act for retaliation against workers for reporting injuries. Since FRSA provides for an administrative process for the adjudication of cases, it is much easier for OSHA to pursue these cases than those cases filed under 11(c) of the OSH Act.

The FRSA anti-retaliation cases brought by OSHA provide further evidence that retaliation against workers for injury reporting is a significant problem. In 2013, OSHA found serious whistleblower violations at the Norfolk Southern Railroad where the company retaliated against workers for reporting injuries. The company was ordered to reinstate the workers, and ordered to pay the workers back wages and more than $683,000 in damages.[47]  Widespread, systematic violations for injury reporting were also found at the BSNF Railroad. OSHA found that the personnel policies of the railroad, which included assigning negative points to employees who reported work-related injuries, were discriminatory. A settlement reached with BNSF resulted in the points policy being eliminated, other disciplinary polices related to injury reporting modified, and resolution of anti-retaliation complaints filed by 36 employees.[48] The OSHA press releases on these cases and other FRSA cases are being submitted as evidence along with these comments.

---

[47] U.S. Department of Labor, Occupational Safety and Health Administration. (2013). Norfolk Southern Railway Co. ordered by U.S. Labor Department's OSHA to pay $1.1 million after terminating 3 workers for reporting injuries: Investigation found violations of Federal Railroad Safety Act whistleblower provisions [Press release]. Retrieved from
https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=NEWS_RELEASES&p_id=23694
[48] U.S. Department of Labor, Occupational Safety and Health Administration. (2013). BNSF Railway Co. signs accord with U.S. Department of Labor's OSHA regarding employee practices under Federal Railway Safety Act [Press release]. Retrieved from
https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=NEWS_RELEASES&p_id=23529

APP 0037

OSHA's efforts to address retaliation for and disincentives and barriers to injury reporting are welcome and helpful. The issuance of the "Fairfax memo" has helped to reinforce that retaliation for injury reporting is a violation of 11(c) and FRSA and that other employer programs, policies and actions that impede injury reporting by workers may also violate these provisions and OSHA's recordkeeping requirements. The enforcement actions taken by OSHA under 11(c) and FRSA have addressed specific cases of retaliation against workers for injury reporting. However, these actions are limited and not sufficient to address the problem.

As GAO pointed out in its 2012 report on safety incentive programs, enforcement actions under 11(c) usually are limited to addressing the adverse action experienced by an individual worker, and don't address the underlying systematic programs or practices that are the source of the retaliation and impact injury reporting.[49] Similarly, under OSHA's recordkeeping regulations, the agency enforces the failure to record injuries on the log, but has not addressed the systematic policies or practices that are the cause of the underreporting. These enforcement actions occur only after the fact, and are not by themselves sufficient to address the scope and breadth of practices and policies that result in underreporting. In addition, as OSHA is well aware, section 11(c) has severe limitations – a short 30 day statute of limitations, a high burden of proof, and an inefficient judicial enforcement scheme – rendering it a weak measure for enforcing against discrimination of workers for safety and health activities of all types, let alone addressing the practices and policies that lead to the discrimination.

**OSHA's Recordkeeping Regulation Must be Strengthened to Remove Barriers to Injury Reporting and Address Employer Practices, Polices and Programs that Retaliate against Workers for Reporting Injuries**

OSHA recognized when promulgating the 2001 injury recordkeeping and reporting rule, that employee participation is critical for a successful workplace safety and health program, particularly for injury and illness reporting. As the agency explained in the preamble to the final standard:

"OSHA believes that employee involvement is essential to the success of all aspects of an employers' safety and health program. *This is especially true in the area of recordkeeping, because free and frank reporting by employees is the cornerstone of the system.* (emphasis added). If employees fail to report their injuries and illnesses, the "picture" of the workplace that the employer's OSHA forms 300 and 301 reveal will be inaccurate and misleading. This means, in turn, that employers and employees will not have the information they need to improve safety and health in the workplace." (66 Fed. Reg., 6050, Jan. 19, 2001).

To facilitate and encourage employee participation in injury reporting, OSHA included specific provisions on employee participation in the 2001 final injury recording and reporting rule. Section 1904.35 – Employee involvement- established an affirmative

---

[49] GAO, 2012, p. 20.

APP 0038

obligation on employers to involve employees in the injury recordkeeping system. The rule required employers to inform employees on how to report injuries and illnesses and to provide employees and their representatives access to injury and illness records. In addition, the final rule included a provision that made clear that section 11(c) of the Act prohibits employers from discriminating against an employee for reporting a work-related fatality, injury or illness (29 CFR 1904.36).

However, the final rule failed to adopt specific requirements to inform employees that they had the right to report an injury without fear of reprisal or to make retaliation against workers for reporting injuries or illnesses a violation of the recordkeeping standard itself, subject to citation and penalty. The final rule also failed to address the systematic policies, programs or practices that subjected workers to retaliation for reporting injuries or discourage the reporting of injuries and illnesses.

Unfortunately, evidence and experience has demonstrated that the existing provisions in the 2001 recordkeeping rule and enforcement under 11(c) have failed to adequately address the widespread problems related to discrimination for injury reporting.

With OSHA's proposal to expand the collection of workplace injury and illness information from employers for enforcement and other purposes and to make it public, there is great concern that there will be efforts by employers to reduce recordable injuries and further suppress injury reporting. This concern was expressed by numerous participants at OSHA's public meeting on the proposed regulation in January 2014, and in written comments submitted to the record. Unions, public health and medical groups and employers all expressed this concern.[50]

According to comments by the National Association of Home Builders: "[s]ubmission of injury and illness data will be misleading and lead to the under recording of injuries and illness."[51] ORCHSE Strategies, LLC, a management consulting group on workplace safety stated; "ORCSHE has every reason to believe that publishing OSHA injury and illness data for individual companies will increase the likelihood that some employers will under-report."[52]

These concerns are not unfounded. There have been numerous well-documented cases of employers failing to record injuries and suppressing injury reporting in order to keep reported injury rates low. For example, in 2006, the California State Auditor documented significant underreporting of injuries by the prime contractor for the San Francisco-Oakland bay bridge project, where economic incentives for low

---

[50] For example see comments of National Association of Home Builders (NAHB) (Docket:OSHA-2013-0023-1408) , ADSC (Docket:OSHA-2013-0023-1430), ORCSHE Strategies, LLC (Docket:OSHA-2013-0023-1339), United Steelworkers (Docket:OSHA-2013-0023-1424), Occupational Health Subcommittee of the Council of State and Territorial Epidemiologists (Docket:OSHA-2013-0023-1227) and American College of Occupational and Environmental Medicine (ACOEM) (Docket:OSHA-2013-0023-1327).
[51] NAHB, Docket:OSHA-2013-0023-1408.
[52] ORCSHE, Docket:OSHA-2013-0023-1339.

APP 0039

injury rates were identified as the likely cause for the underreporting.[53] In 2011, a federal grand jury indicted the medical case manager for S&W, a maintenance contractor for the Tennessee Valley Authority (TVA), for defrauding the government by misclassifying and underreporting work-related injuries. Under its contract with TVA, S&W received safety bonuses for low reported injury rates. The case manager, Walter Cardin was convicted for eight counts of fraud for improperly recording the work-related injuries, a conviction that was upheld on appeal to the United States Court of Appeals to the Sixth Circuit.[54]

Industry groups have argued that the solution to the suppression of injury reporting that may result from the proposed injury reporting rule is to withhold the information from the public. We do not agree. The solution is to strengthen the protections for workers who report injuries and to address the systematic employer policies and practices that lead to the underreporting of work-related injuries through regulatory requirements in the injury and illness recordkeeping and reporting standard (29 CFR 1904), as OSHA is now considering.

We point out that under the Federal Railroad Safety and Health Act (FRSA), the Federal Railroad Administration (FRA), which is the primary agency responsible for the safety and health of railroad workers, has issued regulations as part of its injury recording and reporting rules that address retaliation against workers for injury reporting (49 CFR 225). These regulations are in addition to the anti-retaliation regulations issued by OSHA to enforce the anti-retaliation provisions of FRSA, which OSHA has responsibility for under a memorandum of agreement with the FRA, and are enforced by the FRA with citations and penalties.[55] Under the memorandum, OSHA and the FRA coordinate enforcement for whistleblower violations under 49 U.S.C. 20109 (administered by OSHA) and injury reporting violations under 49 CFR Part 225 (administered by the FRA).

The FRSA recordkeeping regulations are emphatic about the need for the accuracy of injury reporting and that harassment or intimidation for injury reporting will not be tolerated. Specifically, section 225.33 of the regulations requires employers to adopt and comply with an Internal Control Plan for its injury and incident reporting procedures. The regulations require that the Internal Control Plan be "designed to maintain absolute accuracy. The plan must include:

---

[53] California State Auditor, Bureau of State Audits. *San-Francisco-Oakland Bay Bridge Worker Safety: Better State Oversight Is Needed to Ensure That Injuries Are Reported Properly and That Safety Issues Are Addressed.* Report 2005–119. February 2006. Report available at www.bsa.ca.gov/pdfs/reports/2005-119.pdf

[54] U.S. v. Cardin, No. 13-5667, 2014 U.S. App. LEXIS 16260 (6th Cir., Aug. 22, 2014).

[55] Memorandum of Agreement between The Federal Railroad Administration, U.S. Department of Transportation and the Occupational Safety and Health Administration, U.S. Department of Labor, July 16, 2012 https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=MOU&p_id=1125

**APP 0040**

"(1) A policy statement declaring the railroad's commitment to complete and accurate reporting of all accidents, incidents, injuries, and occupational illnesses arising from the operation of the railroad, to full compliance with the letter and spirit of FRA's accident reporting regulations, and to the principle, in absolute terms, that harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment or from reporting such accident, incident, injury or illness will not be permitted or tolerated and will result in some stated disciplinary action against any employee, supervisor, manager, or officer of the railroad committing such harassment or intimidation.

(2) The dissemination of the policy statement; complaint procedures. Each railroad shall provide to all employees, supervisory personnel, and management the policy statement described in paragraph (a)(1). Each railroad shall have procedures to process complaints from any person about the policy stated in paragraph (a)(1) being violated, and to impose the appropriate prescribed disciplinary actions on each employee, supervisor, manager, or officer of the railroad found to have violated the policy. These procedures shall be disclosed to railroad employees, supervisors, managers, and officers. The railroad shall provide "whistle blower" protection to any person subject to this policy, and such policy shall be disclosed to all railroad employees, supervisors and management." (49 CFR 255.33)

Violations of these requirements are subject to civil penalties under 49 CFR 225.29 of the FRSA regulations, which for willful violations provide for penalties against individuals as well as employers, as well as criminal penalties:

§225.29  Penalties.

"Any person (an entity of any type covered under 1 U.S.C. 1, including but not limited to the following: a railroad; a manager, supervisor, official, or other employee or agent of a railroad; any owner, manufacturer, lessor, or lessee of railroad equipment, track, or facilities; any independent contractor providing goods or services to a railroad; and any employee of such owner, manufacturer, lessor, lessee, or independent contractor) who violates any requirement of this part or causes the violation of any such requirement is subject to a civil penalty of at least $650 and not more than $25,000 per violation, except that: Penalties may be assessed against individuals only for willful violations, and where a grossly negligent violation or a pattern of repeated violations has created an imminent hazard of death or injury to persons, or has caused death or injury, a penalty not to exceed $105,000 per violation may be assessed. Each day a violation continues shall constitute a separate offense. See appendix A to this part for a statement of agency civil penalty policy. A person may also be subject to the criminal penalties provided for in 49 U.S.C. 21311."

APP 0041

The penalties for these violations can be significant. According to the schedule of penalties in included as Appendix A to Part 225, failure to record an injury is subject to a $2,500 penalty ($5,000 for willful violations) with each instance a separate violation, and each day of non-compliance a separate offense. The failure to comply with the harassment/intimidation requirements of the Internal Control Plan are subject to similar penalties.

**Appendix A to Part 225—Schedule of Civil Penalties[1]**

| Section[2] | Violation | Willful Violation |
|---|---|---|
| 225.6: Failure to comply with consolidated reporting requirements | $2,500 | $5,000 |
| 225.9: | | |
| (1) Failure to report | 2,500 | 5,000 |
| (2) Failure to immediately report | 1,000 | 2,000 |
| (3) Failure to accurately report | 1,000 | 2,000 |
| 225.11: | | |
| (1) Failure to report accident/incident | 2,500 | 5,000 |
| (a) Highway-rail grade crossing | | |
| (b) Rail Equipment | | |
| (c) Death, Injury, or occupational illness | | |
| (2) Report is incomplete | 1,000 | 2,000 |
| 225.12: Failure to file Railroad Employee Human Factor form | 2,500 | 5,000 |
| (a) Failure to file Railroad Employee Human Factor Attachment correctly: | | |
| (1) Employee identified | 2,500 | 5,000 |
| (2) No employee identified | 1,000 | 2,000 |
| (b) | | |
| (1) Failure to notify employee properly | 2,500 | 5,000 |
| (2) Notification of employee not involved in accident | 2,500 | 5,000 |
| (c) Failure of employing railroad to provide requested information properly | 1,000 | 2,000 |
| (d) | | |
| (1) Failure to revise report | 2,500 | 5,000 |
| (2) Failure to notify after late identification | 2,500 | 5,000 |
| (f) Submission of notice if employee dies as result of the reported accident | 2,500 | 5,000 |
| (g) Willfully false accident statement by employee | | 5,000 |

APP 0042

| | | |
|---|---|---|
| 225.13: | | |
| (1) Failure to Late reports | 2,500 | 5,000 |
| (2) Failure to Review Employee Statement | 2,500 | 5,000 |
| (3) Failure to Amend Report | 1,000 | 2,000 |
| 225.18: Alcohol or drug involvement | 2,500 | 5,000 |
| 225.23: Joint operations | (¹) | (¹) |
| 225.25: | | |
| (1) Recordkeeping | 2,500 | 5,000 |
| (2) Failure to post list | 1,000 | 2,000 |
| (3) Posting Prohibited Information | 1,000 | 2,000 |
| (4) Missing fields | 1,000 | 2,000 |
| 225.27: | | |
| (1) Failure to retain records | 1,000 | 2,000 |
| (2) Failure to retain electronic receipt | 1,000 | 2,000 |
| (3) Failure to comply with electronic recordkeeping requirements | 1,000 | 2,000 |
| (4) Failure to provide access to records | 1,000 | 2,000 |
| 225.33: | | |
| (1) Failure to adopt Internal Control Plan or more than two missing/outdated/incorrect components | 2,500 | 5,000 |
| (2) Internal Control Plan with less than three missing/outdated/incorrect components | 1,000 | 2,000 |
| (3) Failure to comply with Internal Control Plan | 2,500 | 5,000 |
| (4) Failure to comply with the intimidation/harassment policy in Internal Control Plan | 2,500 | 5,000 |
| (5) Failure to comply with requirements associated with Form FRA F 6180.150 | 2,500 | 5,000 |
| 225.35: Access to records and reports | 2,500 | 5,000 |

¹A penalty may be assessed against an individual only for a willful violation. The Administrator reserves the right to assess a penalty of up to $105,000 for any violation where circumstances warrant. *See* 49 CFR part 209, appendix A. A failure to comply with §225.23 constitutes a violation of §225.11. For purposes of §§225.25 and 225.27 of this part, each of the following constitutes a single act of noncompliance: (1) A missing or incomplete log entry for a particular employee's injury or illness; or (2) a missing or incomplete log record for a particular rail equipment accident or incident. Each day a violation continues is a separate offense.

²The penalty schedule uses section numbers from 49 CFR part 225. If more than one item is listed as a type of violation of a given section, each item is also designated by a "penalty code," which is used to facilitate assessment of civil penalties, and which may or may not correspond to any subsection designation(s). For convenience, penalty citations will cite the CFR section and the penalty

APP 0043

code, if any. FRA reserves the right, should litigation become necessary, to substitute in its complaint the CFR citation in place of the combined CFR and penalty code citation, should they differ.

Employer policies and practices that discourage injury reporting or discriminate against workers for reporting are not unique to the rail industry. Just as the FRA has done, OSHA should adopt strong regulations stressing the requirements for full and accurate injury reporting and prohibiting actions that discourage injury reporting or retaliation for injury reporting.

The ANSI/AIHA Z10-2012 voluntary standard on Occupational Safety and Health Management Systems, which was developed with broad participation from employers, unions and safety and health professionals, also addresses employer programs and policies that may discourage the reporting of injuries and illnesses. Section 3.2, E3.2C of the standard on employee participation states:

> "Given the importance of employee participation as well as accurate injury and illness data, employees should be encouraged to report injuries, illnesses, accidents, incidents, deficiencies and concerns. Properly designed programs can be used to promote employee participation in activities such as reporting problems and making safety improvements.

> "Incentive programs, drug testing programs, and disciplinary mechanisms should be carefully designed and implemented to ensure employees are not discouraged from effective participation in the OHSMS.

> "Examples of obstacles or barriers include lack of response to employee input or suggestions, reprisals (supervisory and/or peer), and any policy, practice or program that penalizes or discourages participation" [56]

Appendix C of the standard sets forth additional guidance on the ways to encourage and facilitate employee participation and outlines barriers to participation. The barriers include, among other actions: treating worker behavior as it is a root or underlying cause, rather than identifying hazards or systematic causes; and administering a post-accident program, such as drug testing in a way that discourages injury reporting; blaming employees with undue emphasis on discipline instead of implementing safety system changes.

**Comments and Recommendations on OSHA's Proposed Approach to Addressing Disincentives to and Retaliation for Injury Reporting.**

In the supplemental notice of proposed rulemaking OSHA has announced that the agency is considering adding three provisions to the current 29 CFR 1904

---

[56] ANSI/AIHA Z10 Committee, American National Standard- Occupational Health and Safety Management Systems, ANSI/AIHA Z10-2012.

APP 0044

recordkeeping regulation to address employer practices and policies that discourage injury reporting or retaliate against workers for reporting injuries. These are:

(1) A requirement that employers inform their employees of their right to report injuries and illnesses free from discrimination or retaliation;
(2) A provision requiring that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome; and
(3) A prohibition against disciplining employees for reporting injuries and illnesses.

As outlined below, the AFL-CIO supports each of these provisions. In our view these measures will help encourage the full and accurate reporting of injuries and illnesses by workers and improve injury and illness reporting practices by employers. These provisions will also strengthen OSHA's ability to address retaliation against workers who report injuries. But as we explain below, to be truly effective, the provisions must not only address adverse actions against individual workers; they must also address the systematic employer policies and programs that discourage reporting or retaliate against workers for injury reporting.

**A requirement that employers inform their employees of their right to report injuries and illnesses free from discrimination or retaliation**

The AFL-CIO strongly supports adding a requirement to the recordkeeping rule to require that employers inform their workers that they have a right to report injuries and illnesses free from discrimination or retaliation. As discussed above, many injuries go unreported due to a lack of knowledge of how to report injuries, or that reporting injuries can make their workplace safer. It is important that workers know that they have a right to report injuries and illnesses and that they cannot be retaliated against for doing so. As noted above, the FRA recordkeeping regulations require railroad employers to have an Internal Control Plan that prohibits the retaliation against workers for injury reporting. The regulations also require that railroad operators affirmatively inform employee's of the anti-retaliation prohibitions. (49 CFR 225.33(a)(2).

The AFL-CIO recommends that the following regulatory language be added to section 1904.35 (b)(1) on employee involvement:

*"(iii) You must tell each employee that they have a right to report injuries and illnesses, that reporting an injury and illness is a protected activity under OSHA and that employees cannot be retaliated against for reporting injuries and illnesses.*

*(iv) You must provide the information to employees in a manner and form that the employee can understand."*

This is not a burdensome requirement, particularly since employers already have an affirmative obligation to inform employees on how they should report injuries and illnesses in the workplace. This information should be conveyed to employees in a

25

manner and form they can understand. This is particularly important for non-English speaking workers and vulnerable workers who do not know their rights and may be at increased risk of injury and adverse actions by the employer. The information could be conveyed orally or in writing. It could be accomplished by posting injury reporting procedures that include the information that employees have a right to report injuries and illnesses and cannot be retaliated against for doing so.

In addition to this regulatory requirement, in order to help inform workers that they have a right to report injuries without the fear of retaliation, the AFL-CIO recommends that OSHA revise and update the OSHA poster on OSHA rights to include this information.

### A provision requiring that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome

The AFL-CIO supports adding a provision to the recordkeeping regulation that requires that the employer injury and illness reporting procedures be reasonable and not unduly burdensome. Many employers have policies that require the immediate reporting of a work-related injury by the worker, and for some employers failure to follow this requirement will result in discipline, regardless of the circumstances. In some cases workers may be unaware that they have suffered an injury, since the pain or symptoms do not manifest until later. (For example, see the case described earlier in these comments about a worker who experienced momentary wrist pain that developed into a more serious injury and was discharged for failing to immediately report the injury). This is particularly true for musculoskeletal injuries. The worker reports the injury when they recognize it has occurred, but are disciplined because the reporting did not occur until after the event that caused the injury occurred.  For some employers these immediate injury reporting requirements are accompanied by other policies under which every recordable work-related injury results in some kind of adverse action. Thus, a worker experiences an adverse action if they fail to report the injury or if they do. These kinds of employer policies discourage injury reporting.

The current recordkeeping regulation requires that employers set up a way for employees to report injuries and illnesses promptly (1904.35(b)(1)(i)). The AFL-CIO agrees that the prompt reporting of injuries by employees is to be encouraged and promoted, both to provide for prompt medical treatment of the employee, but also to identify and correct any hazardous condition.  But it is also important for employer injury reporting procedures to be reasonable and not unduly burdensome. Employer prompt reporting requirements should require employees to report the injury promptly upon learning that the injury has occurred so as to account for the fact that in some cases an employee will not immediately learn that an injury has occurred at the time the event causing the injury takes place.  A prompt reporting rule that does not take account of such later-discovered injuries is not reasonable. To achieve both of these purposes, we recommend that section 1904.35(b)(1)(i) of the recordkeeping regulation be modified to read as follows:

26

> *"(b)(1)(i) You must set up a way for employees to report injuries and illnesses promptly. In order to encourage the timely reporting of injuries and illnesses, your procedures for employees to report injuries and illness must be reasonable and not unduly burdensome."*

In comments filed on this supplemental notice some employer groups have claimed that the approach OSHA is proposing will prohibit employers from requiring the immediate or prompt reporting of injuries. We do not agree. The provisions that OSHA is considering and the language that we are recommending simply requires that injury reporting procedures not be overly burdensome and be applied in a reasonable manner.

## A prohibition against disciplining employees for reporting injuries and illnesses

The AFL-CIO strongly supports adding a provision to the 1904 recordkeeping rule that prohibits employers from disciplining employees for reporting injuries and illnesses. OSHA has long held that retaliation against a worker for reporting an injury or illness is a protected activity and prohibited under Section 11(c) of the Act. This was made explicit in section 1904.36 of the 2001 recordkeeping rule:

> "Section 11(c) of the Act prohibits you from discriminating against an employee for reporting a work-related fatality, injury or illness. That provision of the Act also protects the employee who files a safety and health complaint, asks for access to the Part 1904 records, or otherwise exercises any rights afforded by the OSH Act."

In the March 12, 2012 "Fairfax memo" OSHA made clear that discipline against an employee for reporting an injury constitutes a violation of 11(c) stating:

> "Reporting an injury is always a protected activity. OSHA views discipline imposed under such a policy against an employee who reports an injury as a direct violation of section 11(c) or FRSA."

As we outlined earlier in these comments, it is the AFL-CIO's view that retaliation against a worker for reporting an injury should also be explicitly prohibited by OSHA's 1904 recordkeeping regulations, just as it is under FRA injury reporting regulations under FRSA. Including such a provision in the 1904 recordkeeping regulation will make it clear to employees and employers alike that workers have a right to report injuries without fear of retaliation and give OSHA additional enforcement tools to protect against retaliation for injury reporting. Such a provision will help encourage workers to report injuries and provide for fuller and more accurate injury information, which is exactly the purpose and goal of OSHA's recordkeeping regulations.

It is imperative that, in addition to incorporating a prohibition against an individual worker who reports an injury or illness, the recordkeeping regulations, also prohibit the systematic employer policies, programs or practices that retaliate against workers for

27

APP 0047

reporting injuries or illnesses or discourage them from reporting. Such a prohibition is necessary to address the systematic practices that impede injury reporting and undermine the collection of full and accurate injury and illness information.  As we have discussed above, 11(c) by itself is not an effective means to address such systematic discriminatory policies and practices. These practices and policies need to be covered by the 1904 recordkeeping rule itself, which will enhance OSHA's ability to enforce against such policies and practices. Moreover, the inclusion of such a prohibition will help bring about needed changes in employer injury reporting policies and programs that will help lead to better injury reporting, more accurate data and improved injury and illness prevention.

We recommend the following regulatory language be added to section 29 CFR 1904.35 and 1904.36:

> *1904.35(b)(1)……*
> *"(v) You may not institute any program, policy or practice that discourages employees from or retaliates against employees for reporting work-related injuries or illnesses;*
>
> *(vi) You may not discriminate or retaliate against any employee who reports a work-related injury or illness to the employer, representative of the employer or a healthcare provider."*
>
> *1904.36*
> *\*\*\*\*\*\*\*\**
> *"Violations of section 1904.35 and all other provisions of Part 1904 are subject to the citations, enforcement procedures and penalties provided for in Sections 9, 10 and 17 of the Occupational Safety and Health Act."*

The AFL-CIO recognizes that many of the determinations about what policies, programs or practices constitute discrimination or pose and impermissible barrier to reporting will have to be evaluated on a case by case basis. However, we believe that OSHA can and should provide guidance in the preamble on the kind of policies, programs and practices that constitute or may constitute illegal discrimination or barriers to reporting.  OSHA has already done so in the March 12, 2012 Fairfax memo on "Employer Safety Incentive and Disincentive Policies and Practices" and should reaffirm and elaborate upon that guidance in this rulemaking.[57]

Specifically OSHA has made clear that policies that discipline all employees who report an injury, regardless of cause is illegal and a direct violation of 11(c). OSHA should make clear that such policies are also a violation of the 29 CFR 1904 recordkeeping regulation.

In addition the preamble should set forth the kinds of policies, programs and practices that may be impermissible under the recordkeeping regulation as the agency

---

[57] Memorandum from Richard E. Fairfax, *op.cit.*

APP 0048

has articulated in Fairfax memo and that will receive close attention by the agency. After the final regulation is issued, OSHA can provide additional guidance in the compliance directive on the new injury reporting and recordkeeping requirements, and update this guidance as appropriate.

As the AFL-CIO outlined in our earlier comments on the Proposed Rule on Improve Tracking of Workplace Injuries and Illnesses filed on March 10, 2014, in order for these provisions of the recordkeeping rule to be effective, they must be backed up by strong enforcement. But OSHA's current enforcement policy only treats recordkeeping violations as a single "other-than-serious violations" with a maximum combined penalty of $1,000, except for egregious cases. The AFL-CIO believes that OSHA must change its enforcement policy on the 1904 recordkeeping regulation to treat violations such as discrimination against workers who report injuries and policies that discourage reporting or retaliate against workers for reporting as serious or willful violations, similar to the penalties and enforcement for such violations under the Federal Railroad Administration's injury recordkeeping and reporting regulations. (49 CFR 225.29). Moreover OSHA must also use the enforcement and penalty provisions under Section 17(g) to criminally prosecute employers who willfully make false injury and illness reports. Only with an enforcement policy that treats injury reporting as important and significant will OSHA's recordkeeping rule, including the new proposed injury reporting provisions, provide data that is complete, accurate and useful for injury prevention.

### OSHA Has Ample Legal Authority to Promulgate Recordkeeping Regulations that Protect Workers from Retaliation for Reporting Injuries

OSHA has clear legal authority for the proposals contained in this supplemental rulemaking.

In enacting the OSH Act, Congress declared its purpose "to assure as far as possible every working man and woman in the Nation safe and healthful working conditions," a goal it stated could be achieved in part "by providing for appropriate reporting procedures with respect to occupational safety and health which procedures will help achieve the objectives of this chapter and accurately describe the nature of the occupational safety and health problem." 29 U.S.C. § 651(b)(12). Accordingly, the recordkeeping provisions of the OSH Act direct the Secretary to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses," 29 U.S.C. § 657(c)(2), as well as to "issue regulations requiring that employers, through posting of notices or other appropriate means, keep their employees informed of their protections and obligations" under the law, § 657(c)(1). Further, in order "to accurately describe the nature of the occupational safety and health problem," 29 U.S.C. § 651(b)(12), the Secretary is directed to "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics," including "compil[ing] accurate statistics on work injuries and illnesses," 29 U.S.C. § 673(a).

APP 0049

These statutory provisions vest OSHA with ample authority to amend 29 C.F.R. § 1904.35 to "require that employers inform their employees of their right to report injuries and illnesses," as OSHA has proposed in this supplemental rulemaking. *See* 79 Fed. Reg. at 47606-07. As part of an employer's obligation to "maintain accurate records of . . . work-related deaths, injuries and illnesses," 29 U.S.C. § 657(c)(2), OSHA already requires employers to "set up a way for employees to report work-related injuries and illnesses promptly" and to "tell each employee how to report work-related injuries and illnesses," 29 C.F.R. § 1904.35(b)(1). Requiring employers to also inform employees of their right to report injuries and illnesses without retaliation is fully consistent with these existing requirements. And, since OSHA relies on accurate employer recordkeeping for its own statistics, such a requirement will also serve to ensure that the Secretary is able to "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics," resulting in "accurate statistics on work injuries and illnesses." 29 U.S.C. § 673(a).

Similarly, OSHA's proposal "requir[ing] that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome," 79 Fed. Reg. at 47606-08, also falls well within OSHA's statutory mandate to ensure that employers "maintain accurate records of . . . work-related deaths, injuries and illnesses," 29 U.S.C. § 657(c)(2), a mandate which can only be achieved if employees are able to report workplace injuries and illnesses without facing unreasonable or undue burdens. Indeed, OSHA's existing rule requiring employers to "set up a way for employees to report work-related injuries and illnesses promptly," 29 C.F.R. § 1904.35(b)(1), implicitly bars unreasonable and unduly burdensome reporting requirements. *See* R. Fairfax, Deputy Assistant Secretary, Occupational Safety and Health Administration, Employer Safety Incentive and Disincentive Policies and Practices 1 (March 12, 2012) (describing specific employer reporting policies that may violate OSHA's existing recordkeeping regulations). Given the central importance of accurate employee reporting of workplace injuries and illnesses to the OSH Act's core purpose of ensuring safe and healthful working conditions, OSHA's proposal to explicitly prohibit unreasonable and unduly burdensome reporting requirements has a firm grounding in the statute. As OSHA explained in promulgating the current version of 29 C.F.R. § 1904.35, "free and frank reporting by employees is the cornerstone of [and employer's safety and health system]. If employees fail to report their injuries and illnesses, the 'picture' of the workplace that the employer's OSHA forms 300 and 301 reveal will be inaccurate and misleading," with the result that "employers and employees will not have the information they need to improve safety and health in the workplace." OSHA, Occupational Injury and Illness Recording and Reporting Requirements, 66 Fed. Reg. 5915, 6050 (Jan. 19, 2001) (Final Rule).

Finally, OSHA's proposal to "prohibit employers from taking adverse action against employees for reporting injuries and illnesses," 79 Fed. Reg. at 47606, 47608, similarly falls well within OSHA's statutory authority to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses," 29 U.S.C. § 657(c)(2). There can be no doubt that when an employer terminates or takes other adverse employment action against an

APP 0050

employee for reporting an injury or illness that that act chills the willingness of that particular employee to ever come forward again as well as the willingness of other employees to make similar reports, thus interfering with an employer's duty to maintain accurate records. OSHA therefore has authority to prohibit employers from taking adverse action against employees who report injuries and illnesses in order to effectuate the OSH Act's basic recordkeeping requirement. And, as with any other recordkeeping violation, OSHA has authority to enforce such a rule through civil penalties and by requiring the employer to take appropriate action to abate the violation.

The fact that Section 11(c), the OSH Act's anti-retaliation provision, separately prohibits employers from "discharg[ing] or in any manner discriminat[ing] against any employee . . . because of the exercise by such employee . . . of any right afforded by [the Act]," 29 U.S.C. § 660(c), does not prevent OSHA from promulgating an additional *recordkeeping* rule requiring employers' recordkeeping systems be reasonable and not unduly burdensome and prohibiting employers from taking adverse action in the specific context of employee reporting of workplace injuries and illnesses. It is true that many adverse actions against individual employees for reporting injuries or illnesses may also constitute retaliation prohibited by Section 11(c). *See* 29 C.F.R. § 1904.36 ("Section 11(c) of the Act prohibits [an employer] from discriminating against an employee for reporting a work-related fatality, injury or illness."). But the fact that an alternative remedy may be available to some subset of individual employees does not divest OSHA – the agency delegated by Congress to enforce the recordkeeping provisions of the OSH Act – of authority to effectively enforce statutory recordkeeping requirements by requiring employers to have reasonable recordkeeping systems that do not unduly burden reporting and by making it a violation of the recordkeeping rules to take adverse action against employees for reporting injuries or illnesses. The provisions are complementary of each other and certainly do not exceed OSHA's authority under the OSH Act.

### Conclusion

Employer policies, programs and practices that discourage the reporting of work-related injuries and illnesses and/or retaliate against workers for injury reporting are a significant and widespread problem. These programs, policies and practices impede the collection of full and complete information on workplace injuries and illnesses and undermine prevention efforts. Efforts to address retaliation and barriers to injury reporting under section 11(c) have not been sufficient.

Stronger measures are needed. OSHA should use its authority under the Occupational Safety and Health Act to strengthen its recordkeeping regulation to enhance worker's rights to freely report injuries, prohibit programs and practices that discourage workers from, or retaliate against workers for, reporting injuries and enforce these requirements through the issuance of citations and penalties for violations.

31

APP 0051



# UNITED STEELWORKERS

**UNITY AND STRENGTH FOR WORKERS**

March 10, 2014

OSHA Docket Office
U.S. Department of Labor
Room N-2625
200 Constitution Ave. NW
Washington, DC 20210

RE:   Comments of the United Steelworkers International Union on
      Occupational Safety and Health Administration's (OSHA's) proposed rule:
      Improve Tracking of Workplace Injuries and Illness
      Docket Number OSHA-2013-0023

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial
and Service Workers International Union (USW) strongly supports the proposed
modification to 29 CFR Part 1904 with recommendations included in these comments.
The USW represents 850,000 members across the United States and Canada in many
sectors of the economy including steel, paper and forestry, rubber, manufacturing,
energy, allied industrial and service sector industries.  Every 12 days, on average, a
worker is killed in a USW represented workplace; many more suffer life-altering and
other types of injuries as well as occupational diseases. Effective workplace health and
safety programs find and fix unsafe and unhealthy conditions, reducing work-related
injury, illness and death.  A vital resource for an effective health and safety program is
accurate data about workplace injuries and illnesses, which facilitates the identification,
control and prevention of hazards. The USW lauds OSHA's efforts to provide better
access to this information for relevant stakeholders, and recommends an addition to
OSHA's proposal that will ensure the quality of this data.

OSHA's proposed recordkeeping changes, published in the Federal Register November
8, 2013, Vol. 78, No. 217, meet the goals of Transparency and Open Government as
outlined by President Obama.[1] The proposal provides added transparency and
promotes worker, union, employer and public participation and collaboration in
identifying injuries, illnesses and trends; and the hazards associated with them. The
USW agrees with OSHA that this proposal provides important benefits such as:

- Better compliance with OSHA's statutory directive "to assure so far as possible
  every working man and woman in the Nation safe and healthful working
  conditions and to preserve our human resources" (29 U.S.C. 651(b)) "by

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

APP 0052

March 10, 2014
Page 2

providing for appropriate reporting procedures with respect to occupational safety and health which procedures will help achieve the objectives of this Act and accurately describe the nature of the occupational safety and health problem" (29 U.S.C. 651(b)(12)).

- Increased workplace safety as a result of expanded OSHA access to timely, establishment-specific injury/illness information; making timely, establishment-specific injury/illness information public and easily available to employers, employees, employee representatives, potential employees, customers and potential customers.
- Improved research on occupational safety and health: public access to timely, establishment-specific injury and illness information will allow researchers to identify patterns of injuries or illnesses that are masked by the aggregation of injury/illness data in existing data sources.

*Annual Reporting for Employers with more than 20 Employees for Summary Data and Quarterly Reporting by Employers with more than 250 employees for Injury Logs and 301 Incident Report Form Data:*

The USW supports OSHA's transition to the electronic submission of injury and illness data that employers are already required to keep. There are many examples of electronic submission of data, and there is no reason why this injury and illness data cannot be regularly and reliably reported to OSHA electronically, given the technology that employers now have and utilize. Many employers in USW represented facilities already keep this data electronically and have done so for years. We do not believe that the electronic submission of this information will create a burden on employers. It is important that OSHA ensure that electronic systems put in place for this initiative are compatible with existing systems in common use. We also encourage OSHA to update their system as necessary to keep up with advances in technology and facilitate the transfer of employer data.

The USW supports requiring mandatory online submission of OSHA 300 Log information and 301 Incident Report Forms for facilities with 250 or more employees; and annual summaries for employers with 20 or more employees in the previous calendar year in designated high hazard industries. The submission of this data not only allows OSHA to maintain and review all records in a timely, systematic manner; it allows workers, employers, and workers' representatives access to information that will enhance their efforts to identify and abate workplace hazards. The database developed by OSHA must allow components of the collected information to be searched, such as queries by incident type or by industry sector.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

**APP 0053**

The USW Health, Safety and Environment Department and USW local unions have always utilized OSHA 300 Log data and 301 Incident Report Forms to identify trends in injuries and illnesses in particular workplaces and industries and formulate strategies to eliminate or reduce hazards that cause or contribute to those injuries and illnesses. For example, as the result of information gained from reviewing OSHA 300 Logs, we have identified and worked to correct noise hazards in steel mills, hazards contributing to musculoskeletal injuries in tire plants, machine guarding concerns in paper facilities, temperature extreme hazards in aluminum facilities, and upper extremity repetitive strain injuries among hospital ultrasound technicians.

While Section 1904.35 of OSHA's Recordkeeping Rule provides workers and worker representatives access to OSHA 300 Logs and 301 Incident Report Forms, USW members and local union representatives routinely encounter difficulty in obtaining these logs and forms. Employers have denied access, giving reasons such as "HIPAA" (the Health Insurance Portability and Accountability Act); or simply not complied with requests for the logs. One USW local union requested their OSHA 300 Log in early December, 2013; they finally received it at the end of January, 2014. Section 1904.35 provides that employers must give OSHA 300 Logs, upon request, to workers, worker representatives and former workers by the end of the next business day from when it was requested. Access to OSHA 300 Logs and 301 Incident Report Forms electronically will allow for updated, timely and certain access to these data.

### Proposed Phase in period:

The USW believes that employers with 250 or more employees are able to meet the requirement for mandatory electronic reporting upon implementation of the web portal or software by OSHA, and OSHA's assurance that the system used will only display data with personal identifiers scrubbed, including from all 301 Incident Report Forms. Further, the USW agrees that it may be necessary for smaller employers (20 employees or less) to be provided a phase in period for compliance with the new requirements of one or two years.

### Enterprise Wide Reporting:

The USW supports OSHA's proposal for enterprise-wide submission with the following proviso:

Enterprise wide data must retain discernible facility identification information so that stakeholders can determine which facility each injury or

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

APP 0054

illness entry occurred.  This will provide stakeholders with the ability to determine where specific hazards exist and engage in efforts to eliminate or reduce these hazards.

Providing employers with the ability to submit enterprise wide data affords those employers with multiple worksites the ability to compile and submit one set of data to OSHA.  We find that many USW represented employers already compile OSHA injury and illness data into one corporate or enterprise wide report.  In addition, the USW finds that many employers already include some form of injury and illness data in readily available information, such as corporate sustainability reports.[2,3,4,5,6]

### How should OSHA ensure the quality of data?

(1)     Policies that discourage reporting:

The June, 2008 Congressional Hearing and Majority Staff Report by the Committee on Education and Labor, U.S. House of Representatives titled "Hidden Tragedy: The Underreporting of Workplace Injuries and Illnesses" highlighted the importance of accurate injury and illness data for targeting of OSHA inspections, setting OSHA's priorities, judging the effectiveness of OSHA programs, and determining the state of workplace health and safety in this country. On a workplace level, accurate data is essential to identify injury and illness trends, as well as find and address hazards. Inaccurate and incomplete data degrade efforts to identify injury and illness trends and find and fix hazards.

There are major concerns with the quality of workplace injury and illness data. The ubiquitous presence of employer policies, practices and programs that discourage workers from reporting work-related injuries and illnesses has been documented in government and academic studies and highlighted as having significant impacts on data quality. In the Federal Register, January 19, 2001: Occupational Injury and Illness Recording and Reporting Requirements Final Rule (Vol. 66, No. 13), page 6050, OSHA stated, "One of the goals of the final rule is to enhance employee involvement in the recordkeeping process. OSHA believes that employee involvement is essential to the success of all aspects of an employer's safety and health program. This is especially true in the area of recordkeeping, because free and frank reporting by employees is the cornerstone of the system. If employees fail to report their injuries and illnesses, the "picture" of the workplace that the employer's OSHA forms 300 and 301 reveal will be inaccurate and misleading. This means, in turn, that employers and employees will not have the information they need to

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

improve safety and health in the workplace." When employer data is shared with OSHA electronically, the same ill effects may be true regarding OSHA's efforts to assure that safety and health is improved in this nation's workplaces.

In 2001, to address the problem OSHA identified on page 6053 of the Federal Register, January 19, 2001: Occupational Injury and Illness Recording and Reporting Requirements Final Rule (Vol. 66, No. 13) of "evidence that retaliation against employees for reporting injuries is not uncommon and may be 'growing,'" OSHA added a "Prohibition Against Discrimination" (Section 1904.36) to the Recordkeeping Rule in 2001 that stated, "Section 11(c) of the Act prohibits you [the employer] from discriminating against an employee for reporting a work-related fatality, injury or illness. That provision of the Act also protects the employee who files a safety and health complaint, asks for access to the Part 1904 records, or otherwise exercises any rights afforded by the OSH Act." Providing individual workers with access to the OSH Act's 11(c) whistleblower protections if they suffered retaliation for reporting a work-related injury or illness, and reminding employers of their obligation not to discriminate, was codified as the way to deal with retaliatory employer practices.

Unfortunately, Section 1904.36 ("Protection from Discrimination") has not worked to end or prevent large-scale retaliation against workers who report occupational injuries and illnesses.

Employer practices that discourage injury reporting have grown significantly in the last several decades; they include prize programs where workers receive money or prizes for low or no injuries reported, injury discipline policies where workers reporting injuries suffer discipline up to and including termination, and more. An employer in a USW represented workplace had a long-standing safety incentive program that awarded every worker in a warehouse a monthly cash award when there were no reported recordable injuries that month (and provided escalating amounts of cash for each month there was no OSHA recordable injury). If there was an OSHA recordable injury, no one received cash that month, and the next month cash began again at the lowest amount ($10). Several years ago this employer proposed a new element to be added to their program: workers who suffered an OSHA recordable injury would be required to wear a fluorescent orange vest while at work for one week. These practices benefit employers: workers are less likely to report injuries and file workers compensation claims; employers with low recordable injuries are unlikely to experience surprise OSHA inspections;

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

supervisors and managers may receive bonuses; the employers' public image is enhanced, resulting in more investments and contracts being secured. Workers themselves suffer threats, fear and job loss. When workers don't report injuries and illnesses, underlying hazards are not identified, assessed or addressed. As a result, workplace health and safety is degraded, as is important data about on job injuries and illnesses.  Without OSHA providing adequate protections against such retaliatory practices in this final rule, the proposed changes to place injury and illness data on the internet may promote employers' implementation of such deterrents to job injury and illness reporting.

The USW contends that these practices that discourage reporting are the norm in this nation's workplaces. At a recent USW International health and safety Conference, over 90% of conference delegates completing a survey reported that one or more of these retaliatory practices is currently present in their workplace.

The 2008 Congressional Report titled "Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses" underscored the importance of accurate recordkeeping and described in detail employer practices that discourage injury reporting and the devastating impact they have on workers and job health and safety. An October 2009, Government Accountability Office report titled "Workplace Safety and Health: Enhancing OSHA's Records Audit Process Could Improve the Accuracy of Worker Injury and Illness Data" revealed that over two-thirds of occupational health practitioners surveyed observed workers fearing disciplinary action or job loss for reporting their job injuries. Another GAO report from 2012 confirmed the pervasive nature of employer practices that discourage injury reporting. The survey they conducted with manufacturing companies revealed that 75% had such practices.

Academic studies have found similar results. A 2012 study published in the American Journal of Industrial Medicine about employer reward and punishment practices that discourage injury reporting among carpenters was subtitled "You're Pretty Much Screwed If You Get Hurt At Work." This study found that a majority of carpenters surveyed reported the presence of these practices at their worksite and over 30% said injuries were almost never or rarely reported in their current workplace.  In 1988, John Ruser who worked at the Bureau of Labor Statistics and his colleague Robert Smith conducted a study looking at the effect of OSHA's records-check inspections on reported occupational injuries in manufacturing establishments. They found consistent evidence that inspection targeting based on firm-reported injury rates led firms to under-report injuries. They

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

concluded that any system used for risk evaluation needs to draw on data from circumstances were the incentives to understate risk are counteracted.

Unfortunately, the drivers for employers to discourage injury reporting are prevalent and widespread. The USW welcomed the release of OSHA's March, 2012, Memorandum on Employer Safety Incentive and Disincentive Policies and Practices.  This policy document provides guidance to OSHA's whistleblower investigators about retaliatory employer practices. However, the USW does not believe that Section 11(c) of the Occupational Safety and Health Act alone is sufficient to address these damaging practices.

In summer, 2013, an employer in a USW represented workplace unleashed their "Worst Safety Performers" program. Workers with OSHA Recordable, lost-time and/or restricted work injuries were told that any further injury could disqualify them from their current job. If they experienced another injury they would have 30 days to bid into a non-physical job; if bidding was unsuccessful their employment would be terminated. Rather than waiting for workers to suffer retaliation before action can be taken, the USW believes that OSHA should simply prohibit employers from having such practices. To be effective, such a provision must be enforceable as a violation of the recordkeeping rule itself.

Following the release of the 2009 GAO Report noted earlier, Senator Patty Murray was quoted in the New York Times saying,  "This report confirms that when it comes to the documenting of workplace injuries, we can't just take employers at their word....The system, to this point, has been all too easy to game."[7]  With the addition of an enforceable prohibition on employer practices that discourage injury and illness reporting to OSHA's proposal, such gaming of the system would be curtailed and the goals of the Occupational Safety and Health Act of 1970 as well as those that OSHA established for improvements in workplace safety and health and data accuracy through improved tracking of workplace injuries and illnesses may be realized.  Recommended language to consider that would expressly bar the use of practices, policies or programs that discourage injury and illness reporting is as follows:

> *"An employer shall not institute any program, policy or practices which has the effect of discouraging the reporting of work-related injuries or illnesses."*

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

March 10, 2014
Page 8

OSHA's role as an enforcement agency is also a needed and necessary component of a system to ensure proper data quality.  Employers who underreport workplace injuries and illnesses, those who retaliate against workers who report, or employers who have or implement policies or practices that discourage the reporting of injuries must be held accountable by OSHA through the enforcement process. Thus, this provision should be enforceable through penalties and citations along with and in the same manner as other provisions of this rule.

Included with these comments are the following references for inclusion to the docket:

- (2014).Plant 2014 Gain sharing Plan. [payout pool of $25,000 per quarter if there are zero OSHA recordable injuries]
- (2004).Safety Incentives Safety Bingo. *Safety Pays: Workplace Incentives.* Retrieved from http://www.safetypays.com [Safety incentive program]
- "Plant Warning Notice" [Injury discipline practice]
- "Memorandum Re: Written Warning – Targeted Safety Training Notice" [Injury discipline practice]
- (2013). Group 1 Talking Points – Our Worst Safety Performers. Publication 20131. [Injury discipline policy]
- "Accident Report Form" [for bee sting; see question #22]
- (2013).Accident Repeater Program. [Injury discipline policy]
- "State of Michigan, Michigan Administrative Hearing System: In the Matter of: Docket No.: 12-000674-MIOSHA" [ALJ decision in one of dozens of OSHA 11(c) cases filed by workers who suffered retaliation after reporting on-the-job injuries]
- United States. House of Representatives. Committee on Education and Labor. (2008, June).Report of. Report of Hidden Tragedy: Underreporting of Workplace Injuries and Illness.14-29.
- United States. Government Accountability Office. (2009, October). Report of Workplace Safety and Health to Enhancing OSHA's Record and Audit Process Could Improve the Accuracy of Worker Injury and Illness Data
- Rosenman, K et al. (2006).How Much Work-Related injury and Illness is Missed by the Current National Surveillance System? *Journal of Occupational and Environmental Medicine,* Vol. 48, Number 4
- Pransky, G et al. (1999). Under-reporting of Work-related Disorders in the Workplace: A Case Study and Review of the Literature. *Ergonomics,* Vol. 42, No.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

APP 0059

- o  Azaroff, L et al. (2001).Occupational Injury and Illness Surveillance: Conceptual Filters Explain Underreporting. *Public Health Matters,* Vol. 92, No. 9
- o  Lipscomb, H, et al. (2012). Safety, Incentives, and the Reporting of Work-Related Injuries Among Union Carpenters: Your Pretty Much Screwed If You Get Hurt at Work. *American Journal of Industrial Medicine.*
- o  Lessin, N & McQuiston, T.(2013).An Inverse Relationship Between Injuries and Fatalities: What Is Surprising-And What is Not. *American Journal of Industrial Medicine*
- o  Publication of the American Public Health Association, 2013 Policy Statement: Support for Workplace Injury and Illness Prevention Programs [See 4th page "Action Steps," 5th recommendation regarding prohibition of employer policies, programs and practices that discourage workers from reporting job injuries and illnesses.]
- o  Brown, G & Barab, J. (2007).Cooking the Books – Behavior-Based Safety at the San Francisco Bay Bridge. *New Solutions,* Vol. 17(4), 311-324
- o  Greenhouse, S. (2009, November 17). *New York Times* . Retrieved from http://www.nytimes.com
- o  Hagerty, J. (2013, July 22).Workplace Injuries Drop, but Claims of Employer Retaliation Rise. *Wall Street Journal.* Retrieved from http://www.wsj.com
- o  Written copies of oral comments presented by James Frederick and Nancy Lessin on January 9, 2014 at OSHA's hearing on its "Improve Tracking of Workplace Injuries and Illnesses" proposal.

(2)    Underreporting of hearing loss:

Many injuries and illnesses result chronic exposure to a stressor or condition which may be present both at, and outside of work. The Recordkeeping rule states that the employer is not required to record injuries and illnesses if "(ii) The injury or illness involves signs or symptoms that surface at work but result solely from a non-work-related event or exposure that occurs outside the work environment;" (Section 1904.5(b)(2)(ii)).

This provision applies to hearing loss (Section 1904.10(b)(5)). However, the very next section states: "If a physician or other licensed health care professional determines that the hearing loss is not work-related or has not been significantly aggravated by occupational noise exposure, you are

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

**APP 0060**

not required to consider the case work-related or to record the case on the OSHA 300 Log" (Section 1904.10(b)(6)).

This provision creates a huge loophole for unscrupulous employers. Of course, the employer can choose any health care provider they wish. So long as the provider is licensed, he or she has the sole discretion to declare a case non-occupational and non-recordable. It is to be hoped that the provider would act in accord with the language of 10(b)(5), but there is no enforceable obligation to do so. Several years ago, the USW discovered an employer with noise levels routinely exceeding 90 dBA, but no recorded cases of occupational hearing loss. We documented scores of hearing loss cases, some of which had resulted in workers compensation. But none had ever been recorded on the OSHA 300 Log, because the licensed health care professional reviewing such cases always found some excuse – hunting, listening to rock music, attending auto races – to declare them non-occupational. The OSHA area office considered a recordkeeping citation, but the Solicitor's Office ultimately decided that 10(b)(6) precluded such a citation.

We do not know how widespread this practice is, but we have anecdotal evidence of other such cases in a variety of workplaces. More is at stake than the integrity of the OSHA 300 Log. The Occupational Noise Exposure standard requires that employers take steps to protect employees with hearing loss – unless the loss is determined by a physician to be non-occupational.

The best way to correct this problem and ensure the quality of data would be to remove Section 1904.10(b)(6) altogether. Section 1904.5(b)(2) provides sufficient guidance on the work-relatedness of injuries and illnesses, including hearing loss. Employers would still be able to use health care professionals to evaluate hearing loss, but the employer would have an incentive to ensure that those professionals act ethically, and follow the criteria of the standard.

As OSHA stated in the summary of its proposal "Improve Tracking of Workplace Injuries and Illnesses, "An updated and modernized reporting system would enable a more efficient and timely collection of data and would improve the accuracy and availability of the relevant records and statistics."

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

As noted by OSHA in its proposal, Section 8(c)(1) of the Occupational Safety and Health Act requires each employer to "make, keep and preserve, and make available to the Secretary [of Labor] or the Secretary of Health and Human Services, such records regarding his activities relating to this Act as the Secretary . . . may prescribe by regulation as necessary or appropriate for the enforcement of this Act or for developing information regarding the causes and prevention of occupational accidents and illnesses" (29 U.S.C. 657(c)(1)). Section 8(c)(2) directs the Secretary of Labor to prescribe regulations "requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job" (29 U.S.C. 657(c)(2)). Section 8(g)(2) of the OSH Act empowers the Secretary of Labor to "prescribe such rules and regulations as [he] may deem necessary to carry out [his] responsibilities under this Act" (29 U.S.C. 657(g)(2)).

Section 24 of the OSH Act (29 U.S.C. 673) contains a similar grant of authority. This section requires the Secretary to "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics" and "compile accurate statistics on work injuries and illnesses which shall include all disabling, serious, or significant injuries and illnesses . . ." (29 U.S.C. 673(a)). Section 24 also requires employers to "file such reports with the Secretary as [he] shall prescribe by regulation" (29 U.S.C. 673(e)). These reports are to be based on "the records made and kept pursuant to section 8(c) of this Act" (29 U.S.C. 673(e)).

The purpose of the Occupational Safety and Health Act, as declared by Congress, is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions" (29 U.S.C. 651(b)). As OSHA highlighted in its proposal "Improve Tracking of Workplace Injuries and Illnesses," a way in which the Act is meant to achieve this goal is "by providing for appropriate reporting procedures. . . [that] will help achieve the objectives of this Act and accurately describe the nature of the occupational safety and health problem" (29 U.S.C. 651(b)(12)).

Section 5(a)(1) of the OSH Act states:  [Each employer] "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."  With the provisions described in these comments included in the final rule, the USW believes that the purposes of the Occupational Safety and Health Act will be furthered, and employers' abilities to provide safe and healthful workplaces will be enhanced by OSHA's proposed changes to their recordkeeping requirements.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

March 10, 2014
Page 12

Respectfully submitted,

James S. Frederick
Assistant Director
Health, Safety & Environment
Department
United Steelworkers International Union

Ashlee Fitch
Intern
Health, Safety & Environment
Department
United Steelworkers International Union

Nancy Lessin
Senior Staff for Strategic Initiatives
United Steelworkers – Tony Mazzocchi
Center for Worker Health, Safety and
Environmental Education

Michael J. Wright
Director
Health, Safety & Environment
Department
United Steelworkers International Union

---

[1] (2013). Transparency and Open Government. Memorandum for the Heads of
Executive Departments and Agencies.  Retrieved from http://www.whitehouse.gov
[2] Royal Dutch Shell PLC.(2012). Sustainability Report. pg. 36
[3] Caterpillar. (2012). 2012 Sustainability Report. pg. 42
[4] SC Johnson.(2013).Green Choices: SC Johnson 2013 Public Sustainability report
pg. 28
[5] Procter and Gamble. (2013). 2013 Sustainability Report.  pg. 48
[6] DuPont. (2013). 2013 Global Reporting Initiative Report. pg. 47
[7] Greenhouse, S. (2009, November 17). *New York Times* . Retrieved from
http://www.nytimes.com

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

APP 0063



**UNITED STEELWORKERS**

**UNITY AND STRENGTH FOR WORKERS**

October 14, 2014

OSHA Docket Office
U.S. Department of Labor
Room N-2625
200 Constitution Ave. , NW
Washington, D.C. 20210

**RE: U.S. Occupational Safety and Health Administration Proposed Rule:**
**Improve Tracking of Workplace Injuries and Illnesses**
**Docket Number: OSHA-2013-1123**
**RIN 1218-AC49**

The United Steel, Paper and Forestry, Manufacturing, Energy, Allied Industrial and Service
Workers International Union (USW) provided oral comments on OSHA's proposed rule
Improve Tracking of Workplace Injuries and Illnesses on January 9, 2014 and submitted
post-hearing comments on March 10, 2014. Both our oral and written comments supported
the proposed modification to 29 CFR 1904 with recommendations provided in our
comments. These recommendations included the necessity for OSHA to assure quality data
by addressing in the rulemaking the problem of employer policies, practices and programs
that discourage workers from reporting occupational injuries and illnesses by prohibiting
these practices. Pages 4-9 of the USW's post-hearing comments were devoted to this issue.

OSHA has, on numerous occasions, expressed concerns regarding employers' retaliatory
and discriminatory practices that discourage workers from reporting injuries. On October
5, 2010 Dr. David Michaels, Assistant Secretary of Labor for OSHA, commented, "If accurate
records are not compiled because workers believe they will be fired or disciplined for
reporting an injury, or supervisors fear they will lose their bonuses if workers report
injuries, real safety is not being achieved. Accurate workplace injury and illness records are
vital tools for identifying hazards and protecting workers' health and safety." [OSHA
Regional News Release, U.S. Department of Labor, Office of Public Affairs, Region 5 News
Release: 10-1364-CHI, October 5, 2010].

The issue of employer practices discouraging workers from reporting job injuries and
illnesses is far from new. In the AFL-CIO's comments in 1996 regarding OSHA's proposed
occupational injury and illness recording and reporting requirements, the labor federation
noted that the integrity of OSHA's recordkeeping system depends largely on the willingness
of workers to report injuries and illnesses to their employers, and that this will be impeded
if workers are discouraged from reporting or believe they will face discrimination or
retaliation if they report workplace injuries and illnesses. [Comments of the American
Federation of Labor and Congress of Industrial Organizations Concerning the Occupational

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

APP 0064

Safety and Health Administration's Proposed Occupational Injury and Illness Recording and Reporting Requirements, Docket R-02, 1996]

In January, 2001 the Occupational Safety and Health Administration issued a final rule on Recordkeeping ("29 CFR Parts 1904 and 1952 Occupational Injury and Illness Recordkeeping and Reporting Requirements; Final Rule") with a preamble highlighting the functions of the Recordkeeping System:

- "One use is to provide information to employers whose employees are being injured or made ill by hazards in the workplace. The information in OSHA records makes employers more aware of the kinds of injuries and illnesses occurring in the workplace and the hazards that cause or contribute to them. When employers analyze and review the information in their records, they can identify and correct hazardous workplace conditions on their own. Injury and illness records are also an essential tool to help employers manage their company safety and health programs effectively."
- "Employees who have information about the occupational injuries and illnesses occurring in their workplace are also better informed about hazards they face. ...When employees are aware of workplace hazards and participate in the identification and control of these hazards, the overall level of safety and health in the workplace improves."
- "The records required by the recordkeeping rule are also an important source of information for OSHA. ... OSHA also uses establishment-specific injury and illness information to help target its intervention efforts on the most dangerous worksites and the worst safety and health hazards. Injury and illness statistics help OSHA identify the scope of occupational safety and health problems and decide whether regulatory intervention, compliance assistance, or other measures are warranted."
- "Finally, the injury and illness records required by the OSHA recordkeeping rule are the source of the BLS-generated national statistics on workplace injuries and illnesses, as well as on the source, nature and type of these injuries and illnesses. ...These statistics chart the magnitude and nature of the occupational injury and illness problem across the country. Congress, OSHA, and safety and health policy makers in Federal, State and local governments use the BLS statistics to make decisions concerning safety and health legislation, programs and standards." [Federal Register, Vol. 66, No. 13/Friday, January 19, 2001 pages 5916-5917]

In June, 2008 the U.S. House of Representatives Committee on Education and Labor held a hearing focusing on occupational injury and illness recordkeeping, and specifically the underreporting of job injuries and illnesses, for which a Majority Staff Report titled "Hidden Tragedy: The Underreporting of Workplace Injuries and Illnesses" was issued.  An introductory section of that report reiterated the importance of both recordkeeping and *accurate* recordkeeping:

- "For individual employers and workers, accurate counting of injuries, illnesses and other safety and health indicators is essential to identify the root causes of workplace incidents and illnesses, to address unsafe conditions, to ensure that workers get appropriate medical treatment and to establish an effective management safety system."

- "Targeting of OSHA Inspections: OSHA relies on accurate injury and illness data to target its inspections at the most dangerous worksites. Inaccurate data mean that OSHA may not be inspecting high hazard facilities."
- "Setting OSHA's priorities: OSHA needs information on where workers are getting injured, sick and killed, in order to identify high-hazard industries where aggressive enforcement programs may be required, and to determine what new standards are needed and how to target its compliance assistance efforts."
- "Judging the effectiveness of OSHA programs: An accurate and reliable assessment of the extent of occupational injuries, illnesses and fatalities is essential to enable policy makers to determine whether OSHA's programs are succeeding or failing and where improvements can be made."
- "Determining the state of workplace safety and health in this country: ...Are workplace safety trends still improving? Could we be doing better? What are the research needs? Accurate statistics are necessary to make these determinations." [United States House of Representatives, Committee on Education and Labor. *Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses*

In fact, none of these goals of a recordkeeping system can be realized if employer practices, policies and programs are discouraging workers from reporting work-related injuries and illnesses and retaliating against them when they do.

We applaud OSHA for following up on this important issue with the Federal Register notice on August 14, 2014. OSHA is now amending the agency's regulation on the annual OSHA injury and illness reporting requirements and requesting comments on measures OSHA can take to address the concern that their Improve Tracking of Workplace Injuries and Illnesses proposal could promote an increase in workplace policies and procedures that deter or discourage employees from reporting work-related illnesses. OSHA is considering these measures to protect the integrity of the injury and illness data collected electronically by making it a violation for an employer to discourage employee reporting of work-related injuries and illnesses.  OSHA is now seeking comment on whether to amend the proposed rule to (1) require that employers inform their employees of their right to report injuries and illnesses; (2) require that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome; and (3) prohibit employers from taking adverse action against employees for reporting injuries and illnesses.

Concerns about the impact of employers' electronic, on-line reporting of occupational injury and illness data on the underreporting of workplace injuries and illnesses have been included in both oral and written comments to OSHA from employers and employer organizations, labor organizations, occupational safety and health professionals and their organizations, and others.

Pat O'Connor representing the American College of Occupational and Environmental Medicine (ACOEM) and speaking at OSHA's January 9, 2024 public meeting on their November 8, 2013 proposal Improve Tracking of Workplace Injuries and Illnesses stated,

"As much as we endorse OSHA's goals, we have concerns that the rule, as written, may have many unintended consequences, foremost of which are first,

underreporting. Establishment-specific and open public reporting of injury and illness data may promote underreporting of this data, to avoid being targeted by OSHA and to avoid damaging public reputation essential to attracting employees and businesses. The desire to avoid reputational harm in OSHA inspections may create further pressure by some employers and occupational medicine personnel to downgrade the severity of their diagnoses and withhold appropriate treatment."
[https://www.osha.gov/recordkeeping/DOLMeeting-ITWII01-09-2014.pdf pg 67]

The ACOEM reiterated these concerns in their March 10, 2014 written comments, "We believe that establishment-specific and open public reporting of injury and illness data may promote under-reporting of this data to avoid being 'targeted' by OSHA and to avoid damaging public reputation essential to attracting employees and business."
[http://www.acoem.org/TrackingRule.aspx ].

During OSHA's January 9, 2014 public meeting on their proposal Improve Tracking of Workplace Injuries and Illnesses, James Thornton, Health and Safety Director for Newport News Shipbuilding, representing the American Society of Safety Engineers (ASSE), stated,

"...[U]nderreporting might bias OSHA targeting. ...There are companies that also are maybe less responsive and recalcitrant. Those very companies are the ones that will find a way to make the numbers be right but not necessarily reduce injuries. So when OSHA is thinking about targeting or how to apply its resources, this proposal, if enacted, might actually give OSHA more opportunities for citations but not necessarily have them gain on the data that will get the data that will help them focus on resources."
[https://www.osha.gov/recordkeeping/DOLMeeting-ITWII01-09-2014.pdf page 102-103]

An article in the on-line publication Business Insurance by Sheena Harrison titled "Proposed OSHA mandate to publicly post worker injury data riles industry" featured Dave Heidorn, the manager of government affairs and policy for the American Association of Safety Engineers explaining that companies with weak safety track records likely would underreport accidents to avoid appearing unsafe. He also stated, "It's going to incentivize not reporting, which is not good safety at all." [Harrison, S. "Proposed OSHA mandate to publicly post worker injury data riles industry" *Business Insurance*, posted July 6, 2014 http://www.businessinsurance.com/article/20140706/NEWS08/307069989 ]

In their December 13, 2013 notice to appear at OSHA's January, 2014 public meeting on OSHA's November 8, 2013 proposal Improve Tracking of Workplace Injuries and Illnesses, the Coalition for Workplace Safety (CWS), an organization comprised of employers and employer associations, Tressi Cordaro, an attorney with Jackson Lewis representing CWS listed among their concerns about the proposal, "The potential chilling effect such a rule will have on injury and illness reporting."
[http://www.regulations.gov/#!documentDetail;D=OSHA-2013-0023-0114 ]

Many labor organizations also expressed concerns about the impact of employers' on-line reporting of injuries and illnesses, and also provided recommendations for addressing these concerns. Peg Seminario, director of Occupational Safety and Health for the AFL-CIO

stated at OSHA's January 9, 2014 public meeting, "[U]nfortunately, with information being collected and made available, there are some employers that may create pressure to [drive] injury reporting underground. ...To deal with those employers and those situations where this may create a disincentive to reporting because of the focus on injury and illness records of individual employers, it really is critical that the rule include a prohibition on both actions against workers who report as well as the policies and practices that may either discourage reporting or retaliate against workers for that reporting." [https://www.osha.gov/recordkeeping/DOLMeeting-ITWII01-09-2014.pdf , pgs 54-55]

Broad-based concern was demonstrated by diverse stakeholders that making employer injury and illness data available on-line can impact and increase the underreporting of occupational injuries and illnesses. OSHA's August 14, 2014 notice of proposed rulemaking to amend the agency's regulation on annual OSHA injury and illness reporting requirements to address these concerns is very timely.

The USW has already submitted to OSHA's docket oral and written comments documenting serious problems with employer policies, programs and practices that discourage workers from reporting job injuries and illnesses and retaliate against them when they do; and requested that OSHA add an enforceable prohibition on such employer practices to their proposed Improve Tracking of Workplace Injuries and Illnesses in order for the goals OSHA set out for improvements in workplace safety and health and data accuracy through improved tracking of workplace injuries and illnesses to be realized. Our March 10, 2014 comments include answers to some of the questions OSHA asked in the Federal Register notice of August 14, 2014.

In our October 14, 2014 comments we will expand our comments on several of the questions OSHA has posed in the August 14, 2014 supplemental notice of proposed rulemaking regarding their proposal Improved Tracking of Workplace Injuries and Illnesses.

## Examples of Employer Practices that Discourage the Reporting of Injuries and Illnesses

Below are brief descriptions of some of the major types of employer policies, practices and programs that serve to discourage workers from reporting work-related injuries and illnesses and retaliate against them when they do report; along with specific examples of these practices. Following this section describing the practices will be a section describing some of the academic and government reports and studies as well as other studies that explain adverse impacts of these practices.

- **Safety incentive and prize programs**, where individual workers or groups of workers receive rewards ranging from donuts to days off to drive-away vehicles when there are no recordable injuries or a low number, usually over some period of time. In some cases, particular goals are set for a certain low number of recordable and/or lost-time injuries and if the goals are met, everyone in a department or workplace receives rewards ranging from free meals and award picnics to bonuses. Bonuses may be tied to gain-sharing or profit-sharing plans which may also have additional goals involving

production or quality. A certain percentage of each of these plans is devoted to "safety," measured by a low number of recordable injuries.

- o  At a USW-represented workplace the employer has a safety participation program in place that requires workers to meet two objectives in order to receive a monthly bonus: "We cannot have an injury, and each individual must participate in one of a dozen or so ways [with safety]."
- o  At a USW-represented workplace the employer implemented a reward program: "They have a drawing every quarter for those that have not reported an accident, and one member out of a combination of hourly and company people receive a cash reward."
- o  At a USW-represented workplace there is both a quarterly and annual bonus program where injuries/lost-time accidents decrease or eliminate workers' bonuses. A local union representative commented, "It certainly seems that workers...shy away from reporting accidents and injuries when it reflects in their bank accounts. We are penalized financially as an entire group..."
- o  In a USW-represented workplace in 2008 and two years prior, an employer had a safety incentive program involving a prize drawing. The worker whose name was drawn would go home with a prize such as a big screen TV. However, workers who reported an injury or had an OSHA recordable injury such as hearing loss shift were excluded from the drawings – their names were removed from the "hat." [Note: we are appending the letter sent to this employer by Iowa OSHA stating that this program came under discrimination under the IOSH Act, that employees who have had injuries/illnesses occurring in the work environment cannot be retaliated against, that this type of action has a dampening affect on all employees, and asking for the employer's assurance that in the future this retaliation of removing names from the drawing will cease.]
- o  At a USW-represented workplace there is a reward program for working "injury-free." A local union representative commented, "I...have a problem with this program. It is a trade off, silence about my injury in return for a prize. So much for safety!"
- o  An employer initiated their "Safety Focus Program" in 2001. Under this program there are specific quarterly safety-performance targets, and payouts are made to participating personnel quarterly. The payouts for each plant or group are based on target OSHA Recordable Rates ranging from 0 to 3.00, with payouts being proportional with the plant or group's Recordable Rate for the quarter. The Recordable Rates are figured on a quarter-by-quarter basis and not on year-to-date totals. The payouts range from $100 per employee if the plant or group achieves a recordable rate above 1.5 but below 3.0 for the quarter, to $300 per employee if the plant or group achieves a zero Recordable Rate for the quarter. The policy also includes the following provision: "Failure to report a Recordable Injury within 24 hours will result in the incident being counted twice when calculating the quarterly Recordable Rate."  Such a provision does not prevent this program from discouraging injury reporting. [Note: the "Safety Focus Program 2001" policy is appended to our comments.]
- o  In 2012 the employer at a USW-represented workplace instituted a safety incentive program where workers who have gone 100 days without a recordable

injury are entered into a lottery for a home theater system. Every 100 days a "Safety Hall of Fame" bulletin board displays a picture of the worker who won the entertainment system with their prize and the heading "Winner of the Home Theater – 100 days without a recordable injury."

o The employer at a USW-represented workplace is currently running a "Safety Bingo" game. The jackpot starts at $25 for each group. Each day workers in that group work without a recordable injury or illness, the pot is increased by $5.00. The jackpot has a cap of $300. The first person to have BINGO in a group wins the jackpot. Each worker gets a card. Every day a BINGO ball with a number on it is pulled. BINGO occurs when a worker has five numbers in a row. If $300 has not been reached, the jackpot keeps climbing each day. If there is a recordable injury within a group, the jackpot is reduced back to $25 on the day the incident is reported. Workers who have a recordable injury are not eligible for the next game. [Note: the written rules for "Safety Bingo" are appended to our comments.]

o An early safety incentive program, from 1983, involved the maintenance and construction department of a workplace. The employer ran a "Safety Wins" program that involved monthly drawings for prizes including watches, televisions, and radios. Each employee received several tickets for the drawing. Workers would lose one ticket for each lost-time accident experience by their department during the month. A worker who has any type of accident (lost-time or non-lost-time) lost all of their tickets for the month the accident occurred. [Note: the "Safety Wins Program" is appended to our comments.]

o A question has been raised about the amount of rewards or prizes in these types of safety incentive programs and whether or not there might be a reward that would not discourage workers from reporting injuries or illnesses. We have heard from local union representatives who described how a prize of donuts for the workforce when there are no recordable injuries leads to workers not reporting injuries – no one wants to be the reason co-workers aren't getting their free donuts that month. Likewise, we heard from another local union representative about pizza parties provided by management periodically when "their numbers were good" (no recordable injuries for a certain length of time). He described how local union members did not want to be seen as the reason the pizza party was cancelled. From our experience, donuts (with or without sprinkles) and pizza parties (with or without anchovies) are powerful enough rewards to discourage workers from reporting work-related injuries and illnesses.

- **Injury discipline policies and practices**, where workers who report injuries are threatened with or receive automatic discipline or are put on a "progressive discipline" track that could begin with a verbal warning or counseling on how to be a safer worker, and progress to suspension and termination if more injuries are reported. Injury discipline can be informal, where workers are summoned to a meeting with management that specifically focuses on identifying what a worker did wrong and where discipline is threatened or delivered. These meetings are not true accident investigations aimed at identifying contributing and root causes, as well as hazards and hazardous conditions that need to be addressed. Injury discipline also includes formal

written programs with names such as "Accident Repeaters' Programs" that give increasing amounts of discipline for subsequent injuries, up to and including termination. A feature of all of these types of injury discipline practices is that the act of "having an injury" regardless of circumstance is equated automatically with "committing an unsafe act."

- o At a USW-represented workplace the following incidents happened in the same year:
  - a worker received a 3-day suspension when he reported an accident where he slipped in some water the department manager told him to work in.
  - a worker received a 5 day suspension when he reported a hand injury – his hand was caught in moving equipment doing a procedure in the exact way that management allows. Management informed him that he had not raised the roll high enough before putting his hand in the machine.
  - a worker received a 3-day suspension when a scissor-lift table fell on the worker's head causing a broken nose, broken cheek bone and cut to head and hand. The worker was removing a hydraulic cylinder when the chock slipped out. After several surgeries the worker returned to work, at which time management asked him to help establish a lock-out procedure that they had not established earlier for this piece of equipment.
  - a worker received a 10 day suspension after suffering a partial finger amputation after it was caught between belt and pulley. Jogging belts had been observed by management and allowed due to the fact that it only took 3 minutes vs. 30 minutes to loosen the idler tensioner and then tighten back up. Workers had asked on several occasions for management to fix the pulley so the belt would stay on. Management had not done this.
- o At a USW-represented workplace, workers became ineligible for a promotion to a higher-paying position if they had an OSHA recordable injury in the past three years.
- o In 1998 a "Zero Tolerance for Unsafe Acts" Policy was instituted at a workplace. The list of "Class II Unsafe Act" included a worker's action "that resulted in a personal OSHA recordable injury." Penalties would be different depending on whether or not the worker had a record of other incidents involving recordable injuries, first aid injuries and/or other problems; they included receiving "verbal and written counseling," with the possible addition of "Decision-making Leave" [suspension]. [Note: this written "Zero Tolerance for Unsafe Acts" policy is appended to our comments.]
- o An employer instituted an "Individual Employee Safety Counseling Program" that established "an objective system of identifying and correcting the behaviors of individuals that demonstrate an inability to perform their respective job assignments in a safe manner." The program applied to all employees with four or more incidents in a rolling 12-month period. The list of incidents included "New non-recordable injuries reported to the company are worth one incident," and "New recordable injuries reported to the company are worth two incidents." The policy stated that workers would be initially counseled by management; and re-counseled should another incident occur. If there are too many incidents, the worker could "face discipline up to and including discharge or disqualification

from their current job classification." [Note: the "Individual Employee Safety Counseling Program" is appended to our comments.]

o   An employer issued "Injury Review" letters to workers who had several injuries. In 2003 such a letter was issued to a worker, reviewing all of his injuries dating back to 1983, which included "back strain," "right wrist pain," "lower back pain," "exposure to gas fumes," "strain to right side," "pulled tendon in left knee," "strain to left side," " carbon monoxide exposure," and several other injuries. The letter stated, "Under the General Duty clause in the O.S.H.A. regulations, the employer has a duty to place employees in the proper job. We are concerned about the number of injuries you have sustained during your period of employment and are concerned that it may become impossible to place you in a job suited to your physical limitations. If you demonstrate this continued high frequency of accidents, we may deem you industrially unemployable and terminate your employment." [Note: this "Injury Review" letter is appended to our comments.]

o   The employer at a USW-represented workplace sought to implement an "Accident Improvement Program" to "curtail injuries by employees who have had a higher percentage of injuries than normal."  The program set up a four step process for "accident repeaters" that counted either incidents or "BLS recordable injuries" over a period of time. For the worst category of 'offenders' ("Fourth....BLS recordable within 18 months") management "may opt to progressively discipline the employee for consistent unsafe behavior in accordance with ..."Violation of safety rules or common safety practices." [Note: the "Accident Improvement Program" is appended to our comments.]

o   The employer at a USW-represented workplace issued its "Safety Incident Repeaters" program. The program aimed to manage "Employees who have three or more safety incidents (first aid or OSHA recordable injury) in three years." Under this program, a "Safety Improvement Plan" is developed to "help the employee become more aware of their personal safety and more involved in the [employer's] safety program." "Failure to comply with the terms of the Safety Improvement Plan, or failure to improve an employee's safety performance may result in disciplinary action, up to an including Discharge." [Note: a copy of the "Safety Incident Repeaters" program is appended to our comments.]

- **Safety discipline,** where workers who report job injuries or illnesses are told that they violated a vague or ill-defined safety rule such as "failing to work carefully" or "lacking situational awareness"; or where a group of workers may be working in a particular way but the only one who receives discipline is the worker who reported an injury while doing the same tasks in the same way as the other workers. In both cases, failing to follow a safety rule is pretextual disciplinary actions. While the worker receives discipline for violating a safety rule, that is not the real reason for the discipline. If an injury wasn't reported, no discipline would have been received.

o   This description is from a USW Safety Representative in a USW-represented workplace: "Our manager likes to give out written warnings for employees who get hurt. The usual reason is 'not aware of your surroundings.' The latest one came for an employee who received a laceration on the finger while moving a piece of equipment. He had all of the required PPE. Even after a management

investigation revealed that they did not have the proper device to make this equipment move, he received a written warning for 'not properly evaluating the situation.'"

o In an effort this year to lower their OSHA Total Incident Rate, a company has started disciplining workers who report injuries. Without changing any policies, management has started issuing discipline to workers who report injuries no matter how small or big. For example, a worker received a formal reprimand for accidently hitting his finger with a hammer. The discipline stated he was in "the line of fire."

o In 2013 at a USW-represented workplace, a millwright with 17 years of service was working on a weld job. He was using a 4.5" hand grinder with a cutting wheel instead of a grinding wheel. He was holding a piece of 1/8" flat bar with one hand and using the other hand to operate the hand grinder. As he was cutting the metal it pinched the cutting blade and caused the grinder to kick back. The cutting wheel hit his knee resulting in a laceration that required 6 stitches. It was an OSHA recordable, but the worker did not miss work. The worker received a written warning and a 3-day suspension for "disregard of safe work practices by improperly using a grinder during the course of his job." The investigation revealed that the manufacturer of the equipment stated that the auxiliary handle needs to be used, but the Job Safety Procedure for this job did not require this, nor did supervisors require what the manufacturer advised. Since this injury, management has agreed to revise the grinder and the portable hand tool Job Safety Procedures to align them with the manufacturer's recommendation. The USW Safety Rep stated, "In the meantime [the company] beat up an injured worker for turning in an accident. ... He did not have any other discipline in his 17 years at the facility. His actions [leading up to the accident were] part of millwright work that was performed almost every day. ...This accident followed by discipline has clearly crippled our safety program. I know that the employees feel that if they get hurt and turn it in then they will be punished. I have seen it. They are hiding injuries."

o At a USW-represented workplace in 2013, two USW members were suspended for 5 days due to getting injured. Two maintenance workers were instructed to re-attach a plastic tarp which was used to redirect water from was falling in from the roof. In order to get to the top of where the tarp was hanging, the workers were told to use a forklift with a bucket attached, and in order to do so, foam blocks that were stored beneath the tarp had to be moved. Unbeknownst to the workers, water had been soaking into the blocks inside, which made them heavier than normal. When the block fell to the ground, it bounced back and injured the two workers. It rolled on one worker who sprained his knee, the other worker sprained his shoulder while attempting to prevent the block from rolling back on the first worker. The company stated that the reason for the suspension was that the workers should have assessed that it was dangerous and told supervision of the condition, even though their supervisor was the one who assigned them the task.

o In 2013 in a USW-represented workplace, a worker was cutting the plastic banding off a stack of rail car shipping dunnage and his pocket knife folded on the 2nd of the two bands, cutting the tip of his index finger. He had been wearing

his mandatory cut-resistant gloves and was breaking no rules or policies. He went to the emergency room to get medical treatment for the injury. This workplace has a large sign at the entrance with the number of days since the last recordable injury plus the facility's safety record. On that day it was 97 days since the last recordable injury. The worker was more concerned with being the person who zeroed the board than with his cut finger. The worker got the wound treated and came back to work. Two days later management was moving to reprimand the worker and was considering terminating him. They told him to consider himself off the schedule (to not come in to work) while they decided his fate. He had two other injuries on his record, the most recent was about one year earlier. The reason management gave for discipline was his "bad behavior" of using his pocket knife. At this facility there was no rule or policy against using a pocket knife. In fact, this worker was using the pocket knife his supervisor had given him as a reward for loading a record number of tons of product. Management decided to give him a written reprimand and 3 days off without pay. His official written warning stated, "[He] needs to slow down, pay attention to his surroundings and maintain reasonable work standards." If he has another incident, it will be grounds for automatic termination. A few days after this incident management sent out a notice that pocket knives are to be left at home and not used for work purposes. A local union official stated, "[This worker] was reprimanded because he got hurt. The company has stated, 'Nobody will ever be disciplined for reporting an injury.' This is what they have done to [this worker].

o   At a USW-represented workplace management maintained that they never issued discipline for workers who reported injuries; discipline was reserved for work rule violations. Management at this facility issued a new work rule. The rule stated, "You must work carefully." After this new rule was implemented, all workers who reported injuries were charged with violating a work rule – the one that stated that "You must work carefully."

- **Work rules that require all injuries, no matter how minor, to be reported "immediately"** and are used to discipline workers who may not notice a particular injury immediately, as pain or discomfort develops over time. Often employers who have various types of injury-rate-based safety incentive programs or various types of injury discipline and safety discipline practices point to this particular work rule ("all injuries must be reported immediately") as evidence or proof that none of their practices are aimed at discouraging injury reporting. In fact, workers are often caught in a "Catch-22" type situation: they can be fired or disciplined if they don't report, but they will be disciplined or fired if they do report.

  o   In one USW-represented workplace, the employer has a policy that requires all injuries to be reported immediately. A worker received a cut through his cut-resistant glove. He reported the injury and received discipline for "failure to maintain work standards."

  o   In one USW-represented workplace, management's "House Rules" include a list of offenses that are considered sufficient cause for suspension of 1-5 days or discharge. The list includes "Failure to immediately report an injury." In a situation where pain or numbness from a work-related musculoskeletal disorder develops after shift or over a weekend, or a welder develops flash burn at night

while at home, workers could be suspended or terminated for not reporting their injuries "immediately."

- **Bringing injured workers back to work before they are recovered enough to be safely back at work. This could involve workers sitting in a room with little or nothing to do (often called "the rubber room").**
  - The following description is from an email we received from a local union in a USW-represented workplace: "We have an employee that slipped, fell and broke his leg here at work. The company doctor released him to come back to work after his surgery (he was only out a few days). He has a cast, crutches, must keep his leg elevated, needs ice (not getting), needs help in and out of the bathroom and unable to drive back and forth to work. There is no work that he is able to do, they just have him sitting in a chair for eight hours. " Contrast this situation with that of workers who are injured off the job and are allowed to stay home to recuperate. They are not required to come back to work until they have recovered.

- **Post-injury drug testing** for every job injury or illness that is reported, or for injuries and illnesses that require medical treatment (a recordable injury). Worker testimony and some academic studies have noted that automatic post-injury drug testing can serve to discourage workers from reporting work-related injuries (see, for example "Does Post-Accident Drug Testing Reduce Injuries? Evidence from a Large Retail Chain," by Alison D. Morantz and Alexandre Mas in American Law and Economic Review https://www.princeton.edu/~amas/papers/246.full.pdf) In one USW-represented workplace workers who suffer work-related injuries are required to take a drug test. They are met by security guards who march them out of the workplace. They must remain at home for three days until the results of the drug test are back. Co-workers in the workplace see them being escorted out of the facility by security guards. When they are home for three days they have to explain to their families and children why they are home. It is a heavy burden for injured workers, and workers in this workplace have commented that they are indeed discouraged by this employer practice from reporting injuries and illnesses.  In another workplace the drug test, a urine test, requires workers to urinate in front of a management observer. They must fully turn around before urinating. Again, workers in this workplace said they feel humiliated and retaliated against because of this post-injury drug testing policy, and are discouraged from reporting because of it.

- **Supervisor or management bonuses** tied to low/no recordable injuries in their departments or the workplace. At least a quarter of USW members surveyed believe that supervisors and/or management get bonuses when there is low or no injury reports in their departments or workplaces. Some USW members have heard directly from supervisors about their bonuses; others suspect this to be true because of the actions and practices engaged in by supervisors and management to discourage reporting of work-related injuries and illnesses.

In addition to the examples of employer policies, practices and programs above that discourage workers from reporting injuries, please also see seven more written policies

that discourage workers from reporting injuries that the USW included in our comments on OSHA's proposed Improve Tracking of Workplace Injuries and Illnesses Docket Number OSHA-2013-0023 submitted on March 10, 2014:

- (2014).Plant 2014 Gain sharing Plan. [payout pool of $25,000 per quarter if there are zero OSHA recordable injuries]
- (2004).Safety Incentives Safety Bingo. *Safety Pays: Workplace Incentives.* Retrieved from http://www.safetypays.com [Safety incentive program]
- "Plant Warning Notice" [Injury discipline practice]
- "Memorandum Re: Written Warning – Targeted Safety Training Notice" [Injury discipline practice]
- (2013). Group 1 Talking Points – Our Worst Safety Performers. Publication 20131. [Injury discipline policy]
- "Accident Report Form" [for bee sting; see question #22]
- (2013).Accident Repeater Program. [Injury discipline policy]

There are incentives and benefits employers receive for having practices such as those above that discourage workers from reporting injuries and retaliate against them when they do. The June, 2008 U.S. House of Representatives' Committee on Education and Labor Majority Staff Report titled "Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses outlined some of the incentives for employers to discourage workers from reporting job injuries and illnesses:

- Low injury and illness rates decrease the chance of being inspected by OSHA.
- Low numbers of injuries and illnesses decrease workers' compensation expenses.
- Low injury and illness rates can earn businesses bonuses and incentives.
- Low injury and illness numbers look good to the public and to customers. [U.S. House of Representatives, Committee on Education and Labor Majority Staff Report *Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses* (2008) pgs 14-15]

With increased visibility of employers' injury and illness experience, there will be increased incentives for employers to show low numbers of occupational injuries and illnesses. Without measures to address these incentives for employers to underreport, we expect employer practices that discourage workers from reporting job injuries and illnesses will increase.

**Selected Academic, Government and Other Studies and Reports on Practices that Discourage Injury and Illness Reporting**

On July 22, 2013 the Wall Street Journal published a news story titled "Workplace Injuries Drop, but Claims of Employer Retaliation Rise." The article begins, "The number of workplace injuries recorded by the federal government has dropped by 31% over the last decade. But that improvement may not be what it seems, according to a growing group of workers who say companies are retaliating against them for reporting injuries in the first place." The article includes a quote from Marc Freedman, the head of labor policy for the U.S. Chamber of Commerce: "There are always going to be some small number of employers who may not do the right thing, but there is no evidence of a widespread effort to suppress reports. If anything, companies may overreport injuries to avoid running afoul

of complex regulations." (Wall Street Journal July 22, 2013 "Workplace Injuries Drop, but Claims of Employer Retaliation Rise" James R. Hagerty)

In fact, there is a large and growing body of peer-reviewed academic and government studies and reports documenting the nature, extent and impacts of employer policies, practices and programs that retaliate against and discourage workers from reporting injuries and illnesses.  Among these academic and government studies and reports on practices that discourage injury and illness reporting are the following:

**Ruser J, Smith R. (1988) The effect of OSHA records-check inspections on reported occupational injuries in manufacturing establishments. Journal of Risk and Uncertainty**: Study found consistent evidence that targeting schemes linking firms with higher reported injury rates with an increased chance of government inspections led firms to underreport injuries. The authors concluded that any system used for risk evaluation needs to draw on data from circumstances where the incentives to understate risk are counteracted or kept in check.

**Pransky, G et al. (1999). Under-reporting of Work-related Disorders in the Workplace: A Case Study and Review of the Literature. *Ergonomics*, Vol. 42, (1): 171-82**: This case study focused on safety incentive programs that provide rewards for reducing workplace injury rate. Authors found that while more than 85% of 98 employees in several industrial facilities experienced work-related illness or injury symptoms, and almost 50% had work-related health problems that lasted through the week, and 30% had lost time or faced work restrictions because of these problems;  fewer than 5% of the workers had officially reported a work-related health problem. Among the reasons workers gave for not reporting were fear of discipline or of being labeled a complainer. Additional barriers to reporting included company goals of no reported injuries, reinforced by safety incentive programs that rewarded low numbers or rates of reported injuries and illnesses. The study concluded that corporate and facility safety incentives appeared to have an indirect but significant negative influence on the proper reporting of workplace injuries and illnesses by workers.

**Azaroff, L et al. (2001). Occupational Injury and Illness Surveillance: Conceptual Filters Explain Underreporting. *Public Health Matters*, Vol. 92, No. 9**:  In the section of this study focusing on "Filters to Reporting to Supervisors" the study states, "Workers who report health problems to supervisors may risk disciplinary action, denial of overtime or promotion opportunities, stigmatization, drug testing, harassment, or job loss. Others may fear such outcomes even in the absence of demonstrable risk. Some safety incentive systems reward workers who do not report injuries with money, material goods, or recognition."

**"United States. House of Representatives. Committee on Education and Labor Majority Staff Report: Hidden Tragedy: Underreporting of Workplace Injuries and Illnesses. (2008).** Pages 14-15 describe incentives for employers to underreport occupational injuries and illnesses; pages 15-29 provide extensive examples of methods used by employers to discourage accurate reporting of workplace injuries and illnesses and the impacts of those employer policies, practices and programs.

**United States Government Accountability Office. (2009, October). "Workplace Safety and Health: Enhancing OSHA's Records Audit Process Could Improve the Accuracy of Worker Injury and Illness Data":** A survey of 1,187 occupational health practitioners revealed that more than two-thirds of them observed workers who feared discipline or losing their jobs if they reported work-related injuries; over half said they were pressured by employers to downplay injuries to avoid them being OSHA recordable injuries; and one-third said they were pressured to provide insufficient treatment to injured workers to avoid an injury being classified as recordable. According to stakeholders and occupational health practitioners interviewed, many factors affect the accuracy of employers' injury and illness data including disincentives that may discourage workers from reporting work-related injuries and illnesses to their employers and disincentives that may discourage employers from recording them. The report found that workers did not report occupational injuries and illnesses because they feared being disciplined or fired, and also because they were concerned about fellow workers losing rewards where there were group-based safety incentive programs.

**United States Government Accountability Office (2012) "Workplace Safety and Health: Better OSHA Guidance Needed on Safety Incentive Programs."** This report underscored the pervasive nature of employer policies, programs and practices that discourage workers from reporting job injuries and illnesses. The report presents the results of a GAO survey of U.S. manufacturing companies that found that 75% of firms had safety incentive programs or other workplace safety policies that can affect workers' reporting of injuries and illnesses. The GAO recommended that OSHA assess the impacts of safety incentives and other safety and health programs on injury reporting, given their prevalence in today's workplaces.

**Lipscomb, H, et al. (2012). Safety, Incentives, and the Reporting of Work-Related Injuries Among Union Carpenters: Your Pretty Much Screwed If You Get Hurt at Work.** *American Journal of Industrial Medicine.* Authors conducted an anonymous survey of 1,020 carpenter apprentices to document prevalence of their exposure to programs offering rewards for 'improved safety records' or that punish workers in some way for reporting injuries. The study found 58% of respondents reported some safety incentive or negative consequence for reporting work-related injuries on their current jobsite. Reporting of work-related injuries was 50% less prevalent when workers were disciplined for injury experience. In addition, over 30% of respondents said injuries were almost never or rarely reported in their current workplace. The study concluded that there are multiple layers of disincentives to reporting work-related injuries.

**American Public Health Association, 2013 Policy Statement: Support for Workplace Injury and Illness Prevention Programs:** This policy statement includes a reference to the many practices, policies, and programs present in workplaces today that discourage workers from reporting injuries, illnesses, incidents, and accidents, and highlights concerns about their ability to obscure the hazards that cause and contribute to injuries and illnesses. It notes that workplaces in which all workplace injuries are reviewed with an eye toward specific infractions committed by the individual prior to the injury (rather than searching for root causes) and where any infractions are punished by point systems that

lead to suspension or firing, reduce workers' willingness to report injuries as work related, thereby obscuring valuable information and data about health and safety. Similarly, the APHA policy statement notes that safety reward programs in which groups of workers are awarded incentives as small as a pizza party or as large as pick-up trucks and expense-paid vacations create peer pressure that again mitigates against reporting injuries.  The policy statement makes the following recommendation: "OSHA and MSHA must strengthen legal requirements prohibiting employers from implementing or maintaining policies, programs, or practices that discourage employees from reporting work-related injuries and illnesses. These policies, programs, and practices include, but are not limited to, safety incentive programs that provide rewards to individual workers as well as groups of workers when there are few or no reports of injuries or illnesses; injury discipline policies wherein employees receive threats of or actual discipline when they report work-related injuries or illnesses; mandated post-injury drug testing for employees who report work-related injuries or illnesses; and programs that focus on worker behaviors as the primary cause of occupational injuries and illnesses."

Investigations and reports about employer policies, practices and programs that retaliate or discriminate against workers who report work-related injuries and illnesses have also been conducted in the rail and the mining sectors.

Research conducted in 2007 by the U.S. House of Representatives Committee on Transportation and Infrastructure provided an in-depth review of underreporting and complaints of harassment of rail employees who report injuries, including the documentation of 200 cases of alleged management harassment of workers following injury reports. Examples of harassment and retaliation included:

- **"Risky" employee assessments:** Employees are placed in disciplinary jeopardy by being assigned points for safety incidents, rule infractions, and injuries regardless of the cause, often before an investigation is done.
- **Targeting employees for increased monitoring and testing:** Injured employees are "targeted" for close supervisor scrutiny, where minor rule infractions result in employee termination following injuries.
- **Supervisors discouraging employees from filing accident reports:** Front-line supervisors often try to subtly prevent employees from filing injury reports and/or lost workday reports in an attempt to understate or minimize on-the-job injury statistics
- **Supervisors attempting to influence employee medical care:** Railroad supervisors are often accused of trying to accompany injured employees to their medical appointments to try to influence the type of treatment they receive. In addition, they try to send employees to company physicians instead of allowing them to choose their own treatment providers.
- **Light duty work programs v. injury leave:** Injured employees are required to come to work, often doing nothing but sitting in an empty room and allowing carriers to minimize the required reporting of lost work days.
- **Availability policies:** These policies require employees to work a certain number of days per year. If the employee cannot work the required number of days, he or she is no longer a full-time employee.

- **Supervisor compensation:** Some companies base management compensation
  upon performance bonuses, which can be based in part upon recordable injury
  statistics within their supervisory area.

The 2007 report concluded:

"Today's railroad regulatory environment is more oriented toward assigning blame to a
single individual, without a thorough examination of the underlying causes that led that
single individual to commit an error. This approach is apparent in both railroad internal
investigations of injury accidents, as well as FRA regulatory reports". [United States. House
of Representatives. Committee on Education and Labor, Majority Staff Report: "Hidden
Tragedy: Underreporting of Workplace Injuries and Illnesses." (2008). pages 24-25]

Three years later, on March 4, 2010, a rail employee spoke at an "OSHA Listens" meeting
and stated, "...[rail] workers are scared and intimidated by the [rail] carriers' systematic
retaliation... The culture of intimidation and retaliation continues to cause serious
underreporting of injuries, underreporting of lost work days due to injuries, and the
underreporting of safety hazards."

Despite the attention to the rail sector and serious problems in this sector with employer
practices that retaliate against workers who report injuries and illnesses and discourage
injury and illness reporting, rail carriers' retaliatory practices continue. Recent OSHA
whistleblower awards for rail workers who were retaliated against for reporting injuries
include:

- Over $300,000 to Burlington Northern Santa Fe RR employee for retaliation after
  reporting an injury (8/18/2011)
- $269,707 to conductor, and $154,694 to carman at Illinois Central RR for retaliation
  after reporting injuries (6/19/2012)
- $38,561 to switchman for Union Pacific RR for retaliation after reporting injury
  (6/25/2012)
- $300,000 to rail worker at Norfolk Southern Railway for retaliation after reporting
  injury (8/8/2012)
- $932,000 to switchman and trackman at Norfolk Southern Railway for retaliation
  after reporting injuries (8/12/2012)
- $288,000 to rail worker at Norfolk Southern Railway for retaliation after reporting
  injury (11/29/2012)
- $1.1 million to 3 workers at Norfolk Southern Railway for retaliation after reporting
  injuries (2/28/2013)
- $309,000 to conductor at Union Pacific RR for retaliation after reporting a co-
  worker's injury
- $350,000 to rail worker at Union Pacific RR for retaliation after reporting injury
  (3/12/2013)
- Over $352,000 to conductor at Wisconsin Central Limited part of CN) for reporting
  an injury
- Over $85,000 to injured rail workers at Union Pacific Railroad for retaliation  after
  reporting an injury (4/23/2014)

- Over $526,000 to two rail workers at Burlington Northern Sante Fe Railroad for retaliation after injury reporting. (5/19/2014)

In March, 2014 the U.S. Department of Labor, Office of the Inspector General – Office of Audits released a report on underreporting in the mine sector titled "MSHA Has Taken Steps to Detect and Deter Underreporting of Accidents and Occupational Injuries and Illnesses, but More Action is Still Needed." One of the findings is that "MSHA has not issued guidance on mine operator practices which may discourage reporting of injuries and illnesses by miners." The Office of Inspector General concluded that "MSHA should make it a priority to develop policy in this area." The report states that "Some mine operators have implemented a variety of policies, programs and practices related to injury/illness reporting, such as progressive discipline measures for repeated reports of injuries, post-injury drug testing, and incentive programs. Operators instituted these programs as incentives for miners to pay more attention to safety. However, some miners perceive such programs as disincentives to reporting injuries and illnesses because they introduce potentially adverse consequences for miners who are involved in and who report accidents and injuries." The OIG conducted interviews with miners from several mines to learn about factors that could influence miners to not report. Among the practices they discovered were: injury discipline policies and practices including "Accident Repeaters Programs"; discipline for "untimely" reporting of injuries and illnesses; safety incentive programs that rewarded groups of miners for low or no reported injuries or illnesses within the group; and post-injury drug testing (at least one miner reported that post-injury drug testing had delayed treatment for his injury).  The OIG concluded that MSHA needs to take more action to encourage employers to support injury/illness reporting and "address retaliatory and injurious employer practices." [U.S. Department of Labor, Office of Inspector General – Office of Audit: Mine Safety and Health Administration: MSHA Has Taken Steps to Detect and Deter Underreporting of Accidents and Occupational Injuries and Illnesses, but More Action is Still Needed" March 31, 2014, Report Number 05-14-001-06-001.]

The USW has conducted several surveys with our members to better understand the nature, extent and impacts of employer policies, practices and programs that  impact the reporting of workplace injuries and illnesses.

In 2009 the USW conducted a survey completed by 440 USW local union officers and health and safety representatives from across the country representing many different industry sectors. A summary of results include:

- 52% reported their facilities had safety incentive programs that offered cash, prizes or other rewards to individual workers tied to no/low injury reporting and/or no/low lost-time injuries. Of this group, 66% believed the program discouraged workers from reporting work-related injuries and illnesses.
- 51% reported their facilities had safety incentive programs that offered entire departments, shifts, groups or all in the workplace prizes or benefits if there is no or low injury and illness reporting. Of this group, 66% believed the program discouraged workers from reporting work-related injuries and illnesses.

- 52% reported the presence of policies (formal or informal) in their workplaces where workers receive or are threatened with discipline when they experience a work-related injury, illness or accident. Of this group, 70% believed these policies and practices discouraged the reporting of work-related injuries and illnesses.
- 70% reported the presence in their workplace of a policy or practice that requires workers to submit to drug or alcohol testing when they report a work-related injury. Of this group, 63% believed these policies and practices discouraged the reporting of work-related injuries and illnesses.

In 2013 the USW conducted a survey completed by over 300 USW local union officers and health and safety representatives from across the country representing many different industry sectors. One question on the survey asked about the presence of any of several employer programs, policies and practices that discourage the reporting of job injuries and illnesses, such as safety incentive programs with rewards based on low/no reported injuries, injury discipline policies including but not limited to accident repeater programs, and post-injury drug testing. 91% of respondents reported the presence of one or more of these practices in their current workplace; 75% reported the presence of two or more.

A survey conducted by the USW of 88 local union health and safety representatives from different facilities and locations of a manufacturing corporation had the following results:

- 67% said they had an injury that they did not report to management. Major reasons given were: fear of discipline (42%); do not want to be blamed (42%); don't want to become a company target (37%).
- 83% said they believed they would be disciplined if they reported an accident, incident or injury to a supervisor.

**Response to the Addition of Three Specific Provisions to OSHA's Recordkeeping Rule 29 CFR 1904.35**

(1) A requirement that employers inform their employees of their right to report injuries and illnesses free from discrimination or retaliation

It is vital that OSHA requires employers to inform their employees of their right to report injuries and illnesses free from discrimination or retaliation.  As outlined by OSHA on April 28, 2010, this communication and training should be presented in a manner that employees can understand, including but not limited to language and literacy level. [https://www.osha.gov/dep/standards-policy-statement-memo-04-28-10.html]  OSHA should develop guidance and materials or templates to assist employers, as well as materials for workers on these rights.

(2) a provision requiring that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome

OSHA should have a provision requiring that any injury and illness reporting requirements established by the employer be reasonable and not unduly burdensome. Guidance for this can be found in OSHA's memorandum of March 12, 2012 "Employer Safety Incentive and Disincentive Policies and Practices" (also known as the "Fairfax Memo" https://www.osha.gov/as/opa/whistleblowermemo.html ), especially in #2 ("2. In another

situation, an employee who reports an injury or illness is disciplined, and the stated reason is that the employee has violated an employer rule about the time or manner for reporting injuries and illnesses..."). We have given examples of practices in our section on "Examples of Employer Practices that Discourage the Reporting of Injuries and Illnesses" that are not reasonable and are unduly burdensome. Some injuries and illnesses develop when workers are not at work (for example, some musculoskeletal disorders, and injuries such as flash burns) and reporting systems must allow for these types of injuries and illnesses to be reported in ways that are not burdensome for the injured or ill worker.  We also want to note here that if an employer has practices, policies or programs that discourage or retaliate against workers who report injuries, and also has a policy about prompt reporting of injuries and illnesses, workers are put in a "Catch-22" situation. Workers will perceive that any injury and illness reporting requirements are both unreasonable and burdensome if they are faced with retaliation for the act of reporting their injuries and illnesses.

(3) a prohibition against disciplining employees for reporting injuries and illnesses.

Section 11c of the Occupational Safety and Health Act has proven to be very unreliable protection for workers who suffer retaliation for reporting work-related injuries and illnesses. But even if it could be made to work more effectively to protect workers who suffer retaliation, it does nothing to remove employer practices that *on their face* are discriminatory and retaliatory against workers who report job injuries and illnesses (e.g. safety incentive programs that deny prizes to workers who report injuries; "accident repeaters" programs that discipline workers for having an injury regardless of the circumstances). It also does not provide tools for OSHA to address practices that, upon investigation, show themselves to be discriminatory and retaliatory (e.g. pre-textual safety discipline cases where but for reporting an injury, no discipline would be given). Section 11(c) of the Occupational Safety and Health Act alone is insufficient to address these damaging practices.

In summer, 2013, an employer in a USW represented workplace unleashed their "Worst Safety Performers" program. Workers with OSHA Recordable, lost-time and/or restricted work injuries were told that any further injury could disqualify them from their current job. If they experienced another injury they would have 30 days to bid into a non-physical job; if bidding was unsuccessful their employment would be terminated. If the only tool available was Section 11c, and especially if Section 11c worked better, then maybe workers fired under this program would at some point get their jobs back. But nothing would address the possibility that more and more workers each day could be suffering from retaliation under this program. Rather than waiting for workers to experience retaliation before action can be taken, the USW believes that OSHA should be able to simply prohibit employers from having such practices. To be effective, such a provision must be enforceable as a violation of the recordkeeping rule itself.

With the addition of an enforceable prohibition on employer practices that discourage injury and illness reporting to OSHA's proposal, the goals of the Occupational Safety and Health Act of 1970 as well as those that OSHA established for improvements in workplace safety and health and data accuracy through improved tracking of workplace injuries and illnesses may be realized.

Language to consider that would expressly bar the use of practices, policies or programs that discourage injury and illness reporting is as follows: "An employer shall not institute any program, policy or practice which has the effect of discouraging the reporting of work-related injuries or illnesses."

Guidance for compliance assistance as well as enforcement actions to support a prohibition against employer practices that discourage injury and illness reporting could come from OSHA's memorandum of March 12, 2012 "Employer Safety Incentive and Disincentive Policies and Practices" (also known as the "Fairfax Memo" https://www.osha.gov/as/opa/whistleblowermemo.html ). Certain practices, as noted above, should *on their face* be seen as discriminatory and retaliatory and OSHA should be able to use its full complement of tools as needed to gain compliance and get the program removed from the workplace. Other situations, such as pre-textual safety discipline will need investigation to see if it meets elements such as those outlined in the "Fairfax Memo" or enhanced compliance guidelines.

OSHA's role as an enforcement agency is a needed and necessary component of a system to ensure proper data quality. Employers who underreport workplace injuries and illnesses, those who retaliate against workers who report, or employers who have or implement policies or practices that discourage the reporting of injuries must be held accountable by OSHA through the enforcement process. Thus, this provision should be enforceable through penalties and citations along with and in the same manner as other provisions of OSHA's Recordkeeping Rule.

Respectfully submitted,

James S. Frederick
Assistant Director
Health, Safety and Environment
Department
United Steelworkers International
Union

Nancy Lessin
Senior Staff for Strategic Initiatives
United Steelworkers – Tony Mazzocchi
Center for Worker Health, Safety and
Environmental Education